IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 06-463 |
| C.V. STARR & CO., INC. and AMERICAN INTERNATIONAL MARINE AGENCY OF NEW YORK, INC., | ) | |
| Defendants. | ) | |

## DECLARATION OF RALPH MUCERINO

I, RALPH MUCERINO, declare as follows:

1.      I am a Vice President of American International Group, Inc. ("AIG") and President of AIG Global Marine and Energy.  I have been employed by various entities within the AIG group of companies for 27 years, and have been employed in the insurance industry for approximately 39 years.  I make this declaration based on my personal knowledge, information or belief in support of AIG's request for an order restraining and enjoining defendants from using AMERICAN INTERNATIONAL or AIMA in connection with the marine insurance business.

2.      As a long-time employee of AIG, I am generally familiar with the history of the company.  Unless the context indicates otherwise, my statements below are on information and belief based on company records.

3.      AIG is the world's leading international insurance and financial services organization, with operations in approximately 130 countries and jurisdictions throughout the world.  AIG's member companies serve commercial, institutional, and individual customers

through the most extensive worldwide insurance networks of any insurer. Today, AIG owns and operates 33 companies and divisions with offices in 23 states and territories doing business under the AMERICAN INTERNATIONAL trademark.

4.      AIG traces its roots back to 1919 when a young entrepreneur, Cornelius Vander Starr ("Mr. Starr"), opened a small insurance agency in Shanghai called American Asiatic Underwriters, offering fire and marine coverage initially. Within ten years, the company had expanded to include offices in China, Hong Kong, Indochina, Jakarta, Kuala Lumpur, and the Philippines.

5.      In 1926, using the name and trademark American International Underwriters Corporation ("AIUC"), AIG's predecessor-in-interest, AIUC, opened an office in New York to produce and write insurance for represented companies on American risks outside the United States. In the years that followed, AIUC's business grew, as did the family of related "American International" branded companies.

6.      In 1967, American International Group, Inc. was formed to hold the capital stock of certain of the insurance companies in the corporate family created by Mr. Starr. During the ensuing years, AIG continued to acquire interests in additional insurance and other companies, thus expanding its operations and brand recognition.

7.      AIG is currently the registered owner of thirteen federal trademark registrations, most of which are incontestable by virtue of longstanding and continuous use, for AMERICAN INTERNATIONAL or close variations thereof, including registrations for AIMA and MARINE INSURANCE AIMA, which were registered in 1945 to a predecessor of AIG and subsequently, by duly recorded assignment, transferred to AIG.

8.    AIG spends millions of dollars annually to advertise and promote the AMERICAN INTERNATIONAL marks, and the products and services offered by its various member companies in connection with these marks, through various media, including television, radio, newspaper, and magazines, among others. In 2005, for instance, AIG spent in excess of $30 million on advertisements containing the AMERICAN INTERNATIONAL marks. In addition, AIG and its member companies have advertised the AMERICAN INTERNATIONAL marks through direct mailings, brochures distributed at trade shows, point-of-purchase display material, signage, and banners.

9.    AIG also promotes the AMERICAN INTERNATIONAL marks on various websites, including aig.com, aigmarine.com, aigbank.com, aigdirect.com, aiggig.com, aigag.com, aiu.com, aigfp.com, aig4auto.com, aigaandh.com, aigamericanhome.com, aigaviation.com, aigconsultants.com, aigenvironmental.com, aigfinancialadvisors.com, aigidtheft.com, aigpcg.com, aigriskmgmt.com, aigsmallbusiness.com, and aigworldsource.com. AIG's primary website, located at www.aig.com, receives approximately 3.4 million hits per year. Since 2004, there has been an average of 200,000 visits per month to AIG.com.

10.    The American International Marine Agency of New York, Inc. (the "Marine Agency") was formed in 1945 to serve as a managing general agent ("MGA") for certain member insurance companies of AIG and its predecessors, and did so throughout its history until July 25, 2006. The Marine Agency is currently a wholly-owned subsidiary of C.V. Starr, a privately-held corporation presently run by Maurice R. Greenberg and certain associates.

11.    To the best of my knowledge, the Marine Agency has operated for virtually its entire existence for the single purpose of serving the AIG and certain member insurance companies and representing them in the marketplace. Having been formed and

operated to service the marine business of the AIG and certain member insurance companies, as their fiduciary and agent, the Marine Agency was authorized to use AMERICAN INTERNATIONAL as part of its name only for so long as its agency relationship with the AIG Insurers existed and only in connection with the business of those entities.

12.    The Marine Agency used the AIMA and AMERICAN INTERNATIONAL MARINE AGENCY marks pursuant to an implied license from AIG. For as long as the Marine Agency remained part of the greater AIG family of companies, functioned as managing general agent to AIG member insurance companies, and was subject to the control and supervision of AIG, it was permitted to use AIG's world famous marks.

13.    On June 6, 2006, after learning that the Marine Agency had entered into negotiations to act as MGA for an AIG competitor, I sent a letter to David French, President and CEO of the Marine Agency, instructing the Marine Agency that it was not authorized to use AMERICAN INTERNATIONAL or the letters AI as part of its name in business dealings other than those undertaken for the sole benefit of AIG. My letter also requested that the Marine Agency inform AIG of any potential or actual agreements between the Marine Agency and non-AIG insurers. Attached hereto as Exhibit A is a true and correct copy of my June 6, 2006 letter to Mr. French.

14.    On June 8, 2006, Mr. French responded stating that the Marine Agency was not "presently writing as a managing general agent for any other insurer." Attached hereto as Exhibit B is a true and correct copy of Mr. French's June 8, 2006 letter to me.

15.    In a follow-up letter to Mr. French, dated June 9, 2006, I reiterated my instruction that the Marine Agency immediately inform AIG of any negotiated, potential or actual agency agreements between the Marine Agency and non-AIG insurers. I also requested

that the Marine Agency inform AIG how it would continue to carry out its fiduciary duties as AIG's agent in light of these arrangements. Attached hereto as Exhibit C is a true and correct copy of my June 9, 2006 letter to Mr. French.

16.     By letter dated June 12, 2006, Mr. French asserted, among other things, that AIG was "not entitled" to know about the Marine Agency's plans to do business with AIG's competitors, but assured me that the Marine Agency would promptly notify AIG if the Marine Agency entered into an agreement with another principal. Attached hereto as Exhibit D is a true and correct copy of Mr. French's June 12, 2006 letter to me.

17.     At the end of June, AIG and the Marine Agency each delivered to the other written notice that the relationship between them would terminate as of year-end 2006. In a press release issued on June 30, 2006, the Marine Agency announced that it "look[s] forward to serving new underwriters next year." Based on this press release, coupled with Mr. French's prior correspondence, I understood the Marine Agency to be representing that it would not begin acting for a competing insurance company prior to the termination of the six-month notice period, during which time it would continue to serve as AIG's exclusive agent. AIG relied on that representation. Attached hereto as Exhibit E is a copy of the Marine Agency's June 30, 2006 press release.

18.     On July 21, 2006, without notifying AIG in advance, the Marine Agency announced to the media that it had entered into an agreement with National Liability and Fire Insurance Company ("National Liability"), a member of the Berkshire Hathaway group of insurance companies -- and a direct competitor of AIG. In this press release, a copy of which is attached hereto as Exhibit F, the Marine Agency used the AMERICAN INTERNATIONAL and AIMA marks to publicize its business dealings with a direct competitor of AIG.

19.    In a letter dated July 24, 2006, I reminded Mr. French that the Marine Agency could no longer make lawful use of the AMERICAN INTERNATIONAL or AIMA designations as part of its operating name in connection with any business dealings not undertaken solely for the benefit of AIG and the AIG Insurers. I instructed the Marine Agency to immediately cease and desist any and all advertising, marketing and other operations that involve the use of the names AMERICAN INTERNATIONAL MARINE AGENCY and AIMA in connection with insurance products and services offered by any insurers other than AIG and the AIG Insurers, including but not limited to operations on behalf of National Liability. Attached hereto as Exhibit G is a true and correct copy of my July 24, 2006 cease and desist letter to Mr. French.

20.    In response to our demands, on July 25, 2006, Mr. French indicated that the Marine Agency had no present intention of changing its name and discontinuing its use of the AMERICAN INTERNATIONAL trademark. Attached hereto as Exhibit H is a true and correct copy of Mr. French's July 25, 2006 letter.

21.    In a separate letter, dated July 25, 2006, the Marine Agency stated that unless AIG rescinded within 24 hours certain instructions it had issued to the Marine Agency related to its function as agent for AIG during the six-month notice period leading up to the December 31, 2006 termination, the Marine Agency would consider AIG to be in breach of the agreement between the parties, and that the agreement and the MGA relationship would be deemed terminated. Attached hereto as Exhibit I is a true and correct copy of Mr. French's July 25, 2006 letter.

22.    Later that day, I responded to Mr. French and stated that based on his last letter AIG understood that the Marine Agency deemed the Management Agreement to be

terminated immediately. I stated that as a result of the Marine Agency's repudiation of the agency relationships and its obligations to AIG, the Marine Agency had absolutely no authority to act in any way on behalf of the AIG Insurers or to represent, expressly or impliedly, that it is in any way affiliated with or authorized by them to act as their agent. Attached hereto as Exhibit J is a true and correct copy of my July 25, 2006 letter.

23.    In reliance on the Marine Agency's representations that it considered the agency agreement terminated, AIG announced the termination of its agency relationship with the Marine Agency in a July 25, 2006 press release. Attached hereto as Exhibit K is a true and correct copy of AIG's July 25, 2006 press release.

24.    In a letter dated July 27, 2006, Mr. French reiterated the Marine Agency's refusal to cease using the American International marks. Attached hereto as Exhibit L is a true and correct copy of this July 27, 2006 letter.

25.    Defendants' website, located at cvstarrco.com, prominently features the AMERICAN INTERNATIONAL and AIMA marks to promote the services of the Marine Agency. True and correct copies of representative pages from Defendants' website are attached hereto as Exhibit M.

26.    To date, notwithstanding AIG's demands, the Marine Agency continues to represent to the marine-insurance market that the Marine Agency's insurance products and services are endorsed by or affiliated with AIG. The Marine Agency's conduct in continuing to use the AMERICAN INTERNATIONAL and AIMA designations in connection with the provision of marine insurance will actually reduce or diminish the capacity of the AMERICAN INTERNATIONAL marks to distinguish the unique origin of AIG's goods and services.

27.     As a result of the Marine Agency's actions, participants in the marine-insurance market may assume that the Marine Agency remains associated in some way with AIG.  As AIG no longer controls or supervises the quality of the Marine Agency's services, any consumer confusion along these lines would place AIG's name, reputation and goodwill in jeopardy.

28.     For all of the reasons noted, if the Marine Agency's conduct is allowed to continue unabated, AIG and the AIG Insurers stand to suffer both material financial detriment and irreparable injury by way of harm to their reputation, goodwill, and critical relationships with the brokers and insureds that form the AIG Insurers' customer base.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York this ___ day of August, 2006.

Ralph Mucerino

# EXHIBIT A

## AMERICAN INTERNATIONAL GROUP, INC.
### 175 WATER STREET
### NEW YORK, NY 10038

RALPH W. MUCERINO
VICE PRESIDENT

(212) 458-5955
FAX  (212) 458-6105

*Via Electronic Mail and Facsimile*

June 6, 2006

Mr. David French
American International Marine Agency of New York, Inc.
90 Park Avenue, 7th Floor
New York, New York 10016

Re: *American International Marine Agency*

Dear David:

I write on behalf of the AIG insurance companies ("AIG") for which American International Marine Agency ("AIMA") currently acts as managing general agent. It has come to our attention that AIMA has entered into negotiations, and possibly a consummated agreement, under which AIMA would act as a managing general agent for an insurance company or companies that compete directly with AIG in the lines of business for which AIMA is currently AIG's agent.

So that we can better understand how such arrangement impacts the agency relationship between AIG and AIMA, among other issues, please provide me no later than 5:00 PM, Thursday, June 8, 2006, with details of the nature and status of any such negotiations or agreements. In particular, please provide AIG with the names of the insurance company counterparts, the nature of any proposed or actual agency relationship between them and AIMA, the types of insurance and the specific markets in which such insurance is to be offered, the effective date of such relationship and how AIMA intends to ensure that any proposed or actual agency relationships with AIG's competitors will not interfere with AIMA's contractual and fiduciary duties to AIG. Finally, while AIG awaits the necessary information with which to evaluate the appropriateness of any putative or actual relationships between AIMA and non-AIG insurers, please be advised that AIMA is hereby instructed not to use the "American International" or "AI" designations as part of its operating name in connection with any business dealings that are not undertaken for the sole benefit of AIG.

AIG expressly reserves all of its rights or remedies arising out of or related to the matters addressed herein.

Very truly yours,

Ralph W. Mucerino

# EXHIBIT B

# AMERICAN INTERNATIONAL MARINE AGENCY

OF NEW YORK, INC.
90 PARK AVENUE, 7TH FLOOR
NEW YORK, NY 10016

**DAVID S. FRENCH**
PRESIDENT & CEO

Tel: (646) 227-6401
Fax: (212) 359-3129

Via Electronic Mail and Facsimile

June 8, 2006

Mr. Ralph W. Mucerino
Vice President
American International Group, Inc.
175 Water Street
New York, NY 10038

Re: **American International Marine Agency ("AIMA")**

Dear Ralph:

I am writing in response to your letter of June 6, 2006, concerning the request for information about negotiations and agreements involving AIMA.

AIMA does not believe that any of what you have called the "AIG Insurance Companies" is entitled to the information sought in your inappropriate June 6, 2006 letter because, among other reasons, AIMA is a non-exclusive agent for these companies. Nevertheless, we are prepared to state that AIMA is not presently writing as a managing general agent for any other insurer. With respect to your request for information about AIMA's intentions for the future, please be assured that AIMA is fully aware of its rights and obligations under the Marine Management Agreement.

AIMA reserves all of its rights and remedies arising out of or related to the matters addressed herein.

Sincerely,

David S. French

# EXHIBIT C

**AMERICAN INTERNATIONAL GROUP, INC.**
175 WATER STREET
NEW YORK, NY 10038

RALPH W. MUCERINO                                          (212) 458-6955
VICE PRESIDENT                                          FAX  (212) 458-6105

*Via Electronic Mail and Facsimile*

June 9, 2006

Mr. David French
American International Marine Agency of New York, Inc.
90 Park Avenue, 7th Floor
New York, New York 10016

Re:  *Books and Records Maintained by American International Marine Agency*

Dear David:

I am in receipt of your letters to me of June 7 and 8. On behalf of the AIG insurance companies ("AIG") for which American International Marine Agency ("AIMA") currently acts as managing general agent, I provide the following response.

First, with respect to your contention that AIG's demand for copies of certain documents related to its in-force insurance policies and related reinsurance is "unreasonable" and "harassment", nothing could be further from the truth. In fact, AIG requested copies of all documents related to the insurance agency business transacted on its behalf by AIMA *in January*. For the past six months, AIMA serially has refused to produce any such documents, agreed to do so under unreasonable terms, agreed to only a partial production and most recently refused yet again to produce any of the documents required by AIG. In light of this blatant disregard for AIG's longstanding and pressing need for (and legal right to) documents related to its own policies and policyholders, AIG has no choice but to place a strict deadline upon the instruction issued to AIMA in my letter to you of June 6, 2006. Moreover, any contention by AIMA that AIG's demand is "unreasonable" is directly contradicted by the fact that AIG is willing to arrange and pay for the expedited copying of the requested documents as soon as AIMA makes them available.

Second, with respect to your letter of June 8, 2006, which states that "AIMA is *not presently writing* as a managing general agent for any other insurer," I reiterate AIG's instruction that AIMA immediately inform AIG of the nature and status of any negotiated, potential or actual agency agreements between AIMA and non-AIG insurers (collectively, "Potential/Actual Agreements"), and that AIMA inform AIG how AIMA intends to protect and serve the interests of its AIG principals in light of such Potential/Actual Agreements. Furthermore, this request is a continuing one, and AIG instructs AIMA to immediately provide AIG with the same information in the event that AIMA has any Potential/Actual Agreements in the future. AIG has a legitimate need for such information so that it can protect the interests of its policyholders and reinsurers, and assess its rights with respect to the duties owed to it by AIMA, its managing general agent. AIG expressly reserves any and all rights and remedies arising out of or related to the matters addressed herein.

Very truly yours,

Ralph Mucerino

# EXHIBIT D

# AMERICAN INTERNATIONAL MARINE AGENCY

OF NEW YORK, INC.
90 PARK AVENUE, 7TH FLOOR
NEW YORK, NY 10016

DAVID S. FRENCH
PRESIDENT & CEO

Tel: (646) 227-6401
Fax: (212) 539-3129

Via Facsimile and E-Mail

June 12, 2006

Mr. Ralph W. Mucerino
Vice President
American International Group, Inc.
175 Water Street
New York, NY 10038

Re:  Books and Records Maintained by
American International Marine Agency ("AIMA")

Dear Ralph:

This is in response to your letters dated June 6 and June 9, 2006.

Through your letter dated June 6, 2006, what you have called the
"AIG Insurance Companies" requested that AIMA produce an overwhelming
number of documents.  Most of these documents already have been copied,
including AIMA's underwriting files, invoices for outstanding premiums, and
copies of in-force treaties.  Your request that AIMA produce these same
documents yet again is unreasonable.  Please tell me why we should have to
duplicate the exercise already undertaken.

In this respect, the assertions in your June 9, 2006 letter about a
supposed lack of production of requested documents to date on the part of
AIMA are incorrect.  As you know, AIMA has delivered many requested copies
to AIG, but other documents remain with a copying vendor because AIG so far
has refused to pay the copying costs.  AIMA should not be forced to bear a
substantial additional burden, merely because the AIG Insurance Companies are
refusing to pay the already incurred copying costs.  The burden that the AIG
Insurance Companies seek to impose by the expedited production of documents

is even greater than usual at this time because, pursuant to your request, the AIG Insurance Companies currently have on-site at AIMA's office a team of auditors conducting a detailed review of AIMA's documents. We note that only this past Friday, AIMA acceded to the AIG Insurance Companies' request that their auditors be permitted to spend additional time at AIMA's office reviewing its documents. The timing of the document demand, the breadth of documents they seek and the time given by the AIG Insurance Companies for compliance all suggest that the demand is intended to harass AIMA rather than to result in meaningful review by the AIG Insurance Companies.

You also have requested information about whatever negotiations in which AIMA may now be involved concerning the possibility of its entering into a managing general agency agreement with others. As I advised you in my letter dated June 8, 2006, AIMA is fully aware of its obligations under the Marine Management Agreement, including its disclosure obligations. We do not believe you are entitled to know about AIMA's plans, but assure you that if AIMA enters into an agreement with another principal we will inform the AIG Insurance Companies promptly.

AIMA reserves all of its rights and remedies arising out of or related to the matters addressed herein.

Sincerely,

David S. French

# EXHIBIT E

June 30, 2006 10:53 AM US Eastern Timezone

## AIMA Announces Intent to Terminate with AIG

NEW YORK--(BUSINESS WIRE)--June 30, 2006--American International Marine Agency, Inc. (AIMA), a wholly owned subsidiary of C. V. Starr & Co., Inc., today informed American International Group, Inc. (AIG) of its intention to terminate the agency's relationship with the insurance company, effective January 1, 2007.

Notice was given pursuant to terms of an agreement between the agency and AIG, which was established in December 1977, and requires six months termination notice. At the time of termination, AIMA will cease acting as managing general agent for AIG.

"This decision marks a significant milestone for AIMA, which has been a market leader in the marine insurance sector for nearly six decades. We look forward to serving new underwriters next year and building upon our reputation for delivering best in class solutions that meet our clients' specific insurance needs," said David French, President, AIMA.

About American International Marine Agency, Inc.

American International Marine Agency, Inc. (AIMA), a wholly-owned subsidiary of C.V. Starr & Co. Inc., produces ocean marine insurance for cargo, hull and marine liability risks, and covers multinationals, importers, exporters, manufacturers and logistics operators. AIMA is the U.S. market leader in cargo, with a dominant position in multinational and complex risk management segment. The longest standing traditional marine underwriter in North America and a market leader for nearly 60 years, AIMA is a leading marine writer in the United States and one of the top marine writers worldwide.

About C. V. Starr & Co. Inc.

C. V. Starr & Co. Inc. is an independently-owned holding company with insurance agencies and a portfolio of global investments. Through its wholly owned insurance agencies, C. V. Starr historically has produced approximately $2 billion annually of comprehensive insurance coverage among several specialty lines covering aviation, marine, excess casualty and property, including risks with international exposures. These agencies provide a broad spectrum of value-added specialized services including claims handling and settlement, risks assessment and loss prevention, and customer focused attention. C. V. Starr also has more than $3 billion in investment assets that include public and private equity, hedge funds and alternative assets. C. V. Starr's significant presence in global markets, backed by the company's international expertise, has made it an industry leader for more than 50 years. The company is headquartered in New York City.

| Contacts |
| --- |
| Weber Shandwick
Brooke Parker, 212-445-8142 |



# EXHIBIT F

July 21, 2006 05:49 PM US Eastern Timezone

## AIMA Announces Agreement with National Liability and Fire Insurance Company

NEW YORK--(BUSINESS WIRE)--July 21, 2006--American International Marine Agency, Inc. (AIMA), a wholly owned subsidiary of C. V. Starr & Co., Inc., today announced a new agreement with National Liability and Fire Insurance Company, a member of the Berkshire Hathaway group of insurance companies, which will expand the agency's servicing capabilities. The leading insurance agency for the marine industry, AIMA said that the relationship with National Liability and Fire Insurance Company will allow the agency to immediately offer $100 Million of commercial underwriting capacity to its clients.

"Our new agreement with National Liability and Fire Insurance Company ensures that AIMA will continue to offer the breadth of tailored marine products and services that have made the company an industry leader for more than 60 years," said David French, President, AIMA. "It also reflects our commitment to providing superior coverage and solutions, through the industry's top companies, that meet our clients' needs."

About American International Marine Agency, Inc.

American International Marine Agency, Inc. (AIMA), a wholly-owned subsidiary of C. V. Starr & Co. Inc., produces ocean marine insurance for cargo, hull and marine liability risks, and covers multinationals, importers, exporters, manufacturers and logistics operators. AIMA is the U.S. market leader in cargo, with a dominant position in multinational and complex risk management segment. The longest standing traditional marine underwriter in North America and a market leader for nearly 60 years, AIMA is a leading marine writer in the United States and one of the top marine writers worldwide.

About C. V. Starr & Co. Inc.

C. V. Starr & Co. Inc. is an independently-owned holding company with insurance agencies and a portfolio of global investments. Through its wholly owned insurance agencies, C. V. Starr historically has produced approximately $2 billion annually of comprehensive insurance coverage among several specialty lines covering aviation, marine, excess casualty and property, including risks with international exposures. These agencies provide a broad spectrum of value-added specialized services including claims handling and settlement, risks assessment and loss prevention, and customer focused attention. C. V. Starr also has more than $3 billion in investment assets that include public and private equity, hedge funds and alternative assets. C. V. Starr's significant presence in global markets, backed by the company's international expertise, has made it an industry leader for more than 50 years. The company is headquartered in New York City.

Contacts
Weber Shandwick
Brooke Parker, 212-445-8142



# EXHIBIT G

**AMERICAN INTERNATIONAL GROUP, INC.**
175 WATER STREET
NEW YORK, NY 10038

RALPH W. MUCERINO                                                    (212) 458-6955
VICE PRESIDENT                                                    FAX  (212) 458-6105

*Via Electronic Mail and Facsimile*

July 24, 2006

Mr. David French
American International Marine Agency of New York, Inc.
90 Park Avenue, 7th Floor
New York, New York 10016

Re:  *AIMA's Ongoing Agency Obligations*

Dear David:

I write on behalf of the insurance company subsidiaries of American International Group, Inc. ("AIG") for which AIMA continues to act as managing general agent (the "AIG Insurance Companies"). On June 6 and 9, 2006, I wrote to you seeking information concerning the status of AIMA's negotiations and/or agreements to act as managing general agent for insurance companies that compete with the AIG Insurance Companies in the marine insurance market. In particular, the AIG Insurance Companies expressly instructed AIMA "to immediately inform [them] of the nature and status of any negotiated, potential or actual agency agreements between AIMA and non-AIG insurers . . . and that AIMA inform AIG how AIMA intends to protect and serve the interests of its AIG principals in light of such [agreements]." (June 9, 2006 Letter). As I advised you at that time, this instruction is continuing, and AIMA is directed to provide the AIG Insurance Companies with the requested information in the event that AIMA enters into any competing MGA relationships while it remains agent for the AIG Insurance Companies.

You responded to me on June 8, 2006 by stating that "AIMA is not presently writing as a managing general agent for any other insurer" (AIMA June 8, 2006 Letter), and again on June 12 with the assurance that "if AIMA enters into an agreement with another principal we will inform the AIG Insurance Companies promptly" (AIMA June 12, 2006 Letter). Moreover, in a June 30, 2006 press release, you stated that AIMA "look[s] forward to serving new underwriters next year," implying to the marine insurance market and to the AIG Insurance Companies that AIMA will not begin acting for a competing insurance company prior to the termination of the six-month notice period during which AIMA remains the AIG Insurance Companies' agent. Nevertheless, in a press release issued this past Friday, July 21, 2006, AIMA announced for the first time that it has entered into an agreement with National Liability and Fire Insurance Company ("National Liability") whereby it will "immediately offer $100 Million of commercial underwriting capacity to its clients."

Needless to say, the AIG Insurance Companies are gravely concerned by AIMA's apparent commencement of insurance underwriting activities that directly compete with, and, as such, not within the best interests of, the AIG Insurance Companies, as well as by AIMA's failure to follow the AIG Insurance Companies' simple and reasonable instruction to keep them informed as to the existence and status of AIMA's agreements with AIG's competitors (as you expressly promised to do in you June 12 letter to me). The AIG

D. French                              - 2 -                              July 24, 2006

Insurance Companies' concern is exacerbated by the fact that AIMA's agreement with National Liability is being introduced concurrent with AIMA's continuing refusal to follow the AIG Insurance Companies' reasonable instructions designed to protect the AIG Insurance Companies from the potential that AIMA might act outside of their best interests during the six-month notice period, as well as AIMA's ongoing efforts to delay and frustrate the underwriting audit that the AIG Insurance Companies are required by law to conduct.

Once again, AIMA is hereby instructed immediately to provide the AIG Insurance Companies with the full details of AIMA's announced agreement with National Liability, including how and when AIMA will begin (or has already begun) marketing this program to potential clients. AIG has a legitimate need for such information so that it can protect the interests of its policyholders and reinsurers and assess its rights with respect to the contractual and common law duties owed to it by AIMA. In addition, AIMA is hereby expressly instructed not to use any of AIG or the AIG Insurance Companies' confidential and proprietary information for the benefit of National Liability, including but not limited to information concerning the AIG Insurance Companies' policyholders, AIG's insurance products, the historical performance of the AIG Insurance Companies' operations and AIG's computer systems.

Finally, as AIMA was previously instructed in my letter to you of June 6, 2006, AIMA is expressly prohibited from using the "American International" or "AI" designations as part of its operating name in connection with any business dealings that are not undertaken solely for the benefit of AIG and the AIG Insurance Companies. It is clear from the July 21, 2006 press release that AIMA is conducting its operations on behalf of National Liability while using the names "American International Marine Agency, Inc." and "AIMA", and we view such action as a direct violation of the AIG Insurance Companies' instructions as well as of applicable state and federal law, including but not limited to the laws governing trademarks, advertising, competition and insurance services. AIMA is hereby instructed immediately to cease and desist any and all advertising, marketing and other operations that involve the use of the names "American International Marine Agency, Inc." and "AIMA" in connection with insurance products and services offered by any insurers other than AIG and its subsidiaries, including but not limited to AIMA's operations on behalf of National Liability. AIMA is further instructed to take immediate measures to retrieve and destroy any and all marketing and other materials that make unauthorized use of the "American International" or "AI" designations. Please provide us with your written confirmation no later than 5:00 PM, July 25, 2006 that AIMA will comply with these directives as well as with a detailed description of how AIMA intends to correct any public statements or other representations that have already been made containing unauthorized uses of the "American International" or "AI" designations in connection with the AIMA's agreement with National Liability.

The AIG Insurance Companies reserve any and all rights with respect to the issues addressed herein.

Very truly yours,

*Ralph W. Mucerino*

Ralph W. Mucerino

# EXHIBIT H

AMERICAN INTERNATIONAL MARINE AGENCY
OF NEW YORK, INC.
90 PARK AVENUE, 7TH FLOOR
NEW YORK, NY 10016

DAVID S. FRENCH
PRESIDENT & CEO

TELEPHONE (646) 227-6401
FACSIMILE (212) 599-3129

July 25, 2006

<u>Via Electronic Mail and Facsimile</u>

Ralph W. Mucerino
Vice President
American International Group, Inc.
175 Water Street
New York, NY 10038

Re:   **American International Group, Inc.'s ("AIG")**
      **<u>Improper Demands</u>**

Dear Mr. Mucerino:

      This responds to your letter dated July 24, 2006 (the "July 24 Letter") written on behalf of the insurance company subsidiaries of AIG (collectively, the "AIG Insurers") for which American International Marine Agency, Inc. ("AIMA") acts as a managing general agent. In your July 24 Letter, you request information regarding the details of the negotiations and agreement between AIMA and National Liability and Fire Insurance Company ("National Liability") and demand that AIMA cease using its name in connection with business activities that are not for the benefit of the AIG Insurers.

      Your request for information regarding the details and negotiations of AIMA's agreement with National Liability is yet another transparent example — as are the numerous restrictions the AIG Insurers have sought to impose upon AIMA in your Letter of

Ralph W. Mucerino
July 25, 2006
Page 2

Termination dated June 29, 2006 -- of the AIG Insurers trying to
take advantage of their position as principal to gain confidential
information regarding AIMA's business and use that information
to compete with AIMA. AIMA will not succumb to these tactics.
AIMA has absolutely no obligation to provide the AIG Insurers
with any information regarding the details of the negotiations and
agreement between AIMA and National Liability, and declines to
do so.

In addition, AIMA notes your comment regarding
confidential and proprietary information. Please identify all AIG
information in AIMA's possession that the AIG Insurers consider
to be confidential and proprietary.

Your demand that AIMA immediately cease using its
name "American International Marine Agency" or "AIMA" on all
advertising, marketing and other operations when used in
connection with business dealings that are not for the benefit of
the AIG Insurers is improper. AIMA has the right to use its name.
The AIG Insurers have not shown any basis for the belief that
there will be any customer confusion regarding which insurance
company is providing coverage.

AIMA reserves all of its rights and remedies with respect
to the foregoing.

Sincerely,

David S. French / ler

David S. French

# EXHIBIT I

AMERICAN INTERNATIONAL MARINE AGENCY
OF NEW YORK, INC.
90 PARK AVENUE, 7TH FLOOR
NEW YORK, NY 10016

DAVID S. FRENCH
PRESIDENT & CEO

TELEPHONE (646) 227-6401
FACSIMILE (212) 599-3129

July 25, 2006

<u>Via Electronic Mail and Facsimile</u>

Mr. Ralph W. Mucerino
Vice President
American International Group, Inc.
175 Water Street
New York, NY 10038

Re:   <u>Improper Restrictions Imposed on AIMA</u>

Dear Mr. Mucerino:

This is in response to your letter dated July 21, 2006 (the "July 21 Letter") written on behalf of certain insurers, including National Union Fire Insurance Company of Pittsburgh, Pa., AIU Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Commerce and Industry Insurance Company and American Home Assurance Company (collectively, the "AIG Insurers") regarding the numerous new restrictions and limitations that the AIG Insurers seek to impose upon AIMA as listed in the AIG Insurers' June 29, 2006 termination letter.

Before addressing each new restriction, we would like to address some of the many misstatements contained in the July 21 Letter. Most fundamentally, the AIG Insurers falsely claim that these new restrictions do not attempt to alter materially the parties' relationship. Yet, the AIG Insurers do not dispute the point made repeatedly in AIMA's July 12, 2006 letter, i.e., that the new restrictions not only will materially and adversely affect AIMA's profitability, but also will provide the AIG Insurers with an unfair

Mr. Ralph W. Mucerino
July 25, 2006
Page 2

competitive advantage. Nothing in the Marine Management
Agreement, effective as of December 1, 1977, between AIMA and
the AIG Insurers (the "Agreement") permits the AIG Insurers to
diminish substantially the profitability of AIMA; nor to use AIMA
information to aid a competitor, merely because the agency rela-
tionship is approaching its end. AIMA considers these new re-
strictions wholly unreasonable. AIMA hereby puts the AIG In-
surers on notice that unless these restrictions are rescinded in writ-
ing, within 24 hours, AIMA will consider the AIG Insurers to be
in material breach of the Agreement and the Agreement will be
deemed terminated.

There are numerous other misstatements in the July 21 Let-
ter. The AIG Insurers ignore that the Agreement nowhere pro-
vides for what the AIG Insurers refer to as "Notice Period Instruc-
tions" and certainly does not contemplate that the AIG Insurers
will be permitted to unilaterally change actual and implied terms
of the Agreement -- exactly what the AIG Insurers purport to do.
The AIG Insurers assert that the relationship between the parties
has changed and that these instructions merely "formalize" the
parties' relationship. But the parties' relationship was formalized
almost thirty years ago and nothing in that formalized Agreement
permits the unilateral changes that the AIG Insurers now seek for
their own benefit.

The AIG Insurers try to support the "Notice Period Instruc-
tions" by citing to the supposed nature of the change in the rela-
tionship between the parties. The AIG Insurers cite not only the
parties' respective terminations of each other, but that AIMA has
commenced legal action against the AIG Insurers. The AIG In-
surers fail to mention that AIMA commenced arbitration against
the AIG Insurers -- as a result of the AIG Insurers' interference
with AIMA's performance of its duties -- *five months ago*. Trying
to justify the new restrictions by reference to the five-month-old
and inactive arbitration merely underscores the improper nature of
the Notice Period Instructions.

What is more, the AIG Insurers cite to alleged actions of
AIMA and the other C.V. Starr agencies and make sweeping ac-
cusations against AIMA and the other C.V. Starr agencies, includ-
ing that the agencies "have raided AIG's employees, entered into

Mr. Ralph W. Mucerino
July 25, 2006
Page 3

secret and self-serving arrangements to undermine [the AIG Insurers'] interests, misappropriated [the AIG Insurers'] proprietary documents and information, intentionally or wrongfully mishandled underwriting, claims handling, reinsurance and other matters . . . [and] converted millions of dollars in [the AIG Insurers'] policyholders' premium trusts." These claims are not only without basis, but actions of the other agencies are wholly irrelevant to the relationship between the AIG Insurers and AIMA, a separate agency.

The AIG Insurers also miss the mark when they say they are "hard-pressed" to understand how the AIG Insurers' (i) notice of creation of AIG Global Marine and (ii) public statement that insureds can now directly renew with AIG violates AIMA's rights. As we explained in our July 12, 2006 letter, it is this intention coupled with the restrictions, which for the most part require that the AIG Insurers -- by their own declaration, AIMA's new competitor -- approve AIMA's normal business activities and be granted access to confidential, proprietary information which makes the AIG Insurers' entry into unfair competition with AIMA harmful to AIMA's rights.

The July 21 Letter also inappropriately asserts that AIMA was "subject to AIG's continuous and regular oversight and control." This is an inaccurate depiction of the relationship between the parties. AIMA employees reported to AIMA senior management. While AIMA employees generally worked in the same offices as the AIG Insurers, AIMA paid rent for its space and did not commingle its documents with those of the AIG Insurers. The AIG Insurers' Internal Audit Division conducted infrequent audits -- approximately every three years; the AIG Insurers did not freely have access to AIMA documents. That is why certain quarterly reports were provided for in the Agreement. Further, the AIG Insurers did not exercise "continuous and regular oversight and control" over AIMA's business decisions. Indeed, AIMA has and had broad discretion to control its business decisions.

The AIG Insurers falsely claim that AIMA is the one who has been soliciting and hiring AIG employees. That is simply not the case. There is only one employee who works for AIMA who previously worked for AIG. The reality, however, is that she was

Mr. Ralph W. Mucerino
July 25, 2006
Page 4

an AIMA employee, was lured over to AIG a few months ago and
then returned unsolicited to AIMA.

The AIG Insurers claim that AIMA has acted in defiance by
(1) not providing certain documents to the AIG Insurers, (2) not
permitting an underwriting audit, and (3) failing to comply with
these restrictions. AIMA was willing to provide the AIG Insurers
with a copy of AIMA's documents directly related to the AIG In-
surers' business, but the AIG Insurers refused to pay the vendor so
the vendor stopped the copy process. Additionally, AIMA was
willing to permit an underwriting audit provided it was given rea-
sonable notice as to what files were to be reviewed. AIMA will
further address these purported restrictions and the AIG Insurers'
latest comments on these restrictions in their order of presentation:

1.    "AIMA shall obey and cooperate with ar-
      rangements to complete the provision by
      July 15, 2006 of copies of all records relat-
      ing to the insurance and reinsurance
      business for which AIMA acts as manag-
      ing agent for any of the AIG Insurance
      Companies... The records shall be made
      available by a vendor selected by the AIG
      Insurance Companies at the AIG Insur-
      ance Companies' expense in form and or-
      der in which they have been maintained
      by AIMA ..."[1]

Notwithstanding the lack of its having any contractual or in-
dependent legal obligation to do so, AIMA has provided certain of
its documents to a copy vendor so that the AIG Insurers can have
copies made. The AIG Insurers claim that AIMA has prevented
the AIG Insurers from having access to AIMA's documents is

---

[1]  We assume that the last sentence of restriction 1, which states: "Instead of
merely re-inscribing the instructions, I think we should summarize their
objection," was someone's comment on a prior draft of the July 21 Letter,
rather than a part of the instruction itself. If that is not correct, please let us
know.

Mr. Ralph W. Mucerino
July 25, 2006
Page 5

simply not true. AIMA began sending its documents to the vendor earlier this year. The AIG Insurers received documents pursuant to this agreement. About two and a half months ago, the AIG Insurers refused to pay their copy bill, and the copy vendor refused to continue providing documents. AIMA had no control over whether the AIG Insurers paid their bill. Additionally, you offer no support for your baseless assertion that documents were produced in a "jumbled form."

That being said, I am informed that our respective attorneys are in the process of working out an agreement whereby the copying process will resume and the AIG Insurers will be provided with copies of the AIMA files relating to the AIG Insurers' policies. AIMA hopes that this process will be completed as quickly as possible. The negotiations between counsel also concern the timing of payment for, and delivery of, the copies.

Your request for an underwriting audit set forth in the July 21 Letter was addressed in a separate letter we sent dated July 24, 2006.

2.    "AIMA shall implement a procedure to ensure that all correspondence, documents and other records related to AIG, the AIG Insurance Companies and/or the business underwritten or services on their behalf that AIMA receives or creates during and after the Notice Period are promptly forwarded to the AIG Insurance Companies, in care of Richard Decker."

AIMA is willing to provide the AIG Insurers with a copy of its documents related to the AIG Insurers' business created during or after the notice period at the expense of the AIG Insurers. That expense would include without limitation an allocated portion of AIMA's labor expense that would be necessitated by this increased burden being undertaken by AIMA. It is not necessary that the AIG Insurers provide personnel to assist in this process. This response is subject to working out a mutually acceptable agreement on cost sharing. As a result of the AIG Insurers' evic-

Mr. Ralph W. Mucerino
July 25, 2006
Page 6

tions of AIMA from its offices around the country and the docu-
ment copying process currently ongoing, AIMA will be able to
begin providing such information once AIMA has settled into its
new offices.

### 3. and 4. Severe Restrictions on Coverage that AIMA may Write on Behalf of the AIG Insurers.

The AIG Insurers' response effectively concedes the poten-
tial anti-competitive and deleterious impact on AIMA of the pro-
vision of information to the AIG Insurers about such a large num-
ber of policies. The AIG Insurers seek to remedy this inequity by
offering for the first time in the July 21 Letter that "AIMA seek
pre-approval (and make all related submissions of information) to
a representative of AIG's Underwriting Resources Division, who
will maintain such information separate from AIG Global Ma-
rine." This response neither addresses the concern about unfair
competition from the AIG Insurers nor addresses the other con-
cerns previously raised by AIMA.

First, as AIMA previously noted -- and the AIG Insurers did
not dispute -- the ability of AIMA to secure profitable business
often depends on prompt decision making; the requirement of
three business days' notice, with no limitations on how long the
AIG Insurers may take to respond to these requests, simply im-
poses too many shackles on AIMA and is unacceptable. While
we cannot agree with your assertion that this will affect less than
20 percent of policies, it is irrelevant in any event. This provision
will have the same anti-competitive effect upon AIMA.

The AIG Insurers' position that the eSTART system will
protect AIMA in this regard is without basis. The AIG Insurers
have cut off AIMA's ability to access eSTART, but at the same
time the AIG Insurers still want AIMA to use eSTART. This is
nothing more than an attempt by the AIG Insurers to gain infor-
mation about AIMA's business. AIMA has not used eSTART
since its access was cut off and will not resume using eSTART.

In addition, the notion of pre-approval is at odds with the na-
ture of the Agreement. Nothing in the Agreement requires AIMA

Mr. Ralph W. Mucerino
July 25, 2006
Page 7

to conduct business in this burdensome and inefficient new manner. This too is unacceptable.

Finally, the offer that the information be provided, to AIG's Underwriting Resources Division, rather than AIG Global Marine is of little value, particularly when you offer no iron clad assurances that information will not be shared, such as a judicially enforceable confidentiality agreement with very strict penalties for non-compliance. As framed, both the original new restriction in the June 29 Letter and the more recent version in the July 21 Letter are unacceptable.

> 5. "AIMA shall not quote or bind any renewal of an existing insurance policy at a rate reduction of 10% or greater from the previous policy term without the express prior written approval by one of the designated authorized representatives of the AIG Insurance Companies identified on Exhibit A hereto. AIMA shall make all requests for such prior or written approval and provide all necessary information in connection with such requests within a reasonable time in advance of when such approval is needed, but in any event with no less than three business days' notice. For any accounts that AIMA renews at a rate reduction of less than 10% from the previous policy term, AIMA shall provide notice thereof to the designated representatives of the AIG Insurers referred to above within 24 hours after binding the renewal."

Contrary to your assertion, this restriction would impose an unreasonable restraint upon AIMA and its ability to conduct its business and will allow the AIG Insurers to usurp AIMA's business. Your assertion that AIMA will provide policyholders with improper discounts is unfounded. Indeed, AIMA's income is derived through a percentage of premiums and through its profit commission, thus AIMA has an incentive not to provide unreasonable discounts. Again, insureds for whom a 10 percent discount is warranted include some of the most profitable parts of the

Mr. Ralph W. Mucerino
July 25, 2006
Page 8

business, and pre-clearance would create an incentive for the AIG
Insurers to prevent AIMA (with whom the AIG Insurers now have
decided to compete) from underwriting this profitable business.
This pre-clearance is unacceptable.

> 6. "AIMA shall not quote or bind any
>    renewal of an existing insurance pol-
>    icy with a loss ratio in excess of 80%
>    during the previous policy term with-
>    out the express prior written approval
>    by one of the designated authorized
>    representatives of the AIG Insurance
>    Companies identified on Exhibit A
>    hereto. AIMA shall make all requests
>    for such prior written approval and
>    provide all necessary information in
>    connection with such requests within a
>    reasonable time in advance of when
>    such approval is needed, but in any
>    event with no less than three business
>    days' notice."

Again, contrary to your assertion, this restriction will im-
pose an unreasonable restraint upon AIMA and its ability to con-
duct its business and will allow the AIG Insurers to usurp AIMA's
business. The nature of this pre-approval step removes AIMA's
ability to negotiate contracts and control its business and again
AIMA maintains its incentive to write profitable business and not
underprice the policies. This pre-clearance is unacceptable.

> 7. "AIMA shall not cancel or non-renew
>    any existing insurance policy without
>    the express prior written approval by
>    one of the designated authorized rep-
>    resentatives of the AIG Insurance
>    Companies identified on Exhibit A
>    hereto. AIMA shall make all requests
>    for such prior written approval and
>    provide all necessary information in
>    connection with such requests within a
>    reasonable time in advance of when

Mr. Ralph W. Mucerino
July 25, 2006
Page 9

> such approval is needed, but in any
> event with no less than three business
> days' notice."

Requiring AIMA to receive approval of cancellation or non-
renewals has the potential for the AIG Insurers to foist unprofit-
able business on AIMA, which would adversely affect AIMA's
profit commission and make AIMA a less viable competitor. This
new restriction is unacceptable.

> 8. "In accordance with current practice,
> any new or renewal business trans-
> acted by AIMA on behalf of the AIG
> Insurance Companies shall continue
> to be processed on AIGMarine.com or
> eMarine, and all cargo certificates
> shall be issued through the Oceanwide
> system, as applicable. AIMA shall
> continue to comply with the submis-
> sion procedures for processing
> eSTART reservations set forth in my
> letter to you of February 10, 2006.
> AIMA shall cooperate with the AIG
> Insurance Companies in order to en-
> sure that AIMA has appropriate ac-
> cess to all systems that the AIG Insur-
> ance Companies shall require AIMA
> to use during the Notice Period."

Again, this request to use the eSTART reservation system is
unreasonable. AIMA has full authority under the Agreement to
accept and decline risk. As I wrote in response to restrictions 3
and 4, the AIG Insurers have cut off AIMA's ability to access
eSTART, but the AIG Insurers still want AIMA to use eSTART.
This is nothing more than an attempt by the AIG Insurers to gain
information about AIMA's business. AIMA has not used
eSTART since its access was cut off and will not resume using
eSTART.

> 9. "Effective immediately, AIMA shall
> have no authority to act on behalf of

Mr. Ralph W. Mucerino
July 25, 2006
Page 10

> AIG's foreign general insurance op-
> erations conducted through American
> International Underwriters ("AIU")
> in connection with referrals or rein-
> surance of marine liability risks origi-
> nated by AIU. AIMA immediately
> shall provide to AIU all records and
> information related to any foreign
> general marine policies previously re-
> ferred or reinsured to it by AIU."

AIMA has provided reinsurance to AIU London for the bulk
of its liability policies in connection with what the parties refer to
as a Treaty. The AIG Insurers commonly refer to this as "Treaty
038873" on documents they issue. This restriction is unreason-
able and AIMA is unable to comply.

> 10. "Effective immediately, AIMA shall
> have no authority to issue or service
> any issuing office "underlyer" policies
> issued in North America for AIU pro-
> ducing offices outside of North Amer-
> ica, and AIMA immediately shall pro-
> vide to AIU all records and informa-
> tion related to such previously issued
> policies."

There is no basis for your assertion that you understand this
to be a representation that "AIMA has produced all such records
and information to the AIG Insurance Companies and specifically
that AIMA is not in possession of any such documents and infor-
mation that have not already been provided by it to AIG." My
initial comment merely reflected that AIMA documents were be-
ing provided pursuant to agreement between the parties and
AIMA would not additionally and separately provide these docu-
ments. As I currently understand, AIMA has provided documents
to be copied for the AIG Insurers' benefit. These documents ei-
ther have already been copied for the AIG Insurers and sent to the
AIG Insurers, or have been awaiting copying for the last two and a
half months as a result of the AIG Insurers' refusal to pay its bill.

Mr. Ralph W. Mucerino
July 25, 2006
Page 11

Again, I am informed that our respective attorneys are working out an agreement whereby the copying process will resume.

> 11. "Effectively immediately, AIMA shall have no authority to conduct or provide any loss control services in connection with any insurance business produced or originated by AIU, and AIMA immediately shall provide to AIU all records and information related to such services that AIMA has conducted."

Please refer to my response to restriction 10 regarding document copying.

> 12. "Effective immediately, AIMA shall have no authority to seek, negotiate or enter into any reinsurance agreement (e.g., treaty, facultative, facultative obligatory or other reinsurance arrangement) on behalf of the AIG Insurance Companies unless it receives the express prior written approval of Richard Skolnik, AIU's Vice President and Senior Reinsurance Officer. For all reinsurance arrangements other than individual facultative reinsurance agreements, AIMA shall make all requests for such prior written approval and provide all necessary information in connection with such requests within a reasonable time in advance of when such approval is needed, but in any event no less than 60 days' written notice. For individual facultative reinsurance placements, AIMA shall make all requests for such prior written approval and provide all necessary information in connection with such requests with at

Mr. Ralph W. Mucerino
July 25, 2006
Page 12

> least three business days' written no-
> tice."

With regard to facultative reinsurance placements this re-
sponse is unreasonable and directly contrary to an express provi-
sion in the Agreement which provides that the Managing Agent
can "enter into reinsurance agreements with reinsurers by treaty or
otherwise." Besides the fact that these statements regarding Starr
Technical Risks Agency, Inc. are inaccurate, they have absolutely
no relevance to the Agreement and relationship between AIMA
and the AIG Insurers. This restriction inappropriately limits
AIMA's ability to control its business and is yet another way for
the AIG Insurers to gain information and an unwarranted com-
petitive advantage.

> 13. "All claims made under or related to
>     insurance policies underwritten or
>     serviced by AIMA shall continue to be
>     adjusted and approved by AI Marine
>     Adjusters. Nothing herein is intended
>     to change the manner in which such
>     claims are currently adjusted and ap-
>     proved."
>
> No additional response is necessary to
> this provision.
>
> 14. "AIMA shall provide to the AIG In-
>     surers, care of Richard Decker, a
>     weekly report, in written and elec-
>     tronic form, identifying and detailing
>     all new and renewal insurance busi-
>     ness quoted, bound and submitted on
>     behalf of the AIG Insurance Compa-
>     nies and all policies (by policy number
>     and premium) expiring during the
>     week of the report and the following
>     two-week period."

We appreciate that you are changing the request from a
weekly to a monthly report, but even that is not provided for in the

Mr. Ralph W. Mucerino
July 25, 2006
Page 13

Agreement. As we stated in the July 12 Letter, AIMA will continue to provide information concerning renewals, newly bound, and lost business by name of insured on a monthly basis, as it has done in the past. AIMA, however, will not agree to the new report that you have included in the new restrictions.

> 15. "AIMA shall provide to the AIG Insurers, care of Richard Decker, on a weekly basis with access to an updated version of all databases currently maintained for hull fleet schedules and cargo warehouses as well as updated written and electronic reports containing all information related thereto."

The fact that AIMA is no longer leasing space from the AIG Insurers is due to the AIG Insurers hastily evicting them. The AIG Insurers cannot use their own unilateral evictions as a basis to impose additional administrative costs on AIMA. Moreover, the information sought can only be used to seek to obtain an unfair competitive advantage and is viewed as an unacceptable new restraint. As I said in my initial response, AIMA currently provides similar information on a quarterly basis and will continue to do so.

> 16. "AIMA shall, on a monthly basis, provide to the AIG Insurers, care of Julie Kanter, the financial reports and information identified on Exhibit B.1 hereto."

Again, this request for these monthly reports is unreasonable. The Agreement provides that this information be provided on a quarterly basis and AIMA sees no reason to alter the Agreement.

> 17. "AIMA shall, on a quarterly basis, provide to the AIG Insurers, care of Julie Kanter, the financial reports and

Mr. Ralph W. Mucerino
July 25, 2006
Page 14

> information identified on Exhibit B.2
> hereto."

Much of the information that the AIG Insurers request here
is already in the AIG Insurers' possession. In your response, you
even admit that the AIG Insurers have some of this information,
but that AIMA should still provide the information, with no ex-
planation as to why AIMA should do so. AIMA sees no reason
why it should now have to start providing such duplicative infor-
mation to the AIG Insurers. This is nothing but a request to make
AIMA perform unnecessary work. As stated in our original re-
sponse, AIMA will provide the information requested herein ex-
cept for (i) a report concerning net loss greater than $50,000 on all
lines other than cargo on which the reporting threshold is
$100,000, and (ii) the "Supplemental Reports" that you have re-
quested in B.2.c.

*    *    *

If the AIG Insurers do not provide written notice within 24
hours that they withdraw the new restrictions that AIMA deems
unreasonable and unacceptable, AIMA will consider the AIG In-
surers to be in material breach of the Agreement and the Agree-
ment will be deemed terminated.

AIMA reserves all of its rights and remedies with respect to
the foregoing.

Sincerely,

*David S. French/ler*

David S. French

# EXHIBIT J

**AMERICAN INTERNATIONAL GROUP, INC.**
175 WATER STREET
NEW YORK, NY 10038

RALPH W. MUCERINO                                                    (212) 458-5955
VICE PRESIDENT                                                   FAX  (212) 458-4105

*Via Electronic Mail and Facsimile*

July 25, 2006

Mr. David French
American International Marine Agency of New York, Inc.
90 Park Avenue, 7th Floor
New York, New York 10016

Re:  *AIMA's Ongoing Agency Obligations*

Dear David:

I write in reference to your letter of today in which AIMA has repeated its continued refusal to follow the instructions issued by the AIG Insurance Companies in connection with their June 29, 2006 Notice of Termination of the agency relationship between the parties (the "Notice Period Instructions"). Your letter states that "unless these restrictions are rescinded in writing within 24 hours, AIMA will consider the [AIG Insurance Companies] to be in material breach of the [1977 Marine Management] Agreement and the Agreement will be deemed terminated."

For the reasons set forth in my prior letters to you on this subject, the Notice Period Instructions are reasonable and necessary to protect the AIG Insurance Companies' interests and the interests of their reinsurers, policyholders and AIG and its shareholders.  The Notice Period Instructions are appropriate under the parties' agreement, as well as under applicable common law, statutory and regulatory authority. As such, the AIG Insurance Companies have no obligation to and no intention of rescinding the Notice Period Instructions beyond the reasonable compromises proposed in my letter to you of July 21, 2006.

We are disappointed that AIMA has elected to terminate the parties' agency relationship prior to the completion of the six-month notice period.  In light of the unequivocal declaration in your letter of this afternoon, however, we understand that AIMA has deemed the Marine Management Agreement to be terminated effective immediately.  As such, and without prejudice to the AIG Insurance Companies' rights and remedies, AIMA is relieved of any and all authority to act as agent on behalf of the AIG Insurance Companies.  AIMA is hereby instructed immediately to remit to the AIG Insurance Companies all funds (net of outstanding claims payments) that AIMA holds on behalf of the AIG Insurance Companies or on behalf of the AIG Insurance Companies' policyholders, including but not limited to funds held in premium trust accounts.  Nothing herein should be construed to relieve AIMA of its ongoing obligations not to use or disclose the AIG Insurance Companies' confidential and proprietary information.

D.French                              -2-                        July 25, 2006

In light of AIMA's election to terminate the parties' agency relationship effective immediately, AIMA is instructed to cease and desist immediately from using the "American International" or "AI" designations as part of its operating name for any purpose. In particular, any rights that AIMA has enjoyed to advertise or market its services through use of the names "American International Marine Agency, Inc." or "AIMA" in its capacity as the agent of the AIG Insurance Companies are hereby terminated, effective immediately. AIG and the AIG Insurance Companies will consider any action by AIMA in contravention of this directive as a violation of applicable state and federal law, including but not limited to the laws governing trademarks, advertising, competition and insurance services.

Finally, in light of AIMA's decision to terminate the parties' agency relationship prior to the expiration of the six-month notice period, the AIG Insurance Companies have been denied the opportunity to make advance arrangements to ensure an orderly transition in connection with the termination of AIMA's role as their agent. As such, we fully expect that AIMA will cooperate with the AIG Insurance Companies to make all necessary arrangements for such transition. The AIG Insurance Companies will provide AIMA with a more detailed communication concerning such transition measures as soon as practicable in light of the current circumstances.

The AIG Insurance Companies reserve any and all rights with respect to the issues addressed herein.

Very truly yours,

Ralph W. Mucerino

# EXHIBIT K

July 25, 2006 06:24 PM US Eastern Timezone

## AIG Companies Announce Termination of Agency Relationship with American International Marine Agency

NEW YORK--(BUSINESS WIRE)--July 25, 2006--The AIG Companies have announced that their agency relationship with American International Marine Agency of New York, Inc. (AIMA), a subsidiary of C.V. Starr & Co. Inc., originally scheduled to cease on December 31, 2006, has been terminated, effective today. Accordingly, AIMA no longer has any authority to act as agent for the AIG Companies.

All marine insurance business formerly conducted by AIMA on behalf of the AIG Companies will now be serviced by AIG Global Marine, a division of the property and casualty insurance subsidiaries of AIG. This includes all underwriting of new business, renewal business, in-force policy service, marine loss control and engineering, accounting and administrative functions formerly conducted by AIMA as an agent of the AIG Companies. Claims will continue to be handled by AI Marine Adjusters, Inc., a wholly owned subsidiary of AIG.

American International Group, Inc. (AIG), world leaders in insurance and financial services, is the leading international insurance organization with operations in more than 130 countries and jurisdictions. AIG companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer. In addition, AIG companies are leading providers of retirement services, financial services and asset management around the world. AIG's common stock is listed on the New York Stock Exchange, as well as the stock exchanges in London, Paris, Switzerland and Tokyo.

**Contacts**

AIG
Joe Norton, 212/770-3144
Director of Public Relations



# EXHIBIT L

AMERICAN INTERNATIONAL MARINE AGENCY
OF NEW YORK, INC.
90 PARK AVENUE, 7TH FLOOR
NEW YORK, NY 10016

DAVID S. FRENCH
PRESIDENT & CEO

TELEPHONE (646) 227-6401
FACSIMILE (212) 599-3129

July 27, 2006

Via Electronic Mail and Facsimile

Ralph W. Mucerino
Vice President
American International Group, Inc.
175 Water Street
New York, NY 10038

Re: Termination of Agency

Dear Mr. Mucerino:

This responds to your letter dated July 25, 2006 (the "July
25 Letter") in which AIG has mischaracterized events concerning
AIG's termination of AIMA as a managing general agent for cer-
tain subsidiaries of AIG (the "AIG Insurers").

Context is necessary to appreciate the depth to your mis-
statements. On June 29, 2006, the AIG Insurers sent a 6-month
notice of termination to AIMA effective January 1, 2007. The
AIG Insurers, however, coupled that notice with a laundry list of
wholly unreasonable restrictions that it demanded AIMA agree to
during the 6-month notice period (the "Notice Period Restric-
tions"). The 1977 Marine Management Agreement (the "Agree-
ment") did not provide the AIG Insurers with the authority to im-
pose these Notice Period Restrictions which, if implemented,
would have altered the fundamental nature and terms of the
Agreement.

AIMA sent its own notice of termination on June 30, 2006,
effective January 1, 2007, but noted that:

Ralph W. Mucerino
July 27, 2006
Page 2

AIMA demands that, prior to the Termination Effective Time, the Insurers faithfully perform their duties and obligations to AIMA, including, but not limited to, abiding by the terms of the Agreement. In addition, AIMA demands that the Insurers not hinder in any way AIMA's ability to exercise its rights and perform its duties under the Agreement, including, but not limited to, the collection of commissions and/or money owed to AIMA, and that the Insurers not interfere with AIMA's access to the documents and information necessary for AIMA to perform its duties as agent.

After an exchange of correspondence between us, in which the AIG Insurers provided wholly unsupported and unsatisfactory answers to why they believed they were entitled to alter fundamentally the nature of the parties' relationship through the imposition of the Notice Period Restrictions, AIMA sent AIG a letter noting that AIMA would deem the Agreement terminated if the Notice Period Restrictions were not rescinded within 24 hours. Fewer than 7 hours later, AIG announced that it had terminated the Agreement effective immediately. Rather than through a direct communication with the AIG Insurers -- as would have been expected -- AIMA first learned of the termination by seeing AIG's July 25, 2006 press release that appeared on the Business Wire. AIMA also understands that AIG informed at least one broker that the Agreement had been terminated effective immediately, even before it notified AIMA of such termination.

Of course, AIMA strongly disagrees with AIG's position that the new restrictions that the AIG Insurers sought to impose were "reasonable and necessary." They were, in fact, wholly unreasonable and completely unnecessary. It is undisputed that AIMA has long produced a steady stream of profits for the AIG Insurers -- including recent record profits. The imposition of a vast array of new restrictions, all of which would have materially altered the manner in which AIMA conducted its business so as to adversely affect its profitability, and the failure to rescind those restrictions, both constituted material breaches of the Agreement.

Ralph W. Mucerino
July 27, 2006
Page 3

We note the AIG Insurers' request for immediate remittance
of premium trust funds. Such funds shall be remitted as in the
past, on a quarterly basis, net of commissions, reinsurance, claims
paid, authorized expenses, paid losses, etc. We also note your ob-
servation about confidentiality obligations. You made that same
observation in your July 24, 2006 letter, to which we responded in
our July 25, 2006 letter before you sent your later July 25, 2006
letter. We see no point repeating our earlier statement when you
have not replied to our earlier response on the issue.

We also disagree with your assertion about the use of
AIMA's long-held corporate name. AIMA has the right to use its
name.

In addition, AIMA strongly objects to your comments that
due to AIMA's actions, "the AIG Insurance Companies have been
denied the opportunity to make advance arrangements to ensure
an orderly transition in connection with the termination of
AIMA's role as their agent." It was, in fact, the AIG Insurers' uni-
lateral imposition of Notice Period Restrictions and its refusal to
lift those restrictions that precipitated the termination. The AIG
Insurers' comments about the need for an "orderly transition" ring
hollow when the AIG Insurers retained counsel in various cities to
evict AIMA in what the AIG Insurers believed to be the shortest
legally permissible time period. In short, AIG's effort to blame
AIMA is transparently pretextual.

Finally, we note an inconsistency between what the AIG In-
surers stated in their July 25, 2006 press release and in their July
25 letter concerning servicing the existing business. As per the
press release: "All marine insurance business formerly conducted
by AIMA on behalf of the AIG Companies will now be serviced
by AIG Global Marine, . . . ." By contrast, the July 25 Letter pro-
claims that:

> "we fully expect that AIMA will cooperate
> with the AIG Insurance Companies to make all
> necessary arrangements for such transition. The
> AIG Insurance Companies will provide AIMA
> with a more detailed communication concerning

Ralph W. Mucerino
July 27, 2006
Page 4

such transition measures as soon as practicable in
light of the current circumstances."

Please immediately provide a clarifying statement to AIMA
regarding servicing so that the AIMA is not further damaged by
the AIG Insurers' conduct.

AIMA reserves all of its rights and remedies with respect to
the foregoing.

Sincerely,

David S. French

# EXHIBIT M

# C.V. STARR & CO., INC.

Home | Products/Services | About Us | Leadership | News | Contact Us | Employee Access | Careers |



## Welcome to C.V. Starr & Co., Inc.

C.V. Starr's deep familiarity with the business of insurance and global investing sets the company apart in its industry.



C. V. Starr & Co., Inc. (C. V. Starr) is a global investment firm founded by Cornelius Vander Starr in China in 1919. It had as its roots the development of insurance agencies and insurance companies.

In 1970, C. V. Starr sold the bulk of its assets, including the managing agency for its foreign general insurance business, to AIG in exchange for AIG common stock. C. V. Starr retained at that time several small domestic agencies along with certain real estate properties and other investments.

C. V. Starr and its trust own approximately 47 million shares of American International Group, Inc., representing approximately $2.8 billion in value. The Starr agencies produce approximately $2 billion in gross premiums annually and employ approximately 400 people globally.

C. V. Starr's deep familiarity with the business of insurance and global investing sets the company apart in its industry.
C. V. Starr's hallmark is its significant presence in global markets, backed by the company's international expertise.

Home | Products/Services | About Us | Leadership | News | Contact Us | Employee Access | Careers |

© C.V. Starr & Co., Inc. All rights Reserved.

C.V. Starr & Co., Inc. - Home

# C.V. STARR & CO., INC.

Home | Products/Services | About Us | Leadership | News | Contact Us | Employee Access | Careers |



### Welcome to AIMA

"AIMA has specialized in ocean marine insurance for over 60 years and has grown to be one of the largest writers of ocean marine insurance in the U.S. Few Managing General Agencies are able to offer the breadth of tailored marine products and services available through AIMA including multinational cargo programs, marine liability coverages and hull insurance, often incorporating risk management/captive approaches to best meet a given client's needs."

*David S. French, President and CEO*
*Tel: (646) 227-6300*

  

**CARGO:**

**Ocean Cargo**
The Cargo/Transport policy can provide worldwide coverage of goods in transit from warehouse to warehouse with tailor-made coverages available to fit the most diverse insurance needs. Coverage for goods moving by land, sea or air can be expanded to include pure domestic movements, warehouse, storage or consolidation risks, as well as coverage for war, strikes, riots and civil commotion.

Warehouse to warehouse coverage for physical loss of or damage to goods from an external cause, including coverage for:

- General Average losses and General Average contributions
- Sue and Labor expenses incurred to prevent or mitigate a loss
- Import Duty
- Landing, warehousing and forwarding charges incurred as the result of an insured peril
- Return shipments in the event of the refusal or inability of the assured or consignee to accept delivery at destination
- Loss or damage resulting from war risks
- Loss or damage resulting from strikes, riots and civil commotion
- Theft and Hijacking
- Shortage and Non-delivery

**Typical Clients:**

Large exporters or importers of finished goods, manufacturers of finished goods selling to worldwide markets, international companies building markets in developing areas such as the CIS, China, Indochina, Latin America and S.E. Asia.

**Cargo Legal Liability**
Cargo Legal Liability insurance covers the liability imposed by law on the insured as a motor carrier, air carrier, bailee or warehouseman for loss of or damage to goods in their care, custody or control resulting from insured perils.

**Target Customers:** Freight Forwarders & NVOCC's, Truckers, Air

**LIABILITY:**

**Commercial Marine Liability**
A comprehensive marine liability policy, usually combined with other forms of marine liability coverage, which covers the operations, contractual liabilities and products/completed operations liability exposures of maritime operators.
- includes bodily injury and property damage liability
- CSL/Occ and Annual Aggregate limit subject to deductible

**Charterers' Legal Liability**
A marine liability policy for vessel charterers, providing for the charterers obligation to owners under a charter party, primarily hull damage and Charterer's P&I exposures.
- CSL/Occ limit subject to deductible

**Excess Marine Liabilities**
A marine liability policy which provides limits in excess of those provided by the policyholder's primary marine liability program.
- generally follows the terms and conditions of primary coverage unless noted
- may include excess non-marine liabilities of an incidental nature
- CSL/Occ limit

**Ship Repairers' Legal Liability**
A marine liability policy for ship repairers, providing care, custody and control coverage for damage to vessels under repair by the policyholder.
- can be extended to include bodily injury liability.
- can be combined with Commercial Marine Liability for comprehensive coverage
- CSL/Occ limit subject to deductible

C.V. Starr & Co., Inc. - Home

Carriers & Warehousemen.

The AIMA Advantage - Our Survey and Loss Control Division can help reduce or eliminate preventable losses.

**BLUEWATER HULL:**
**Hull and Machinery**
This product provides coverage for physical loss or damage to scheduled vessels, as per policy conditions on a named peril basis. Also provides coverage for Collision Liability up to the agreed value of the vessel. Coverage is provided on standard industry forms and pre-approved manuscript wordings. Classes of vessels covered include: containerships, tankers and bulk carriers and other classes of vessels over 2,500 Gross Registered Tons.

Excluded classes - We will not consider Cruise Vessels, Commercial Fishing Vessels, Casino Vessels or Yachts and fleets with less than three vessels.

**NON-BLUEWATER HULL:**
**Hull and Machinery**
This product provides coverage for physical loss or damage to scheduled vessels. Coverage is provided on standard industry forms and pre-approved manuscript wordings. Classes of vessels covered include tugs, towboats, barges, dredges, and passenger vessels.

**Primary Protection and Indemnity**
This product covers a vessel owner's liabilities arising out of the operation of scheduled vessels. Standard industry forms or pre-approved manuscript wordings are utilized, providing coverage for liabilities incurred as a result of damage to third-party property and injury to or death of crewmembers, passengers, longshore workers, and others. Limits up to $1,000,000 are offered.

**Hull Builder's Risks**
Hull Builder's Risks coverage insures the builder or owner against physical loss or damage to vessels during the construction period. The policy also covers collision liability and protection and indemnity exposures during trial trips, and coverage can be extended to cover delivery trips. Coverage is provided on standard industry forms, and limits are offered on a per vessel and/or per yard basis.

**Charter Vessel Program**
AIMA's Charter Vessel Program offers hull and protection and indemnity coverage to sportfishing and other small excursion vessels that carry no more than six passengers. Our plain language form offers numerous coverage extensions including increased medical payments and coverage for rods and reels.

**Stevedores' Legal Liability**
A marine liability policy for stevedores, providing care, custody and control coverage for damage to non-owned vessels and cargo, while loading or unloading.
- can be expanded to include bodily injury liability
- can be combined with Commercial Marine Liability for comprehensive coverage
- CSL/Occ limit subject to deductible

**Terminal Operators Legal Liability**
A marine liability policy for terminal and port operators, providing care, custody and control coverage for damage to vessels and cargo handled at the terminal.
- can be expanded to include bodily injury liability
- can be combined with Commercial Marine Liability for comprehensive coverage
- CSL/Occ limit subject to deductible

**Wharfingers' Legal Liability**
A marine liability policy for operators of commercial piers and wharves, providing bailee liability coverage for damage to vessels and cargo using the facility.
- can be expanded to include bodily injury liability
- can be combined with Commercial Marine Liability for comprehensive coverage
- CSL/Occ limit subject to deductible

**LOSS CONTROL SERVICES:**
AIMA Global Loss Control Services
Tel.: 646-227-6414
Fax: 646-227-6649
24 Hr. Cell 646-509-0962
24 Hr. Fax 845-783-6118
E-Mail: Clients based in North America

Our clients have access to a dedicated team of Loss Control Professionals strategically located to assure delivery of high quality Value Added services. Our team will perform a comprehensive review of each client's claims history and analyze shipping procedures, packing, handling and stowage of cargo. When the review is complete, they will be able to assist with designing and coordinating a detailed plan to fit the individual needs of each client. All services are coordinated through our New York, San Francisco and Chicago offices and delivered by our global network. This approach assures the delivery of high quality services by qualified professional surveyors, engineers, and investigators under our direction and supervision.

Our activities are solely for marine business written by AIMA, and dedicated to Loss Control endeavors, with no additional cost for our services. Due to the volume of business and geographic areas covered, we also utilize a large network of qualified, independent marine surveyors worldwide with expertise in various areas of the maritime industry. Our in-house Loss Control Professionals coordinate the efforts of these experts at several opportunity points to assure our clients of quality control.

**Maritime Employer's Liability (MEL)**
This product provides coverage to non-vessel owners for liabilities incurred under the Jones Act as a result of their employees carrying out their duties on board vessels. Limits up to $1,000,000 are offered.

The Loss Control Services team has over 145 years of combined experience in a variety of maritime transportation industry related functions. Each of our members has presented at various industry related events, and has been quoted in a number of industry related publications.

Through a close working partnership with our client's key personnel, we develop a working knowledge of your business operations and areas of concern and then address them from a Loss Control perspective. Together we work to assist you (our clients) in realizing your goals - from major cargo movements to expansion into international markets - by cooperatively developing the necessary measures and plans that will effectively and efficiently reduce damage and/or loss. This not only protects your cargo interests but also reinforces protection of your relationship with the clients that you serve.

At AIMA Loss Control Services, we believe that our combined knowledge, resources and experience make us the leader in "Transportation Risk Management Services". Our most important attributes are in the value of services we stand ready to make available to you.

**The best loss is the one that was prevented!**

© C.V. Starr & Co., Inc. All rights Reserved.

CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing were caused to be served on

August 8, 2006, upon the following in the manner indicated:

**BY HAND**

Edward P. Welch
Edward B. Micheletti
Skadden Arps Slate Meagher & Flom LLP
One Rodney Square
Wilmington, DE 19801

Rodger D. Smith II (#3778)
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com