## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    Case No. 06-463 |
| | : |
| C.V. STARR & CO., INC. and AMERICAN INTERNATIONAL MARINE AGENCY OF NEW YORK, INC., | : |
| | : |
| Defendants, | : |
| | : |

## TRANSMITTAL AFFIDAVIT OF JENNESS E. PARKER
## TO DEFENDANTS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION TO TRANSFER

STATE OF DELAWARE          )
                           )  ss.
COUNTY OF NEW CASTLE   )

Jenness E. Parker, being duly sworn, deposes and says:

1.     I am a member of the Delaware Bar, and I am associated with the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for C.V. Starr & Co. and American International Marine Agency of New York, Inc. (collectively called "Defendants").

2.     I make this affidavit for the purpose of transmitting to the Court true and correct copies of the following documents which are referenced in Defendants' Opening Brief In Support of their Motion to Transfer , dated August 16, 2006, and filed concurrently herewith:

**Description**

**Exhibit**

Affirmation of Kenneth E. Plevan In Support of C.V. Starr's
Application to Enjoin AIG from Proceeding in Related Action,
filed in *C.V. Starr & Co. v. A. Int'l Group Inc.*, 06 CV 2157,
Southern District of New York, August 1, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

C.V. Starr's Amended Complaint filed in *C.V. Starr & Co. v. A. Int'l Group
Inc.*, 06 CV 2157, Southern District of New York, April 20, 2006 . . . . . . . . . . . . . . . . . . . . . B

AIG's Amended Counterclaims filed in *C.V. Starr & Co. v. A. Int'l Group
Inc.*, 06 CV 2157, Southern District of New York, June 5, 2006 . . . . . . . . . . . . . . . . . . . . . . . . C

AIG's Memorandum In Opposition To C.V. Starr's Motion to Dismiss
filed in *C.V. Starr & Co. v. A. Int'l Group Inc.*, 06 CV 2157,
Southern District of New York, July 14, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D

Ralph Mucerino New York Declaration, April 20, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E

C.V. Starr's Memorandum of Law in Support of Application
to Enjoin AIG from Proceeding in Related Actions, filed in *C.V. Starr & Co. v. A. Int'l Group
Inc.*, 06 CV 2157, Southern District of New York, August 1, 2006 . . . . . . . . . . . . . . . . . . . . . F

Declaration of Kenneth A. Plevan In Support of Defendants' Motion To
Transfer Venue, August 15, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G

Jenness E. Parker  (I.D. No. 4659)

SWORN TO AND SUBSCRIBED
before me this *16*th day
of August, 2006

Notary Public

CYNTHIA J. SENFT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires March 20, 2007

466036-Wilmington S1A

2

EXHIBIT A

Kenneth A. Plevan (KP 2551)
John L. Gardiner (JG 8715)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036

Nicholas A. Gravante, Jr. (NG 4411)
Steven I. Froot (SF 7662)
Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY  10022

Attorneys for Plaintiffs/Counterclaim-Defendants

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| C. V. STARR & CO., INC., C.V. STARR & CO., and STARR TECHNICAL RISKS AGENCY, INC., | : | |
| | : | 06 CV 2157 (HB) (KNF) |
| Plaintiffs, | : | ECF Case |
| v. | : | **AFFIRMATION OF KENNETH A. PLEVAN** |
| AMERICAN INTERNATIONAL GROUP, INC. and STARR EXCESS LIABILITY INSURANCE COMPANY, LTD., | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., | : |
| Counterclaim-Plaintiff, | : |
| v. | : |
| C. V. STARR & CO., INC., STARR TECHNICAL RISKS AGENCY, INC., STARR ASSOCIATES, INC., C.V. STARR & CO., and STARR AVIATION AGENCY, INC., | : |
| Counterclaim-Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KENNETH A. PLEVAN, under penalty of perjury, affirms as follows:

1.    I am a member of the bar of this Court, and of the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for plaintiffs and counterclaim-defendants herein (the "C. V. Starr Parties"). The opposing parties are American International Group, Inc. and several of its subsidiaries ("AIG").

2.    The Court is familiar with the background to the disputes being litigated, having already ruled on a motion for a preliminary injunction (see Opinion and Order of May 9, 2006), and having held a scheduling conference with counsel on May 25, 2006. Briefly stated, AIG asserts in its Amended Counterclaims that it owns the "Starr" names and trademarks for insurance services. The C. V. Starr Parties, two of which have used said names and marks for more than five decades, have moved to dismiss AIG's Amended Counterclaims, and said motion is scheduled to be argued on August 14, 2006, at 11:00 A.M.[1]

### Summary of Relief Requested

3.    The instant motion relates to a trademark infringement lawsuit filed by AIG on Friday afternoon, July 28, 2006, around 4:00 P.M. in federal court in Delaware (06 CV 463). (Ex. A hereto) (the "Delaware Lawsuit"). The defendants in that lawsuit are (i) plaintiff and counter-claim defendant herein C. V. Starr & Co., Inc., the parent company of the four active managing general agencies ("C. V. Starr"), and (ii) American International Marine Agency of New York, Inc. ("AIMA"), the only one of the C. V. Starr agencies not yet named as a counterclaim-defendant herein. C. V. Starr seeks to have this Court enjoin AIG from prosecuting said lawsuit.

---

[1]    In compliance with the Court's Individual Practices, the extensive briefing on this motion was only completed after AIG served an amended pleading.

4.    In AIG's Amended Counterclaims, in this Court AIG acknowledged that, as of June 5, 2006, AIMA was still authorized to use AIG's marks in that (i) AIMA was a Managing General Agent for AIG insurance companies, and (ii) AIMA's right to use the AIMA name and related marks was pursuant to an implied trademark license. (See Am. Counterclaims ¶¶ 10, 75; see also Delaware Complaint ¶¶ 25, 27, 30.)

5.    As we reported in our Reply Memorandum in Support of Motion to Dismiss AIG's Amended Counterclaims, dated July 26, 2006, AIG did issue a termination notice to AIMA on or about June 29, 2006, which notice gave 6-months prior notice as required by the "Marine Management Agreement." (Ex. B hereto.) (See Plevan Reply Aff., Ex. 30; see also Delaware Complaint ¶ 40.)

6.    Thereafter, on July 25, 2006, AIG gave AIMA notice that the agency relationship was being terminated effective immediately. (See AIG press release, Ex. C hereto.)

7.    The Delaware Lawsuit was filed late on the afternoon of Friday, July 28th, without any prior notice to the C. V. Starr Parties or their counsel. Said lawsuit seeks an immediate injunction against AIMA's continued use of its name.

8.    In view of the termination of the agency relationship, AIMA will proceed to change its name, as soon as is feasible to do so under state law. AIMA believes that it is entitled to a reasonable transition period (approximately 3 months) to continue using its name, the minimum time necessary to obtain the approvals from state regulatory offices for the name change. Without this transition period, AIMA would be unable to compete in the market for marine insurance services.

9.    It is respectfully submitted that the Delaware Lawsuit constitutes impermissible forum shopping by AIG for several reasons:

2

- All of the parties to the Delaware Lawsuit are headquartered in New York City.

- The principal witnesses to this dispute are all located in New York City.

- AIG's principal counsel in said Lawsuit, Quinn Emanuel, is located in New York City.

- The issues raised in the Delaware Lawsuit are closely related to the issues already being actively litigated in the lawsuit before this Court.

- The Court is already familiar with the background to the dispute, having, as noted, issued one Opinion and Order and having held a conference and issued a Scheduling Order.

10.     As set forth in the accompanying Memorandum of Law, the Court has the clear authority to enjoin AIG from prosecuting the Delaware Lawsuit, as it is a "second-filed" action. In addition, there is no reason for two federal judges, in different districts and circuits, to be addressing the trademark disputes between AIG and C. V. Starr related to the unwinding of decades-old relationships. There is no doubt, moreover, that, had AIG filed its lawsuit in this district, said lawsuit would have been considered a related case under Local Rule 1.6.

11.     In sum, AIG's forum shopping should not be countenanced.

12.     Additional background is set forth below.

## Marine Agency Agreement/Implied License

13.     AIMA was formed in 1945. (See Am. Counterclaims ¶ 23; see also Delaware Complaint ¶ 13.)

14.     AIMA has served as an MGA for AIG insurance companies pursuant to a written agreement since December, 1977. (Ex. B.) Said agreement provides that it can only be terminated on 6 months notice, and includes an arbitration clause.

15.     It is AIG's position that AIMA has been using AIG marks under an implied license. (See Am. Counterclaims ¶ 75; see also Delaware Complaint ¶ 30.) It is apparent

3

that said implied license has been in existence for at least as long as AIG has existed, i.e. since at least 1970 when AIG became a public company.

16.    As noted, all four parties in the Delaware Lawsuit are headquartered in New York. (See Delaware Complaint ¶¶ 2-4.)

17.    By our estimation, there have been approximately 30 letters relating to the AIG-AIMA agency relationship exchanged this calendar year between AIG, by one of its officers located in New York City, and AIMA's President, also located here.

### Similarities Between the Pending
### Lawsuit and the Delaware Lawsuit

18.    There is no doubt that the issues raised by AIG in its Delaware Complaint are closely related to the issues already being litigated in the New York case.  For example, AIG's position on "sanctioned" vs. "unauthorized" use of "American International" or "AI" by C. V. Starr and the C. V. Starr Agencies appears both in AIG's Amended Counterclaims herein (see, e.g., Am. Counterclaims ¶¶ 90-95), and on page 20 of AIG's memorandum of July 14, 2006, filed in opposition to the motion to dismiss those counterclaims.

19.    Many of the factual allegations in the Delaware Complaint are paraphrases of, or even word-for-word identical to, the allegations contained in AIG's Amended Counterclaims in the New York lawsuit.  This is particularly true with respect to AIG's factual allegations concerning the parties' relationships, and its contentions that these alleged facts are the principal means of determining ownership of trademark rights.  (Compare Delaware Complaint ¶¶ 31-35 with Am. Counterclaims ¶¶ 63, 64, 66, 67, and 72.)

### Pre-Application Efforts to Resolve the Dispute

20.    On Monday morning, July 31, I wrote to counsel for AIG, assuring them that the AIMA name would be changed as soon as permitted by state regulatory requirements.

4

21.    Later that day, the counsel for the parties spoke by phone. I also gave written assurances that day that AIMA would be making name-change regulatory applications this week, and anticipated that it would be in a position to announce and implement a name change within 2 ½ - 3 months. I also gave written assurances that AIMA was no longer using any marketing material with references to AIG.[2]

22.    Unfortunately, the parties were not able to resolve the dispute.

### Reasons Why AIMA Is Entitled
### To A Reasonable Transition Period

23.    As set forth in the accompanying Memorandum of Law, under New York (and Delaware) law, contracts of indefinite duration can only be terminated on reasonable notice. Here, the reasonable period should be at least as long as is necessary to obtain regulatory approvals for a name change. The management agreement itself provides for a termination notice of six months.

24.    Certainly, three months is manifestly fair for the unwinding of a four-decades-old relationship. In this connection, when American International Aviation Agency, Inc. ("AIAA") a party herein, was terminated by AIG earlier this year (see Am. Counterclaims ¶ 74; Delaware Complaint ¶ 52), the parties negotiated and agreed to a name-change transition period of about three months.

25.    We submit that there will not be any market confusion during the transition period. There has already been an article in the trade press about the AIMA termination (Ex. D), and more will surely follow. The industry professionals have been

---

[2]    We also pointed out to AIG's counsel why the dispute did not belong in Delaware, and asked AIG to agree to not serve the Delaware Complaint. In response, AIG's counsel responded that the Complaint would be served.

inundated with publicity regarding the AIG – C. V. Starr disputes. These sophisticated parties do not enter into major insurance transactions without knowing who they are dealing with.

26.    While AIG will no doubt argue that AIMA is not a party herein, it could easily have sought Court leave to add it. Alternatively, a separate lawsuit could have been filed in this district, and then referred to the Court pursuant to Local Rule 1.6.

27.    In this connection, counsel for the parties had agreed that AIMA would be bound by the final result herein without the necessity for AIMA being added as a formal party.

### Reasons For Moving By
### Order To Show Cause

28.    C. V. Starr submits that the situation presented here justifies emergency relief. There is no reason we should have to litigate closely-related issues on an expedited track in federal court in Delaware, while the New York lawsuit is being actively prosecuted and defended as it moves toward the fact discovery cut-off.

29.    There is, moreover, a risk of inconsistent rulings if the two lawsuits are permitted to proceed.

### No Prior Application

30.    No prior application has been made for the relief sought herein.

### Conclusion

31.    It seems apparent AIG has engaged in forum-shopping.

32.    We believe that AIG's Delaware Lawsuit is motivated by a desire to inflict damage on AIMA's business, by forcing it off the market for several months, thereby protecting AIG from new competition. No doubt AIG would have preferred that this Court not become aware of these anti-competitive tactics.

33.    The requested application should be granted.

6

I affirm, under penalty of perjury, that the foregoing is true and correct. Executed in New York, New York on August 1, 2006.

Respectfully submitted,

Kenneth A. Plevan

7

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMERICAN INTERNATIONAL GROUP, INC.,          )
                                             )
                    Plaintiff,               )
                                             )
        v.                                   )
                                             )    Case No. _0 6 - _4 6 3
C.V. STARR & CO., INC. and AMERICAN          )
INTERNATIONAL MARINE AGENCY OF NEW           )
YORK, INC.,                                  )    DEMAND FOR JURY
                                             )    TRIAL
                    Defendants.              )
                                             )

## COMPLAINT

Plaintiff American International Group, Inc. ("AIG" or "Plaintiff") for its

complaint against Defendants C.V. Starr & Co., Inc. ("C.V. Starr") and American

International Marine Agency of New York, Inc. (the "Marine Agency," together with C.V.

Starr, "Defendants") hereby alleges as follows:

### NATURE OF THE ACTION

1.      AIG, the world's leading insurance enterprise, brings this action for

trademark infringement, false designation of origin and related claims against C.V. Starr and

its wholly owned subsidiary the Marine Agency, AIG's longstanding former managing

general agent in the marine insurance business, to enjoin the Marine Agency's continued

unauthorized, deceptive and unlawful use of the designation AMERICAN

INTERNATIONAL MARINE AGENCY, the abbreviation AIMA, and any other designation

that trades upon the goodwill of AIG's federally registered and world famous marks (referred

to collectively herein as AIG's "AMERICAN INTERNATIONAL Marks"). On July 25,

2006, the Marine Agency announced that it deemed the agency relationship with AIG to be

terminated. As such, the Marine Agency is no longer AIG's agent and no longer enjoys the

right to use AMERICAN INTERNATIONAL and AIMA in connection with its business. As the federally registered owner of the AMERICAN INTERNATIONAL Marks, including the AIMA designation, AIG will incur substantial damages and suffer extreme irreparable harm through the loss of control of its world famous marks unless Defendants are required to cease using AIG's trademarks. Moreover, AIG will be harmed because Defendants will be impermissibly trading off of the substantial goodwill associated with the AMERICAN INTERNATIONAL Marks, and creating confusion in the marketplace and the false impression that Defendants remain affiliated with AIG, even while the Marine Agency acts as the agent for AIG's direct competitors. Immediate injunctive relief is required to prevent further misuse and erosion of AIG's famous AMERICAN INTERNATIONAL Marks by Defendants.

## PARTIES

2.    Plaintiff ("AIG") is a Delaware corporation with its principal place of business at 70 Pine Street, New York, New York 10270.

3.    Defendant C.V. Starr & Co., Inc. ("C.V. Starr") is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York 10022.

4.    Defendant American International Marine Agency, Inc. of New York, Inc. (the "Marine Agency") is a New York corporation with its principal place of business now located at 90 Park Avenue, 7th Floor, New York, New York 10016. For many years, and until earlier this year, the Marine Agency's principal place of business was within the same office locations as AIG.

## JURISDICTION AND VENUE

5.    Plaintiff brings this action for federal trademark infringement in violation of Section 32(1) of the Trademark Act of 1946, as amended (the "Lanham Act"), 15 U.S.C. § 1114(1); federal unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); federal trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); false advertising in violation of Section 2532 of the Delaware Deceptive Trade Practices Act; trademark infringement and unfair competition in violation of the common laws of the State of Delaware and of the several states of the United States.

6.    This Court has original jurisdiction under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1338(a) and 1338(b).  This Court has supplemental jurisdiction over all other claims asserted herein under 28 U.S.C. § 1367(a).

7.    This Court has personal jurisdiction over defendant C.V. Starr because it is duly incorporated and organized under the State of Delaware.  This Court has personal jurisdiction over the Marine Agency pursuant to 10 Del. C. § 3104.  Among its numerous contacts with the State of Delaware, the Marine Agency holds a valid producer license from the Delaware Insurance Department, and on information and belief regularly transacts and solicits business in Delaware.

8.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## BACKGROUND OF THE DISPUTE

### The Business of Plaintiff AIG

9.    Today (as it has been for decades), AIG is the world's leading international insurance and financial services organization, with operations in approximately

3

130 countries and jurisdictions throughout the world. AIG's member companies serve commercial, institutional, and individual customers through the most extensive worldwide insurance network of any insurer.

10.    AIG offers a variety of insurance and financial products and services. Through its member companies, AIG is the leading underwriter and provider of insurance in the United States.

11.    AIG's history can be traced back to 1919 when a young entrepreneur, Cornelius Vander Starr ("Mr. Starr"), opened a small insurance agency in Shanghai called American Asiatic Underwriters, offering fire and marine coverage initially. Within ten years, the company had expanded to include offices in China, Hong Kong, Indochina, Jakarta, Kuala Lumpur, and the Philippines.

12.    In 1926, using the name and trademark AMERICAN INTERNATIONAL UNDERWRITERS CORPORATION ("AIUC"), AIG's predecessor-in-interest, AIUC, opened an office in New York to produce and write insurance for represented companies on American risks outside the United States.

13.    During the years that followed, AIUC's business grew, as did the family of related "American International" branded companies. Among others, those companies included American International Marine Agency of New York, Inc. (formed in 1945), American International Underwriters Overseas, Ltd. (1948), American International Reinsurance Company, Inc. (1948), American International Assurance Company Ltd. (1948), and American International Aviation Agency, Inc. (the "Aviation Agency") (1961).

14.    In 1967, American International Group, Inc. was formed to hold the capital stock of certain of the insurance companies in the corporate family created by

Mr. Starr. During the ensuing years, AIG continued to acquire interests in additional insurance and other companies, thereby expanding its operations and brand recognition.

15.    Today, AIG owns and operates 33 companies and divisions with offices in 23 states and territories doing business under the AMERICAN INTERNATIONAL Marks.

## The American International Trademarks

16.    Since 1926, AIG and its predecessors-in-interest have continuously used the AMERICAN INTERNATIONAL Marks in connection with their business of underwriting insurance, both in the United States and throughout the world. AIG is currently the registered owner of thirteen federal trademark registrations, most of which are incontestable by virtue of longstanding and continuous use, for AMERICAN INTERNATIONAL or close variations thereof, including registrations for AIMA and MARINE INSURANCE AIMA, which were registered in 1945 to a predecessor of AIG and subsequently, by duly recorded assignment, transferred to AIG.

17.    AIG is the owner of the following United States trademark registrations:

| Registration No. | Mark | Class(es) | Date of First Use | Incontestable |
|---|---|---|---|---|
| 1040729 | MARINE INSURANCE AIMA | 36 | 1945 | Yes |
| 1040730 | AIMA | 36 | 1945 | Yes |
| 1023912 | AMERICAN INTERNATIONAL | 36 | 1926 | Yes |
| 1661062 | AMERICAN INTERNATIONAL COMPANIES | 36 | 1967 | Yes |
| 1190934 | AMERICAN INTERNATIONAL | 36 | 1970 | Yes |

5

| 1151230 | AMERICAN INTERNATIONAL | 36 | 1926 | Yes |
|---|---|---|---|---|
| 2168144 | AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY | 36 | 9/26/1996 | Yes |
| 2037682 | AMERICAN INTERNATIONAL PACIFIC INSURANCE COMPANY | 36 | 6/1/1995 | Yes |
| 1840829 | AMERICAN INTERNATIONAL ASSISTANCE SERVICES, INC. | 35, 36, 39, 42 | 11/20/1978 | Yes |
| 1872028 | AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY | 36 | 9/25/1992 | Yes |
| 2376437 | AMERICAN INTERNATIONAL GROUP | 36 | 1968 | No |
| 2398912 | AMERICAN INTERNATIONAL COMPANIES | 36 | 1967 | No |
| 2487923 | AMERICAN INTERNATIONAL GROUP | 36 | 5/1/2000 | No |

The foregoing registrations are valid and subsisting, unrevoked and uncancelled, in full force and effect, and all but three (Nos. 2487923, 2398912 and 2376437) have become incontestable pursuant to 15 U.S.C. § 1065. True and correct copies of the aforesaid federal trademark registrations are attached hereto as Exhibit A.

18.    AIG spends millions of dollars annually to advertise and promote the AMERICAN INTERNATIONAL Marks, and the products and services offered by its various member companies in connection with these marks, through various media, including television, radio, newspaper, and magazines, among others. In 2005, for instance, AIG spent in excess of $30 million on advertisements containing the AMERICAN INTERNATIONAL Marks.

6

19. In addition, AIG and its member companies have advertised the AMERICAN INTERNATIONAL Marks through direct mailings, brochures distributed at trade shows, point-of-purchase display material, signage, and banners.

20. AIG also promotes the AMERICAN INTERNATIONAL Marks on various websites, including aig.com, aigmarine.com, aigbank.com, aigdirect.com, aiggig.com, aigag.com, aiu.com, aigfp.com, aig4auto.com, aigaandh.com, aigamericanhome.com, aigaviation.com, aigconsultants.com, aigenvironmental.com, aigfinancialadvisors.com, aigidtheft.com, aigpcg.com, aigriskmgmt.com, aigsmallbusiness.com, and aigworldsource.com. AIG's primary website, located at www.aig.com, receives approximately 3.4 million hits per year. Since 2004, there have been an average of 200,000 visits per month to AIG.com.

21. As a result of AIG's continuous and extensive advertising and promotional efforts, the AMERICAN INTERNATIONAL Marks are among the best known brands – if not the best known brands – in the insurance industry and enjoy substantial goodwill.

## Unlawful Conduct by Defendants

22. The Marine Agency was formed in 1945 to serve primarily, if not exclusively, as managing agent for the member insurance companies of AIG and its predecessors, and did so throughout its history until just days ago when the Marine Agency first announced that it had entered into an MGA arrangement with a competitor of AIG.

23. The Marine Agency is currently a wholly-owned subsidiary of Defendant C.V. Starr, a privately held corporation presently controlled by Maurice R. Greenberg and certain associates. Mr. Greenberg was also the Chairman and CEO of AIG

until March 2005. C.V. Starr owns and controls several other insurance agencies in addition to the Marine Agency (together with the Marine Agency, the "Agencies"), which, like the Marine Agency, historically serviced only AIG member companies.

24.    The Agencies' relationships with AIG date back to the late 1960s, when Mr. Greenberg formed AIG into a public company. In 1970, Mr. Greenberg caused AIG to purchase substantially all of the assets of C.V. Starr in exchange for a large block of AIG stock, which remains C.V. Starr's primary asset. C.V. Starr owns approximately 45 million shares of AIG stock.

### *AIG and the Marine Agency Operated in a Principal-Agent Relationship*

25.    From at least 1975 until July 25, 2006, the Marine Agency served as a managing general agent ("MGA") to AIG and certain of its member companies (the "AIG Insurers"). In that capacity, the Marine Agency had responsibility for marketing the AIG Insurers' North American major commercial-marine-insurance business, underwriting and binding insurance policies; collecting premiums; and assisting in negotiating reinsurance agreements. In the common parlance, the AIG Insurers gave the Marine Agency "the pen" and authorized it, within limits and subject to instruction, to write direct marine insurance on their behalf under the AMERICAN INTERNATIONAL Marks. An MGA is a fiduciary of an insurer, operating, as its name suggests, as an agent servicing its principal.

26.    The Marine Agency has operated for virtually its entire existence with the single purpose of serving the AIG Insurers and representing them in the marketplace. For all intents and purposes, the Marine Agency operated, and was widely perceived in the marketplace as, a captive agent.

8

27.     Having been formed and operated to service the marine business of the AIG Insurers, as their fiduciary and agent, the Marine Agency was authorized to use AMERICAN INTERNATIONAL and AIMA as part of its name only for so long as its agency relationship with the AIG Insurers existed and only in connection with the business of those entities.

### *AIG's Ownership of the AIMA Brand and Mark*

28.     The AMERICAN INTERNATIONAL MARINE AGENCY and AIMA designations used by the Marine Agency have become closely associated with AIG in the mind of the consuming public.  As far as the public is concerned, AMERICAN INTERNATIONAL MARINE AGENCY always has been an agent of AIG.

29.     Neither the Marine Agency nor its parent C.V. Starr owns a single trademark registration for the corporate name AMERICAN INTERNATIONAL MARINE AGENCY, the trademarks AMERICAN INTERNATIONAL, AI and AIMA, or any trademark containing the terms "American International" or the acronym "AI."  To the contrary, as noted, AIG owns uncontestable federal trademark registrations for the marks MARINE INSURANCE AIMA and AIMA.

30.     The Marine Agency used the AIMA and AMERICAN INTERNATIONAL MARINE AGENCY marks pursuant to an implied license from AIG. For as long as the Marine Agency remained part of the greater AIG family of companies, functioned as managing general agent to AIG member insurance companies, and was subject to the control and supervision of AIG, it was permitted to use AIG's world famous marks.

9

## *AIG and the Marine Agency Were Operationally Intertwined*

31.    Operationally, on a day-to-day basis, the Marine Agency functioned under AIG's supervision and was treated as if it were a business division of AIG.

32.    Over a period of decades, and until earlier this year, the Marine Agency was headquartered under the same roof as AIG in office-space owned or leased by AIG, and relied heavily on AIG personnel for certain operational support and services, including claims processing.

33.    Employees of the Marine Agency used "aig.com" email addresses, so their external email communications were indistinguishable to the market from emails from actual AIG employees.

34.    Employees of the Marine Agency were eligible for AIG employee benefits, such as participation in AIG's healthcare and retirement plans.

35.    The corporate governance of C.V. Starr and the Marine Agency reflected the interconnectedness and common purpose of these entities. For most of their history, the Boards of Directors of C.V. Starr and the Marine Agency were composed primarily of senior officers of AIG and its member companies.

## *The Termination of the Marine Agency And The Agreement Between The Parties*

36.    After learning that the Marine Agency had entered into negotiations to (for the first time) act as MGA for an AIG competitor, by letter dated June 6, 2006, AIG instructed the Marine Agency that it was not authorized to use the AMERICAN INTERNATIONAL or AIMA designations in business dealings other than those undertaken to benefit AIG, and to immediately inform AIG of any potential or actual agreements between the Marine Agency and non-AIG insurers.

10

37.    On June 8, 2006, the Marine Agency responded to AIG's letter, stating that it was not "presently writing as a managing general agent for any other insurer."

38.    By letter, dated June 9, 2006, AIG reiterated its instruction that the Marine Agency immediately inform AIG of any potential or actual agreements between the Marine Agency and non-AIG insurers. AIG also requested that the Marine Agency inform AIG how it would continue to perform its fiduciary duties as AIG's agent in light of these potential or actual agreements.

39.    On June 12, 2006, the Marine Agency communicated its view that AIG was not entitled to know about the Marine Agency's plans, but assured AIG that if it entered into an agreement with another principal it would promptly notify AIG.

40.    On June 29, 2006, AIG provided notice of termination of the Marine Agency as the managing general agent of AIG's member insurance companies, effective December 31, 2006. That notice of termination also issued various written instructions for the conduct of the Marine Agency's during the remainder of the agency relationship.

41.    On the following day, June 30, 3006, the Marine Agency gave notice of its intent to terminate the agency agreement between the parties, effective January 1, 2007.

42.    In a press release issued that same day (June 30, 2006), the Marine Agency announced that it "look[s] forward to serving new underwriters next year." Based on this press release, coupled with the Marine Agency's June 8 and June 12 correspondence, AIG reasonably understood the Marine Agency to be representing that it would not begin acting for a competing insurance company prior to the termination of the six-month notice period, during which the Marine Agency would continue to serve as AIG's agent. AIG relied on that representation.

11

43.    Nevertheless and without notifying AIG in advance, on July 21, 2006, the Marine Agency announced to the media that it had entered into an agreement with National Liability and Fire Insurance Company ("National Liability"), a member of the Berkshire Hathaway group of insurance companies – **and a direct competitor of AIG.** The Marine Agency's press release on its new business venture stated, in part, as follows:

> American International Marine Agency, Inc. (AIMA), a wholly owned subsidiary of C.V. Starr & Co., Inc., today announced a new agreement with National Liability and Fire Insurance Company, a member of the Berkshire Hathaway group of insurance companies, which will expand the agency's servicing capabilities. The leading insurance agency for the marine industry, AIMA said that the relationship with National Liability and Fire Insurance Company will allow the agency to immediately offer $100 Million of commercial underwriting capacity to its clients.
>
> "Our new agreement with National Liability and Fire Insurance Company ensures that AIMA will continue to offer the breadth of tailored marine products and services that have made the company an industry leader for more than 60 years," said David French, President, AIMA. "It also reflects our commitment to providing superior coverage and solutions, through the industry's top companies, that meet our clients' needs."

A true and correct copy of the Marine Agency's July 21 press release is attached hereto as Exhibit B.

44.    By letter dated July 24, 2006, AIG reminded the Marine Agency that it could no longer make lawful use of the AMERICAN INTERNATIONAL or AIMA designations as part of its operating name in connection with any business dealings that are not undertaken solely for the benefit of AIG and the AIG Insurance Companies. AIG instructed the Marine Agency to immediately cease and desist any and all advertising, marketing and other operations that involve the use of the names AMERICAN INTERNATIONAL MARINE AGENCY and AIMA in connection with insurance products and services offered by any insurers other than AIG and its subsidiaries, including but not limited to operations on behalf of National Liability.

12

45.    In response to AIG's demands, on July 25, 2006, the Marine Agency indicated that it had no present intention of changing its name and discontinuing its use of the AMERICAN INTERNATIONAL Marks.

46.    In a separate letter, dated July 25, 2006, the Marine Agency stated that unless AIG rescinded the instructions articulated in its June 29, 2006 letter within 24 hours, the Marine Agency would consider AIG to be in breach of the agreement between the parties, and that the agreement and the MGA relationship would be deemed terminated.

47.    Later that day, AIG responded that it understood that the Marine Agency deemed the Management Agreement to be terminated immediately. In a July 25, 2006 press release, in reliance on the Marine Agency's representations that it considered the agency agreement terminated, AIG announced the termination of its agency relationship with the Marine Agency.

48.    In a July 27, 2006 response to that letter, the Marine Agency reiterated its refusal to cease using the AMERICAN INTERNATIONAL and AIMA names.

49.    The Marine Agency continues to make prominent and unlawful use of AIG's famous AMERICAN INTERNATIONAL Marks in violation of AIG's intellectual property rights. Most prominently, when the Marine Agency announced to the world that, for the first time, it was going into business for a principal other than AIG, it did so using the AMERICAN INTERNATIONAL and AIMA marks.

50.    In addition, defendants are currently using the AMERICAN INTERNATIONAL and AIMA marks in Internet advertisements designed specifically to target customers of AIG. These ads not only use the AMERICAN INTERNATIONAL and

AIMA designations in their content, but, upon information and belief, are triggered through the use of "AIG" as a keyword.

51.    In addition, Defendants' website, located at cvstarrco.com, prominently features the AMERICAN INTERNATIONAL and AIMA marks to promote the services of the Marine Agency.

52.    Defendants'    refusal    to    cease    using    the    AMERICAN INTERNATIONAL and AIMA designations in connection with the Marine Agency stands in stark contrast to C.V. Starr's reasonable post-termination treatment of another of the terminated Agencies, American International Aviation Agency (the "Aviation Agency"). Following the termination of the agency relationship between AIG and the Aviation Agency and AIG's objection to any continued use of "American International" in connection with aviation insurance. C.V. Starr agreed to cease using the AMERICAN INTERNATIONAL or AIAA designations.

### *False Advertising and Confusion In the Marketplace*

53.    The Marine Agency continues to prominently use the AMERICAN INTERNATIONAL and AIMA marks in connection with marine insurance, impermissibly trading off of the substantial goodwill embodied in the AMERICAN INTERNATIONAL Marks and creating confusion in the marketplace and the false impression that the Marine Agency continues to be affiliated with AIG.

54.    Defendants continue to make prominent use of the AMERICAN INTERNATIONAL and AIMA marks on their website located at cvstarrco.com to promote the business and services of the Marine Agency.

14

55.    As this conduct makes clear, rather than establishing a new corporate identity after severing ties with AIG, the Marine Agency and C.V. Starr have chosen to appropriate the AMERICAN INTERNATIONAL and AIMA brands for themselves, presumably to benefit from the substantial goodwill associated AIG's AMERICAN INTERNATIONAL Marks. However, in doing so, defendants are blatantly and falsely misleading the public into believing that they remain associated with AIG, when they are not.

56.    As a result of the Marine Agency's refusal to cease using the AMERICAN INTERNATIONAL and AIMA designations, AIG and the AIG Insurers are suffering both material financial harm and irreparable harm by way of injury to their reputation, goodwill, and critical relationships with the brokers and insureds that form the AIG Insurers' customer base. AIG will continue to suffer substantial harm from the loss of control over one of its most valuable assets — its famous AMERICAN INTERNATIONAL Marks.

57.    The Marine Agency's conduct in continuing to use the AMERICAN INTERNATIONAL and AIMA designations in connection with the provision of marine insurance will actually reduce or diminish the capacity of the AMERICAN INTERNATIONAL Marks to distinguish the unique origin of AIG's goods and services.

58.    To counter the Marine Agency's continued unauthorized, deceptive and unlawful use of the AMERICAN INTERNATIONAL and AIMA marks, it will be necessary for AIG to spend money and resources to communicate to the marketplace that the Marine Agency is not affiliated with AIG.

59.    An immediate injunction is urgently required to prevent further irreparable harm to AIG.

### FIRST CAUSE OF ACTION
(Federal Trademark Infringement)

60.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 59.

61.    Defendants, without the consent of Plaintiff, have used, and unless enjoined will continue to use, in commerce designations confusingly similar to AIG's registered AMERICAN INTERNATIONAL Marks on or in connection with goods and services closely related to those of Plaintiff.

62.    The aforesaid acts of Defendants constitute trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

63.    The aforesaid acts of Defendants have caused, and are causing, substantial and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

### SECOND CAUSE OF ACTION
(Federal Unfair Competition)

64.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 59.

65.    The aforesaid acts of Defendants constitute use in commerce of words, terms, names, symbols, and devices, and combinations thereof; false designation of origin; false and misleading descriptions of fact; and false and misleading representations of fact that are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval of Defendants' services, goods, or any other commercial activities by Plaintiff.

16

66.    The aforesaid acts of Defendants constitute use in commerce of words, terms, names, symbols, and devices, and combinations thereof; false designation of origin; false and misleading descriptions of fact; and false and misleading representations of fact in commercial advertising or promotion that misrepresent the nature, characteristics, or qualities of Defendant's services, goods, or other commercial activities.

67.    The aforesaid acts of Defendants constitute false designation of origin and false and misleading descriptions and representations in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

68.    The aforesaid acts of Defendants have caused, and are causing, substantial and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

### THIRD CAUSE OF ACTION
#### (Federal Dilution and Delaware Common Law Dilution)

69.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 59.

70.    The aforesaid acts of Defendant constitute commercial use beginning after the AMERICAN INTERNATIONAL Marks had become famous and will dilute the distinctive quality of the AMERICAN INTERNATIONAL Marks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) and the Delaware Trademark Act, 6 Del. C. § 3313.

71.    The aforesaid acts of Defendants were willfully intended to trade on Plaintiff's reputation and to dilute the famous AMERICAN INTERNATIONAL Marks.

17

72.    The aforesaid acts of Defendants have caused, and are causing, substantial and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

## FOURTH CAUSE OF ACTION
### (Delaware Statutory False Advertising)

73.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 59.

74.    By making statements and using words and designs, or combinations thereof, that fail to reveal facts material in light of such representations with respect to the subject service, or under such conditions as are customary or usual, the aforesaid acts of Defendant constitute misleading advertisement of goods and services.

75.    The aforesaid acts of Defendants constitute false advertising in violation of Section 2532(a)(5) of the Delaware Deceptive Trade Practices Act.

76.    The aforesaid acts of Defendants have caused, and are causing, substantial and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

## FIFTH CAUSE OF ACTION
### (Delaware Common Law Trademark Infringement)

77.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 59.

78.    The aforesaid acts of Defendants constitute use that is likely to cause confusion as to the source of Plaintiff's goods and services.

79.    The aforesaid acts of Defendants constitute trademark infringement in violation of common law.

18

80.    The aforesaid acts of Defendants have caused, and are causing, substantial and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

### SIXTH CAUSE OF ACTION
#### (Delaware Deceptive Trade Practices Act Violation)

81.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 59.

82.    The aforesaid acts of Defendants misrepresent the source of Plaintiff's services.

83.    The aforesaid acts of Defendants constitute use that is likely to cause confusion as to the source of Plaintiff's goods and services in violation of Section 2532(a)(1) of the Delaware Deceptive Trade Practices Act.

84.    The aforesaid acts of Defendants have caused, and are causing, substantial and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

### SEVENTH CAUSE OF ACTION
#### (Delaware Common Law Unfair Competition)

85.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 59.

86.    The aforesaid acts of Defendants constitute use that is likely to cause confusion as to the source of Plaintiff's services.

87.    The aforesaid acts of Defendants constitute unfair competition in violation of common law.

19

88.    The aforesaid acts of Defendants have caused, and are causing, substantial and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

## EIGHTH CAUSE OF ACTION
### (Delaware Common Law False Designation of Origin)

89.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 59.

90.    The aforesaid acts of Defendants constitute use of the Plaintiff's trademarks in connection with its offering of marine insurance falsely represents that such services originate with, or are sponsored, endorsed, underwritten or licensed by, Plaintiff.

91.    The aforesaid acts of Defendants are unauthorized and Plaintiff cannot exercise any control over the nature and the quality of Defendants' services.

92.    Upon information and belief, the aforesaid acts of Defendants constitute false designation of origin as such acts were willful and deliberate, and were designed specifically to trade upon the consumer goodwill enjoyed by Plaintiff in the marine insurance community.

**WHEREFORE**, Plaintiff prays for a judgment in its favor and against Defendants, and each of them, as follows:

1. That Defendants, and each of their officers, directors, agents, servants, employees and representatives, and those persons in active concert or participation with them or any of them, be preliminarily and permanently enjoined and restrained from:

a. Using on or in connection with the products and services of Defendant the Marine Agency, including, without limitation, the service of underwriting marine-related insurance, the designation AMERICAN INTERNATIONAL MARINE AGENCY, the marks AMERICAN INTERNATIONAL, AI, AIMA, or any colorable imitations thereof, or anything confusingly similar thereto;

b. Representing by any means whatsoever, directly or indirectly, or doing any other acts or things calculated or likely to cause confusion, mistake, or to deceive consumers into believing that Defendant the Marine Agency's services and any related products are the services or products of Plaintiff, or that there is any affiliation or connection between Plaintiff or its services and the marine products and services of Defendant the Marine Agency, and from otherwise unfairly competing with Plaintiff;

c. Using any mark in a manner so as to cause the dilution of the distinctive quality of the famous AMERICAN INTERNATIONAL Marks.

2. That Defendants be directed to file with this Court and to serve upon Plaintiff within fifteen (15) days after service upon Defendants of this Court's injunction issued in this action, a written report by Defendant under oath setting forth in detail the manner in which Defendants have complied with this injunction.

21

3.    That Plaintiff recover its damages sustained as a result of Defendants' federal trademark infringement, unfair competition, and dilution, including any amounts reasonably necessary to correct any misimpression in the marketplace caused by Defendants' conduct, together with an accounting of Defendants' profits arising from such activities, and that the Court exercise its discretion and enter judgment for such additional sums as the Court shall find to be just, according to the nature of the acts of Defendants.

4.    That Plaintiff have and recover treble damages under 15 U.S.C. § 1117 by reason of the willful and deliberate acts of federal trademark infringement by Defendants.

5.    That Plaintiff have and recover its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

6.    That Plaintiff have and recover Defendants' profits and/or damages by reason of Defendants' acts of trademark infringement and unfair competition under the common law.

7.    That Defendants be required to recall from all channels of trade any and all advertising and promotional materials or other infringing matter, and to take affirmative steps to dispel any false suggestion of a connection to Plaintiff by virtue of their infringing activities, including, but not limited to (1) changing the name of Defendant the Marine Agency so that it does not contain the designation AMERICAN INTERNATIONAL, AI, AIMA, or any designation confusingly similar thereto, and (2) notifying the relevant public that it has changed its name and that Defendant the Marine Agency has no affiliation with AIG.

8.    That Plaintiff have and recover its taxable costs and disbursements herein.

22

9.    That Plaintiff have such other and further relief as the Court may deem just and proper.

## JURY DEMAND

AIG hereby demands a trial by jury of any and all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_(signature)_

Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
*Attorneys for Plaintiff American International Group, Inc.*

OF COUNSEL:

Jeffrey A. Conciatori
Michael B. Carlinsky
Jennifer J. Barrett
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010-1601
(212) 849-7000

July 28, 2006

530771

23

**EXHIBIT B**

## MARINE MANAGEMENT AGREEMENT

THIS AGREEMENT effective as of the first day of December, 1977, by and between NATIONAL UNION FIRE INSURANCE COMPANY, BIRMINGHAM FIRE INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, COMMERCE AND INDUSTRY INSURANCE COMPANY, AIU INSURANCE COMPANY (hereinafter called the "COMPANIES") and AMERICAN INTERNATIONAL MARINE AGENCY OF NEW YORK, INC. (Hereinafter called the "MANAGING AGENT").

WITNESSETH:

FIRST:  The Companies hereby appoint AMERICAN INTERNATIONAL MARINE AGENCY OF NEW YORK, INC. to act as their Managing Agent for Marine insurance (including Marine War Risk) in the Continental United States, Canada, Alaska and Hawaii, subject to such instructions as may be issued from time to time by the Companies for the conduct of the Managing Agency.

The Managing Agent shall have authority to appoint and remove sub-agents, agents and General Agents; issue and cancel contracts of insurance and reinsurance; accept and decline risks; collect premiums; to reject, adjust, compromise and pay losses; to enter into reinsurance agreements with reinsurers by treaty or otherwise, for part or all of any liability assumed by the Companies; to recover from reinsurers return premiums, losses and expenses; to pay return premiums, reinsurance premiums; to pay for surveys, to pay all taxes and fees imposed by authorities in various countries or agencies thereof in respect of business to which this Agreement applies; and generally do everything necessary for the management of Marine business, all by virtue of authority, privileges, duties and obligations herein granted and assumed and which may hereafter be granted or assumed.

The Managing Agent accepts the appointment and agrees faithfully to perform the duties thereof to the best of its knowledge, skill and judgment, and to obey promptly such instructions as it may receive from time to time from the Companies.

- 1 -

The Companies and the Managing Agent agree that the limits of the Managing Agents' underwriting authority and the retention by each Company for its own account of risks written by the Managing Agent under this Agreement, shall be as set forth in Appendix B attached herewith and any subsequent amendments thereto.

SECOND: The authority granted herein is in respect of risks usually undertaken by the Ocean Marine Departments of insurance companies and specifically as permitted by the charters of the Companies.

THIRD: The Managing Agent undertakes to maintain an office in New York, N.Y., competent to receive, summarize and adjust all acts or transactions with the Companies, and its records shall be available to the Companies.

FOURTH: No later than thirty (30) days after the close of each quarter ending March 31, June 30, September 30 and December 31, a statement of accounts shall be forwarded to the Companies in such form and in such detail as may be required by the Companies, and the balance due as shown in such statement shall be remitted to the Companies not later than ninety (90) days after the close of each quarter.  Accounts shall be rendered and all payments made in United States currency.

The Companies shall remit, or permit a deduction from balances paid to them, monies for account of losses paid or claims settled and to be paid.

The Managing Agent shall also furnish the Companies, as soon as practicable after the end of each calendar quarter, or at any time after the close of any month, at the request of the Companies, statements reflecting all necessary figures, for the inclusion in any statements, annual or otherwise, required by Insurance Departments or other authorities of Municipal, State or Federal Governments.

The Managing Agent agrees to use due diligence to collect payment of all premiums of policies or contracts of insurance issued by the Managing Agent and/or any of its appointees however designated and shall in no case be entitled to credit by reason of its failure to collect said premiums from brokers, its agents or policyholders.

- 2 -

FIFTH: The Companies agree to pay all costs imposed by the authorities of various states and countries to comply with the legal requirements; legal expenses; Underwriting Association fees and assessments; forms and stationary; postage, telegraphic expenses incurred in the conduct of the Agency business; survey expenses; cost of Lloyd's Register and similar publications.

The Companies agree to reimburse the Managing Agent for brokerage, commissions and discounts allowed by said Managing Agent on the business written by it for account of the Companies under this Agreement.

The Managing Agent agrees to credit the Companies with brokerage, overriding commissions (other than management commission), commissions (except contingent commissions), discounts and other allowances received by said Managing Agent on the reinsured portion of the business written by it for account of the Companies under this Agreement.

It is understood that the Managing Agent may retain for its own account allowances made by reinsurers to cover the factor of remuneration of Managing Agent, directly, or indirectly when reinsuring on a "net cost" or similar basis, provided, however, said retentions for the account of the Managing Agent shall not be made to any extent which would result in reducing the total reinsurance allowance factors to each Company to a lesser percentage than what the acquisition cost percentage to each Company would have been had the amount reinsured been retained.

SIXTH: The Companies will allow the Managing Agent remuneration in respect of all business written for account of the Companies as shown in the Schedule attached herewith designated APPENDIX "A".

SEVENTH: The Agreement is unlimited as to its duration, but it may be terminated at the end of any calendar year by any party giving to the other parties six (6) months' notice in writing of such desire.

However, this Agreement may be terminated by the Companies at any time and with immediate effect in the event that the Managing Agent becomes insolvent or makes an assignment for the benefit of creditors, and, in such event, the right of the Companies to the use and profit of the management plant in connection with the business written by the Managing Agent or its agents for the Companies, shall be conceded and held inviolate, it being

- 3 -

further understood that should the Companies at their option effect the collection of monies from agents, policyholders, or others from whom monies may be due on account of the Companies policies issued through Managing Agent, the Companies shall give the Managing Agent credit for such sums in their mutual account.

EIGHT: The Agreement may be amended from time to time by exchange of letters which shall be considered of the same effect as formal addenda to this Agreement.

NINTH: This Agreement is made in good faith and should there arise from any unforeseen cause, difference of opinion or of interpretation of the Agreement which cannot be amicably settled between the Companies and the Managing Agent, it is then understood and agreed that such difference shall be submitted for arbitration to three disinterested officers of marine insurance offices, one to be chosen by the Companies, one by the Managing Agent, and the third by the two so chosen, and a decision of the majority of the three shall in each case be final. The arbitrators shall be required to decide the matters submitted to them upon the customs and usages of the business and in a spirit of equity rather than of technicalities or of legal requirements. Each party shall pay for the expense of its own arbitrator and a pro rata portion of the expense of the third arbitrator.

TENTH: This Agreement will be effective December 1, 1977, and replaces all prior management agreements between the Companies and the Managing Agent.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed and their corporate seals to be affixed hereto by their duly authorized officers.

NATIONAL UNION FIRE INSURANCE COMPANY

Attest:

- 4 -

Attest:

_[signature]_

BIRMINGHAM FIRE INSURANCE COMPANY

_[signature]_

Attest:

_[signature]_

AMERICAN HOME ASSURANCE COMPANY

_[signature]_

Attest:

_[signature]_

COMMERCE AND INDUSTRY INSURANCE
COMPANY

_[signature]_

Attest:

_[signature]_

AIU INSURANCE COMPANY

_[signature]_

Attest:

_[signature]_

AMERICAN INTERNATIONAL MARINE AGENCY
OF NEW YORK, INC.

_[signature]_ William Mark

- 5 -

**EXHIBIT C**

July 25, 2006 06:24 PM US Eastern Timezone

## AIG Companies Announce Termination of Agency Relationship with American International Marine Agency

NEW YORK—(BUSINESS WIRE)—July 25, 2006—The AIG Companies have announced that their agency relationship with American International Marine Agency of New York, Inc. (AIMA), a subsidiary of C.V. Starr & Co. Inc., originally scheduled to cease on December 31, 2006, has been terminated, effective today. Accordingly, AIMA no longer has any authority to act as agent for the AIG Companies.

All marine insurance business formerly conducted by AIMA on behalf of the AIG Companies will now be serviced by AIG Global Marine, a division of the property and casualty insurance subsidiaries of AIG. This includes all underwriting of new business, renewal business, in-force policy service, marine loss control and engineering, accounting and administrative functions formerly conducted by AIMA as an agent of the AIG Companies. Claims will continue to be handled by AI Marine Adjusters, Inc., a wholly owned subsidiary of AIG.

American International Group, Inc. (AIG), world leaders in insurance and financial services, is the leading international insurance organization with operations in more than 130 countries and jurisdictions. AIG companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer. In addition, AIG companies are leading providers of retirement services, financial services and asset management around the world. AIG's common stock is listed on the New York Stock Exchange, as well as the stock exchanges in London, Paris, Switzerland and Tokyo

**EXHIBIT D**

Business Insurance

 

# When you need resources...

# Business Insurance

**Close Window**

## AIG severs ties with Starr unit AIMA
By Roberto Ceniceros
July 25 19:33:00, 2006

NEW YORK-American International Group Inc. said late Tuesday it has ended its agency relationship effective July 25 with American International Marine Agency of New York Inc., a subsidiary of C.V. Starr & Co. Inc.

"Accordingly, AIMA no longer has any authority to act as agent for the AIG Companies," AIG said in a statement. Earlier this month, AIG announced the formation of a new division, AIG Global Marine and Energy, and its intention to cancel the company's arrangement with AIMA, effective Dec. 31. AIG also said earlier this month that policy renewals, new business or in-force policy issues could be handled by AIMA or AIG until the Dec. 31 termination date.

But that apparently is no longer the case. An AIG spokesman declined to provide a reason for the change in effective dates for the termination.

Late last week, AIMA announced an agreement to produce ocean marine business for Berkshire Hathaway Inc. unit National Liability & Fire Insurance Co. Under the agreement, AIMA said it could offer up to $100 million in limits for cargo, hull and marine liability risks.

New York-based AIG said in its statement Tuesday that all marine business formerly conducted by AIMA on behalf of AIG will now be serviced by AIG Global Marine. "This includes all underwriting of new business, renewal business, in-force policy service, marine loss control and engineering, accounting and administrative functions formerly conducted by AIMA as an agent of the AIG Companies," AIG said.

New York-based C.V. Starr, which owns four managing general agencies, for many years produced business for AIG. C.V. Starr and AIG, however, have had a contentious relationship since early 2005, when Maurice R. Greenberg was ousted as AIG's chairman and chief executive officer. Mr. Greenberg is chairman of C.V. Starr & Co.

http://www.businessinsurance.com/cgi-bin/news.pl?newsId=8090

Entire contents © Crain Communications, Inc.
Use of editorial content without permission is strictly prohibited. All rights Reserved

# EXHIBIT B

Kenneth A. Plevan (KP 2551)
John L. Gardiner (JG 8715)
Anthony Dreyer (AD 3571)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| C. V. STARR & CO., INC. and C. V. STARR & CO., | : |
| Plaintiffs, | : |
| v. | : |
| AMERICAN INTERNATIONAL GROUP, INC., | : |
| Defendant. | : |

06 Civ. 2157 (HB)(KNF)

**AMENDED COMPLAINT**

Plaintiffs C. V. Starr & Co., Inc. ("C. V. Starr") and its subsidiary C. V. Starr & Co. ("C.V. Starr California"), by their undersigned counsel of record, for their Amended Complaint against defendant American International Group, Inc. ("AIG"), allege upon personal knowledge with respect to themselves and their own acts, and upon information and belief with respect to all other matters, as follows:

**NATURE OF ACTION**

1.     This action arises out of defendant AIG's improper and infringing use of the service mark "STARR EXCESS" in connection with insurance services, its attempts to appropriate for itself service mark rights that exclusively belong to plaintiff C. V. Starr, its wrongful ownership and use of "starr" domain names, including cvstarr.com, and its

wrongful exercise of control over the C.V. Starr California website accessible at

www.cvstarr.com.

### Starr Excess Marks

2.     Plaintiff C. V. Starr was incorporated in 1950. For more than 50

years through its wholly owned subsidiaries (including plaintiff, C.V. Starr California),

C. V. Starr has offered a variety of insurance and insurance-related services under service

marks consisting of or incorporating the term "STARR." C. V. Starr is the owner of several

federal and common law service marks that use or otherwise incorporate the term "STARR"

for use in connection with insurance and insurance-related services, including the marks C.

V. STARR & CO., STARR TECH, and STARR ASSOCIATES, INC.

3.     For decades, C. V. Starr's subsidiaries had served as managing

general agents for subsidiaries of defendant AIG, providing placement for a variety of AIG

insurance products. As an outgrowth of this business relationship, C. V. Starr conferred on

AIG an implied license to use the STARR EXCESS mark in connection with AIG's

provision of excess insurance coverage and related services.

4.     AIG recently terminated the role of various C. V. Starr subsidiaries as

managing general agents for AIG subsidiaries. As a result of these terminations, AIG's

implied license to use the STARR EXCESS service mark was terminated.

5.     Nevertheless, AIG has improperly continued to use the STARR

EXCESS mark in connection with the provision of insurance and insurance-related services,

and continues to maintain federal service mark registrations for service marks that consist of

or include the STARR EXCESS mark.

6.     AIG's continued use of, and maintenance of federal registrations for,

STARR EXCESS marks constitute service mark infringement, false designation of origin,

2

and unfair competition, under the Lanham Trademark Act of 1946, as amended, Title 15, United States Code, §1501, et seq. (the "Lanham Act"), for which cancellation under the Lanham Act is appropriate and warranted. In addition, AIG's conduct constitutes unfair competition under the common law of the State of New York, as well as service mark infringement under New York General Business Law § 360-k and Cal. Bus. & Prop. Code § 14320 and service mark dilution under New York General Business Law § 360-l and Cal. Bus. & Prop. Code § 14330.

### "Starr" Domain Names

7.      AIG's wrongful conduct includes the ownership and use of certain "starr" domain names, including cvstarr.com which had been transferred to AIG solely for administrative convenience in connection with a proposed upgrade of the website.

8.      In late 2005 and early 2006, AIG refused repeated requests to transfer the cvstarr.com domain name to plaintiffs. Rather, AIG opted to exercise ownership and control over said domain name, as well as over the C.V. Starr California website accessible at www.cvstar.com.

9.      AIG's conduct with respect to the cvstar.com domain name and the C.V. Starr California website constitutes, among other violations of plaintiff's rights, trademark infringement, cybersquatting in violation of Section 43(d) of the Lanham Act, and conversion under the common law of the State of California.

### JURISDICTION AND VENUE

10.      The Court has jurisdiction over the federal claims under 15 U.S.C. § 1121 (original jurisdiction for Lanham Act claims), 28 U.S.C. §§ 1331 (federal question jurisdiction), and 1338(a) (original jurisdiction for Lanham Act claims). Jurisdiction over

3

the state law claims is based on 28 U.S.C. §§ 1367 (supplemental jurisdiction) and 1338(b)

(original jurisdiction for unfair competition claims).

      11.    Jurisdiction over the defendant is proper because defendant is a New

York corporation with its principal place of business in New York.

      12.    Venue is proper in this District under 28 U.S.C. § 1391(b) (venue

based on events) and § 1391(c) (venue based on jurisdiction), because a substantial part of

the events giving rise to this action occurred in this District and defendant AIG is subject to

personal jurisdiction in this District.

### THE PARTIES

      13.    Plaintiff C. V. Starr is a Delaware corporation with its principal place

of business located at 399 Park Avenue, New York, New York.

      14.    Plaintiff C.V. Starr California is a California corporation with its

home office currently located at Two Rincon Center, Suite 310, 121 Spear Street, San

Francisco, California.  C.V. Starr California is a wholly owned subsidiary of C. V. Starr and

is a managing general agency in the business of selling excess insurance in specialty classes,

with approximately 50% of its premiums written in California.

      15.    Defendant AIG is a Delaware corporation with its principal place of

business located at 70 Pine Street, New York, New York.

### C. V. Starr and its STARR Marks

      16.    For over five decades, plaintiff C. V. Starr has offered, through its

subsidiaries, a variety of insurance and insurance-related services under service marks

consisting of or incorporating the term "STARR" (the "STARR Marks").  Among the

services offered by C. V. Starr, through its subsidiaries, under the distinctive STARR Marks

are residential and commercial property and casualty insurance, underwriting services, and agency/brokerage services in connection with excess and surplus umbrella insurance.

17.    Since 1953, C. V. Starr has used the C. V. STARR & CO. mark in commerce in connection with insurance underwriting services. In addition, C. V. Starr, through its wholly owned subsidiary C.V. Starr California, is the owner of the federally registered mark C. V. STARR & CO. for insurance underwriting services (U.S. Reg. No. 2,877,409). C. V. Starr also owns, either directly or through C.V. Starr California, federal registrations for the following STARR Marks for use in connection with insurance underwriting services:

| Mark | U.S. Reg. # | First Use | Registered | Services |
|------|-------------|-----------|------------|----------|
| **STARR TECH and Design** | 1,570,227 | 12/6/1967 | 3/13/1989 | Property and casualty insurance underwriting and agency services |
| **STARR TECHNICAL RISKS AGENCY, INC. and Design** | 1,601,345 | 12/6/1967 | 3/12/1990 | Identifying property and casualty insurance underwriting and agency services |
| **C. V. STARR & CO. and Design** | 2,926,969 | 11/2/2004 | 2/15/2005 | Insurance underwriting services, namely commercial property and casualty insurance |

18.    C. V. Starr also holds common law service mark rights in several STARR Marks, including the mark STARR ASSOCIATES, INC., under which C. V. Starr has, for more than thirty years, offered excess and surplus insurance brokerage services. Said marks are distinctive as a consequence of inherent distinctiveness as well as approved good will.

5

19.    Through advertising, promotion, and extensive sales of insurance services, the STARR Marks have become associated with C. V. Starr, and the STARR Marks represent enormous good will that belongs exclusively to C. V. Starr.

### Defendant's Use of the STARR Marks Under an Implied License

20.    Defendant AIG, through its wholly-owned subsidiaries, is also in the business of providing insurance and insurance-related services.

21.    In or about 1993, AIG began offering insurance underwriting services under certain service marks consisting of or incorporating the service mark STARR EXCESS (the "STARR EXCESS Marks"). At the time, C. V. Starr and several of its affiliates maintained ongoing business relationships with AIG and its subsidiaries, pursuant to which C. V. Starr's subsidiaries served as managing general agents for AIG subsidiaries.

22.    As a consequence of this ongoing business relationship, C. V. Starr conferred upon AIG an implied license to use the STARR EXCESS Marks. C. V. Starr was aware of the nature of AIG's commercial use of the STARR EXCESS Marks, and knew that the services offered by AIG under the marks satisfied appropriate quality standards.

23.    At no time did C. V. Starr assign, or otherwise permit, AIG to acquire for itself service mark ownership rights in the STARR EXCESS Marks or any other service mark consisting of or incorporating the term STARR.

### Defendant's Improper Attempts to Obtain Rights in the STARR EXCESS Marks

24.    Starting in mid-2004, AIG improperly sought to obtain for itself federal service mark rights in the STARR EXCESS Marks. Specifically, AIG filed for, and ultimately obtained, federal service mark registrations in several service marks that incorporate the term STARR EXCESS, including the following:

6

| Mark | U.S. Reg. # | First Use | Registered | Services |
|------|-------------|-----------|------------|----------|
| STARR EXCESS | 2,985,541 | 6/30/1993 | 8/16/2005 | Insurance underwriting services, namely, property and casualty insurance, directors' and officers' liability insurance, errors and omissions liability, fiduciary liability, employee practices liability, and professional liability insurance |
| STARR EXCESS INTERNATIONAL | 3,027,800 | 6/30/1993 | 12/13/2005 | Insurance underwriting services, namely, property and casualty insurance, directors' and officers' liability, errors and omissions liability, fiduciary liability, employee practices liability, and professional liability insurance |
| STARR EXCESS INTERNATIONAL and Design | 3,027,800 | 6/30/1993 | 12/13/2005 | Insurance underwriting services, namely, property and casualty insurance, directors' and officers' liability, errors and omissions liability, fiduciary liability, employee practices liability, and professional liability insurance |
| STARR EXCESS LIABILITY INSURANCE COMPANY, LTD. | 2,985,542 | 6/30/1993 | 8/16/2005 | Insurance underwriting services, namely, property and casualty insurance, directors' and officers' liability insurance, errors and omissions liability, fiduciary liability, employee practices liability, and professional liability insurance |

7

| Mark | U.S. Reg. # | First Use | Registered | Services |
|------|-------------|-----------|------------|----------|
| STARR EXCESS INTERNATIONAL | 3,027,449 | 1/28/1998 | 12/13/2005 | Insurance underwriting services, namely, property and casualty insurance, directors' and officers' liability insurance, errors and omissions liability, fiduciary liability, employee practices liability, and professional liability insurance |
| STARR EXCESS LIABILITY INSURANCE COMPANY, LTD. | 3,027,448 | 1/28/1998 | 12/13/2005 | Insurance underwriting services, namely, property and casualty insurance, directors' and officers' liability insurance, errors and omissions liability, fiduciary liability, employee practices liability, and professional liability insurance |
| STARR EXCESS SERVICES | 2,985,543 | 9/1/1999 | 8/16/2005 | Insurance underwriting services, namely, property and casualty insurance, directors' and officers' liability insurance, errors and omissions liability, fiduciary liability, employee practices liability, and professional liability insurance |

25.    AIG has also registered several domain names that incorporate the term "STARR" (the "Starr Domain Names"), including, without limitation, starrexcess.com, starrtechnical.com, starr-tech.biz, cvstarr.com, and cvstarr.us.

26.    On January 13, 2006, AIG filed an application to register the mark STARR EXCESS BOARD PROTECTOR, U.S. Ser. No. 78/791,312, and on February 27, 2006, AIG filed an application to register STARR EXCESS EXTRA, U.S. Ser. No. 78/824,324.

**Termination of AIG's Implied License
to Use the STARR EXCESS Marks**

27.     In late January 2006 and early February 2006, AIG advised several of

C. V. Starr's subsidiaries serving as managing general agents for AIG subsidiaries that the

Starr subsidiaries were, or soon would be, unilaterally terminated as managing general

agents, or that their agency agreements would not be renewed.

28.     As a consequence of AIG's unilateral terminations and the substantial

cessation of the ongoing business relationship between C. V. Starr and AIG, AIG's implied

license to use the STARR EXCESS Marks terminated.

29.     Despite this termination of the implied license, AIG has improperly

continued to use the STARR EXCESS Marks.

**AIG'S Wrongful Retention of the
the cvstarr.com Domain Name**

30.     During the time in which C. V. Starr's subsidiaries were serving as

managing general agents for AIG subsidiaries, C.V. Starr California solicited the assistance

of AIG's e-Business group to help C.V. Starr California develop an improved website for the

business of C.V. Starr California.  For administrative convenience in aid of this effort, C.V.

Starr California transferred the domain name registration for cvstarr.com to AIG.  Although

efforts to improve the website were later abandoned, AIG has refused to transfer the domain

name and control of the website back to plaintiffs, despite repeated requests.

31.     As a consequence of AIG's ownership of the cvstarr.com domain

name registration, it exercises control over the content of the C.V. Starr California website

accessible at www.cvstarr.com.

9

## IRREPARABLE HARM

32.     AIG's continued use of the STARR EXCESS Marks, its registration of the Starr Domain Names, its wrongful retention of the cvstarr.com domain name, and its exercise of control over the C.V. Starr California website are causing, and if not enjoined will continue to cause, serious and irreparable harm to plaintiffs, for which plaintiffs have no adequate remedy at law.

### FIRST CLAIM FOR RELIEF
### SERVICE MARK INFRINGEMENT
### UNDER SECTION 32(1) OF THE LANHAM ACT

33.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 32 of the Amended Complaint as if fully set forth herein.

34.     Defendant's applications for, and registration, use and threatened continued use of, the STARR EXCESS Marks and the Starr Domain Names, and its exercise of control over the C.V. Starr California website, all in connection with its insurance products and services, infringe C.V. Starr's exclusive rights in its federally registered STARR Marks, in violation of Section 32(l) of the Lanham Act, 15 U.S.C. § 1114(l), in that said conduct is likely to cause consumer confusion and to cause the relevant public to mistakenly believe that there is a connection, association, or affiliation between plaintiffs and defendant.

35.     Defendant's infringing acts have been with full knowledge of plaintiffs' rights in the STARR Marks and the Starr Domain Names.

10

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION AND
## FALSE DESIGNATION OF ORIGIN
## UNDER SECTION 43(a) OF THE LANHAM ACT

36.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 35 of the Amended Complaint as if fully set forth herein.

37.    Defendant's conduct complained of herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

38.    Defendant's applications for, and registration, use and threatened continued use of, the STARR EXCESS Marks and the Starr Domain Names, all in connection with its insurance products and services, and retention of, among others, the cvstarr.com domain name, infringes plaintiffs' exclusive rights in their federally registered STARR Marks and constitutes a false designation of origin in commerce in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## THIRD CLAIM FOR RELIEF
## CANCELLATION OF SERVICE MARK REGISTRATIONS
## UNDER SECTION 37 OF THE LANHAM ACT

39.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 38 of the Amended Complaint as if fully set forth herein.

40.    Defendant AIG has applied for and obtained at least seven federal registrations for marks containing the term STARR EXCESS in connection with its insurance products and services.

41.    Defendant's applications for, and registration, use, and threatened continued use of, the STARR EXCESS Marks in connection with its insurance products and services violates plaintiffs' exclusive rights under Sections 32(1), 43(a), and 43(c) of the

11

Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and 1125(c), in that defendant's usage and registration infringe plaintiffs' federally registered STARR Marks.

## FOURTH CLAIM FOR RELIEF
## COMMON LAW UNFAIR COMPETITION

42.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 41 of the Amended Complaint as if fully set forth herein.

43.    The right of plaintiffs to own and use the STARR Marks is a valuable property right.

44.    Defendant's applications for, and registration, use and threatened continued use of, the STARR EXCESS Marks and the Starr Domain Names, all in connection with its insurance products and services, with knowledge of plaintiffs' rights in the STARR Marks and the importance and value of the right of plaintiffs to use the STARR Marks, has deprived plaintiffs of the right to own and use its valuable property, and constitutes an intentional misappropriation of plaintiffs' STARR Marks, as well as unfair competition, under the common law of the State of New York and the State of California.

## FIFTH CLAIM FOR RELIEF
## SERVICE MARK INFRINGEMENT
## UNDER STATE LAW

45.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 44 of the Amended Complaint as if fully set forth herein.

46.    Defendant's wrongful acts complained of herein are likely to continue to cause confusion with plaintiffs' STARR Marks, and thereby constitute service mark infringement under N.Y. Gen. Bus. L. § 360-k and Cal. Bus. & Prof. Code § 14320.

### SIXTH CLAIM FOR RELIEF
### SERVICE MARK DILUTION
### UNDER STATE LAW

47.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 46 of the Amended Complaint as if fully set forth herein.

48.    Defendants' wrongful acts complained of herein have diluted and are likely to continue to dilute the distinctive nature of plaintiffs' STARR Marks, and therefore violate N.Y. Gen. Bus. L. § 360-l and Cal. Bus. & Prof. Code § 14330.

### SEVENTH CLAIM FOR RELIEF
### CYBERSQUATTING UNDER
### SECTION 43(d) OF THE LANHAM ACT

49.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 48 of the Amended Complaint as if fully set forth herein.

50.    Defendant's continued use of the cvstarr.com domain name constitutes a bad faith intent to profit from said domain name and the C.V. Starr California website and to injure plaintiffs.

51.    Defendant's conduct complained of herein constitutes a violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

52.    Plaintiffs have suffered and will continue to suffer irreparable harm as a result of such violations of law for which there is no adequate remedy at law.

### EIGHTH CLAIM FOR RELIEF
### COMMON LAW CONVERSION

53.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 52 of the Amended Complaint as if fully set forth herein.

54.    The domain name cvstarr.com and the website accessible at www.cvstarr.com are valuable property rights of plaintiff C.V. Starr California.

13

55.    Defendant's retention of the cvstarr.com domain name, and its exercise of control over the associated website, was and is being done without plaintiffs' permission or authorization, and indeed contrary to plaintiffs' express protests.

56.    Defendant's conduct complained of herein constitutes conversion under the common law of the State of California.

57.    C.V. Starr California has suffered and will continue to suffer irreparable harm as a result of such violations of law for which there is no adequate remedy at law.

WHEREFORE, plaintiffs demand judgment:

A.    Preliminarily and permanently enjoining defendant AIG, and its officers, agents, servants, employees and all persons acting in concert or participation with them from using the mark STARR, alone or in combination, for and/or in connection with insurance products and services, or using any names or marks confusingly similar thereto, and from making false designations of origin or unfairly competing with plaintiffs;

B.    Ordering the cancellation of all of defendant's federal registrations and withdrawal of defendant's applications for marks containing the term STARR, alone or in combination with other terms and/or designs, for and/or in connection with insurance products and services;

C.    Ordering a transfer to plaintiffs of the Starr Domain Names, including without limitation, cvstarr.com, and all other Internet domain names that use or otherwise incorporate the term "STARR", as well as control of the C.V. Starr California website; and

14

D.    Awarding to plaintiffs such other and further relief as the

Court shall deem just and proper.

Dated:    April 20, 2006
          New York, New York

Kenneth A. Plevan (KP 2551)
John L. Gardiner (JG 8715)
Anthony Dreyer (AD 3571)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for Plaintiffs

15

EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
C.V. STARR & CO., INC. and C.V.         :        Case No. 06 CV 2157 (HB)
STARR & CO.,                            :

                    Plaintiffs,         :

                                        :        **ANSWER, AFFIRMATIVE DEFENSES**
          vs.                                    **AND AMENDED COUNTERCLAIMS**
                                        :
AMERICAN INTERNATIONAL
GROUP, INC.,                            :

                    Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - -x

                                        x
AMERICAN INTERNATIONAL                  :
GROUP, INC.,

          Counterclaim Plaintiff,      :

          vs.                           :

C.V. STARR & CO., INC., STARR           :
TECHNICAL RISKS AGENCY, INC.,
STARR ASSOCIATES, INC., C.V.            :
STARR & CO., and STARR AVIATION
AGENCY, INC.                            :

          Counterclaim-Defendants.     x
- - - - - - - - - - - - - - - - - - - - - - - - - - - -


### PRELIMINARY STATEMENT

American International Group, Inc. ("AIG") is the world's leading insurance enterprise. It

traces its roots to 1919, when Cornelius Vander Starr opened a small insurance agency in

Shanghai, China. In the years since 1919, the AIG corporate family has grown to encompass

dozens of companies. Throughout all that time, however, the various companies have been

operated as a unified organization. From 1919 until 1968, the chief executive of that

organization was Mr. Starr. From 1968 until early last year, the chief executive was Maurice Greenberg, Mr. Starr's successor. During the last several decades, an important component of the AIG organization has been a group of insurance agencies (the "Agencies") owned by a holding company named C.V. Starr & Co., Inc. ("C.V. Starr"). C.V. Starr was formed by Mr. Starr in 1950, some 31 years into the life of the AIG organization, for the purpose of holding the domestic insurance agencies that serviced the organization's insurance companies.

Prior to 2006, C.V. Starr and the Agencies never conducted any insurance-related operations of their own and had no presence of their own in the marketplace. Some of the Agencies held by C.V. Starr use the STARR mark, and others use the AMERICAN INTERNATIONAL mark. All of them, however, have existed for virtually their entire respective lives for the sole purpose of serving AIG's member insurance companies and representing them in the marketplace. Notwithstanding their nominal ownership by C.V. Starr, the Agencies have for at least the past 36 years been operated as businesses of AIG.

Among other things, the Agencies have been managed by AIG, audited by AIG, staffed by AIG, supplied by AIG and housed by AIG. They are perceived by the marketplace as arms of AIG, and that perception is the result of substantial effort and resources expended by AIG.

Last Spring, after regulators lodged accusations that AIG had engaged in accounting improprieties, Mr. Greenberg was forced to step down as Chairman and CEO of AIG. Following his departure from AIG, Mr. Greenberg, who remained in control of C.V. Starr, decided to try to separate the Agencies from AIG and to use them as a means to remain in the insurance business and compete against AIG. In support of that effort, C.V. Starr and the Agencies, at Mr. Greenberg's direction, have sought to misappropriate business and other assets from AIG (leading to a series of ongoing arbitrations and court proceedings between the parties). In further

-2-

support of that effort, C.V. Starr now seeks to wrest the STARR mark away from AIG. As referenced above and detailed below, the name and trademark STARR has been synonymous with the AIG organization and its predecessors since 1919. AIG, and its predecessors, developed the STARR mark, controlled the nature and quality of services rendered under it, and built it into the valuable brand it is today.

C.V. Starr and the Agencies' effort to associate themselves with the STARR mark is a calculated attempt wrongfully to capitalize on a symbol that has acquired tremendous commercial value in the insurance field and that will provide them with undeserved benefit and commercial gain from being perceived – inaccurately – as an AIG affiliate. In other words, it is *AIG* that owns the STARR mark.

## ANSWER AND AFFIRMATIVE DEFENSES

Defendant/Counterclaim-Plaintiff AIG ("Defendant") by its attorneys Quinn Emanuel Urquhart Oliver & Hedges, LLP, answers the Amended Complaint of Plaintiffs C.V. Starr and C.V. Starr & Co. ("Starr California") as follows:

## NATURE OF ACTION

1.      AIG denies the allegations of Paragraph 1 of the Amended Complaint.

2.      AIG admits that Plaintiff C.V. Starr purports to offer insurance-related services under marks consisting of or incorporating the term STARR and except as so admitted denies the remaining allegations of Paragraph 2 of the Amended Complaint.

3.      AIG admits that Plaintiff C.V. Starr's subsidiaries have served as managing general agents for AIG's subsidiaries and except as so admitted denies the remaining allegations of Paragraph 3 of the Amended Complaint.

-3-

4.    AIG admits that certain of its subsidiary insurance companies recently terminated the role of American International Aviation Agency, Inc., Starr Technical Risks Agency, Inc., and its subsidiaries, and Starr Associates, Inc. as managing general agents to AIG's subsidiaries and except as so admitted denies the remaining allegations in Paragraph 4 of the Amended Complaint.

5.    AIG denies the allegations of Paragraph 5 of the Amended Complaint.

6.    AIG denies the allegations of Paragraph 6 of the Amended Complaint.

7.    AIG denies the allegations of Paragraph 7 of the Amended Complaint.

8.    AIG admits that it refused to transfer the domain name cvstarr.com to Plaintiffs and except as so admitted denies the remaining allegations of Paragraph 8 of the Amended Complaint.

9.    AIG denies the allegations of Paragraph 9 of the Amended Complaint.

### JURISDICTION AND VENUE

10.    AIG admits that Plaintiffs purport to allege that the Court has jurisdiction over federal claims under 15 U.S.C. 1121, 28 U.S.C. §§ 1331 and 1338(a) and that the Court has jurisdiction over state law claims based on 28 U.S.C. §§ 1367 and 1338(b).

11.    AIG admits that Plaintiffs purport to allege the Court has personal jurisdiction over the Defendant. However, AIG denies that it is a New York corporation.

12.    AIG admits that Plaintiffs purport to allege that venue is proper pursuant to 28 U.S.C. §§1391(b) and 1391(c).

### THE PARTIES

13.    AIG admits the allegations of Paragraph 13.

-4-

14.    AIG admits that Plaintiff Starr California is a California corporation that is a wholly-owned subsidiary of Plaintiff C.V. Starr and except as so admitted denies knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 14 of the Amended Complaint.

15.    AIG admits that its principal place of business is 70 Pine Street, New York, New York and except as so admitted denies the remaining allegations of Paragraph 15 of the Amended Complaint.

## FACTUAL ALLEGATIONS

16.    AIG denies the allegations of Paragraph 16 of the Amended Complaint.

17.    AIG admits the trademark C.V. STARR & CO. has been used in connection with certain of Plaintiffs' business activities and that Plaintiff C.V. Starr or its subsidiary Starr California is currently the owner of record of the registrations set forth in Paragraph 17. Except as so admitted, AIG denies the remainder of the allegations made in Paragraph 17 of the Amended Complaint.

18.    AIG denies the allegations of Paragraph 18 of the Amended Complaint.

19.    AIG denies the allegations of Paragraph 19 of the Amended Complaint.

20.    AIG admits that it offers insurance-related services through its wholly-owned subsidiaries, and except as so admitted, denies the remainder of the allegations of Paragraph 20 of the Amended Complaint.

21.    AIG admits the allegations of Paragraph 21 of the Amended Complaint.

22.    AIG denies the allegations of Paragraph 22 of the Amended Complaint.

23.    AIG denies the allegations of Paragraph 23 of the Amended Complaint.

-5-

24.     AIG admits that it filed for and ultimately obtained federal service mark registrations for trademarks containing the term STARR, avers that AIG is the owner of United States Trademark Registrations Nos. 2,985,541 for the mark STARR EXCESS; 3,027,800 for the mark STARR EXCESS INTERNATIONAL and Design; 2,985,542 for the mark STARR EXCESS LIABILITY INSURANCE COMPANY LTD; 3,027,449 for the mark STARR EXCESS INTERNATIONAL; 3,027,448 for the mark STARR EXCESS LIABILITY INSURANCE INTERNATIONAL LTD; and 2,985,543 for the mark STARR EXCESS SERVICES, and except as so stated, denies the allegations of Paragraph 24 of the Amended Complaint.

25.     AIG admits the allegations of Paragraph 25 of the Amended Complaint.

26.     AIG admits the allegations of Paragraph 26 of the Amended Complaint and avers that is also the owner of federal trademark application serial number 78/824,324 for the mark STARR EXCESS EXTRA filed on February 27, 2006.

27.     AIG avers that it has advised certain C.V. Starr subsidiaries of the termination of their respective prior relationships and respectfully refers to the termination notices for the contents thereof, and except as so stated, denies the allegations of Paragraph 27 of the Amended Complaint.

28.     AIG denies the allegations of Paragraph 28 of the Amended Complaint.

29.     AIG denies the allegations of Paragraph 29 of the Amended Complaint.

30.     AIG avers that in 2002, AIG sought to work with Starr California to upgrade the Starr California website. During that effort, it came to light that the cvstarr.com domain was registered to Starr California. Pursuant to AIG's corporate domain name policy, AIG requested that Starr California transfer ownership of the domain name to AIG and Starr

-6-

California complied. AIG and Starr California worked together over the course of a year to design a content-managed webpage for Starr California as part of the "aigonline.com" website, which, at the time, housed the webpages of various other AIG business divisions, including WorldSource, AIG Risk Finance and AIG Environmental. Ultimately, however, the improved website never came to fruition because Starr California did not provide AIG with new content for the site. Except as so stated, AIG denies the allegations of Paragraph 30 of the Amended Complaint.

    31. AIG admits the allegations of Paragraph 31 of the Amended Complaint.

    32. AIG denies the allegations of Paragraph 32 of the Amended Complaint.

### FIRST CLAIM FOR RELIEF
### SERVICE MARK INFRINGEMENT
### UNDER SECTION 32(1) OF THE LANHAM ACT

    33. AIG reasserts and incorporates by reference its responses to the allegations in Paragraphs 1 through 32 of the Amended Complaint.

    34. AIG denies the allegations of Paragraph 34 of the Amended Complaint.

    35. AIG denies the allegations of Paragraph 35 of the Amended Complaint.

### SECOND CLAIM FOR RELIEF
### UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN
### UNDER SECTION 43(a) OF THE LANHAM ACT

    36. AIG reasserts and incorporates by reference its responses to the allegations in Paragraphs 1 through 35 of the Amended Complaint.

    37. AIG denies the allegations of Paragraph 37 of the Amended Complaint.

    38. AIG denies the allegations of Paragraph 38 of the Amended Complaint.

-7-

### THIRD CLAIM FOR RELIEF
### CANCELLATION OF SERVICE MARK REGISTRATIONS
### UNDER SECTION 37 OF THE LANHAM ACT

39.    AIG reasserts and incorporates by reference its responses to the allegations

in Paragraphs 1 through 38 of the Amended Complaint.

40.    AIG denies the allegations of Paragraph 40 and avers that AIG is the

owner of United States Trademark Registrations Nos. 2,985,541 for the mark STARR EXCESS;

3,027,800 for the mark STARR EXCESS INTERNATIONAL and Design; 2,985,542 for the

mark STARR EXCESS LIABILITY INSURANCE COMPANY LTD; 3,027,449 for the mark

STARR EXCESS INTERNATIONAL; 3,027,448 for the mark STARR EXCESS LIABILITY

INSURANCE INTERNATIONAL LTD; and 2,985,543 for the mark STARR EXCESS

SERVICES.

41.    AIG denies the allegations of Paragraph 41 of the Amended Complaint.


### FOURTH CLAIM FOR RELIEF
### COMMON LAW UNFAIR COMPETITION

42.    AIG reasserts and incorporates by reference its responses to the allegations

in Paragraphs 1 through 34 of the Amended Complaint.

43.    AIG avers that Paragraph 43 does not contain any allegations that require a

response, but nonetheless denies that Plaintiffs have any right to use the STARR Marks, unless

authorized by AIG to do so.

44.    AIG denies the allegations of Paragraph 44 of the Amended Complaint.


-8-

**FIFTH CLAIM FOR RELIEF**
**SERVICE MARK INFRINGEMENT**
**UNDER N.Y. GEN. BUS. L. § 360-k**

45.   AIG reasserts and incorporates by reference its responses to the allegations in Paragraphs 1 through 44 of the Amended Complaint.

46.   AIG denies the allegations of Paragraph 46 of the Amended Complaint.

**SIXTH CLAIM FOR RELIEF**
**SERVICE MARK DILUTION**
**UNDER N.Y. GEN. BUS. L. § 360-L**

47.   AIG reasserts and incorporates by reference its responses to the allegations in Paragraphs 1 through 46 of the Amended Complaint.

48.   AIG denies the allegations of Paragraph 48 of the Amended Complaint.

**SEVENTH CLAIM FOR RELIEF**
**CYBERSQUATTING UNDER**
**SECTION 43(d) OF THE LANHAM ACT**

49.   AIG reasserts and incorporates by reference its responses to the allegations in Paragraphs 1 through 48 of the Amended Complaint.

50.   AIG denies the allegations of Paragraph 50 of the Amended Complaint.

51.   AIG denies the allegations of Paragraph 51 of the Amended Complaint.

52.   AIG denies the allegations of Paragraph 52 of the Amended Complaint.

**EIGHTH CLAIM FOR RELIEF**
**COMMON LAW CONVERSION**

53.   AIG reasserts and incorporates by reference its responses to the allegations in Paragraphs 1 through 52 of the Amended Complaint.

60738/1855421.8

54.    AIG avers that Paragraph 54 does not contain any allegations that require a response, but nonetheless avers that Starr California is not the rightful owner of the domain name cvstarr.com.

55.    AIG denies the allegations of Paragraph 55 of the Amended Complaint.

56.    AIG denies the allegations of Paragraph 56 of the Amended Complaint.

57.    AIG denies the allegations of Paragraph 57 of the Amended Complaint.

58.    AIG avers that the WHEREFORE paragraph and subparagraphs A through D do not contain any allegations that require a response. To the extent Plaintiffs' prayer for relief is deemed by the Court to include allegations, AIG denies them.

### FIRST AFFIRMATIVE DEFENSE
#### (Failure To State a Claim for Relief)

59.    Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to state a claim for which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
#### (No Likelihood of Confusion)

60.    Plaintiffs' purported STARR Marks are controlled, and therefore owned, by AIG and, as such, no likelihood of confusion can be caused by the use of any of the purported STARR Marks by or under the authority of AIG.

### THIRD AFFIRMATIVE DEFENSE
#### (No Likelihood of Confusion)

61.    The use of any designation bearing the word STARR by or under the authority of AIG cannot cause confusion with any mark purportedly owned by Plaintiffs.

### FOURTH AFFIRMATIVE DEFENSE
#### (Non-Ownership by Plaintiffs of Purported STARR Marks)

-10-

62.    Plaintiffs' purported STARR Marks and federal registrations cannot be

asserted as against AIG, as AIG is the beneficial owner of such marks.

### FIFTH AFFIRMATIVE DEFENSE
### (Misrepresentation as to Source)

63.    Plaintiffs' purported STARR Marks and registrations are defective, as they

are being used to misrepresent the source of the services with which they are used.

### SIXTH AFFIRMATIVE DEFENSE
### (Abandonment as to AIG's Use)

64.    Plaintiffs' claims are barred, in whole or in part, because, as to the usages

complained of, Plaintiffs have abandoned any rights in the mark STARR or variations thereof.

### SEVENTH AFFIRMATIVE DEFENSE
### (Abandonment of Control Over STARR Marks)

65.    At least as long ago as 1970, if not earlier, Plaintiffs ceded control of the

purported STARR Marks to AIG and therefore impliedly assigned such rights to AIG.

### EIGHTH AFFIRMATIVE DEFENSE
### (Trademark Priority)

66.    Since Plaintiffs have made no use of the STARR Marks other than under

the control of AIG and its predecessors in interest, they lack trademark priority over AIG.

### NINTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

67.    Plaintiffs' claims are barred, in whole or in part, by the equitable doctrine

of unclean hands.

### TENTH AFFIRMATIVE DEFENSE
### (Acquiescence)

68.    Plaintiffs' claims are barred, in whole or in part, by the equitable principle

of acquiescence.

-11-

### ELEVENTH AFFIRMATIVE DEFENSE
#### (Laches)

69.    Plaintiffs' claims are barred, in whole or in part, by the equitable principle

of laches.

### TWELFTH AFFIRMATIVE DEFENSE
#### (Waiver)

70.    Plaintiffs' claims are barred, in whole or in part, by the equitable principle

of waiver.

### THIRTEENTH AFFIRMATIVE DEFENSE
#### (The STARR Marks Are Licensed to AIG)

71.    Under terms of a certain license agreement dated June 29, 1993, AIG's

wholly-owned subsidiary Starr Excess Liability Insurance Company, Ltd. has the right to use the

trademark STARR.

### FOURTEENTH AFFIRMATIVE DEFENSE
#### (Ownership of the Cvstarr.com Domain Name)

72.    Plaintiffs' claims are barred, in whole or in part, because AIG is the

rightful owner of the cvstarr.com domain name.


### AMENDED COUNTERCLAIMS

Counterclaim-Plaintiff AIG, for its counterclaims against Counterclaim-Defendants C.V.

Starr & Co., Inc. ("CV Starr"), Starr Technical Risks Agency, Inc. ("Starr Tech"), Starr

Associates, Inc. ("Starr Associates") Starr Aviation Agency, Inc. ("Starr Aviation") and C.V. Starr

& Co. ("Starr California") (collectively, "Counterclaim-Defendants") alleges as follows:

-12-

## PRELIMINARY STATEMENT

1.    AIG is the world's leading insurance enterprise. It traces its roots to 1919, when Cornelius Vander Starr opened a small insurance agency in Shanghai, China.

2.    In the years since 1919, the AIG corporate family has grown to encompass dozens of companies. Throughout all that time, however, the various companies have been operated as a unified organization. From 1919 until 1968, the chief executive of that organization was Mr. Starr. From 1968 until early last year, the chief executive was Maurice Greenberg, Mr. Starr's successor.

3.    During the last several decades, an important component of the AIG organization has been a group of insurance agencies (the "Agencies") owned by a holding company named C.V. Starr & Co., Inc. ("C.V. Starr"). C.V. Starr was formed by Mr. Starr in 1950, some 31 years into the life of the AIG organization, for the purpose of holding the domestic insurance agencies that serviced the organization's insurance companies. Prior to 2006, C.V. Starr and the Agencies never conducted any insurance-related operations of their own and had no presence of their own in the marketplace.

4.    Some of the Agencies held by C.V. Starr use the STARR mark, and others use the AMERICAN INTERNATIONAL mark. All of them, however, have existed for virtually their entire respective lives for the sole purpose of serving AIG's member insurance companies and representing them in the marketplace. Notwithstanding their nominal ownership by C.V. Starr, the Agencies have for at least the past 36 years been operated as if they were businesses of AIG. Among other things, the Agencies have been managed by AIG, audited by AIG, staffed by

-13-

AIG, supplied by AIG and housed by AIG. They are perceived by the marketplace as arms of AIG, and that perception is the result of substantial effort and resources expended by AIG.

5.    Last Spring, after regulators lodged accusations that AIG had engaged in accounting improprieties, Mr. Greenberg was forced to step down as Chairman and CEO of AIG.

6.    Following his departure from AIG, Mr. Greenberg, who remained in control of C.V. Starr, decided to try to separate the Agencies from AIG and use them as a means to remain in the insurance business and compete against AIG. In support of that effort, C.V. Starr and the Agencies, at Mr. Greenberg's direction, have sought to misappropriate business and other assets from AIG (leading to a series of ongoing arbitrations and court proceedings between the parties).

7.    In further support of that effort, C.V. Starr now seeks to wrest the STARR mark away from AIG.

8.    As referenced above and detailed below, the name and trademark STARR has been synonymous with the AIG organization and its predecessors since 1919. AIG, and its predecessors, developed the STARR mark, controlled the nature and quality of services rendered under it, and built it into the valuable brand it is today. Counterclaim-Defendants' effort to associate themselves with the STARR mark is a calculated attempt to capitalize wrongfully on a symbol that has acquired tremendous commercial value in the insurance field and that will provide them with undeserved benefit and commercial gain from being perceived – inaccurately – as an AIG affiliate.

-14-

## PARTIES

9.      American International Group, Inc. is a Delaware corporation having its principal place of business at 70 Pine Street, New York, New York 10270.

10.     Counterclaim-Defendant C.V. Starr & Co., Inc. is a Delaware corporation, with its principal place of business at 399 Park Avenue, New York, New York. C.V. Starr is a holding company that owns the capital stock of five insurance agencies, four of which, Starr Tech, Starr Aviation , Starr California and Starr Associates, are Defendants to this lawsuit. American International Marine Agency ("AIMA"), the remaining Agency, is not named in this lawsuit because it does not make use of AIG's STARR trademark.

11.     Counterclaim-Defendant Starr Technical Risks Agency, Inc. is a New York corporation, wholly owned by C.V. Starr & Co., Inc. with, upon information and belief, its principal place of business at 399 Park Avenue, New York, New York.

12.     Counterclaim-Defendant Starr Associates, Inc. is a New York corporation, wholly owned by C.V. Starr & Co., Inc., with, upon information and belief, its principal place of business in Atlanta, Georgia.

13.     Counterclaim-Defendant Starr Aviation Agency, Inc. is upon information and belief, a New York corporation, wholly owned by C.V. Starr & Co., Inc., with its principal place of business at 1170 Peachtree Street, NE Ste. 1200, Atlanta, Georgia. Since 1961 and until recently, Counterclaim-Defendant Starr Aviation was known as American International Aviation Agency, Inc. ("AIAA"). In May 2006, over the objections of AIG, AIAA changed its name to Starr Aviation Agency, Inc.

-15-

14. Counterclaim-Defendant C.V. Starr & Co. is a California corporation, wholly owned by C.V. Starr & Co., Inc., with its principal place of business at Two Rincon Center, Suite 310, 121 Spear Street, San Francisco, California.

## JURISDICTION AND VENUE

15. AIG brings this action for federal trademark infringement in violation of Section 32(1) of the Trademark Act of 1946, as amended (the "Lanham Act"), 15 U.S.C. §1114(1); federal unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); cancellation of trademark registrations pursuant to Section 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§1114(1) and 1125(a); false advertising in violation of Sections 349 and 350 of the New York General Business Law; and trademark infringement and unfair competition in violation of the common laws of the State of New York and of the several states of the United States.

16. This Court has original jurisdiction under 15 U.S.C. §1121(a) and 28 U.S.C. §§ 1331, 1338(a) and 1338(b). This Court has supplemental jurisdiction over all other claims asserted herein under 28 U.S.C. §1367(a).

17. Venue is proper in this district pursuant to 28 U.S.C. §§1391(b) and (c).

## CORNELIUS VANDER STARR AND THE FOUNDING OF AIG

18. AIG traces its roots back to the second decade of the twentieth century when a young entrepreneur, Cornelius Vander Starr ("Mr. Starr"), conceived of and founded the organization that has now become the leading insurance enterprise in the world.

19. Almost a century after he began his first insurance venture, Mr. Starr remains an important part of AIG's corporate heritage and brand identity. Portraits, plaques,

-16-

photographs and even statues of Mr. Starr appear in the halls and conference rooms of AIG offices around the world, and certain of AIG's marketing materials and websites proudly recount Mr. Starr's life and work while they tell the story of AIG's founding.

20.    In 1919, drawn to the bustling international commercial center of Shanghai, Mr. Starr established his first company, a small insurance agency called American Asiatic Underwriters ("AAU"). AAU represented a number of American insurance companies and initially offered fire and marine insurance coverage.

21.    The success of AAU led Mr. Starr to set up the Asia Life Insurance Company ("ALIC"), and within 10 years he had established offices across China, Hong Kong, the Philippines, Indochina, Jakarta and Kuala Lumpur.

22.    In 1926, Mr. Starr started the first of many related companies in the United States to use the now famous AMERICAN INTERNATIONAL brand. Mr. Starr formed American International Underwriters Corporation ("AIUC") which was based in New York and produced and wrote insurance for represented companies on American risks outside the United States.

23.    During the years that followed, AIUC's business grew, as did the family of related "American International" branded companies. Among others, those companies included American International Marine Agency of New York, Inc. ("AIMA") (formed in 1945), American International Underwriters Overseas, Ltd. (1948), American International Reinsurance Company, Inc. (1948), American International Assurance Company Ltd. (1948), and American International Aviation Agency, Inc. ("AIAA") (1961).

24.    In 1950, twenty-four years after he first began establishing AMERICAN INTERNATIONAL-branded companies, Mr. Starr formed a company named C.V. Starr & Co.,

-17-

Inc. ("C.V. Starr"). The primary, if not sole, purpose for the formation of C.V. Starr was to hold Mr. Starr's domestic insurance agencies, including AIMA and AIAA.

        25.     In 1967, American International Group, Inc. was formed to hold the capital stock of certain of the insurance companies in the corporate family created by Mr. Starr. During the ensuing years, AIG continued to acquire interests in additional insurance and other companies, thus expanding its operations and brand recognition.

        26.     In May 1970, seeking further to formalize its existing close relationships with the C. V. Starr-owned insurance agencies that serviced its insurance companies, AIG purchased substantially all of the assets of C.V. Starr, including Mr. Starr's first U.S. company, AIUC, a domestic insurance agency. C.V. Starr was left with few significant holdings other than AIG stock.

        27.     Among the assets that C.V. Starr retained after the 1970 transaction were several small insurance agencies, including Starr Technical Risks Agency, Inc. ("Starr Tech"), C.V. Starr & Co. ("Starr California"), Starr Associates, Inc. ("Starr Associates"), AIAA (now "Starr Aviation") and AIMA (collectively, the "Agencies"). In 1969, the total combined commissions paid by AIG subsidiaries to the Agencies was less than one million dollars.

        28.     Although not formally acquired in the AIG consolidation in 1970, the Agencies and C.V. Starr continued to operate under the close supervision and control of the AIG insurance companies until early 2006, and one, AIMA, continues to this day to operate under such supervision and control. The Agencies had little infrastructure of their own and were completely dependant on AIG for basic operational support. For example, the Agencies were housed in AIG office space, used supplies obtained through AIG, used AIG as a payroll agent to

-18-

pay their employees through AIG's payroll system and offered employees benefits packages substantially similar to those offered to AIG employees.

## THE BUSINESS OF AIG

29.    Today (as it has been for decades), AIG is the world's leading international insurance and financial services organization, with operations in approximately 130 countries and jurisdictions throughout the world.  AIG's member companies serve commercial, institutional, and individual customers through the most extensive worldwide insurance network of any insurer.

30.    AIG offers a variety of insurance and financial products and services. Through its member companies, AIG is the leading underwriter and provider of insurance in the U.S.  AIG's financial services businesses include aircraft leasing, financial products, trading and market making.  AIG also has one of the largest U.S. retirement services businesses and is a leader in asset management for the individual and institutional markets, with specialized investment management capabilities in equities, fixed income, alternative investments and real estate.

31.    AIG's portfolio of products and services, historically, have been provided to the market through an expansive network of companies directly owned or controlled by AIG. Some of these do business under the AMERICAN INTERNATIONAL trademark, while others do business under the trademark STARR.  All, however, are part of the greater AIG family, and are known to the market as such.

### AIG's STARR Trademarks

32.    In addition to its common law rights in the STARR trademark, AIG owns the following United States Trademark Registrations:

-19-

| Registration No. | Mark | Class | Date of First Use |
|---|---|---|---|
| 2985541 | Starr Excess | 36 | 6/30/93 |
| 2985542 | Starr Excess Liability Insurance Company, Ltd. | 36 | 6/30/93 |
| 2985543 | Starr Excess Services | 36 | 9/1/99 |
| 3027448 | Starr Excess Liability Insurance International, Ltd. | 36 | 1/28/98 |
| 3027449 | Starr Excess International | 36 | 1/28/98 |
| 3027800 | Starr Excess International (and Design) | 36 | 6/30/93 |

These registrations are valid and subsisting, unrevoked and uncancelled, in full force and effect. True and correct copies of the aforesaid federal trademark registrations are attached hereto as Exhibit 1.

33.     In addition, as the entity in control of the quality of the services rendered thereunder, AIG is the rightful owner of the trademark registrations asserted by Counterclaim-Defendants C.V. Starr and Starr California. U.S. Trademark Registrations Nos. 2877409 for C.V. STARR & Co., 2926969 for C.V. STARR & Co. (and Design), 1601345 for STARR TECHNICAL RISKS AGENCY, Inc. (and Design), and 1570227 for STARR TECH (and Design) were filed and prepared by *AIG* employees for the benefit of *AIG* (together with the registrations attached as Exhibit 1, the "AIG STARR Marks").

34.     Employees of the AIG Intellectual Property Group themselves historically policed the AIG STARR Marks, as they did all other AIG-owned marks. Attached hereto as

-20-

Exhibit 2 are true and correct copies of cease and desist letters policing the STARR trademark sent to third-parties by outside counsel on behalf of AIG.

35.    AIG has incurred considerable expense advertising and promoting the AIG STARR Marks and the products and services offered in connection with these marks. True and correct copies of sample print advertisements and promotional materials using the AIG STARR Marks are attached hereto as Exhibit 3.

36.    The AIG STARR Marks are often, if not always, used in connection with the AIG house brand, further strengthening the connection between AIG and the STARR brand.

37.    AIG also promotes the AIG STARR Marks on various AIG-owned websites, including on the website for Starr Excess, located at starrexcess.com. Attached hereto as Exhibit 4 are true and correct copies of printouts from AIG-owned websites demonstrating AIG's use of the AIG STARR Marks.

38.    The news media frequently make reference to AIG in connection with the AIG STARR Marks, strengthening the connection between the two in the minds of the public. Attached hereto as Exhibit 5 are true and correct copies of news articles referencing AIG together with the AIG STARR Marks.

39.    As a result of AIG's substantial advertising and promotional efforts, and their long and continuous use by or under the control of AIG, the AIG STARR Marks enjoy tremendous goodwill and have come to be known by consumers as symbolizing the products and services offered by AIG.

40.    Now that C.V. Starr and the Agencies and AIG are severing their ties, Counterclaim-Defendants may no longer use the STARR trademarks in connection with their

-21-

business unless authorized by AIG to do so, and should not remain the record owner of trademark registrations containing the designation STARR.

### *AIG's Starr Excess Insurance Company*

41. Starr Excess Liability Insurance Company, Inc. ("Starr Excess") was formed in 1993 as a Bermuda corporation. At the time of its formation, Starr Excess was a wholly owned subsidiary of Starr Excess Liability Insurance Company, Ltd. ("SELIC") of which AIG was an approximately 24% owner. The remaining 76% of SELIC was owned by parties outside the AIG family of companies.

42. In 1998, AIG acquired the outstanding shares of SELIC, dissolved it as a holding company, and re-domesticated Starr Excess in Delaware as a subsidiary of AIG's wholly owned National Union Fire Insurance Company of Pittsburgh, Pa.

43. Today, Starr Excess is a leading writer of high-limit excess liability and financial lines coverage.

44. In 1993, Starr Excess (as licensee) entered into a license agreement (the "License Agreement") with C.V. Starr (as licensor), that granted Starr Excess a non-exclusive, non-transferable right to use the STARR trademark for an unspecified term of years, with only two events triggering termination of the agreement: (1) the consummation of an Initial Public Offering of Starr Excess or (2) a reduction in the ownership by AIG in the stock of SELIC below 5% of the outstanding shares of stock. Attached hereto as Exhibit 6 is a true and correct copy of this agreement.

45. The License Agreement is inadequate in a number of respects. The License Agreement is "naked" on its face in that it contains no quality control provisions

-22-

enabling the purported licensor, C.V. Starr, to monitor or control the licensee's use of the trademark and contained no restrictions on the use of the mark by the licensee.

46.    In addition, the purported licensor, C.V. Starr, was powerless to terminate the license.  Only two circumstances—neither of which could be controlled by C.V. Starr—gave rise to the termination of the license: (1) the consummation of an Initial Public Offering of Starr Excess or (2) a reduction in the ownership by AIG in the stock of SELIC below 5% of the outstanding shares of stock.  To the extent that neither of these events occurred, the "license" would exist perpetuity.

47.    Further, the License Agreement does not definitively assert that C.V. Starr, the purported licensor, is the owner of the "Starr" mark being licensed.  Rather, the License Agreement states that C.V. Starr "is the owner of, *or has or may have other rights to*, a corporate name and certain trademarks, service marks, trade names, designs, logos, brand marks and/or brand names which include the name "Starr" and registrations and applications therefor."

48.    In addition, the license is completely royalty-free and is granted without adequate consideration.

49.    The license was signed by Thomas Tizzo, who was, at the time, the President of AIG.

50.    Once the License Agreement was signed, C.V. Starr had no continuing relationship with Starr Excess and did not monitor or control its operations in any way, and as such, the License Agreement is a naked license.

51.    The purpose of the License Agreement was to ensure that AIG, the beneficial owner of the STARR mark, would not lose control of the mark in the event AIG

-23-

ceased to have a substantial interest in Starr Excess, providing for the mark to revert to C.V. Starr in that circumstance.

52.     To the extent this license agreement conferred any rights at all, being of unlimited duration, it functioned as an assignment in perpetuity of any rights that were the subject of the grant.

## THE BUSINESS OF C.V. STARR AND THE AGENCIES

53.     Counterclaim-Defendant C.V. Starr is a privately held corporation, presently controlled by Maurice R. Greenberg and certain associates, that was formed in 1950 to hold Cornelius Vander Starr's domestic insurance agencies. Mr. Greenberg was also the Chairman and CEO of AIG from approximately 1968 until March 2005, when he retired.

54.     As a holding company for all of the Agencies, C.V. Starr does not provide insurance products or services to the market and thus has minimal if any trademark recognition.

55.     Counterclaim-Defendant Starr Tech writes insurance for manufacturing facilities involving petroleum, natural gas, chemical, utilities, paper and pulp, mining, electronics, basic metals and related hazardous risks. Starr Tech was formed for the purpose of managing certain of AIG's energy-related insurance businesses and, for at least the past 20 years and until its termination in early 2006, operated as a *de facto* division of AIG, existing exclusively to produce and service AIG business.

56.     Counterclaim-Defendant Starr Aviation conducted business as American International Aviation Agency, Inc. from its formation in 1961 until approximately May, 2006. Starr Aviation has existed for virtually its entire existence for the sole purpose of managing the AIG Insurers' aviation-insurance business and operated as if it were a businesses unit or division of AIG. Starr Aviation heavily relied on AIG for business support in servicing AIG Insurers. In

-24-

fact, Starr Aviation had virtually no employees in the United States from 1987 onward. Instead, Starr Aviation handled this business by hiring AIG Aviation, Inc. ("AIG Aviation"), a subsidiary of Plaintiff AIG, as *its own* MGA, and purporting to reimburse AIG for the cost of these services.

57.     Counterclaim-Defendant Starr California, until recently, was underwriting manager for AIG Insurers in Excess Commercial Casualty Insurance lines. Like its sister Starr Agencies, Starr California operated as a division/profit center of AIG, under AIG's direct supervision and control.

58.     Counterclaim-Defendant Starr Associates served as managing general agent to AIG member company The Insurance Company of the State of Pennsylvania, to sell property insurance from approximately 1986 until the mid 1990s. Subsequently, Starr Associates took over the management of several insurance programs operated by AIG member insurance companies, all of which are now either concluded or in run off. On information and belief, Starr Associates currently has no active business and is essentially a dormant company.

### AIG and the Agencies Operated in a Principal-Agent Relationship

59.     As of early 2006, the Agencies had served for many decades, and for most if not all of their corporate lives, as managing general agents ("MGAs") to AIG member companies.

60.     An MGA is an agent authorized by an insurance company to manage all or part of an insurer's business, often in a specific geographic territory and/or for a particular class of insurance. An MGA may market an insurer's business, underwrite and issue policies, collect premiums, adjust and pay claims, supervise policy-related litigation and negotiate reinsurance agreements. In exchange for these services, MGAs typically retain a percentage of the premiums collected on the business they underwrite.

-25-

61.    An MGA is a fiduciary of an insurer, operating, as its name suggests, as an agent servicing its principal.

62.    As MGAs to AIG member insurance companies, the Agencies' authority to do business was closely controlled by the various AIG member insurance companies that were their principals. For example, the Agencies were typically limited in the amount of liability they could assume on any one risk, were required to obtain approval from the AIG member company for underwriting and producer guidelines they created, and were excluded from writing certain classes of risk. Further, AIG member companies would typically retain the right to cancel or not renew any policy written by the Agencies.

***AIG, C.V. Starr and the Agencies Were Operationally Intertwined***

63.    The corporate separation between C.V. Starr, the Agencies and AIG was largely a formality. Operationally, on a day-to-day basis, C.V. Starr and the Agencies functioned under AIG supervision and were treated like any other AIG-owned business division.

64.    C.V. Starr and the Agencies were managed by AIG corporate executives, operated out of office-space owned or leased by AIG, and regularly relied on AIG personnel for basic operational support and services.

65.    Until recently, employees of certain of the Agencies carried business cards, used letterhead, and even carried credit cards bearing the AIG trademark. Attached hereto as Exhibit 7 is a true and correct copy of a business card used by a Starr California employee prominently bearing the AIG trademark.

66.    Employees of certain of the Agencies used "aig.com" email addresses, so their external email communications were indistinguishable to the market from emails from actual AIG employees.

-26-

67.    Employees of C.V. Starr and the Agencies were eligible for AIG employee benefits, such as participation in AIG's healthcare and retirement plans.

68.    AIG's internal newsletter, *AIG Contact*, "[t]he Employee Publication of the American International Companies," was routinely distributed to the personnel of C.V. Starr and the Agencies.

69.    Internal AIG correspondence was sometimes written on letterhead bearing both the AMERICAN INTERNATIONAL and STARR trademarks. Attached hereto as Exhibit 8 are true and correct copies of internal memoranda bearing trademarks of both American International Underwriters, an AIG business unit, and Starr Tech.

70.    AIG employees prepared and filed trademark registrations in the name of related companies C.V. Starr and Starr California.

71.    Likewise, AIG registered and owns numerous domain names containing the designation STARR, including, *inter alia*, cvstarr.com, cvstarr.us, starr-tech.com, starr-tech.biz, starr-tech.info, starr-tech.net, starr-tech.org, starr-tech.us, starrtechnical.com, starrtechnical.biz, starrtechnical.info, starrtechnical.net, and starrexcess.com among others. These domain names correspond to the corporate names of both AIG-owned STARR branded companies, such as Starr Excess, and AIG-controlled STARR branded companies, such as Starr Tech and Starr California. Until very recently, the domain name cvstarr.com housed the website for Starr California.

72.    The corporate governance of C.V. Starr and the Agencies reflected the interconnectedness and common purpose of these entities. For most of their history, the Boards of Directors of C.V. Starr and the Agencies were comprised largely, if not entirely, of senior officers of AIG, its member companies, or its predecessors-in-interest.

-27-

73.     That C.V. Starr and the Agencies have always been part of the greater AIG family is evidenced by the corporate names of the Agencies: two of the four Agencies, American International Aviation Agency and American International Marine Agency, are (or were until quite recently in the case of AIAA) named "American International," while the remaining three, Starr Tech, Starr California and Starr Associates, are named "Starr." All five of the Agencies have shared in AIG's brand identity.

74.     In fact, C.V. Starr has conceded AIG's superior rights in the AMERICAN INTERNATIONAL trademark by discontinuing use of AMERICAN INTERNATIONAL by AIAA pursuant to an agreement with AIG. Recently, after over forty years of doing business under the AMERICAN INTERNATIONAL brand, AIAA, over the objections of AIG, has changed its name to Starr Aviation and intends to offer insurance services to the aviation insurance market under the designation STARR.

75.     AIMA, the other C.V. Starr subsidiary named AMERICAN INTERNATIONAL continues to operate as the agent to AIG insurance companies, and may therefore continue to make use of the AMERICAN INTERNATIONAL trademark, but only under the close supervision and control of AIG.

*C.V. Starr and the Agencies Are Considered Part of AIG by the Consuming Public*

76.     Not surprisingly, having functioned as MGAs to AIG member companies since at least 1970, the Agencies, their parent C.V. Starr, and the trademark STARR, are associated with AIG in the minds of the consuming public. In fact, C.V. Starr and the Agencies have little, if any, brand-recognition independent of AIG. As far as the public is concerned, C.V. Starr and the Agencies are, and always have been, part of the AIG family of companies.

-28-

77.    Moreover, until recently, that is how C.V. Starr and the Agencies presented themselves to the marketplace. For example, certain of Starr Tech's marketing materials bear the AIG trademark and refer to Starr Tech as "an affiliate of American International Companies." Similarly, Starr California's marketing materials also bear the AIG trademark and refer to Starr California as "a member company of the American International Group, Inc." Attached hereto as Exhibits 9 & 10, respectively, are true and correct copies of marketing and promotional materials for Starr Tech and Starr California.

78.    Until recently, Starr Tech was a key component of AIG's Global Energy Group, an integrated team of energy businesses, which was branded "AIG Global Energy" and presented to the marketplace as a single business unit. Attached hereto as Exhibit 11 are true and correct copies of an AIG Global Energy Brochure available to the public on an AIG website and presentation entitled "Global Energy Clients Solutions Platform" prepared in 2002 identifying Starr Tech as a member of AIG's Global Energy Group.

79.    For approximately forty-five years, from its formation in 1961 until about May 2006, Starr Aviation operated as "American International Aviation Agency, Inc." In May 2006, several months after the relationship between AIAA and AIG formally ended, AIAA changed its name to Starr Aviation, over the immediate objections of AIG. For almost half a century, however, Defendant Starr Aviation conducted business under the "American International" banner, representing itself to the consuming public as an integral part of the American International family of companies.

80.    Over the years, both C.V. Starr and AIG have issued press releases about company business that created the impression that C.V. Starr and the Agencies were part of the

-29-

AIG family of companies. Attached hereto as Exhibit 12 are true and correct copies of such press releases.

81.    In fact, the media, including business and insurance industry publications, have often referred to various of the Agencies as part of AIG. Attached hereto as Exhibit 13 are true and correct copies of such articles referring to certain of the Agencies as divisions, subsidiaries (or other similar terms) of AIG.

82.    Insurance brokers have always considered the Agencies to be part of AIG. Attached hereto as Exhibit 14 is a true and correct copy of an email dated February 2, 2006, sent by an employee at AON, one of the world's largest insurance brokers, to other Aon employees, stating that Aon has always regarded C.V. Starr as part of AIG.

### AIG Granted Certain of the Agencies an Implied License To Use the STARR Trademark And Closely Controlled The Quality Of Services Rendered Thereunder

83.    As their activities have been controlled consistently throughout the years by AIG and its predecessors, C.V. Starr and the Agencies have used the designation STARR pursuant to an implied license from AIG. For as long as C.V. Starr and the Agencies remained part of the greater AIG family of companies, functioned as managing general agents to AIG member insurance companies, and were subject to the control and supervision of AIG, they were permitted to use AIG's STARR trademark

84.    In its capacity as principal/licensor, AIG exercised tight control over the business operations and quality of services provided by the Agencies. The Agencies have been managed and overseen by AIG executives, audited by AIG's internal auditing groups, staffed entirely or in part by AIG employees, and housed in office space owned or leased by AIG. Virtually all of the services that the Agencies required to operate, from human resources

-30-

functions, to legal services, to the provision of office supplies were provided by AIG. On a day–to–day basis, C.V. Starr and the Agencies, including Counterclaim Defendants, functioned under AIG supervision and were treated like any AIG–owned business division.

85.    AIG's Underwriting Resource Division conducted regular audits of the Agencies' business operations and issued "Underwriting Audit Reports" to AIG management. These audits assessed the operations of the agency at issue to determine whether they met the quality control standards set by AIG.

86.    AIG's Internal Audit Division also conducted regular audits of the Agencies' business operations and issued "Internal Audit Reports" to AIG management. These reports reviewed the adequacy and effectiveness of the Agencies' operations and often made detailed recommendations for their improvement.

87.    Further, all insurance policy forms used by the Agencies were reviewed and approved by AIG. Often, these forms bore AIG copyright notices.

88.    Performance reviews of Agency personnel were conducted in part by AIG Human Resources employees, pursuant to AIG standards, and recorded on AIG performance appraisal forms. Attached hereto as Exhibit 15 is a true and correct copy of an AIG Performance Appraisal form dated May 26, 2004, for Robert J. Penny, a former employee of Starr California.

89.    In stark contrast to the extensive monitoring and control exercised by AIG over the Agencies' operations, C.V. Starr, the Agencies' corporate parent, exercised no quality control over the services provided by the Agencies.

-31-

**THE TERMINATION OF CERTAIN OF THE AGENCIES AND CONFUSION IN THE MARKETPLACE**

90.    In early 2006, AIG's insurance subsidiaries terminated Starr Tech, Starr California, Starr Associates, and AIAA as their agents.

91.    During the week of March 27, 2006, C.V. Starr placed an advertisement in the *Wall Street Journal* touting its "specialist companies, AIAA, AIMA, Starr Tech, and CV Starr & Co." Upon information and belief, this advertisement, and similar advertisements, have recently been featured in several other high-circulation business publications, including *BusinessWeek* and the *Financial Times*, and have appeared on numerous insurance and business-related Internet websites. Attached hereto as Exhibit 16 is a true and correct copy of this advertisement.

92.    C.V. Starr has also placed several Internet advertisements in the web-publication *Business Insurance*, and, upon information and belief, in a blatant attempt to confuse consumers, C.V. Starr has contracted to have such advertisements automatically appear adjacent to on-line articles that reference AIG.

93.    These advertisements misrepresent the nature, characteristics and origin of Counterclaim-Defendants' services and contain misleading representations of fact that are likely to cause consumers to believe, falsely, that Counterclaim-Defendants' services are associated, sponsored or otherwise approved by AIG, when they are not.

94.    Further, in approximately March 2006, C.V. Starr launched a website, located at cvstarrco.com. Initially, this website advertised the services of the Agencies, and prominently made use of AIG's trademark AMERICAN INTERNATIONAL in the names of both American International Aviation Agency and American International Marine Agency,

-32-

abbreviated on the site as "AIAA" and "AIMA," respectively. Attached hereto as Exhibit 17 is a true and correct copy of the cvstarrco.com home page making use of the AMERICAN INTERNATIONAL trademark through these designations. Pursuant to an agreement with AIG, Starr Aviation has agreed to cease all use of the trademark AMERICAN INTERNATIONAL, and has removed the references to "AIAA" on its webpage.[1]

95.     This recent conduct makes clear that, rather than establishing a new corporate identity after severing ties with AIG, Counterclaim-Defendants have chosen to appropriate the STARR brand to themselves, presumably to benefit from goodwill embodied in this name. However, in doing so, Counterclaim-Defendants are blatantly and falsely misleading the public into believing that they remain associated with AIG, when they do not.

96.     On March 20, 2006, C.V. Starr filed the instant action claiming ownership of the STARR brand and suing AIG for trademark infringement, unfair competition and related claims.

97.     With the filing of these counterclaims, AIG asserts its ownership of the STARR trademark and seeks to prevent Counterclaim-Defendants from defrauding the public and impermissibly trading on AIG's goodwill through their continued use of the STARR brand in connection with insurance services without the permission of AIG. AIG, the rightful owner of the STARR trademark and legacy, will suffer both material and irreparable harm by way of

---

[1]    American International Marine Agency, Inc. (AIMA) remains AIG's managing general agent today and therefore continues to use the famous AMERICAN INTERNATIONAL trademark with AIG's permission and under its supervision and control.

-33-

injury to its reputation, goodwill, and critical business relationships if Counterclaim-Defendants
are not immediately enjoined from unauthorized use of the STARR mark.

## COUNT I-FEDERAL TRADEMARK INFRINGEMENT

98.     AIG hereby realleges and incorporates by reference the allegations of
paragraphs 1 through 97.

99.     Counterclaim-Defendants, without the consent of AIG, have used, and will
continue to use, in commerce designations confusingly similar to the registered AIG STARR
Marks on or in connection with goods and services closely related to those of AIG.

100.    The aforesaid acts of Counterclaim-Defendants constitute trademark
infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

101.    The aforesaid acts of Counterclaim-Defendants have caused, and are
causing, great and irreparable harm to AIG and, unless permanently restrained by this Court, said
injury will continue.

## COUNT II-FEDERAL UNFAIR COMPETITION

102.    AIG hereby realleges and incorporates by reference the allegations of
paragraphs 1 through 101.

103.    The aforesaid acts of Counterclaim-Defendants constitute use in
commerce of words, terms, names, symbols, and devices, and combinations thereof; false
designation of origin; false and misleading descriptions of fact; and false and misleading
representations of fact that are likely to cause confusion, or to cause mistake, or to deceive as to
the affiliation, connection, or association of Counterclaim-Defendants with AIG, or as to the
origin, sponsorship, or approval of Counterclaim-Defendants' services, goods, or any other
commercial activities.

-34-

104.    The aforesaid acts of Counterclaim-Defendants constitute false designation of origin and false and misleading descriptions and representations in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

105.    The aforesaid acts of Counterclaim-Defendants have caused, and are causing, great and irreparable harm to AIG and, unless permanently restrained by this Court, said injury will continue.

## COUNT III-FEDERAL UNFAIR COMPETITION
### (False Advertising)

106.    AIG hereby realleges and incorporates by reference the allegations of paragraphs 1 through 105.

107.    The aforesaid acts of Counterclaim-Defendants constitute use in commerce of words, terms, names, symbols, and devices, and combinations thereof; false designation of origin; false and misleading descriptions of fact; and false and misleading representations of fact in commercial advertising or promotion which misrepresents the nature, characteristics, qualities, or geographic origin of Counterclaim-Defendants' services and/or commercial activities.

108.    The aforesaid acts of Counterclaim-Defendants constitute false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

109.    The aforesaid acts of Counterclaim-Defendants have caused, and are causing, great and irreparable harm to AIG and, unless permanently restrained by this Court, said injury will continue.

-35-

## COUNT IV-FALSE ADVERTISING UNDER NEW YORK LAW

110.    AIG hereby realleges and incorporates by reference the allegations of paragraphs 1 through 109.

111.    Counterclaim-Defendants misleadingly advertised goods and services in that Counterclaim-Defendants made statements, used words, designs, devices, sounds or combinations thereof that failed to reveal facts material in light of such representations with respect to the subject service, or under such conditions as are customary or usual.

112.    The aforesaid acts of Counterclaim-Defendants constitute false advertising in the conduct of business, trade, or commerce or in the furnishing of any service in New York State in violation of Sections 349 and 350 of the New York General Business Law.

113.    The aforesaid acts of Counterclaim-Defendants have caused, and are causing, great and irreparable harm to AIG and, unless permanently restrained by this Court, said injury will continue.

## COUNT V-COMMON LAW TRADEMARK INFRINGEMENT

114.    AIG hereby realleges and incorporates by reference the allegations of paragraphs 1 through 113.

115.    The aforesaid acts of Counterclaim-Defendants constitute use that is likely to cause confusion as to the source of Counterclaim-Defendants' services.

116.    The aforesaid acts of Counterclaim-Defendants constitute trademark infringement in violation of common law.

117.    The aforesaid acts of Counterclaim-Defendants have caused, and are causing, great and irreparable harm to AIG and, unless permanently restrained by this Court, said injury will continue.

-36-

## COUNT VI-COMMON LAW PASSING OFF

118.   AIG hereby realleges and incorporates by reference the allegations of paragraphs 1 through 117.

119.   The aforesaid acts of Counterclaim-Defendants misrepresent the source of Counterclaim-Defendants' services as AIG.

120.   The aforesaid acts of Counterclaim-Defendants constitute use that is likely to cause confusion as to the source of Counterclaim-Defendants' services.

121.   The aforesaid acts of Counterclaim-Defendants have caused, and are causing, great and irreparable harm to AIG and, unless permanently restrained by this Court, said injury will continue.

## COUNT VII-COMMON LAW UNFAIR COMPETITION

122.   AIG hereby realleges and incorporates by reference the allegations of paragraphs 1 through 121.

123.   The aforesaid acts of Counterclaim-Defendants constitute use that is likely to cause confusion as to the source of Counterclaim-Defendants' services.

124.   The aforesaid acts of Counterclaim-Defendants constitute unfair competition in violation of common law.

125.   The aforesaid acts of Counterclaim-Defendants have caused, and are causing, great and irreparable harm to AIG and, unless permanently restrained by this Court, said injury will continue.

## COUNT VIII-COMMON LAW UNJUST ENRICHMENT

126.   AIG hereby realleges and incorporates by reference the allegations of paragraphs 1 through 125.

-37-

127.    Counterclaim-Defendants have benefited, at AIG's expense, from their unauthorized use of the AIG STARR Marks, and the goodwill embodied therein, in connection with insurance agency services no longer affiliated with or controlled by AIG.

128.    Equity and good conscience thus require restitution.

### COUNT IX-CANCELLATION OF TRADEMARK REGISTRATIONS

129.    AIG hereby realleges and incorporates by reference the allegations of paragraphs 1 through 128.

130.    Counterclaim Defendant C.V. Starr and its wholly-owned subsidiary Starr California, applied for and obtained at least four federal registrations for marks containing the term STARR in connection with insurance products and services. These applications and registrations were filed and prepared by AIG employees for the benefit of AIG, the entity that controlled the quality of the services provided to the market under these trademarks.

131.    Counterclaim-Defendants' registrations should be cancelled pursuant to 15 U.S.C. § 1064 on the grounds that they falsely suggest a connection with AIG, and are therefore contrary to the provisions of 15 U.S.C. § 1052 (a).

132.    Counterclaim-Defendants' registrations should be cancelled pursuant to 15 U.S.C. § 1064 on the grounds that they misrepresent the source of the services on or in connection with which the mark is used.

133.    Counterclaim-Defendants' registrations should be cancelled pursuant to 15 U.S.C. § 1064 on the grounds that they have been abandoned.

### REQUESTED RELIEF

WHEREFORE, AIG prays for a judgment in its favor and against Counterclaim-Defendants ordering:

-38-

a. That Counterclaim-Defendants, and each of their subsidiaries, officers, directors, agents, servants, employees and representatives, and those persons in active concert or participation with them or any of them, be permanently enjoined and restrained from:

    1) Using on or in connection with the products and services of Counterclaim-Defendants, including, without limitation, the service of underwriting insurance, the mark STARR, or any colorable imitations thereof, or anything confusingly similar thereto, without authorization from AIG;

    2) Representing by any means whatsoever, directly or indirectly, or doing any other acts or things calculated or likely to cause confusion, mistake, or to deceive consumers into believing that their services and any related products are the services or products of AIG, or that there is any affiliation or connection between Counterclaim-Defendants, their subsidiaries, or their services and products and services and AIG and from otherwise unfairly competing with AIG, without authorization from AIG;

b. That Counterclaim-Defendants be directed to file with this Court and to serve upon AIG within fifteen (15) days after service upon Counterclaim-Defendants of this Court's injunction issued in this action, a written report by Counterclaim-Defendants under oath setting forth in detail the manner in which they have complied with this injunction.

c. That AIG recover its damages sustained as a result of Counterclaim-Defendants' federal trademark infringement, unfair competition, and false advertising together with an accounting of Counterclaim-Defendants' profits arising from such activities, and that the Court exercise its discretion and enter judgment for such additional sums as the Court shall find to be just, according to the nature of the acts of Counterclaim-Defendants.

d. That AIG have and recover treble damages under 15 U.S.C. § 1117 by reason of the willful and deliberate acts of federal trademark infringement by Counterclaim-Defendants.

e. That AIG have and recover its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

f. That AIG have and recover Counterclaim-Defendants' profits and/or damages by reason of Counterclaim-Defendants' acts of trademark infringement and unfair competition under the common law.

g. That AIG have and recover damages and reasonable attorneys fees pursuant to Section 350(e) of the New York General Business Law.

h. That Counterclaim-Defendants be required to recall from all channels of trade and any and all advertising and promotional materials or other infringing matter, and to take affirmative steps to dispel any false suggestion of a connection to AIG by virtue of their infringing activities, including, but not limited to (1) changing the name of C.V. Starr & Co., Inc., Starr Technical Risks Agency, C.V. Starr & Co. Starr Associates, Inc. and Starr Aviation Agency, Inc. so that they do not contain the designation STARR, C.V. STARR, or any designation confusingly similar thereto and (2) notifying the relevant public that these entities have changed their names and they have no affiliation with AIG, if they do not.

i. That this Court order the cancellation of United States Trademark Registrations Nos. 2877409 for C.V. STARR & Co., 2926969 for C.V. STARR & Co. (and Design), 1601345 for STARR TECHNICAL RISKS AGENCY, Inc. (and Design), and 1570227 for STARR TECH (and Design), or, in the alternative, that Counterclaim-Defendants be required to assign said trademark registrations to AIG to rectify the Federal Register.

-40-

j.  That AIG have and recover its taxable costs and disbursements herein.

k.  That AIG have such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

AIG respectfully demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil

Procedure on any and all issues so triable.

Dated: New York, New York
      June 5, 2006

<div style="margin-left:40%">

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP

By _____
   Robert L. Raskopf (RR-5027)
   Michael B. Carlinsky (MC-6594)
   Jennifer J. Barrett (JB-8749)
   Jessica A. Rose (JR-4300)

   51 Madison Avenue, 22nd Floor
   New York, NY 10010
   Phone: (212) 849-7000
   Fax: (212) 849-7100
   Attorneys for American International Group,
   Inc.

</div>

-41-

EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
             :

C.V. STARR & CO., INC. C.V. STARR
& CO., and STARR TECHNICAL RISKS  :
AGENCY, INC.,

             Plaintiffs,      :

           vs.        :

AMERICAN INTERNATIONAL     :
GROUP, INC. and STARR EXCESS   x
LIABILITY INSURANCE COMPANY,
LTD.

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

                x
AMERICAN INTERNATIONAL     :
GROUP, INC.,

        Counterclaim Plaintiff,   :

        vs.       :

C.V. STARR & CO., INC., STARR    :
TECHNICAL RISKS AGENCY, INC.,
STARR ASSOCIATES, INC.      :

        Counterclaim-Defendants.  x
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case No. 06 CV 2157 (HB)

## MEMORANDUM OF LAW IN OPPOSITION TO MOVANTS'
## MOTION TO DISMISS AIG'S COUNTERCLAIMS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................................... 1

STATEMENT OF FACTS ................................................................................................................. 3

ARGUMENT ....................................................................................................................................... 9

I.     AIG HAS ADEQUATELY PLED OWNERSHIP OF THE STARR MARKS ................ 10

     A.    AIG Has Adequately Pled Ownership of The Starr Marks by Alleging
           That It Controlled The Quality of Services Rendered Under Them ...................... 10

     B.    AIG Has Adequately Pled Ownership of The Starr Marks as The Senior
           User ............................................................................................................................. 15

II.    AIG'S AMENDED COUNTERCLAIMS DO NOT DEPEND ON ITS
      OWNERSHIP OF THE STARR MARK .......................................................................... 17

     A.    AIG Has Stated Claims For False Advertising ...................................................... 17

           1.     False Advertising under The Lanham Act .................................................. 17

           2.     False Advertising under New York Law ..................................................... 21

     B.    AIG Has Stated Claims For Unfair Competition .................................................. 22

           1.     False Designation of Origin Under the Lanham Act ................................. 22

           2.     False Designation of Origin Under New York Law ................................... 23

     C.    AIG Has Stated A Claim for Unjust Enrichment. .................................................. 24

     D.    AIG Has Stated A Claim for Cancellation of Trademark Registration. ................ 25

           1.     AIG Has Stated A Claim For Cancellation or Assignment of the
               "C.V. Starr & Co." Registrations. ............................................................... 25

           2.     AIG Has Stated A Claim For Cancellation or Assignment of the
               "Starr Tech" Registrations. .......................................................................... 26

III.   AIG HAS ALLEGED GROUNDS FOR AN ACCOUNTING AND FEES. .................... 28

CONCLUSION .................................................................................................................................. 32

i

## TABLE OF AUTHORITIES

**Page**

### Cases

Admiral Corp. v. Sewing Mach. Sales Corp.,
   156 F. Supp. 796 (S.D.N.Y. 1957) ...................................................................................31

Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.,
   977 F. Supp. 264 (S.D.N.Y. 1997) .................................................................................25

Am. Home Prods. Corp. v. Johnson & Johnson,
   577 F.2d 160 (2d. Cir. 1978) ........................................................................................18

America Online Latino v. America Online, Inc.,
   250 F. Supp. 2d 351 (S.D.N.Y. 2003) ...........................................................................11

Ames Publ'g Co. v. Walker-Davis Publ'ns, Inc.,
   372 F. Supp. 1 (E.D. Pa. 1974)......................................................................................22

Arc/Connecticut v. O'Meara,
   No. 3:01cv1871, 2002 WL. 31106383 (D. Conn. Aug. 20, 2002) ...........................................29

Asher v. Reliance Ins. Co.,
   308 F. Supp. 847 (N.D. Cal. 1970).................................................................................29

Ballet Makers, Inc. v. U.S. Shoe Corp.,
   633 F. Supp. 1323 (S.D.N.Y. 1986) ...................................................................12, 14, 25

Banff, Ltd. v. Colberts, Inc.,
   996 F.2d 33 (2d Cir. 1993) ...........................................................................................31

Banjo Buddies, Inc. v. Renosky,
   399 F.3d 168 (3d Cir. 2005) ..........................................................................................30

Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.,
   289 F.3d 589 (9th Cir. 2002) .........................................................................................12

Bell v. Streetwise Records, Ltd.,
   640 F. Supp. 575 (D. Mass 1986)...........................................................................11, 13, 14

Billy Baxter, Inc. v. Coca-Cola Co.,
   431 F.2d 183 (2d. Cir. 1970) .........................................................................................10

Blue Planet Software, Inc. v. Games Int'l, LLC,
   334 F. Supp. 2d 425 (S.D.N.Y. 2004) ............................................................................14

CNA Fin. Corp. v. Brown,
   930 F. Supp. 1502 (M.D. Fla. 1996)...............................................................................11

Cheng v. Dispeker,
   35 U.S.P.Q. 2d 1493 (S.D.N.Y. 1995) ...........................................................................13

ii

Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,
    794 F.2d 38 (2d Cir. 1986) ........................................................................................................11

Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.,
    166 F. Supp. 2d 891 (S.D.N.Y. 2001) ....................................................................................23

Conley v. Gibson,
    355 U.S. 41 (1957) ...................................................................................................................9

Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,
    671 F. Supp. 1369 (S.D.N.Y. 1987) .......................................................................................31

Cuban Cigar Brands N. V. v. Upmann Int'l, Inc.,
    457 F. Supp. 1090 (S.D.N.Y. 1978), aff'd, 607 F.2d 995 (2d Cir. 1979) ................................28

Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,
    604 F.2d 200 (2d Cir. 1979) ...................................................................................................26

Eco Manufacturing v. Honeywell Int'l,
    357 F.3d 649 (7th Cir. 2003) ..................................................................................................14

FTC v. Crescent Publ'g Group, Inc.,
    129 F. Supp. 2d 311 (S.D.N.Y. 2001) ....................................................................................21

Franchised Stores of New York, Inc. v. Winter,
    394 F.2d 664 (2d Cir. 1968) ...............................................................................12, 14, 25, 27

In re Gen. Motors Corp.,
    383 F. Supp. 2d 1340 (W.D. Okla. 2005).................................................................................29

Gidatex, S.r.L. v. Campaniello Imps., Ltd.,
    82 F. Supp. 2d 136 (S.D.N.Y. 2000) ......................................................................................30

Gilliam v. Am. Broad. Cos.,
    538 F.2d 14 (2d Cir. 1976) ...............................................................................................22, 23

Goshen v. Mut. Life Ins. Co. of New York,
    774 N.E.2d 1190 (N.Y. 2002) ................................................................................................21

H.H. Scott, Inc. v. Annapolis Electroacoustic Corp.,
    195 F. Supp. 208 (D. Md. 1961).............................................................................................28

In re Houbigant, Inc.,
    914 F. Supp. 964 (S.D.N.Y. 1995) ...........................................................................................8

I.H.T. Corp. v. News World Commc'ns, Inc.,
    No. 83 Civ. 3862-CSH, 1984 WL. 604 (S.D.N.Y. July 3, 1984) .............................................16

Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,
    58 F.3d 27 (2d Cir. 1995) .......................................................................................................23

Johnson & Johnson v. Carter-Wallace, Inc.,
    631 F.2d 186 (2d Cir. 1980) .......................................................................................18, 19, 20

In re Julie White,
    73 U.S.P.Q. 2d 1713 (T.T.A.B. 2004) ................................................................................27

Katz v. Modiri,
    283 F. Supp. 2d 883 (S.D.N.Y. 2003) .................................................................................18

La Terraza De Marti, Inc. v. Key West Fragrance & Cosmetic Factor, Inc.,
    617 F. Supp. 544 (S.D. Fla. 1985)........................................................................................9

Liebowitz v. Elsevier Science Ltd.,
    927 F. Supp. 688 (S.D.N.Y. 1996) ................................................................10, 11, 12, 13

Lipton v. Nature Co.,
    71 F.3d 464 (2d. Cir 1995) .................................................................................................18

Lurzer GMBH v. Am. Showcase, Inc.,
    75 F. Supp. 2d 98 (S.D.N.Y. 1998) ...............................................................................12, 26

Marvel Comics Ltd. v. Defiant,
    837 F. Supp. 546 (S.D.N.Y 1993) .....................................................................................9, 20

Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.,
    No. 02 Civ. 3691, 2004 WL. 326708 (S.D.N.Y. Feb. 23, 2004).........................................30

Mfrs. Hanover Trust Co. v. Chem. Bank,
    160 A.D.2d 113, 559 N.Y.S.2d 704 (App. Div. 1st Dep't 1990)..........................................24

Mobil Oil Corp. v. Pegasus Petroleum Corp.,
    818 F.2d 254 (2d Cir. 1987) ...............................................................................................18

Morehouse Mfg. Corp. v. J. Strickland & Co.,
    407 F.2d 881 (C.C.P.A. 1969)............................................................................................26

Moses v. Citicorp Mortgage, Inc.,
    982 F. Supp. 897 (E.D.N.Y. 1997) .....................................................................................21

Nat'l Trailways Bus Sys. v. Trailway Van Lines,
    269 F. Supp. 352 (E.D.N.Y. 1965).....................................................................................11

NetTech Solutions, L.L.C. v. ZipPark.com, Inc.,
    No. 01 Civ. 2683, 2001 WL. 1111966 (S.D.N.Y. Sept. 20, 2001)......................................23

Nike, Inc. v. Top Brand Co. Ltd.,
    No. 00 Civ. 8179, 2005 WL. 1654859 (S.D.N.Y. July 13, 2005)........................................30

Nora Beverages, Inc. v. Perrier Group of Am., Inc.,
    164 F.3d 736 (2d Cir. 1998) ...............................................................................................29

Norwalk CORE v. Norwalk Redevelopment Agency,
    395 F.2d 920 (2d Cir. 1968) ...............................................................................................29

Original Appalachian Artworks, Inc., v. Granada Elecs., Inc.,
    816 F.2d 68 (2d Cir. 1987) .................................................................................................10

PPX Enters., Inc. v. Audiofidelity, Inc.,
   746 F.2d 120 (2d Cir. 1984) ...................................................................................18, 19, 20

Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,
   469 U.S. 189 (1985) .................................................................................................14

Polymer Tech. Corp v. Mimran,
   37 F.3d 74 (2d Cir. 1994) .........................................................................................10

Popular Merch. Co. v. "21" Club, Inc.,
   343 F.2d 1011 (C.C.P.A. 1965) ................................................................................26

Quick Techs., Inc. v. Sage Group PLC,
   313 F.3d 338 (5th Cir. 2002) ....................................................................................30

Rick v Buchansky,
   609 F. Supp. 1522 (S.D.N.Y. 1985) .........................................................................11

Ryan v. Volpone Stamp Co.,
   107 F. Supp. 2d 369 (S.D.N.Y. 2000) ........................................................................9

Schatt v. Curtis Mgmt. Group, Inc.,
   764 F. Supp. 902 (S.D.N.Y. 1991) ...........................................................................24

Securitron Magnalock Corp. v. Schnabolk,
   65 F.3d 256 (2d Cir. 1995) .......................................................................................21

Shakur v. Selsky,
   391 F.3d 106 (2d Cir. 2004) .......................................................................................9

Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship,
   380 F.3d 126 (2d. Cir. 2004) ....................................................................................18

Staley/Robeson, Inc. v. Staley/Robeson/Ryan/St. Lawrence, Inc.,
   38 F. Supp. 2d 280 (S.D.N.Y 1999) .........................................................................21

Stanfield v. Osborne Indus.,
   52 F.3d 867 (10th Cir. 1995) ....................................................................................12

Terry v. UNUM Life Ins. Co.,
   394 F.3d 108 (2d Cir. 2005) .....................................................................................29

The Martha Graham School and Dance Found., Inc. v. Martha Graham Ctr. of Contemporary
Dance, Inc.,
   153 F. Supp. 2d 512 (S.D.N.Y. 2001) ........................................................................8

Tumblebus Inc. v. Cranmer,
   399 F.3d 754 (6th Cir. 2005) ....................................................................................11

Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,
   220 F. Supp. 2d 289 (S.D.N.Y. 2002) .......................................................................18

W.E. Bassett Co. v. Revlon, Inc.,
   305 F. Supp. 581 (S.D.N.Y. 1969) ...........................................................................31

In re Wella A.G.,
   787 F.2d 1549 (Fed. Cir. 1986) .............................................................................16

In re Wielinski,
   49 U.S.P.Q. 2d 1754 (T.T.A.B. 1998) ...................................................................26

## Statutes

15 U.S.C. § 1052 ...................................................................................................26

15 U.S.C. § 1052(a) ..............................................................................................26

15 U.S.C. § 1055 ...................................................................................................16

15 U.S.C. § 1064 ...................................................................................................26

15 U.S.C. § 1064(3) .....................................................................................26, 27, 28

15 U.S.C. § 1115(a) ...............................................................................................14

15 U.S.C. § 1115(b) ...............................................................................................14

15 U.S.C. § 1115(b)(2) ...........................................................................................14

15 U.S.C. § 1115(b)(3) ...........................................................................................15

15 U.S.C. § 1115(b)(9) ...........................................................................................15

15 U.S.C. § 1117 ...............................................................................................28, 29

15 U.S.C. § 1117(a) ...............................................................................................29

15 U.S.C. § 1119 ..............................................................................................12, 26

15 U.S.C. § 1125(a) ..........................................................................................18, 22

15 U.S.C. § 1127 ...................................................................................................16

Fed. R. Civ. P. 12(b)(6) .............................................................................1, 3, 14, 21

N.Y. Gen. Bus. Law § 349 ......................................................................................21

N.Y. Gen. Bus. Law § 349(h) ..................................................................................21

N.Y. Gen. Bus. Law § 350 ......................................................................................21

Counterclaim-plaintiff AIG International Group, Inc. ("AIG") respectfully submits this memorandum of law in opposition to the motion of C.V. Starr & Co., Inc. ("C. V. Starr & Co."), Starr Technical Risks Agency, Inc. ("Starr Tech"), Starr Associates, Inc. ("Starr Associates"), C.V. Starr & Co. ("Starr California") and Starr Aviation Agency, Inc. ("Starr Aviation") (collectively, the "Movants") to dismiss AIG's Amended Counterclaims pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Movants, in seeking dismissal of AIG's counterclaims, self-servingly mischaracterize them. Starting from the assumption that Movants own the Starr marks at issue here, Movants argue that AIG is laying claim to "their" intellectual property based solely on the fact that AIG and Movants were long-standing business partners and, therefore, associated with each other in the public mind. Labeling this a novel "once together, always together" theory of trademark law, Movants assert that allowing AIG to prevail here will create a terrible new world in which rapacious auto companies are free to gobble up the marks of their independent dealers and Cablevision can never sell the New York Knicks.

All very scary, and all very irrelevant. AIG is not, through its Amended Counterclaims, arguing for a new "once together, always together" rule that would allow the bigger or better-known of two joint venturers to appropriate the marks of its smaller or lesser-known partner. Nor is AIG claiming that it should be permitted to take Starr marks that allegedly belong to Movants simply because those marks were used in the service of the parties' common business goals. Rather, AIG claims that it owns the Starr marks because AIG and its predecessors have, from the outset, been the parties that closely and continuously controlled the quality of all insurance-related services rendered under the Starr marks, including those rendered by Movants while they were subordinate parts of the AIG organization. As alleged in the

60738/1905538.3

Amended Counterclaims, during the half-century that preceded this year, whenever an insurance policy was written through Movants, the customer expected to receive a policy and service consistent with AIG's high quality standards. AIG exercised substantial oversight over Movants to make sure this expectation was the reality.

In claiming the Starr marks on this basis, AIG is not staking out any "novel" or "extraordinary" legal ground. It relies on the well-established rule that the owner of a mark is the party that controls the quality of the goods or services sold under it. That rule goes to the very heart of what a trademark is—a signifier to the market that goods or services are of a consistent known quality—and it is embodied not only in case law but in provisions of the Lanham Act that allow Courts to strip a mark (even an "incontestable" one) away from a registered owner who fails to exercise quality control, and award it to the party that does.

Movants, in urging the Court to disregard this rule, are the ones who would turn trademark law on its head. Their argument that a manufacturer must own (as opposed to simply control) its captive distributor in order to have rights in a mark the distributor uses to sell the manufacturers' products ignores both the purposes and practicalities behind trademarks. To borrow Movants' example, if Henry Ford had established a Ford dealership named "Perry-Egan" as a separate company, but maintained it as part of the larger Ford organization, and used it to sell only Ford products under Ford's close quality control for the entirety of its existence, so that the Perry-Egan mark came to signify Ford products and quality, descendants of Henry Ford who inherited the capital stock in Perry-Egan would hardly be entitled to use that mark in the service of another auto company. That, however, is essentially the result Movants' advocate here.

By seeking dismissal of AIG's counterclaims, Movants ask the Court to allow them to take Starr marks that AIG has developed into signifiers of high-quality insurance

2

services provided by AIG and attach them to something entirely different, with the result that customers will be misled and AIG's goodwill impaired. They do so, moreover, in a 12(b)(6) context, where all of AIG's allegations about its control of the Starr marks and their strong attachment to the American International brand must be accepted as true. AIG's only burden at this stage was to plead a set of facts that support a viable legal claim, and AIG has easily met that burden. Accordingly, the Movants' motion to dismiss must be denied.

## STATEMENT OF FACTS

### The Parties

AIG, the world's leading insurance company, is a Delaware corporation with its principal place of business in New York, New York. (AIG Am. Countercl. ¶¶ 1, 9.) AIG traces its roots to 1919, when Cornelius Vander Starr ("Mr. Starr") formed an insurance agency in Shanghai, China. (*Id.* ¶ 1.)

C. V. Starr & Co., a Delaware corporation, is a holding company formed by Mr. Starr in 1950 as part of the American International organization. (*Id.* ¶¶ 3, 10.)

The remaining counterclaim-defendants (the "Agencies"), Starr Tech, Starr Aviation, Starr California and Starr Associates, are insurance agency subsidiaries of C. V. Starr & Co. Starr Tech, a New York Corporation, writes insurance for facilities in the energy and manufacturing industries. Starr Aviation, a New York corporation, writes insurance for the aviation industry. Starr California, a California corporation, writes excess commercial casualty insurance. Starr Associates formerly wrote property insurance and managed a surety program. It is now a dormant company. (*Id.* ¶¶ 11-14.)

### Movants' Historical Relationship with AIG

Underlying Movants' arguments for dismissal is an unstated assumption that Movants have a long history of independence from AIG and operated as co-equal partners during

3

the parties' long business relationship. Movants tacitly invoke this assumption in arguing that it is unfair for AIG to claim Starr marks that are "owned" by its "partners". The assumption, however, is utter fiction. As set forth in the AIG's Counterclaims (in allegations which, for present purposes, must be credited as true), Movants were born as and remained component, subservient parts of the AIG organization, until earlier this year. Notwithstanding their legal status as separate entities, AIG (and its predecessors) has controlled Movants in the same manner as it controlled its other business units, and Movants were known within and without AIG as members of the AIG family. Movants' use of the Starr marks, like virtually all of their operations, was under the direction and supervision of AIG. (*Id.* ¶¶ 31, 33-34, 83.)

As referenced above, the corporate family that, until recently, embraced both AIG and the Movants was founded by Cornelius Vander Starr in 1919. Mr. Starr formed American International Underwriters Corporation ("AIUC"), a New York-based underwriter and the first American International company, in 1926. (*Id.* ¶ 22.) In the years that followed, AIUC's business grew, as did the family of related American International companies, which now numbers in the dozens. (*See id.* ¶ 23.) Among others, those companies included the insurance agencies American International Marine Agency of New York, Inc. ("AIMA"), formed in 1945, and American International Aviation Agency, Inc. ("AIAA"; now Starr Aviation), formed in 1961. (*Id.*)

C. V. Starr & Co. was created by Mr. Starr as a holding company in 1950, for the purpose of holding the capital stock of the domestic insurance agencies in the American International organization. (*Id.* ¶ 24.) From its inception, C. V. Starr & Co. was one of the many parts of the American International organization, as evidenced by the fact that it was vested with

4

nominal ownership of American International companies like AIUC, AIMA and AIAA. *(See id.*
¶¶ 23-24.)

AIG was incorporated in 1967. Like C. V. Starr & Co., it was also formed as a
holding company. It initially held ownership interests in several of the American International
organization's insurance companies. Over time, it acquired interests in additional insurance and
other companies and, eventually, it evolved into the multinational that sits at the top of the
organization today. *(See id.* ¶ 25.) A significant event in that process occurred in May 1970,
when most of the assets held by C. V. Starr & Co. were transferred to AIG. C. V. Starr & Co.
was left holding the capital stock of the Agencies, which were then relatively small. *(Id.* ¶ 26.)

The May 1970 transaction did not alter the status of C. V. Starr & Co. and the
Agencies as parts of the American International organization. Their boards of directors, as
always, continued to be composed largely, if not entirely, of senior officers of AIG and its
member companies. *(Id.* ¶ 72.) The Agencies, including those operating under the Starr brand,
served exclusively as agents of AIG (selling and writing insurance policies issued by AIG
companies), which exercised tight control over their business operations and the quality of
services they provided to the marketplace. *(See id.* ¶¶ 55-58.) Among other things, the Agencies
were managed and overseen by AIG executives, audited by AIG's internal auditing groups,
staffed entirely or in part by AIG employees whose performance was reviewed by AIG
personnel, participated in AIG healthcare and retirement plans, used AIG-provided legal, payroll
and human resources services, and housed in office space owned or leased by AIG. *(Id.* ¶ 84.)
In stark contrast to the extensive monitoring and control exercised by AIG over the Agencies'
day-to-day operations, C.V. Starr, their nominal owner, functioned merely as a holding company
and exercised no quality control over the services provided by the Agencies. *(Id.* ¶ 89.)

5

Not surprisingly, given their *de facto* status as divisions of AIG and the fact that they only underwrote policies issued by AIG companies, the Agencies and their parent C. V. Starr came to be and are associated with AIG in the minds of the consuming public. (*See id.* ¶ 76.) Indeed, that is how the Agencies, acting at AIG's direction, presented themselves to the marketplace in marketing materials, press releases and correspondence. (*Id.* ¶ 77.) C. V. Starr and the Agencies thus have little, if any brand-recognition independent of AIG. (*Id.* ¶ 76.) As far as the public is concerned, C. V. Starr and the Agencies -- both those operating under the American International brand *and those operating under the Starr brand* -- are and always have been part of AIG. (*Id.*) The Starr brand, in other words, signifies AIG and its high standard of service, and that is a direct result of the manner in which AIG operated and used the entities bearing the Starr name.

**The Starr Marks**

In the Spring of 2005, AIG's longtime Chairman and CEO, Maurice R. Greenberg, was forced to step down after regulators lodged allegations that AIG had engaged in accounting improprieties. (*See id.* ¶¶ 2, 5.) Following his departure from AIG, Mr. Greenberg, who remained in control of C. V. Starr & Co., decided to try to separate the Agencies from AIG and use them as a means to remain in the insurance business and compete against AIG. (*Id.* ¶ 6.) As a consequence, AIG's insurance subsidiaries terminated their agency relationships with Starr Tech, Starr California, Starr Associates and Starr Aviation (then AIAA) in early 2006. (*Id.* ¶ 90.) Following those terminations, C. V. Starr and the Agencies have made clear their intention to continue their use of the Starr marks. Rather than establishing a new corporate identity after their ties with AIG were severed, Movants have chosen to appropriate the Starr brand to

themselves, presumably to benefit from the substantial goodwill embodied in the name. *(See id.*
¶¶ 91-95.)

There are several marks at issue, including two "Starr Tech" marks registered to
C. V. Starr & Co. in 1989 and 1990; two "C. V. Starr & Co." marks registered by C. V. Starr &
Co. in 2004 and 2005; and six "Starr Excess" marks registered by AIG in 2005. Each of these
registrations was prepared and filed by AIG employees for the benefit of AIG. *(See id.* ¶¶ 32-
33.) Employees of the AIG Intellectual Property Group policed all of these Starr marks in the
same way they policed all other AIG-owned marks, including by sending cease-and-desist letters
to third parties on behalf of AIG. *(Id.* ¶ 34.) AIG also registered and owns numerous internet
domain names corresponding to the STARR marks, including, *inter alia,* cvstarr.com, cvstarr.us,
starr-tech.com, starr-tech.biz, starr-tech.info, starr-tech.net, starr-tech.org, starr-tech.us,
starrtechnical.com, starrtechnical.biz, starrtechnical.info, starrtechnical.net, and starrexcess.com.
*(Id.* ¶ 71.)

AIG uses its Starr Excess marks in connection with the business of its subsidiary
Starr Excess Liability Insurance Company, Inc. ("Starr Excess"). Before beginning such use,
AIG signed a license agreement, with C. V. Starr & Co. as licensor, that granted Starr Excess a
right to use the "Starr" trademark for an unspecified term of years. *(Id.* ¶ 44.) At the time that
this agreement was signed, AIG held a controlling, but not majority, interest in Starr Excess,
through its holdings of stock in Starr Excess' parent,[1] and the purpose of the license agreement

---

[1]    At the time, Starr Excess was a wholly owned subsidiary of Starr Excess Liability
Insurance Company, Ltd. ("SELIC") of which AIG was an approximately 24% owner. The
remaining 76% of SELIC was owned by parties outside the AIG family of companies. *(Id.* ¶
41.) In 1998, AIG acquired the outstanding shares of SELIC, dissolved it as a holding company,
and re-domesticated Starr Excess in Delaware as a subsidiary of AIG's wholly owned National
Union Fire Insurance Company of Pittsburgh, Pa. *(Id.* ¶ 42.)

was to ensure that AIG would not lose control of the mark in the event AIG ceased to have substantial control over Starr Excess.  (*Id.* ¶ 51.)  The agreement accomplished that purpose by providing for the mark to revert to C. V. Starr & Co. in that circumstance.  (*Id.*)  In particular, the agreement provided that the "license" granted to Starr Excess would terminate in the event of (i) an Initial Public Offering of Starr Excess, or (ii) a reduction in the ownership of AIG in the stock of SELIC (Starr Excess' parent company) below 5% of the outstanding shares.  Notably, C. V. Starr had no control over whether either of those termination events would occur; from its perspective, the license was perpetual.

Further evidencing its formalistic nature and strategic function, the "license" placed no restrictions on AIG's use of the Starr mark and contains no quality control provisions enabling C. V. Starr & Co. to monitor or control AIG's use of it.  (*Id.* ¶ 45.)  Moreover, the document did not even definitively assert that C. V. Starr & Co. was the owner of the Starr mark being licensed, and it did not give C. V. Starr & Co. any termination right.  (*Id.* ¶¶ 46-47.)  Once the agreement was entered into, C. V. Starr & Co. had no continuing relationship with Starr Excess and did not monitor or control its operations in any way.  (*Id.* ¶ 50.)  Therefore, just as AIG, not C.V. Starr & Co., had brand control over the Agencies, so too did AIG have brand control over Starr Excess.[2]

---

[2]   Movants suggest that, having obtained a license from C. V. Starr & Co. for use of the "Starr" mark in connection with Starr Excess, AIG is barred by the doctrine of licensee estoppel from challenging Movants' rights to the Starr marks.  However, the doctrine of licensing estoppel is an equitable one, dependant on the facts and circumstances present in the particular case.  *See The Martha Graham School and Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 153 F. Supp. 2d 512, 520 (S.D.N.Y. 2001) (finding that the "doctrine of licensee estoppel is 'equitable in nature' and is 'not subject to rigid application.'"); *In re Houbigant, Inc.*, 914 F. Supp. 964, 993-94 (S.D.N.Y. 1995) (refusing to dismiss former licensee's claims contesting validity of licensors' title under doctrine of licensee estoppel).  Here, where AIG alleges that Movants and their use of the Starr marks have always been subject to the control of (footnote continued)

## ARGUMENT

A complaint may not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004), quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Under this "lenient" standard, the court must accept as true all factual allegations in the challenged pleading and draw all reasonable inferences in the non-movant's favor. *Marvel Comics Ltd. v. Defiant*, 837 F. Supp. 546, 548 (S.D.N.Y 1993) (denying motion to dismiss trademark infringement claims for failure to state a claim); *see Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 386 (S.D.N.Y. 2000) (same); *see also La Terraza De Marti, Inc. v. Key West Fragrance & Cosmetic Factor, Inc.*, 617 F. Supp 544, 546 (S.D. Fla. 1985) (refusing to dismiss trademark infringement and unfair competition claims where ownership of the mark disputed).

In arguing for the dismissal of all of AIG's Amended Counterclaims, Movants make no attempt to analyze the claims individually -- as the rules require -- let alone demonstrate how each is legally deficient. Instead, Movants fire what they believe to be a single magic bullet, positing that AIG's alleged inability to establish ownership of the Starr marks dooms them all. Movants are doubly wrong. As demonstrated below, AIG has pled (and, ultimately, will prove) a viable theory for its ownership of the Starr marks. Moreover, even were that not so, several of AIG's counterclaims do not depend on it proving ownership of the Starr marks.

---

AIG and its predecessors at the head of the American International organization, application of the doctrine would be inequitable. At a minimum, it would be improper to bar AIG's claims on equitable grounds before AIG has an opportunity to develop a factual record to demonstrate the equities of its position.

**I.**

## AIG HAS ADEQUATELY PLED OWNERSHIP OF THE STARR MARKS

Movants maintain that (i) AIG has conceded their status as the senior users of the Starr marks and (ii) this purported concession is dispositive of AIG's claim of ownership, because the first user of a mark gains priority and can never be displaced. Again, Movants are twice mistaken. *First*, even assuming that Movants used the Starr marks before AIG, AIG's claim that it succeeded to ownership of those marks through decades of controlling the nature and quality of the services rendered under them is legally viable and properly pled. *Second*, AIG does *not* concede that Movants are the senior users of the Starr marks and has, in fact, pled to the contrary. Indeed, evidence already part of the record shows that the Agencies have always been considered part of the American International corporate family and Movants will have considerable difficulty proving otherwise.

### A.    AIG Has Adequately Pled Ownership of The Starr Marks by Alleging That It Controlled The Quality of Services Rendered Under Them.

With respect to the first point, AIG's rights in the STARR mark arise from a fundamental tenet of trademark law: the person controlling the nature and quality of the goods or services bearing a trademark owns the mark. *See Liebowitz v. Elsevier Science Ltd.*, 927 F. Supp. 688, 695-96 (S.D.N.Y. 1996). This rule derives from the fact that the primary purpose of a trademark is to signify consistency in the quality of the goods or services rendered under it. *See Polymer Tech. Corp v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994) (trademark law serves to guarantee the quality of the trademarked product); *Original Appalachian Artworks, Inc., v. Granada Elecs., Inc.*, 816 F.2d 68, 75 (2d Cir. 1987) (same); *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 193 (2d. Cir. 1970) (holding owner mark required to exercise control over trademark to insure "uniform standards of quality"). As Judge Kaplan explained in *Liebowitz*:

10

> A trademark is, essentially, a designation of origin. It serves to inform the public of the source of the goods. As the public comes to know a trademark, it relies on the trademark as a sign that the goods sold under that trademark are *of the same quality* as goods that it has purchased from that source before. . . As all of this illustrates, *whoever controls the quality of the goods marketed under the trademark is the source and therefore owns the trademark.*

927 F. Supp. at 695-96 (emphasis added and internal citations omitted); *see also* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition ("McCarthy") § 3:10 at 3-24.1 (4th ed. 2005) ("'[t]he primary function of a trademark is . . . to offer assurance to ultimate consumers that articles so labeled will conform to quality standards established and . . . controlled by the proprietor.'").

The principle that quality control is a pre-requisite of mark ownership applies equally to service marks and product marks. *See, e.g., Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 43 (2d Cir. 1986) (religious services); *Rick v Buchansky,* 609 F. Supp. 1522, 1537-38 (S.D.N.Y. 1985) (musical performance); *Nat'l Trailways Bus Sys. v. Trailway Van Lines,* 269 F. Supp. 352, 357 (E.D.N.Y. 1965) (passenger bus services); *America Online Latino v. America Online, Inc.,* 250 F. Supp. 2d 351, 360 (S.D.N.Y. 2003) (internet service provider)); *Tumblebus Inc. v. Cranmer,* 399 F.3d 754, 764 (6th Cir. 2005) (gymnastic instruction); *Bell v. Streetwise Records, Ltd.,* 640 F. Supp. 575, 580-81 (D. Mass 1986) (musical performance). At least one court, moreover, has observed the quality control rule in the context of insurance services. *See CNA Fin. Corp. v. Brown,* 930 F. Supp. 1502, 1506-07 (M.D. Fla. 1996) (In order for its family's use of the service marks to be deemed use by CNAF, "CNAF must control . . . the 'nature and quality of the . . . services' associated with the marks").

Where control over the quality of the goods or services rendered in connection with a trademark is insufficient or nonexistent, the trademark in question no longer functions as

11

such and may be cancelled or deemed abandoned. *See Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 668-69 (2d Cir. 1968) (failure of trademark owner to exercise quality control "may result in the cancellation of the mark"); *Ballet Makers, Inc. v. U.S. Shoe Corp.*, 633 F. Supp. 1323, 1335 n.7 (S.D.N.Y. 1986) ("if U.S. Shoe did not retain control over the quality of the goods it could be deemed to have abandoned its mark"); *see also Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) (registered mark cancelled due to lack of quality control); *Stanfield v. Osborne Indus.*, 52 F.3d 867 (10th Cir. 1995) (relationship in which no quality control existed resulted in abandonment of mark).

A court may also award the rights to such a trademark to the party who has been performing the quality control function in lieu of the registered owner. *See* 15 U.S.C § 1119 ("In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations . . . and otherwise rectify the register with respect to the registrations of any party to the action."); *Lurzer GMBH v. Am. Showcase, Inc.*, 75 F. Supp. 2d 98, 105 (S.D.N.Y. 1998) (incontestable mark "may be cancelled or assigned by the Court pursuant to its powers under § 1119").

Where the ownership of a trademark is in dispute, courts look to which party controls the quality of the goods or services. In *Liebowitz*, for example, the Court turned to this "bedrock principle[] of trademark law" to determine whether the publisher or the editor of a series of scientific journals was the rightful owner of the trademarks associated with the journals. In assessing which party exercised quality control over the journals, the court considered which party promulgated and enforced guidelines for the acceptance and rejection of papers, prepared

quality control reports, and approved the appointment of editorial staff. 927 F. Supp. at 697.[3]
The court ultimately found the evidence inconclusive and denied summary judgment.

Likewise, *Cheng v. Dispeker*, 35 U.S.P.Q.2d. 1493 (S.D.N.Y. 1995), a dispute
over ownership of the trademark BRAVO BROADWAY for use in connection with
entertainment services, the court looked to which party "control[led] the nature or quality of the
services which have been marketed under the mark in question" to determine ownership,
ultimately finding there was not enough evidence in the record that plaintiff controlled the
quality of the services in question to support its bid for preliminary injunction. *Id.* at 1496-97.

Similarly, in *Bell v. Streetwise Records*, 640 F. Supp 575 (D. Mass 1986) the
court held that the plaintiffs, the members of a signing group called "New Edition," owned the
trademark NEW EDITION because, *inter alia*, they controlled the quality of the musical services
rendered under the trademark. *Id.* at 582. As in *Liebowitz*, the court articulated the standard that,
where more than one party claims to own a trademark "the legal task is to determine which party

---

[3] Recognizing the power of *Liebowitz*, Movants strive for a full page to distinguish it,
but the effort is unavailing. Movants first argue that the decision is inapposite because the
parties here each have their own mark ("Starr" for Movants and "American International" for
AIG) and "there is no additional property, business or service as in *Liebowitz* that can only have
one name and be owned by one party . . . ." (Br. at 17). Not only does that argument presume
the outcome of this dispute, it mischaracterizes it, because here, as in *Liebowitz*, both parties
claim ownership of a single trademark, *Starr*, for use with respect to the same services. Movants
also argue that *Liebowitz* is distinguishable because the mark at issue here predates the formation
of AIG. As shown above, however, even a party that establishes priority in a mark can lose it if
it fails to perform the essential quality control function, which Movants are alleged to have done.
Finally, Movants urge that application of the quality control rule was more appropriate in
*Liebowitz* than here because *Liebowitz* "dealt with a tangible item (a series of journals), the
source for which is easily identifiable, and not with the provision of services, where it is difficult
to separate out the contributions of the different parties to a coordinated effort." Nothing in
*Liebowitz*, however, suggests that the quality control test is only to be applied when doing so is
"easy," nor should there be such a narrow and novel application of the quality control principle.
In any event, the alleged difficulty of determining who controlled the quality of services is not
cognizable on a motion to dismiss; AIG alleges that it performed the quality control function,
and that claim must be taken as true on this motion.

controls or determines the nature and quality of the goods which have been marketed under the mark in question." *Id.* at 580 (internal quotations omitted).

The fact that Movants own registrations for certain of the Starr marks, some of them incontestable, does not render the quality control rule inapplicable or erect a legal bar to a challenge to their ownership of the marks (which is what they must establish on a Rule 12(b)(6) motion to dismiss). Movants, in fact, cite no authority indicating that the quality control rule cannot apply where one of two parties claiming ownership of a mark owns a trademark registration. On the other hand, it is indisputable that registrations in existence for fewer than five years serve as only *prima facie* evidence of validity and ownership of the underlying mark, *see* 15 U.S.C. § 1115(a), and that even so-called "incontestable" registrations can be set aside when certain statutory defenses are alleged and proven. *See* 15 U.S.C. § 1115(b); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 199-200 (1985); *Blue Planet Software, Inc. v. Games Int'l, LLC*, 334 F. Supp. 2d 425, 438 (S.D.N.Y. 2004) (finding that several affirmative defenses or exceptions defeat incontestable status); *see also Eco Manufacturing v. Honeywell Int'l*, 357 F.3d 649, 651 (7th Cir. 2003) ("The words 'incontestable' and 'exclusive' sound more impressive than the legal rights that the Lanham Act actually conveys, however").

Of particular relevance here, the Lanham Act specifies that an incontestable registration can be set aside where the mark "has been abandoned by the registrant," 15 U.S.C § 1115(b)(2), which describes the situation that occurs when a trademark owner relinquishes quality control. *See, e.g., Franchised Stores of New York*, 394 F.2d at 668-69 (failure of trademark owner to exercise quality control "may result in the cancellation of the mark"); *Ballet Makers*, 633 F. Supp. at 1335 n.7 ("if U.S. Shoe did not retain control over the quality of the goods it could be deemed to have abandoned its mark"). The statute also provides that an

14

incontestable registration can be defeated by proof that the mark is being used "so as to misrepresent the source of the goods or services on or in connection with which the mark is used," 15 U.S.C. § 1115(b)(3), or by the application of "equitable principles, including laches, estoppel and acquiescence . . . ." 15 U.S.C. § 1115(b)(9).

All of these statutory provisions are implicated by AIG's allegation that, for at least the last 40 years, it has been the sole party exercising control over the nature and quality of services rendered under the Starr marks. If a fact finder accepts that allegation as true, as the Court must in this context, the authorities discussed above would support a finding that Movants—by acquiescing to AIG's quality control—had abandoned any rights they might have had in the Starr mark and that AIG had acceded to those rights. Additionally, if the fact finder credits AIG's allegation that its quality control efforts have succeeded in establishing the Starr mark as a signifier of quality insurance services provided by AIG, as the court must in this context, AIG would be entitled to the Starr mark because its continued use by Movants, which are no longer affiliated with AIG, would "misrepresent the source of the . . . services . . . in connection with which the mark [was] used," 15 U.S.C. § 1115(b)(3). Movants, no doubt, will protest that AIG cannot prove these things. But that is a question for another day. At this juncture, the sole question is whether AIG's factual allegations support any legally viable claim for relief. The authorities discussed above make abundantly clear that they do.

**B.      AIG Has Adequately Pled Ownership of The Starr Marks as The Senior User.**

Even if, contrary to fact, Movants were correct that the standard for deciding who owns a trademark were as cut and dry as "who used it first," and a senior user could never be found to have abandoned or otherwise forfeited rights to a mark, AIG's Amended Counterclaims still plead a viable claim to ownership of the Starr marks. The earliest use claimed by Movants, that of C. V. Starr & Co. in 1950, came roughly 24 years into the life of the American

15

International organization that AIG now heads. The Amended Counterclaim alleges that all use of the Starr marks by Movants, including this alleged early use, was at the direction of and for the benefit of the American International organization. Accordingly, C. V. Starr & Co's alleged early use of the Starr mark falls within the "related company" doctrine.

A "related company" under the Lanham Act is one "whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. By statute and case law, use of a mark by a related company inures to the benefit of the owner of the mark. *See* 15 U.S.C. § 1055; *In re Wella A.G.*, 787 F.2d 1549, 1551 (Fed. Cir. 1986); *I.H.T. Corp. v. News World Commc'ns, Inc.*, No. 83 Civ. 3862-CSH, 1984 WL 604, at *6 (S.D.N.Y. July 3, 1984) (holding that the use of a trademark by a related company would inure to the benefit of the trademark owner as long as the owner could demonstrate the requisite level of control over the nature and quality of the goods and services used in conjunction with the trademark); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 16:37 (4th ed. 2005) (stating that "use by a controlled subsidiary inures to the benefit of the parent corporation"); *id* § 18:51 (stating that "the use of a mark by any of several 'family enterprises,' all controlled by a 'leading light,' inures to the benefit of the individual who is that leading light").[4]    Accordingly, having alleged that Movants' use of the Starr marks was at the direction and control of its predecessors at the head of the American International organization, AIG has properly pled a claim to ownership of the Starr marks on the grounds of seniority.

---

[4] Indeed, as a related company to AIG, Movants were granted an implied license to use the STARR trademark for as long as they remained part of the American International family of companies.

16

## II.

### AIG'S AMENDED COUNTERCLAIMS DO NOT DEPEND ON ITS OWNERSHIP OF THE STARR MARK

Contrary to Movants' over-simplified classification of the nature of AIG's Amended Counterclaims, they do not all depend on AIG's establishing ownership of the Starr marks. Although AIG sufficiently alleges facts in the Amended Counterclaims supporting its ownership of the marks – which is all that is required at this stage of the proceeding—such allegations are unnecessary for AIG to prevail on many of its claims, including those for false advertising under the Lanham Act and the New York General Business Law (Counts III and IV), unfair competition under the Lanham Act and common law (Counts II and VII), unjust enrichment (Count VIII) and cancellation of trademark registrations (Count IX). Insofar as Movants have not challenged those claims on any other basis, the motion to dismiss them must be denied.

### A.   AIG Has Stated Claims For False Advertising.

AIG's Amended Counterclaims amply plead claims for false advertising under both federal and state law.

#### 1.   False Advertising under The Lanham Act

Section 43(a) of the Lanham Act provides, in pertinent part:

> Any person who, on or in connection with any goods or services. .
> .uses in commerce any word, term, name, symbol or device, or any
> combination thereof, or any false designation of origin, false or
> misleading description of fact, or false or misleading
> representation of fact, which in commercial advertising or
> promotion, misrepresents the nature, characteristics, qualities or
> geographic origin of his or her or another person's goods, services
> or commercial activities, shall be liable in a civil action by any
> person who believes that he or she is likely damaged by such act.

17

15 U.S.C. § 1125(a). The statute defines a "'statutory tort' intended to secure a market-place free from deceitful marketing practices." *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980).

  False advertising under the Lanham Act encompasses a wide range of misleading tactics, including "innuendo, indirect intimations, and ambiguous suggestions." *Am. Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d. Cir. 1978). As the Second Circuit has observed, "[t]he language of [Section 43(a)] is strikingly general" and should be "broadly construed." *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124-25 (2d Cir. 1984). A plaintiff may state a claim based on an advertisement or representation that "is literally false. . ., or although . . . literally true, it is likely to deceive or confuse consumers." *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship*, 380 F.3d 126, 132 (2d. Cir. 2004) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d. Cir 1995)).

  There is nothing in the language of Section 43(a) that restricts standing under that provision to parties seeking to protect a trademark, nor do Movants cite any case to that effect. To be sure, a plaintiff *can* plead a Section 43(a) claim by alleging that a defendant has impaired goodwill associated with a mark by sowing confusion among consumers with misrepresentations. And, *in such cases*, as the authorities cited by Movants make clear, the question of whether unfair competition or false advertising has been proven is governed by the same standards that govern confusion in a claim for federal trademark infringement.[5] That, however, is but one type of Section 43(a) claim. The statute, as the Second Circuit recognizes, allows for a claim by any party with "a reasonable basis for the belief that [he] is likely to be

---

[5] *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987); *Katz v. Modiri*, 283 F. Supp. 2d 883, 899-900 (S.D.N.Y. 2003); *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 297-98 (S.D.N.Y. 2002).

18

damaged as a result of the false advertising," not only by those seeking to protect trademarks. *Johnson & Johnson*, 631 F.2d at 190.

In *Johnson and Johnson*, the manufacturer of Johnson's Baby Oil asserted a Lanham Act false advertising claim against the manufacturer of Nair, based on an advertising campaign in which the latter asserted that baby oil contained in Nair had moisturizing and softening effects on the skin of the user. *Id.* at 188. Johnson & Johnson maintained that this claim was false and unfairly dissuaded consumers from using Johnson & Johnson's moisturizing products in favor of Nair. *Id.* Its claim was not premised on any trademark-related allegation, as "baby oil" is a generic term. In reversing the district court's dismissal of the claim, the Second Circuit made clear that Johnson & Johnson had adequately pled a cause of action under Section 43(a)'s false advertising prong by alleging (i) that Nair's baby oil claim was false and (ii) that Johnson & Johnson was likely to be damaged because customers that believed Nair's claim about the effects of the baby oil in Nair were likely to stop purchasing Johnson & Johnson's moisturizing products. *Id.* at 190-92.

Another illustrative case is *PPX Enters.*, *supra*. Plaintiffs there were corporations that held rights to receive royalties from the sales of certain Jimi Hendrix albums. *Id.*, 746 F.2d at 121. They asserted a Lanham Act false advertising claim based on defendants' marketing of albums that purportedly featured Hendrix but, according to Plaintiffs, did not. Again, Plaintiffs made no trademark-related allegation in support of their claim and, again, the Second Circuit reversed a decision dismissing it. The court held that Plaintiffs had stated a claim by alleging that defendants were misleading consumers about Hendrix's appearance on defendants' albums and that plaintiffs had "a 'reasonable interest to be protected' against the alleged false

advertising." *Id.* at 125. The court also observed that "there is nothing novel about awarding standing under the Lanham Act to one who has a direct pecuniary interest at stake." *Id.*

Here, as in *Johnson and Johnson* and *PPX Enters.*, AIG has alleged deceptive advertising by Movants and a reasonable interest to be protected. Specifically, AIG has alleged that Movants use of the Starr marks is false and misleading insofar as such use sends a false message that Movants are offering insurance services that are associated, sponsored or otherwise approved by AIG. (AIG Am. Countercl. ¶¶ 90-97.) AIG has further alleged that, in so doing, Movants will cause injury to AIG's reputation, goodwill and critical business relationships. It is also appropriate on a 12(b)(6) motion for the Court to infer that customers who are mislead by Movants' false advertising will be less likely to purchase insurance services from AIG, thereby causing AIG to suffer additional pecuniary injury. *Marvel Comics Ltd.*, 837 F. Supp. at 548 (on 12(b)(6) motion, court must draw all reasonable inferences in non-movant's favor).

AIG has also alleged that several advertisements placed by Movants in high-circulation business publications and on an insurance-business web-publication contain misleading representations of fact that are likely to cause consumers to be confused, or believe, falsely that Movants' services remain affiliated with AIG. (*See* AIG Am. Countcl. ¶¶ 91-95). Specifically, these ads make prominent use of the American International trademark (abbreviated as AI) in close proximity to the Starr trademark in the text of the ads, creating the false impression that Movants' remain affiliated with AIG. (Id.) Further, Movants contracted to have advertisements containing both the American International and Starr trademarks automatically appear adjacent to online articles that reference AIG in the web-publication *Business Insurance*. Any such use of the Starr marks in proximity to the American International mark will necessarily bring to mind a false association with AIG and bring about the same injuries referenced above.

20

*Staley/Robeson, Inc. v. Staley/Robeson/Ryan/St. Lawrence, Inc.*, 38 F. Supp. 2d 280, 282

(S.D.N.Y 1999) (refusing to dismiss false advertising claims against plaintiff's former affiliate

corporation). Taking these allegations as true, as the Court must do when ruling on a motion to

dismiss under Rule 12(b)(6), it is clear that AIG has stated a claim upon which relief can be

granted under Section 43(a) of the Lanham Act.

### 2. False Advertising under New York Law

AIG has also stated a claim for false advertising under Sections 349 and 350 of

New York's General Business Law. *See* N.Y. Gen. Bus. Law §§ 349, 350. The standards for

recovering for deceptive trade practices under Section 349 and false advertising under Section

350 are identical. *Goshen v. Mut. Life Ins. Co. of New York*, 774 N.E.2d 1190, 1195 n.1 (N.Y.

2002). To assert a claim for false or deceptive practices or false advertisement under New York

law, AIG must simply show that: 1) Movants engaged in a materially misleading act or practice;

and 2) such act or practice caused injury to AIG or the public at large. *See Securitron*

*Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *FTC v. Crescent Publ'g Group,*

*Inc.*, 129 F. Supp. 2d 311, 321 n.67 (S.D.N.Y. 2001); *Moses v. Citicorp Mortgage, Inc.*, 982 F.

Supp. 897, 903 (E.D.N.Y. 1997); *Goshen*, 774 N.E.2d at 1195.

Nothing in the statutory language or the case law suggests that these claims are

limited to trademark owners. To the contrary, the law prohibiting deceptive trade practices and

false advertising "is intentionally broad, applying to 'virtually all economic activity.'" *Id.* at

1195; *see also* N.Y. Gen. Bus. Law § 349(h) (stating that "*any person* who has been injured by

reason of any violation of this section" may assert a claim) (emphasis added). For the same

reasons AIG has sufficiently alleged its Lanham Act claims, it has sufficiently plead its causes of

action under the General Business Law.

**B.      AIG Has Stated Claims For Unfair Competition.**

AIG's Amended Counterclaims properly plead claims for unfair competition under both federal and state law.  Specifically, AIG's allegation that Movants' continued use of the Starr marks amounts to a false designation of origin with respect to their services states a claim for unfair competition under the law of both jurisdictions.

**1.      False Designation of Origin Under the Lanham Act**

AIG has alleged facts sufficient to support a claim under Section 43(a) of the Lanham Act that Movants' continued use of the designation STARR amounts to a false designation of origin or false description of fact "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a).

Trademark ownership is not a required element of a claim under this section, as Movants incorrectly assert.[6]  *See Gilliam v. Am. Broad. Cos.*, 538 F.2d 14, 24 (2d Cir. 1976) ("This statute [Section 43(a)], the federal counterpart to state unfair competition laws, has been invoked to prevent misrepresentations that may injure plaintiff's business or personal reputation, *even where no registered trademark is concerned.*") (emphasis added); *see also Ames Publ'g Co. v. Walker-Davis Publ'ns, Inc.*, 372 F. Supp. 1, 11 (E.D. Pa. 1974) ("While the intent of the Lanham Act is to regulate commerce by making actionable the deceptive and misleading use of trademarks, it is also designed 'to protect persons engaged in such [interstate] commerce against

---

[6]   Again, Movants' only authority on this point is the cases previously mentioned (p. 19, n.5, *supra*), which stand for the proposition that, when likelihood of confusion is an issue with respect to a claim under Section 43(a), it is evaluated under the same standard used in federal trademark infringement claims.

unfair competition...' and accordingly the scope of Section 43(a) extends beyond the protection

of trademarks."). As stated by the Second Circuit, "[i]t is sufficient to violate [Section 43(a) of]

the Act that a representation of a product, although technically true, creates a false impression of

the product's origin." *Gilliam*, 538 F.2d at 24. The allegations in AIG's counterclaims clearly

demonstrate the likelihood that consumers will mistakenly associate Movants with AIG based on

their continued use of the STARR marks, (*see* AIG Am. Countcl. ¶¶ 4, 8, 39, 76-83, 91-97).

### 2.    False Designation of Origin Under New York Law

Nor does AIG have to plead or prove trademark ownership to prevail on its common law

unfair competition claims. "Under New York law, an unfair competition claim must be

grounded in either deception or appropriation of the exclusive property of the plaintiff. The

'essence' of an unfair competition claim is the bad faith misappropriation of the labors and

expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the

goods." *Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 166 F. Supp. 2d 891, 894

(S.D.N.Y. 2001) (internal quotations omitted). Numerous courts applying New York law have

recognized that such consumer deception or confusion can occur in the absence of a trademark.

*See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27 (2d Cir. 1995) (plaintiff

asserted claims for both trade dress infringement under the Lanham Act and common law unfair

competition; the unfair competition claims failed because plaintiff failed to show a likelihood of

confusion or defendant's bad faith *and not* because the court held that plaintiff's greeting cards

did not constitute protectable trade dress); *NetTech Solutions, L.L.C. v. ZipPark.com, Inc.*, No.

01 Civ. 2683, 2001 WL 1111966, at **8-9 (S.D.N.Y. Sept. 20, 2001) (party to joint venture

could assert unfair competition claim for false designation of origin and confusion as to source

against former business partner based on sale, advertising and marketing of competing product).

Here, AIG has alleged that the Movants' use of the STARR brand and the STARR marks had

23

been in bad faith, and has been and will continue to deceive consumers into believing that their services are sponsored by or otherwise affiliated with AIG. (*See* AIG Am. Countcl. ¶¶ 6-8, 91-97.) This is more than adequate to plead an unfair competition claim under New York common law.

## C.    AIG Has Stated A Claim for Unjust Enrichment.

AIG has made out a *prima facie* claim for unjust enrichment in the Amended Counterclaims. To recover under a theory of unjust enrichment, AIG must show that: 1) Movants were enriched; 2) the enrichment was at the expense of AIG; and 3) under the principles of equity and good conscience, it would be unjust for Movants to retain the benefits or profits they received. *See Schatt v. Curtis Mgmt. Group, Inc.*, 764 F. Supp. 902, 915 (S.D.N.Y. 1991); *Mfrs. Hanover Trust Co. v. Chem. Bank*, 160 A.D.2d 113, 117, 559 N.Y.S.2d 704, 707-08 (App. Div. 1st Dep't 1990) ("'The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered [citations omitted].'"). The Amended Counterclaims contain allegations sufficient to satisfy these elements.

As detailed above, the substantial goodwill in the STARR mark has been developed through the efforts of AIG and connotes high-quality, dependable insurance services associated with and promoted by AIG. (*See* AIG Am. Countcl. ¶¶ 1, 35-39.) By usurping the Starr brand and using the STARR marks developed by AIG, Movants are trying to take advantage of the effort expended by AIG over the past few decades and avoid having to do the work necessary to establish a brand identity on their own. It would no doubt be unjust to allow Movants to profit from the years spent by AIG developing the Starr brand and the STARR marks. Allowing Movants to do so would unfairly enrich them at AIG's expense.

24

As further alleged in the Amended Complaint, since AIG terminated its relationship with Movants, Movants have intentionally taken steps to mislead the public into believing that they are still associated with AIG. (*See* AIG Am. Countcl. ¶¶ 91-95.) Movants are engaging in this public deception for the sole purpose of benefiting from the tremendous reputation AIG has in the field of insurance services and either diverting customers who would have otherwise done business with AIG or maintaining customers who would not have continued to do business with Movants had they known that the Movants were no longer affiliated with AIG. (*See id.* ¶¶ 8, 95.) It would be manifestly unjust for Movants to reap where they have not sown and retain benefits by perpetrating a fraud on the consuming public.

**D.    AIG Has Stated A Claim for Cancellation of Trademark Registration.**

AIG seeks cancellation or assignment of Movants' United States Trademark Registrations with respect to the Starr marks. The assertion of such a claim does not require the plaintiff to own the mark sought to be cancelled. By statute, there are numerous other grounds available.

**1.    AIG Has Stated A Claim For Cancellation or Assignment of the "C.V. Starr & Co." Registrations.**

A trademark registration less than five years old may be cancelled "for any reason which would have been sufficient to deny registration in the first instance." *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 977 F. Supp 264, 267 (S.D.N.Y. 1997). Here, the two registrations for "C.V. Starr & Co." should be cancelled because they do not reflect the true owner of the marks, as AIG and not Movants controlled the quality of the services listed in the application, and Movants are no longer part of AIG. *See Franchised Stores of New York*, 394 F. 2d at 668-69 (failure of trademark owner to exercise quality control "may result in the cancellation of the mark"); *Ballet Makers*, 633 F. Supp. at 1335 n.7 ("if U.S. Shoe did not retain control over the

25

quality of the goods it could be deemed to have abandoned its mark"). Further, as discussed

elsewhere herein, Movant's continued use of these marks in commerce will create the false

impression that Movants remain associated with AIG, when they do not. *See supra* Section

II.A.1; *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.

1979)

### 2.    AIG Has Stated A Claim For Cancellation or Assignment of the "Starr Tech" Registrations.

A district court may cancel an incontestable trademark registration, or otherwise

rectify the register by assigning the trademark registration to the proper owner, if any one of

several different legal grounds is proved.[7] 15 U.S.C. § 1064; 15 U.S.C. § 1119; *Lurzur GMBH*,

75 F. Supp. 2d at 105-06 (finding assignment preferable to cancellation of registration under

circumstances). AIG has pled facts sufficient to state at least three grounds upon which

Movants' trademark registrations may be cancelled or assigned to AIG under Section 14 of the

Lanham Act: (1) false association with an institution under 15 U.S.C. § 1052(a); (2)

misrepresentation as to the source of the goods under 15 U.S.C. § 1064(3); and (3) abandonment

of the mark under 15 U.S.C. § 1064(3).

A registration for a mark can be cancelled at any time if the registration

"[c]onsists of or comprises...matter which may disparage or falsely suggest a connection with

persons,[8] living or dead, institutions . . ." 15 U.S.C. § 1052. To state a claim for cancellation

under a false association theory, AIG must allege (1) the mark is the same as, or a close

---

[7] The grounds for cancellation discussed in this section apply with equal force to all four registrations at issue in this proceeding.

[8] A corporation is a "person" under the statute. 15 U.S.C. § 1052(a); *Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 888 (C.C.P.A. 1969) (citing *Popular Merch. Co. v. "21" Club, Inc.*, 343 F.2d 1011, 1015 (C.C.P.A. 1965)); *In re Wielinski*, 49 U.S.P.Q.2d 1754 (T.T.A.B. 1998) (the person in § 2(a) must "possess the ability to sue or be sued".)

approximation of, the name or identity previously used by another person or institution; (2) the mark would be recognized as pointing uniquely and unmistakably to that person or institution; (3) the person or institution named by or using the mark is not connected with the activities performed by the applicant under the mark; (4) the fame or reputation of the person or institution is such that when the mark is used to identify the applicant's goods or services, a connection with that person or institution would be presumed. *See In re Julie White*, 73 U.S.P.Q.2d 1713 (T.T.A.B. 2004).

AIG has indisputably pled facts sufficient to support all elements of this claim. AIG has alleged the Movants, having operated as divisions of AIG for decades, and having presented themselves to the marketplace as part of the American International family of companies, the public is likely to believe, falsely, that the Movants continue to be affiliated with AIG should they continue to use the trademark STARR. *See* Amended Counterclaims ¶¶ 29, 76-82.

An incontestable trademark registration can be cancelled or assigned to the proper owner if the court finds that the registrant has abandoned the mark. 15 U.S.C. § 1064(3); *see Franchised Stores of New York*, 394 F. 2d at 668-69 (failure of to exercise quality control works an abandonment which "may result in the cancellation of the mark" under section 1064(3)). As discussed at length above, having never controlled the nature and quality of the insurance services with which the STARR trademark was used, C.V. Starr and Starr California were never the rightful owners the trademarks registered by AIG in their names. However, even if the Court were to find that they once had rights in the STARR trademarks, it would also have to find that these rights were abandoned with respect to insurance products and services through the uncontrolled, naked licensing of the STARR marks to Starr Excess for more than a decade.

27

Finally, an incontestable trademark registration may be cancelled if the "registered mark is being used...so as to misrepresent the source of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1064(3). Blurring distinctions between the parties' products can amount to misuse. *Cuban Cigar Brands N. V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1100 (S.D.N.Y. 1978), *aff'd*, 607 F.2d 995 (2d Cir. 1979); *H.H. Scott, Inc. v. Annapolis Electroacoustic Corp.*, 195 F. Supp 208, 217 (D. Md. 1961) (stating that there was a misrepresentation as to the source of the goods where prospective customers were persuaded that products sold under the SCOTT name and mark, were the product H.H. Scott, Inc.). Trading upon the renown and reputation of the plaintiff also constitutes trademark misuse. *See Cuban Cigar Brands N. V.*, 457 F. Supp. at 1101 (defendant's misuse of mark included efforts to "trade upon the renown and reputation of plaintiff").

AIG has alleged that rather than establishing a new corporate identity after severing ties with AIG, Movants have intentionally appropriate the STARR brand to themselves, in an effort to benefit and trade on goodwill and reputation of AIG's STARR brand. In doing so, Movants are blatantly and falsely misleading the public into believing that they remain associated with AIG, when they do not.

## III.

## AIG HAS ALLEGED GROUNDS FOR AN ACCOUNTING AND FEES.

Movants argue that AIG's request for an accounting of their profits, enhanced damages, and attorney's fees pursuant to 15 U.S.C. § 1117 should be rejected as a matter of law because AIG cannot satisfy the willfulness requirement for an accounting of profits in the Second Circuit. (*See* Mov. Br. at 26.) Movants, however, ignore the current state of the law on

28

the willfulness requirement, mischaracterize the willful nature of their own conduct, and

overstate the barriers to AIG's recovery under this theory.[9]

    While earlier decisions in the Second Circuit held that an accounting of profits

could be awarded only if the claimant established willfulness, *see, eg., Nora Beverages, Inc. v.*

*Perrier Group of Am., Inc.*, 164 F.3d 736, 745 n.9 (2d Cir. 1998), the Trademark Amendments

Act of 1999 abrogated this requirement. In 1999, Congress amended 15 U.S.C. § 1117 to read:

> When a violation of any right of the registrant of a mark registered
> in the Patent and Trademark Office, a violation under section
> 1125(a) or (d) of this title, *or a willful violation under section*
> *1125(c) of this title*, shall have been established in any civil action
> arising under this chapter, the plaintiff shall be entitled, subject to
> the provisions of sections 1111 and 1114 of this title, and subject
> to the principles of equity, to recover (1) defendant's profits, (2)
> any damages sustained by the plaintiff, and (3) the costs of the
> action. 15 U.S.C. § 1117(a) (emphasis added).

As the Southern District of New York has noted, "(t)he 1999 Amendment specifically added the

word "willful" in reference to a violation under section 1125(c) of the Act, but not in reference to

a violation under section 1125(a) of the Act . . . . Thus, the plain language of the statute

indicates that willfulness is a prerequisite only when recovery of profits is sought for a violation

---

[9] In addition, to the extent that Movants are attempting to dismiss portions of AIG's prayer for relief or to dismiss claims based on the alleged unavailability of relief requested by AIG, such efforts are beyond the proper scope of a pre-answer motion to dismiss. The question presented in such a motion is whether a claim has been adequately stated under the applicable law and not what forms of relief can be obtained should the claims succeed. *See Terry v. UNUM Life Ins. Co.*, 394 F.3d 108, 110-11 (2d Cir. 2005) (citing *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 925-26 (2d Cir. 1968)); *see also In re Gen. Motors Corp.*, 383 F. Supp. 2d 1340, 1344 (W.D. Okla. 2005) (refusing to dismiss request for declaratory and injunctive relief "as the prayer for relief is not part of the claim"); *Arc/Connecticut v. O'Meara*, No. 3:01cv1871, 2002 WL 31106383, at *4 (D. Conn. Aug. 20, 2002) (in determining whether plaintiff's amended complaint stated a claim, the court stated that "Defendants' arguments regarding the relief proposed in the Amended Complaint...are vastly premature"); *Asher v. Reliance Ins. Co.*, 308 F. Supp. 847, 850 (N.D. Cal. 1970) ("That certain elements or forms of relief might be unavailable under a stated cause of action does not render that cause of action susceptible to a motion to dismiss.").

of section 1125(c)." *Nike, Inc. v. Top Brand Co. Ltd.*, No. 00 Civ. 8179, 2005 WL 1654859, at

*10 (S.D.N.Y. July 13, 2005); *see also Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338,

347–49 (5th Cir. 2002) (declining to adopt a bright-line willfulness rule in light of the 1999

Amendments, but making willfulness part of a multi-factor test); *Banjo Buddies, Inc. v. Renosky*,

399 F.3d 168, 171, 174 (3d Cir. 2005) (recognizing that the 1999 Amendments had "superseded"

the "bright-line willfulness requirement" that had existed in the Third Circuit).

      To the extent that the Southern District's decision in *Mastercard Int'l Inc. v. First*

*Nat'l Bank of Omaha, Inc.*, No. 02 Civ. 3691, 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004)

conflicts with these decisions, it must be viewed as erroneous in light of them. Thus, the concept

of willfulness is no longer the *sine qua non* of an award of profits for a violation of Section 43(a)

of the Lanham Act — under which AIG seeks its recovery — but part of a fact-intensive multi-

factor inquiry which is not amenable to disposition on the pleadings.

      Even if the court preserves the willfulness requirement for an accounting of

profits, C.V. Starr's conduct satisfies that requirement. C.V. Starr's use of the STARR marks in

its advertising and promotion since its termination from AIG was intended to create the false

impression among consumers that Movants remained affiliated with AIG, thereby continuing to

capitalize on AIG's tremendous goodwill and reputation, and to distract from the fact that

Movants were no longer operating as part of the AIG family of companies. Under the old rule,

for AIG to recover an accounting of Movants' profits, a jury would not need to find that C.V.

Starr had willfully violated trademark law, but rather, that it "intended to willfully deceive the

public by continuing to use the ... trademark." *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F.

Supp. 2d 136, 143 (S.D.N.Y. 2000). C.V. Starr has done just that, contracting to have its

Internet-based advertisements appear alongside articles discussing AIG to create an inference

that C.V. Starr and its STARR marks remain linked to AIG. (AIG Am. Countcl. ¶ 92.) Moreover, it was only the threat of legal action that forced C.V. Starr to terminate its unauthorized use of AIG's AMERICAN INTERNATIONAL trademark, which had for more than five decades functioned to link certain of C.V. Starr's subsidiaries to AIG. (AIG Am. Countcl. ¶ 94.) That Movants knowingly appropriated for themselves a brand that for more than 50 years has symbolized products and services offered by *AIG* is by itself enough to prove a willful intent to deceive the public.

In short, C.V. Starr has deliberately and unnecessarily "acted in a way that was calculated to appropriate or otherwise benefit from the good will [AIG] ha(s) nurtured," *W.E. Bassett Co. v. Revlon, Inc.*, 305 F. Supp. 581, 588 (S.D.N.Y. 1969), *aff'd in part*, 435 F.2d 656 (2d Cir. 1970), and willfulness — whether a bright-line requirement for an accounting or a single factor to consider — is therefore satisfied.  Under the facts alleged, this court should not rule as a matter of law that C.V. Starr was not willful in infringing the STARR marks properly owned by AIG. *See Admiral Corp. v. Sewing Mach. Sales Corp.*, 156 F. Supp. 796, 798 (S.D.N.Y. 1957) (holding that "[w]hether defendants wilfully (*sic*) violated plaintiff's trade-mark or any rights thereunder is ... a question of fact which cannot be disposed of on [a motion for summary judgment]); *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 671 F. Supp. 1369, 1400 (S.D.N.Y. 1987) (noting that, for patents, "[w]illfulness of infringement is a question of fact to be determined by looking at the 'totality of the circumstances'"); *Banff, Ltd. v. Colberts, Inc.*, 996 F.2d 33, 34 (2d Cir. 1993) (in a trademark case, the question of willfulness is tried by the jury).

31

## **CONCLUSION**

For the foregoing reasons, Movants' motion to dismiss AIG's Amended

Counterclaims should be denied.


Dated: New York, New York
       July 14, 2006


                              QUINN EMANUEL URQUHART
                              OLIVER & HEDGES, LLP

                              By

                                Robert L. Raskopf (RR-5022)
                                Michael B. Carlinsky (MC-6594)
                                Kevin S. Reed (KR-5386)
                                Jessica A. Rose (JR-4300)

                                51 Madison Avenue, 22nd Floor
                                New York, NY 10010
                                (212) 849-7254
                                jessicarose@quinnemanuel.com

                              Attorneys for American International Group,
                              Inc. and Starr Excess Liability Insurance
                              Company, Ltd.

32

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -x
          :

C.V. STARR & CO., INC. and C.V.                Case No. 06 CV 2157 (HB)
STARR & CO.,               :

            Plaintiffs,    :

      vs.              :

AMERICAN INTERNATIONAL          **DECLARATION OF**
GROUP, INC.,             :       **RALPH MUCERINO**

          Defendant.   x
- - - - - - - - - - - - - - - - - - - - - - - - -

                  x
AMERICAN INTERNATIONAL          :
GROUP, INC.,

      Counterclaim Plaintiff,  :

      vs.              :

C.V. STARR & CO., INC., STARR     :
TECHNICAL RISKS AGENCY, INC.,
and STARR ASSOCIATES, INC.    :

      Counterclaim Defendants.  x
- - - - - - - - - - - - - - - - - - - - - - - - -

## DECLARATION OF RALPH MUCERINO

      I, RALPH MUCERINO, declare as follows:

    1.     I am a Vice President of American International Group, Inc. ("AIG") and

President of AIG Global Energy. I have been employed by various entities within the AIG group

of companies for 27 years, and have been employed in the insurance industry for approximately

39 years. I submit this declaration based on personal knowledge in opposition to Plaintiffs'

Motion For Preliminary Injunction. I have personal knowledge of the facts set forth herein

except where stated to be on information and belief, in which case, I believe those facts to be true.

## The History of AIG and C.V. Starr

2.      As a long term employee of AIG, I am familiar with AIG company history.

3.      Upon information and belief, AIG traces its roots back to the second decade of the twentieth century when a young entrepreneur, Cornelius Vander Starr ("Mr. Starr"), conceived of and founded the organization that has now become the leading insurance enterprise in the world.

4.      Almost a century after he began his first insurance venture, Mr. Starr remains an important part of AIG's corporate heritage and brand identity.  Portraits, plaques, photographs and even statues of Mr. Starr appear in the halls and conference rooms of AIG offices around the world, and certain of AIG's marketing materials and websites proudly recount Mr. Starr's life and work while they tell the story of AIG's founding.

5.      Upon information and belief, in 1926, Mr. Starr started the first of many related companies in the United States to use the AMERICAN INTERNATIONAL brand.

6.      Upon information and belief, in 1950, twenty-four years after he first began establishing AMERICAN INTERNATIONAL-branded companies, Mr. Starr formed a company named C.V. Starr & Co., Inc. ("C.V. Starr").

7.      Upon information and belief, in 1967, American International Group, Inc. was formed to hold the capital stock of certain of the insurance companies in the corporate family created by Mr. Starr.  During the ensuing years, AIG continued to acquire interests in additional insurance and other companies, thus expanding its operations and brand recognition.

8.     Upon information and belief, Plaintiff C.V. Starr is a privately held corporation, presently run by Maurice R. Greenberg and certain associates, that was formed in 1950 to hold Cornelius Vander Starr's domestic insurance agencies.

9.     In May 1970, AIG purchased substantially all of the assets of C.V. Starr, including Mr. Starr's first U.S. company, American International Underwriters Corporation ("AIUC"), a domestic insurance agency. C.V. Starr was left with few holdings other than AIG stock.

10.    Among the few assets that C.V. Starr retained after the 1970 transaction were several small insurance agencies, including Plaintiff C.V. Starr & Co. ("Starr California"), Starr Technical Risks Agency, Inc. ("Starr Tech"), Starr Associates, Inc. ("Starr Associates"), American International Aviation Agency ("AIAA ") and American International Marine Agency, Inc. ("AIMA") (collectively, the "Agencies").

11.    Upon information and belief, in 1969, the total combined commissions paid by AIG subsidiaries to the Agencies not included in the 1970 acquisition was less than one million dollars.

12.    From at least 1970 until early 2006, the Agencies, including Plaintiff Starr California, have served as managing general agents ("MGAs") to AIG member companies.[1] An MGA is an agent authorized by an insurance company to manage all or part of an insurer's business, often in a specific geographic territory and/or for a particular class of insurance

13.    As MGAs to AIG insurance companies, the Agencies were typically limited in the amount of liability they could assume on any one risk, were required to obtain approval from the

---

[1]   AIMA remains an agent to AIG member insurance companies.

AIG insurance company for underwriting and producer guidelines they created, and were excluded from writing certain classes of risk.

14.    AIG insurance companies would typically retain the right to cancel or not renew any policy written by the Agencies.

15.    Upon information and belief, as the holding company for all of the Agencies, C.V. Starr has never directly provided insurance products or services and, thus, has minimal if any, trademark recognition in the relevant market.

16.    Since 1970, the primary asset of C.V. Starr was AIG stock.

**The Agencies Have Always Acted As and Have Been Considered A Part of AIG**

17.    The corporate separation between the C.V. Starr and Agencies and AIG was until very recently largely a formality.  Until recently, all C.V. Starr Board Members were AIG executives.

18.    Further, notwithstanding their nominal ownership by C.V. Starr, the Agencies, including Plaintiff Starr California, have essentially been operating divisions or arms of AIG for at least the past 30 years or more.  Virtually all of the facilities and services that the Agencies required to operate were provided by AIG.  For example, the Agencies' employees participated in AIG's pension, medical, life insurance, disability and deferred compensation plans; used AIG's legal department, AIG's accountants, AIG's human resources, benefits and payroll departments, AIG's training programs, AIG's tuition reimbursement benefits, AIG's computer systems, hardware and IT support, AIG's mail services, AIG's supply ordering system, AIG's telephone services, AIG's travel agency, AIG's corporate car leasing services, AIG's printing and advertising support services, AIG's corporate credit cards and many, many more AIG resources.

19.    Notwithstanding their nominal ownership by C.V. Starr, the Agencies, including Plaintiff Starr California, have essentially been operating divisions or arms of AIG for at least the past 30 years or more.

20.    The Agencies have been managed and overseen by AIG executives, audited by AIG's internal auditing groups, staffed entirely or in part by AIG employees, and housed in office space owned or leased by AIG.

21.    AIG enjoyed unfettered access to the documents and information created by the Starr Agencies in connection with the AIG insurance companies policies and policyholders.

22.    Operationally, on a day-to-day basis, the C.V. Starr and the Agencies, including Plaintiffs, functioned under AIG supervision and were treated like any other AIG-owned business division. Their executives and employees were overseen and managed by AIG senior management, who approved their salaries, bonuses and travel expenses. The Agencies also submitted their budgets and business plans to senior AIG management for approval.

23.    Consistent with the operational identity between the Agencies and AIG, representatives of AIG policyholders and retail brokers with whom I have spoken have indicated that they have always considered their primary relationship to be with AIG and not with the Agencies. Indeed, as demonstrated by the attached email February 2, 2006 email, sent by an employee at AON, one of the world's largest insurance brokers, to other AON employees, AON has always regarded C.V. Starr "to be a group member of AIG" and as such AON afforded C.V. Starr the status of "Owned Underwriting Division." Attached hereto as Exhibit 1 is a true and correct copy of this email.

24.    The reaction of AON and AIG's other constituents should not be a surprise because over the years the Agencies were consistently *held out* as being affiliates or divisions of

AIG. For example, a press release dated December 6, 1971, issued by the American Home Group, Inc., a member company of AIG, describes Starr Associates as being part of the "American International organization." Attached hereto as <u>Exhibit 2</u> is a true and correct copy of this press release. In addition, a letter to the staff of C.V. Starr, dated, February 25, 1970, signed by Mr. Greenberg, announces AIG's intention to formally acquire the assets of C.V. Starr, and refers to the group of companies involved in this transaction as the "American International family." Attached hereto as <u>Exhibit 3</u> is a true and correct copy of this letter.

25.     Last Spring, after regulators lodged accusations that AIG had engaged in accounting improprieties, Mr. Greenberg was forced to step down as Chairman and CEO of AIG.

26.     Following his retirement from AIG, Mr. Greenberg has attempted to separate the Agencies from AIG and to use them as a means to remain in the insurance business and compete against AIG.

27.     C.V. Starr and the Agencies recently have sought to appropriate business and other valuable assets which belong to AIG. This has lead to a series of ongoing arbitrations between the parties.

### Conclusion

28.     Based on my experience in the insurance industry and as an employee of AIG, there is no doubt in my mind that companies doing business under both the AMERICAN INTERNATIONAL and STARR names are today for many years and have been part of the greater AIG family, and are known to the insurance market as such.

29.     To my knowledge, the Agencies, including Starr California, have no identity in the marketplace that is independent of that which it derived from AIG. For decades, the Agencies existed solely for the purpose of selling insurance on behalf of the AIG member

insurance companies, and, to my knowledge, it had not written direct insurance for any insurer outside of AIG.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Honolulu, Hawaii this 20th day of April, 2006.

_____
Ralph Mucerino

# Exhibit 1

02/19/2006 SUN 10:30 [TX/RX NO 9413] ⌀003

---- Forwarded by Alfred Tobin/NY/ARS/US/AON on 02/03/2006 10:50 AM ----

**Jim Helfert**

To:     Alfred Tobin/NY/ARS/US/AON@AonNA, Kurt Tentinger/TX/ARS/US/AON@AONNA

02/03/2006 10:05 AM

cc:

Subject:   AIG/C V Starr Intermediary Status

## FYI

---- Forwarded by Jim Helfert/IL/ARS/US/AON on 02/03/2006 09:03 AM ----

**Cary Crisp**

To:     Al Pereira/ARYMCA/AON@AONNA, Cary Crisp/ASG/US/AON@AONNA, Chris Rathbone/AGL/UK@... ...,
Christopher J Bronski/ASC/US/AON@AONNA, David JA Mew/ARS/CA/AON@AONNA, Diane Algodi/ASC/US/AON@AC⋯/⋯ ⋯⋯y

02/02/2006     Osorio/ASC/US/AON@AONNA, Jacquise Nepi/ASC/US/AON@AONNA, Jim Helfert/IL/ARS/US/AON@AONNA, Jim

03:57 PM      Melnicia/ARYM/US/AON@AONNA, John Dwyer/IL/ARS/US/AON@AONNA, Kathy Solof/MKAon Consulting@AONNA,
               margie_batine@aon.com, Markell Sanchez/ARYM/US/AON@Aonna, Mark Warno/MASG/US/AON@AONNA, Oriana
               Bakke/US/Warranty@CSG, Paul Haqq/ASC/US/AON@AONNA, Rex Kidder/ASC/US/AON@AONNA, Scott
               Edmiston/ASC/US/AON@AONNA

cc:

Subject:   AIG/C V Starr Intermediary Status

With the recent discussions between AIG and C V Starr regarding the business relationship between the two
companies, the Aon Market Security Department has reviewed the status of Starr's authorization as an
intermediary. We have, for a number of years, considered Starr to be a group member of AIG and have afforded
it the status of Owned Underwriting Division. It has become apparent that this is not the case and that Starr is an
independent operation that has been authorized (as an MGA) to underwrite business on behalf of AIG.

As a result, we will henceforth consider Starr to be an independent intermediary and will require the company to
provide us with all of the documents that we would expect any other intermediary to provide us. We have entered
into discussions with management at Starr and have requested that they submit these documents to us. In light
of these extraordinary events, Aon will continue to process business (through the Bridge accounting system) that
has been placed with members of AIG as before in an attempt to allow Starr to gather the appropriate documents.

It should be noted, that this processing will only be performed for members of AIG. Covers placed with other non-
AIG companies will not be processed without specific client instruction for us to do so until such time as we
receive written notice from those companies that states Starr is authorized to make such placements.

02/03/2006



7d

# Exhibit 2

 **The American Home Group**

Member of American International Group, Inc.
102 Maiden Lane, New York, N.Y. 10005
Telephone: (212) 344-9200

For further information contact:
David G. Pearson, Assistant Director Marketing
American International Group, Inc.
102 Maiden Lane, New York, N.Y. 10005
Tel: 344-9200, ext. 8151

**Transatlantic Reinsurance Company Elects Joseph Sheehan Senior Vice President and Frank Berglas Secretary**

New York, New York, December 6, 1971..... The Transatlantic Reinsurance Company, a member of the American Home Group, has announced the election of Joseph F. Sheehan as Senior Vice President and Frank E. Berglas as Secretary.

Mr. Sheehan joined the American International organization in 1958 working in the surplus lines department of Starr Agencies, Inc. which became Starr Associates, Inc. He later became Vice President of Starr Associates, Inc. and was elected President of that company in 1964. In 1966 he transferred to American Home Assurance Company to become Manager of the Reinsurance Division and was later elected Assistant Vice President. Mr. Sheehan is also President and Director of the American International Aviation Agency, Inc.

Mr. Berglas was appointed Manager of the Reinsurance Division of American Home this past July. He joined American International in 1966 as Manager of the Premium Accounting Department and later served as Administrative Assistant to Robert G. Dennis, President of American International Services. Mr. Berglas received his higher education at Fairleigh Dickinson University where he earned a B.S. degree.

# Exhibit 3

C. V. STARR & CO., INC.
102 MAIDEN LANE
NEW YORK, N. Y. 10005

MAURICE R. GREENBERG
PRESIDENT

February 25, 1970

TO THE STAFF:

The Boards of Directors of the appropriate companies of
the American International family are considering a proposal
to transfer to American International Group, Inc., in exchange
for shares of its Common Stock, ownership of substantially all
of the assets of American International Underwriters Overseas,
Inc., including its worldwide organization and insurance agency
plant, all of the stock of American International Underwriters
Corporation and certain of the other assets of C. V. Starr &
Co., Inc. including Cevesco Services, Inc., Vermont Accident
Insurance Company, Inc. and the buildings at 102 Maiden Lane,
New York City and at 206 Sansome Street, San Francisco,
California.

Attached is a copy of a press release containing certain
other information of general interest concerning the proposed
transaction. By and large, the consummation of this corporate
reorganization will have little effect upon the internal day to
day operations of the various companies or personnel involved
except to the extent that it is anticipated that increased
efficiency will result from better utilization of specialties
and from possible consolidations of some functions within the
group.

Companies remaining with C. V. Starr & Co., Inc. include
American International Marine Agency of New York, Inc. and its
subsidiaries and Albert Ullmann Marine Office, Inc., The
International Cessions Company, Inc., American International
Aviation Agency, Inc., C. V. Starr & Co., Inc. (California),
Starr Technical Risks Agency, Inc. and Starr Associates, Inc.

M. R. Greenberg

EXHIBIT F

Kenneth A. Plevan (KP 2551)
John L. Gardiner (JG 8715)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036

Nicholas A. Gravante, Jr. (NG 4411)
Steven I. Froot (SF 7662)
Boies Schiller & Flexner LLP
570 Lexington Avenue
New York, NY  10022

Attorneys for Plaintiffs/Counterclaim-Defendants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

C. V. STARR & CO., INC., C. V. STARR & CO.,   :
and STARR TECHNICAL RISKS AGENCY,
INC.,                                                              :   06 CV 2157 (HB) (KNF)

                         Plaintiffs,                       :   ECF Case

              vs.                                             :   **MEMORANDUM OF LAW IN SUPPORT**
                                                                   **OF APPLICATION TO ENJOIN AIG FROM**
AMERICAN INTERNATIONAL GROUP, INC.   :   **PROCEEDING IN RELATED ACTION**
and STARR EXCESS LIABILITY INSURANCE
COMPANY, LTD.,                                       :

                         Defendants.            x
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
AMERICAN INTERNATIONAL                  :
GROUP, INC.,
                                                                   :
                  Counterclaim-Plaintiff,
                                                                   :
              vs.
                                                                   :
C. V. STARR & CO., INC., STARR
TECHNICAL RISKS AGENCY, INC.,             :
STARR ASSOCIATES, INC.,
C. V. STARR & CO., and                            :
STARR AVIATION AGENCY, INC.,
                                                                   :
                  Counterclaim-Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

Kenneth A. Plevan (KP 2551)
John L. Gardiner (JG 8715)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036

Nicholas A. Gravante, Jr. (NG 4411)
Steven I. Froot (SF 7662)
Boies Schiller & Flexner LLP
570 Lexington Avenue
New York, NY  10022

Attorneys for Plaintiffs/Counterclaim-Defendants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| C. V. STARR & CO., INC., C. V. STARR & CO., : <br> and STARR TECHNICAL RISKS AGENCY, <br> INC., | : 06 CV 2157 (HB) (KNF) |
| Plaintiffs, | : ECF Case |
| vs. | : **MEMORANDUM OF LAW IN SUPPORT** <br> **OF APPLICATION TO ENJOIN AIG FROM** |
| AMERICAN INTERNATIONAL GROUP, INC. <br> and STARR EXCESS LIABILITY INSURANCE <br> COMPANY, LTD., | : **PROCEEDING IN RELATED ACTION** <br> : |
| Defendants. | x |

- - - - - - - - - - - - - - - - - - - - - - - - - -

AMERICAN INTERNATIONAL                         :
GROUP, INC.,

                                :

              Counterclaim-Plaintiff,

                                :

          vs.                                       :

C. V. STARR & CO., INC., STARR
TECHNICAL RISKS AGENCY, INC.,                  :
STARR ASSOCIATES, INC.,
C. V. STARR & CO., and                         :
STARR AVIATION AGENCY, INC.,

                               :

             Counterclaim-Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... ii, iii

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ................................................................................................... 3

I.    IN ACCORDANCE WITH THE FIRST-FILED DOCTRINE, THE COURT
      SHOULD ENJOIN AIG FROM PROSECUTING THE DELAWARE ACTION ............. 3

      A.    The First-Filed Doctrine ..................................................................... 3

      B.    Principals of Comity and Efficiency Dictate that AIG be Enjoined from
            Prosecuting the Delaware Action.......................................................... 4

      C.    No Factors Exist to Warrant Deviation from First-Filed Rule ................................ 7

II.   THERE IS NO BASIS FOR THE INJUNCTIVE RELIEF AIG SEEKS IN THE
      DELAWARE ACTION .......................................................................... 8

      A.    C. V. Starr Is Entitled to a Reasonable Period Within Which to Transition
            to a New Name for AIMA ..................................................................... 8

      B.    C. V. Starr Should be Given at Least Three Months to Transition to a New
            Name for AIMA..................................................................................... 9

CONCLUSION...................................................................................................... 12

## TABLE OF AUTHORITIES

### CASES

800-Flowers, Inc. v. Intercontinental Florist, Inc.,
    860 F. Supp. 128 (S.D.N.Y. 1994) ...........................................................................3, 7

A.R. Dervaes Co. v. Houdaille Industries, Inc., No. C.A. 6471, 1981 Del. Ch.
    LEXIS 545 (Del. Ch. Sept. 29, 1981)..............................................................................9

Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,
    718 F.2d 1201 (1st Cir. 1983).......................................................................................10

Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445 (S.D.N.Y. 1982) ............10

Bunn-O-Matic Corp. v. Bunn Coffee Services, Inc.,
    88 F. Supp. 2d 914 (C.D. Ill. 2000) ................................................................................9

Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc., No. 87 CIV. 6294, 1988
    WL 52777 (S.D.N.Y. May 18, 1988) ...............................................................................9

Citigroup Inc. v. City Holding, 97 F. Supp. 2d 549 (S.D.N.Y. 2000) .........................3, 4, 7

City of New York v. Exxon Corp., 932 F.2d 1020 (2d Cir. 1991) .......................................3

Colony Liquor Distributors, Inc. v. Jack Daniel Distillery,
    22 A.D.2d 247 (3d Dep't 1964).......................................................................................9

Dial-a-Mattress Operating Corp. v. Mattress Madness, Inc.,
    847 F. Supp. 18 (E.D.N.Y. 1994) ....................................................................................9

Employers Insurance of Wausau v. Duplan Corp., No. 94 CIV. 3143 (CSH), 1994
    WL 637710 (S.D.N.Y. Nov. 10, 1994).........................................................................3, 4

First City National Bank & Trust Co. v. Simmons, 878 F.2d 76 (2d Cir. 1989).............3, 7

Hanson PLC v. Metro-Goldwyn-Mayer Inc., 932 F. Supp. 104 (S.D.N.Y. 1996) ..............7

Italian & French Wine Co., Inc. v. Negociants U.S.A., Inc.,
    842 F. Supp. 693 (W.D.N.Y. 1993) .................................................................................8

Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co.,
    342 U.S. 180 (1952).........................................................................................................3

Kiwanis International v. Ridgewood Kiwanis Club, 806 F.2d 468 (3d Cir. 1986) .............8

Martin v. Graybar Electric Co., 266 F.2d 202 (7th Cir. 1959) ...........................................3

Meeropol v. Nizer, 505 F.2d 232 (2d Cir. 1974) ...................................................................4

National Equipment Rental, Ltd. v. Fowler, 287 F.2d 43 (2d Cir. 1961)............................3

Rosati's Franchise Systems, Inc. v. Rosati, No. 05 C 3146, 2006 WL 163145
      (N.D. Ill. Jan. 17, 2006) .............................................................................................8

S-Fer International, Inc. v. Paladion Partners, Ltd.,
      906 F. Supp. 211 (S.D.N.Y. 1995) .............................................................................4

Toy Biz, Inc. v. Centuri Corp., 990 F. Supp. 328 (S.D.N.Y. 1998) .................................4, 7

William Gluckin & Co. v. International Playtex Corp.,
      407 F.2d 177 (2d Cir. 1969).......................................................................................7

## MISCELLANEOUS

2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
      §18:43 (4th ed. 2005).............................................................................................8, 9

2A NY Jur Agency and Independent Contractors § 42 (2006)............................................8

Plaintiff and counterclaim-defendant C. V. Starr & Co., Inc. ("C. V. Starr") respectfully submits this memorandum of law in support of its application to enjoin defendant counterclaim-plaintiff American International Group, Inc. ("AIG") from proceeding with a related trademark infringement lawsuit, filed on July 28, 2006 in the District of Delaware.

## PRELIMINARY STATEMENT

Notwithstanding the Court's now-intimate familiarity with AIG, the C. V. Starr parties, their decades-long business relationship, the unwinding of that relationship, and the trademark disputes that this unwinding has occasioned, AIG last week chose <u>Delaware</u> federal court when it filed a trademark infringement lawsuit against C. V. Starr and one of its subsidiaries, American International Marine Agency, Inc. of New York ("AIMA"), challenging the use of the American International mark as the name of said subsidiary. The lawsuit follows a July 25, 2006 "stop-immediately" termination of AIMA as Managing General Agent ("MGA") for certain AIG insurance subsidiaries.

It is readily apparent that AIG's filing of this new lawsuit in Delaware is an improper attempt at forum shopping. First, New York is the principal place of business of <u>all of the parties</u>. Each is headquartered in New York, with its executive offices, senior executives familiar with the facts, likely witnesses, and relevant documents also all located in New York. Even AIG's lead counsel, Quinn Emanuel, is located here.

In addition, the issues raised by AIG in its Delaware complaint are closely related to the issues already being litigated in the New York case. Indeed, AIG's position on "sanctioned" vs. "unauthorized" use of "American International" or "AI" by C. V. Starr and the C. V. Starr Agencies appears both in its Amended Counterclaims in the New York action (see, e.g., ¶¶ 90-95), and on page 20 of its July 14, 2006 memorandum in opposition to the motion to

dismiss those claims. Furthermore, numerous of the factual allegations in the Delaware complaint are paraphrases of, or even word-for-word identical to, the allegations contained in AIG's Amended Counterclaims in the New York lawsuit. This is particularly true with respect to AIG's factual allegations concerning the parties' relationships, and its contentions that these alleged facts are the key means of determining ownership of trademark rights. (<u>Compare</u> Del. Compl. ¶¶ 31-35 <u>with</u> Amended Counterclaims ¶¶ 63, 64, 66, 67, and 72.)

      In short, there can be little doubt that the Delaware action "embraces the issues" of the New York case. Accordingly, the Court should exercise its discretion and enjoin AIG from prosecuting the Delaware action. In addition, as shown below, AIG's position asserted in the Delaware complaint is entirely without merit.

<div align="center">

**ARGUMENT**[1]

</div>

I.    **IN ACCORDANCE WITH THE FIRST-FILED DOCTRINE, THE COURT SHOULD ENJOIN AIG FROM PROSECUTING THE DELAWARE ACTION**

A.    **The First-Filed Doctrine**

It is a "well-settled principle" in the Second Circuit that where proceedings involving the same parties and related issues are pending simultaneously in different federal courts, the first-filed of the two takes priority absent "special circumstances." City of New York v. Exxon Corp., 932 F.2d 1020, 1025 (2d Cir. 1991); First City Nat'l Bank & Trust Co. v. Simmons, 878 F.2d 76, 79 (2d Cir. 1989); Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 555 (S.D.N.Y. 2000). Put differently, "the presumption is that 'the court which first has possession of the action decides it.'" Citigroup, 97 F. Supp. 2d at 555 (quoting 800-Flowers, Inc. v. Intercont'l Florist, Inc., 860 F. Supp. 128, 131 (S.D.N.Y. 1994)).

This doctrine, known as the "first-filed rule" is "rooted in principles of judicial efficiency, the concerns being conservation of judicial resources and avoidance of multiple conflicting judgments." Employers Ins. of Wausau v. Duplan Corp., No. 94 CIV. 3143 (CSH), 1994 WL 637710, at *1 (S.D.N.Y. Nov. 10, 1994); see Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183 (1952). As the Second Circuit has observed:

> We believe it to be important that there be a single determination of a controversy between the same litigants and, therefore, a party who first brings an issue into a court of competent jurisdiction should be free from the vexation of concurrent litigation over the same subject matter, and an injunction should issue enjoining the prosecution of the second suit to prevent the economic waste involved in duplicating litigation which would have an adverse effect on the prompt and efficient administration of justice unless unusual circumstances warrant.

Nat'l Equip. Rental, Ltd. v. Fowler, 287 F.2d 43, 46 (2d Cir. 1961) (quoting Martin v. Graybar Elec. Co., 266 F.2d 202, 204 (7th Cir. 1959)).

---

[1]    Given the Court's familiarity with the parties and this matter, the relevant facts are set forth only in the Affirmation of Kenneth A. Plevan dated August 1, 2006 and are incorporated herein by reference.

Complete identity of the parties and issues is not essential for the first-filed rule to apply; rather, the relevant inquiry is whether the second action "embraces the issues" of the first action. Toy Biz, Inc. v. Centuri Corp., 990 F. Supp. 328, 332 (S.D.N.Y. 1998) (Baer, J.) (citing Meeropol v. Nizer, 505 F.2d 232, 235-37 (2d Cir. 1974)). The court in the first-filed action has "the power to enjoin the parties from proceeding in the second action, **and indeed, should do so absent a showing of special circumstances that would give priority to the second action.**" Id. (emphasis added). Consequently, courts in this Circuit routinely have enjoined parties from pursuing in other districts, subsequently-filed actions involving the same issues as the claims in the matter before them. See, e.g., Meeropol v. Nizer, 505 F.2d 232 (2d Cir. 1974); Citigroup, 97 F. Supp. 2d at 556 (enjoining second-filed trademark infringement action); Toy Biz, 990 F. Supp. at 329 (same); S-Fer Int'l, Inc. v. Paladion Partners, Ltd., 906 F. Supp. 211, 217 (S.D.N.Y. 1995); Wausau, 1994 WL 637710, at *3.[2]

**B.    Principles of Comity and Efficiency Dictate That AIG Be Enjoined from Prosecuting the Delaware Action**

Because the Delaware action involves virtually the same parties and same legal and related factual issues as the instant action, to avoid a waste of judicial resources and multiple outcomes, AIG should be enjoined from further prosecution of the Delaware action. It cannot be disputed that the two actions involve the same parent organizations – AIG and C. V. Starr – both of which are headquartered in New York.[3] Moreover, the principal witnesses for the parties, the relevant documents, and even lead outside counsel, all are located in New York. Indeed, between January 12 and July 27, 2006 thirty letters were exchanged between the Vice President

---

[2]    The policy against duplicative litigation is reflected in Local Civil Rule 1.6, which expressly requires counsel appearing before the Court to promptly bring to the Clerk's attention any facts that may bear on whether two pending actions are in any way related.

[3]    Although AIMA is not a named party to the Delaware action, it is a wholly-owned subsidiary of C. V. Starr. In addition, C. V. Starr has expressly agreed that AIMA would be bound by any decision rendered by this Court in connection with this action. (Plevan Aff. ¶ 27 .)

4

of AIG and the President and CEO of AIMA. Each letter concerned aspects of the ongoing

MGA relationship between AIMA and AIG, and was sent from the New York office of one party

to the New York office of the other party. (See Plevan Aff. ¶ 17.)

Nor can it be disputed that the two actions "embrace" the same factual and legal

issues. A significant number of the factual allegations in the Delaware complaint are

paraphrases of, or even word-for-word identical to, the allegations contained in AIG's Amended

Counterclaims in the New York lawsuit. In addition, the propriety of AIMA's continued use of

the American International mark has been put squarely at issue before this Court. For example,

in its June 5, 2006 Amended Counterclaims and the exhibits attached thereto, AIG asserted:

- "AIMA, the other C. V. Starr subsidiary named American International continues
  to operate as the agent to AIG insurance companies, and may therefore continue
  to make use of the American International trademark, but only under the close
  supervision and control of AIG." (Am. Counterclaims ¶ 75.)

- "American International Marine Agency, Inc. (AIMA) remains AIG's managing
  general agent today and therefore continues to use the famous American
  International trademark with AIG's permission and under its supervision and
  control." (Am. Counterclaims ¶ 94 n.1.)

- "During the week of March 27, 2006, C. V. Starr placed an advertisement in the
  Wall Street Journal touting its 'specialist companies, AIAA, AIMA, Starr Tech,
  and CV Starr & Co.'" (Am. Counterclaims ¶ 91.)

- "[I]n approximately March 2006, C. V. Starr launched a website, located at
  cvstarrco.com. Initially, this website . . . prominently made use of AIG's
  trademark American International in the names of both American International
  Aviation Agency and American International Marine Agency, abbreviated on the
  site as 'AIAA' and 'AIMA,' respectively." (Am. Counterclaims ¶ 94 and Ex. 17.)

- Exhibit 16 to AIG's Amended Counterclaims, a C. V. Starr & Co., Inc. Wall
  Street Journal advertisement, states in part: "It's the power of our four specialist
  companies, AIAA, AIMA, Starr Tech, CV Starr & Co., operating globally,
  helping some of the most high-risk ventures on earth manage risk and insure
  against loss." (Am. Counterclaims Ex. 16.)

Similarly, in its Memorandum of Law in Opposition to the C. V. Starr

Companies' Motion to Dismiss AIG's Counterclaims ("Opp. Mem."), dated July 14, 2006, AIG

challenged the C. V. Starr parties' continued use of the American International mark in

connection with advertisements for AIMA:

> [S]everal advertisements placed by [C. V. Starr] in high-circulation business publications and on an insurance-business web-publication contain misleading representations of fact that are likely to cause consumers to be confused, or believe, falsely that Movants' services remain affiliated with AIG" and that **"these ads make prominent use of the American International trademark** (abbreviated as AI) in close proximity to the Starr trademark in the text of the ads, creating the false impression that Movants' [sic] remain affiliated with AIG.

(Opp. Mem. at 20 (citing Am. Counterclaims ¶¶ 91-95 (emphasis added); <u>see also</u> Am.

Counterclaims, Ex. 16 (<u>The Wall Street Journal</u> advertisement).)

      In response to AIG's allegations in this action, the C. V. Starr parties defended

their continued use of the American International mark in connection with AIMA,

notwithstanding their receipt of AIG's June 29, 2006 termination notice:[4]

> With respect to the far less prominent references to the C. V. Starr agencies AIAA and AIMA, there is nothing false or misleading here either because at the time the ad ran, these agencies were still authorized to use those names. Thus, AIG has expressly conceded that, even as of the date of the Amended Counterclaims, AIMA continued "to operate as the agent of AIG insurance companies, and may therefore continue to make use of the American International trademark . . . ." Indeed, a six-month Notice of Termination was not sent to AIMA until June 29, 2006.

(Reply Mem. at 13 (quoting Am. Counterclaims ¶ 75); Plevan Reply Aff., Ex. 30.)

      Given the significant overlap in factual and legal issues, both actions will by

necessity also involve witnesses and documentary evidence that will be virtually identical.

Accordingly, judicial economy dictates that AIG be enjoined from prosecuting the Delaware

action. This would also avoid inconsistent results.

---

[4]   AIG issued a six-month termination notice, the contractually-required notice period, to AIMA on or about June 29, 2006. Thereafter, on July 25, 2006, AIG gave AIMA notice that the agency relationship was to terminate immediately. (<u>See</u> Plevan Aff. ¶¶ 5-6.)

**C.    No Factors Exist to Warrant Deviation From First-Filed Rule**

The party that seeks to deviate from the first-filed rule has the burden of

demonstrating that "special circumstances" justifying an exception exist. See Citigroup, 97 F.

Supp. 2d at 555-56; Hanson PLC v. Metro-Goldwyn-Mayer Inc., 932 F. Supp. 104, 106

(S.D.N.Y. 1996); 800-Flowers, 860 F. Supp. at 132. Special circumstances have been found to

exist where forum shopping alone motivated the choice of forum in the first-filed suit, or where

the first-filed action constitutes an anticipatory filing. See, e.g., Toy Biz, 990 F. Supp. at 332

(rejecting defendant's forum shopping argument where plaintiff's principal place of business was

located in New York and where defendant sold the allegedly infringing products within the

state). The determination as to whether circumstances exist to warrant a departure from the first-

filed rule "is committed to the sound discretion of the district court." See Citigroup, 97 F. Supp.

2d at 556; Simmons, 878 F.2d at 77; William Gluckin & Co. v. Int'l Playtex Corp., 407 F.2d 177,

179 (2d Cir. 1969).

No such circumstances are present here. There can be no credible claim that the

C. V. Starr parties engaged in an anticipatory filing or forum-shopping by filing this lawsuit in

New York. Both C. V. Starr and AIG have actively litigated this matter for months before this

Court. Both parties have their principal places of business in New York. Indeed, as shown

above, there is a significant New York nexus to the AIMA dispute. In contrast, other than being

the State of incorporation for AIG and C. V. Starr (but not defendant AIMA), Delaware has, as

far as we can tell, nothing to do with the issues AIG has now raised.

Thus, the only attempt at forum shopping here is being done by AIG, which is

presumably seeking some sort of tactical advantage in placing its trademark infringement suit in

a forum other than this one. Given that the Delaware action appears to be yet another attempt on

the part of AIG to thwart competition in the insurance field, this time by putting AIMA out of

business for several months while awaiting state regulatory approval to operate under a new

name, AIG's choice of a new forum is not surprising.

## II.    THERE IS NO BASIS FOR THE INJUNCTIVE
## RELIEF AIG SEEKS IN THE DELAWARE ACTION

### A.    C. V. Starr Is Entitled to a Reasonable Period
### Within Which to Transition to a New Name for AIMA

As AIG itself acknowledges (Del. Compl. ¶ 30; Am. Counterclaims ¶ 75),

AIMA's use of the American International mark was under implied license from AIG. As shown

below, under these circumstances, C. V. Starr is entitled to a reasonable time period to transition

to a new name for AIMA.

As a general matter, trademark license contract disputes are governed by the

general rules of contract interpretation. 2 J. Thomas McCarthy, McCarthy on Trademarks and

Unfair Competition § 18:43 (4th ed. 2005); see also Rosati's Franchise Sys., Inc. v. Rosati, No.

05 C 3146, 2006 WL 163145, at *5 (N.D. Ill. Jan. 17, 2006) (applying principles of contract

interpretation in holding that defendants were not infringing plaintiffs' trademark). It is a well-

established principle that state law governs contractual issues relating to trademark licenses.

E.g., Kiwanis Int'l v. Ridgewood Kiwanis Club, 806 F.2d 468, 472 n.8 (3d Cir. 1986) ("A

trademark licensing agreement is a contract to be interpreted and enforced under state law.")

New York law is clear that "reasonable notice" must be given in order to

terminate a contract of indefinite duration. See, e.g., 2A NY Jur Agency and Independent

Contractors § 42 (2006) ("Where there is no provision (in an agency agreement) as to

termination, the contract may be terminated after giving reasonable notice."); Italian & French

Wine Co. v. Negociants U.S.A., Inc., 842 F. Supp. 693, 699 (W.D.N.Y. 1993) ("Even if no

definite period of termination is originally fixed in the contract, such a contract is not terminable

at will by either party, but only upon reasonable notice."); <u>Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.</u>, No. 87 CIV. 6294 (MUL), 1988 WL 52777, at *2 (S.D.N.Y. May 18, 1988) ("In the absence of an express provision, a contract is terminable after a reasonable duration with reasonable notice.").[5]  In determining what type of notice is reasonable, the courts have looked to the individual circumstances of the case at hand.  <u>See</u> <u>Chenowith</u>, 1988 WL 52777, at *3; <u>Colony Liquor Distribs., Inc. v. Jack Daniel Distillery</u>, 22 A.D.2d 247 (3d Dep't 1964) (modifying trial court order and granting defendant nearly a full year to unwind distributor agreement given parties' 11-year relationship).

In light of the foregoing, AIG can only terminate the implied trademark license to use the name AIMA upon reasonable notice.  <u>See</u> 2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 18:43 (4th ed. 2005) ("The term of the license should be specifically stated in the license because the law of some states provides that a license without a stated term is terminable at the will of either party upon reasonable notice."); <u>Dial-a-Mattress Operating Corp. v. Mattress Madness, Inc.</u>, 847 F. Supp. 18, 20 n.1 (E.D.N.Y. 1994) (holding that termination of an agreement conferring a license to use a trademark for an indefinite time requires reasonable advance notice); <u>Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.</u>, 88 F. Supp. 2d 914, 921 (C.D. Ill. 2000) (citing <u>Dial-a-Mattress</u> for the proposition that a "license with indefinite term may be terminated at will with reasonable notice").

**B.    C. V. Starr Should be Given at Least Three Months to Transition to a New Name for AIMA**

While C. V. Starr reserves its right to seek, in a contractually mandated arbitration proceeding, damages and other appropriate relief for AIG's wrongful actions regarding

---

[5]    Although New York law would almost certainly govern the AIMA MGA agreement, Delaware law would require the same result.  <u>See, e.g.</u>, <u>A.R. Dervaes Co. v. Houdaille Indus.</u>, No. C.A. 6471, 1981 Del. Ch. LEXIS 545, at *13 (Del. Ch. Sept. 29, 1981) ("[C]ontracts which are silent as to termination are terminable at will by either party . . . upon reasonable notice.").

9

termination of AIMA's MGA agreement, with regard to the trademark issue relevant here AIMA has agreed to transition to a new name. Thus, the only issue raised by AIG's Delaware complaint that requires resolution is the "reasonable time period" by which C. V. Starr must effectuate the name change.

As also set forth in the Plevan Affirmation, given the circumstances here – including the fact that (i) AIMA has been using the American International mark for more than 30 years, and (ii) C. V. Starr must obtain state insurance agency approval before it can conduct business under a new name – six months is a reasonable time period to change AIMA's name. Indeed, the MGA Agreement itself requires AIG to give AIMA 6-months notice prior to terminating the Agreement.

Nor is there likely to be any confusion created by AIMA's continued use of the American International mark during this transitional period. As AIG itself concedes, the relevant customer base here is obviously highly sophisticated. (See Am. Counterclaims ¶ 28.) Accordingly, such consumers are unlikely to be confused by AIMA's use of the American International mark, particularly during a brief transition period. See, e.g., Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1206 (1st Cir. 1983) ("Perhaps the most critical factor that weighs against Astra in our consideration of this issue is the sophistication of the class of prospective purchasers of the subject products."); Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 449-50 (S.D.N.Y. 1982) (dismissing trademark infringement claims on ground, among others, that defendant's customers were highly sophisticated given "their substantial business experience . . . ").

Moreover, the unwinding of AIG's relationship with C. V. Starr has been widely publicized both in the press and in industry trade journals. (See Plevan Aff. ¶ 26.) In addition,

10

AIG has issued press releases making clear that it has terminated AIMA as an MGA for AIG's insurance subsidiaries. (Id. ¶ 6.) In fact, AIG's week-old termination of AIMA has already begun to make headlines in the business trade press. (Id. ¶ 26.) Accordingly, there is no likelihood that AIG's actual and potential customers will be confused by AIMA's continued use of the American International mark during the transitional period.

In all events, C. V. Starr has advised AIG that it can likely make the name change within three months, an estimate for the time needed to obtain all necessary regulatory approvals based on the transition from AIAA to Starr Aviation earlier this year.

## CONCLUSION

For the foregoing reasons, C. V. Starr respectfully requests that defendant AIG be
enjoined from prosecuting the Delaware action.

Dated:  August 1, 2006

Nicholas A. Gravante, Jr. (NG-4411)
Steven I. Froot (SF-7662)
Amy Foote (AF-0986)
BOIES, SCHILLER & FLEXNER LLP
570 Lexington Avenue
New York, NY  10022

Respectfully submitted,

Kenneth A. Plevan (KP 2551)
John L. Gardiner (JG 8715)
Stephanie J. Kamerow (SK 6921)
Anthony Dreyer (AD 3571)

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522

(212)-735-0000

Attorneys for Plaintiff/Counterclaim-Defendant
C. V. Starr & Co., Inc.

By: _____

12

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-463 |
| | ) | |
| C. V. STARR & CO., INC. and AMERICAN | ) | |
| INTERNATIONAL MARINE AGENCY OF | ) | |
| NEW YORK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF KENNETH A. PLEVAN IN SUPPORT
### OF DEFENDANTS' MOTION TO TRANSFER VENUE

KENNETH A. PLEVAN, under penalty of perjury, declares as follows:

1.     I am a member of the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for defendants C. V. Starr & Co., Inc. ("C. V. Starr") and American International Marine Agency of New York, Inc. I submit this declaration in support of defendants' application for an order pursuant to 28 U.S.C. § 1404(a) transferring this action to the United States District Court for the Southern District of New York.

### The Oral Argument in Connection with C. V. Starr's
### Motion to Enjoin AIG from Proceeding with this Lawsuit

2.     On Friday August 11, 2006, in the case encaptioned <u>C. V. Starr & Co., Inc. v. American International Group, Inc.</u>, No. 06 Civ. 2157 (HB) (S.D.N.Y.) (the "New York Lawsuit") the Honorable Harold Baer held oral argument on (i) C. V. Starr's motion to enjoin AIG from proceeding with this lawsuit; and (ii) C. V. Starr's motion to dismiss the Amended Counterclaims asserted by AIG.

3.      Because the Court Reporter present at oral argument is now on vacation, we are unable to supply the Court with a transcript of said proceedings before Judge Baer.

4.      At the conclusion of the oral argument, the parties provided Judge Baer with a copy of the transcript of the telephonic proceedings held before this court on August 9, 2006.

5.      To the best of my recollection, Judge Baer asked me during oral argument whether the matters raised in C. V. Starr's motion to enjoin AIG could not be decided by this Court under the standards applicable to a motion to transfer venue pursuant to 28 U.S.C. § 1404(a).  I responded that we would be making a transfer motion in this Court.

6.      Judge Baer reserved decision on both argued motions, and gave no indication as to when decisions would be issued.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed in New York, New York on August 15, 2006.

Respectfully submitted,

_____

KENNETH A. PLEVAN

594478-New York Server 6A - MSW

## CERTIFICATE OF SERVICE

I, Edward B. Micheletti, hereby certify that on August 16, 2006, a copy of the

Motion to Transfer, Opening Brief In Support of Defendants' Motion To Transfer Venue,

proposed Order, Transmittal Affidavit of Jennesse E. Parker To Defendants' Opening Brief In

Support of Their Motion To Transfer and Compendium of Unreported Opinions were served on

the following counsel of record :

> VIA CM/ECF
> Rodger D. Smith II, Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899

> /s/ Edward B. Micheletti
> Edward B. Micheletti (I.D. No. 3794)
> SKADDEN, ARPS, SLATE, MEAGHER
>   & FLOM LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, Delaware  19899-0636
> (302) 651-3000

1

466131.01-Wilmington Server 1A - MSW