# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMERICAN INTERNATIONAL GROUP, INC., )
                                   )
         Plaintiff,           )
                                     )
        v.                   )        Case No. 06-463
                                     )
C. V. STARR  & CO., INC. and AMERICAN )
INTERNATIONAL MARINE AGENCY OF )
NEW YORK, INC., )
                                     )
         Defendants.      )

## DEFENDANTS' OPPOSITION TO AIG'S
## MOTION FOR A PRELIMINARY INJUNCTION

> SKADDEN, ARPS, SLATE,
>   MEAGHER & FLOM LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, Delaware 19899-0636
> (302) 651-3000
> Attorneys for Defendants

DATED:  August 16, 2006

## TABLE OF CONTENTS

Table of Authorities ............................................................................................... iii

NATURE AND STAGE OF PROCEEDINGS .................................................1

PRELIMINARY STATEMENT ........................................................................1

No Likelihood of Success on the Merits..........................................................2

AIMA Is Entitled to a Reasonable Transition Period ......................................3

Immediate Irreparable Harm............................................................................3

The Public Interest ...........................................................................................4

FACTUAL BACKGROUND .............................................................................6

      A.     The Parties ...........................................................................6

            1.     Plaintiff AIG .............................................................6

            2.     Defendant AIMA .......................................................6

            3.     Defendant C. V. Starr..................................................8

      B.     AIG's Termination of AIMA's Marine Management Agreement...............8

      C.     The Filing of This Lawsuit .........................................................9

      D.     AIMA's Decision to Change Its Name.....................................10

ARGUMENT....................................................................................................12

AIG'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE
     DENIED..............................................................................................12

      A.     Applicable Preliminary Injunction Standards.............................12

B.  AIG Cannot Establish a Likelihood of Success on the Merits...................12

1.  AIG Cannot Demonstrate Senior Rights to the AIMA Mark ........13

2.  AIG Cannot Demonstrate  a Likelihood of Confusion .................15

(a)  The Sophisticated Customer Base Is Unlikely to Be
Confused ..........................................................................16

(b)  No Evidence of Actual Confusion ....................................17

(c)  AIMA's Good Faith Use of Its Name................................18

3.  AIMA Is Entitled to a Reasonable Period to Complete Its
Name Change.................................................................................19

C.  AIG Cannot Show Irreparable Harm ........................................................22

D.  AIMA Would Be Irreparably Harmed if an Injunction Is Issued .............23

E.  An Injunction Would Not Favor the Public Interest..................................23

CONCLUSION.............................................................................................................24

**Table of Authorities**

## CASES

A. R. Dervaes Co. v. Houdaille Indus., Inc.,
 No. 6471, 1981 WL 7625 (Del. Ch. Sept. 29, 1981) .......................................20

Acierno v. New Castle Cty.,
 40 F.3d 645 (3d Cir. 1994)..............................................................................22

In re Arthur Treacher's Franchisee Litig.,
 689 F.2d 1137 (3d Cir. 1982)..........................................................................12

Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.,
 88 F. Supp. 2d 914, (C.D. Ill. 2000) ...............................................................21

Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,
 269 F.3d 270 (3d Cir. 2001)............................................................................16

Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.,
 No. 87 CIV. 6294 (MJL), 1988 WL 52777 (S.D.N.Y. May 18, 1988) ..........20

Chips N Twigs, Inc. v. Chip-Chip, Ltd.,
 414 F. Supp. 1003 (E.D. Pa. 1976) .................................................................21

Colony Liquor Distribs., Inc. v. Jack Daniel Distillery - Lem Motlow
 Prop., Inc.,
 22 A.D.2d 247 (3d Dep't 1964)......................................................................20

Dial-a-Mattress Operating Corp. v. Mattress Madness, Inc.,
 847 F. Supp. 18 (E.D.N.Y. 1994) ...................................................................20

Duraco Prods., Inc. v. Joy Plastic Enters. Ltd.,
 822 F. Supp. 1202 (W.D. Pa. 1993), aff'd, 40 F.3d 1431 (3d Cir. 1994 ........23

Ford Motor Co. v. Summit Motor Prods., Inc.,
 930 F.2d 277 (3d Cir. 1991).............................................................................16

Freedom Card, Inc. v. JPMorgan Chase & Co.,
    432 F.3d 463 (3d Cir. 2005)..............................................................15

Harley-Davidson Motor Co. v. Iron Eagle of Central Fla., Inc.,
    973 F. Supp. 1421 (M.D. Fla. 1997)...............................................21

Hohe v. Casey,
    868 F.2d 69 (3d Cir. 1989)...............................................................22

Instant Air Freight Co. v. C. F. Air Freight, Inc.,
    882 F.2d 797 (3d Cir. 1989).......................................................12, 22

Interpace Corp. v. Lapp, Inc.,
    721 F.2d 460 (3d Cir. 1983)..............................................................15

Italian & French Wine Co. of Buffalo, Inc. v. Negociants U.S.A., Inc.,
    842 F. Supp. 693 (W.D.N.Y. 1993) .................................................20

Kiwanis Int'l v. Ridgewood Kiwanis Club,
    806 F.2d 468 (3d Cir. 1986)..............................................................19

Kos Pharms., Inc. v. Andrx Corp.,
    369 F.3d 700 (3d Cir. 2004)..............................................................12

Laidlaw, Inc. v. Student Transport of America, Inc.,
    20 F. Supp. 2d 727 (D.N.J. 1998) ....................................................23

Marshak v. Treadwell,
    240 F.3d 184 (3d Cir. 2001)..............................................................13

Marxe v. Jackson,
    833 F.2d 1121 (3d Cir. 1987).............................................................22

Natural Footwear Ltd. v. Hart, Schaffner & Marx,
    760 F.2d 1383 (3d Cir. 1985).............................................................13

Oreck Corp. v. U.S. Floor Sys., Inc.,
    803 F.2d 166 (5th Cir. 1986) ............................................................................16

Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,
    143 F.3d 800 (3d Cir. 1998)..............................................................................18

Perini Corp. v. Perini Constr., Inc.,
    915 F.2d 121 (4th Cir. 1990) ............................................................................16

Roadway Express Inc. v. Roadway Motor Plazas Inc.,
    17 U.S.P.Q. 2d 1131 (N.D.N.Y. 1990) .............................................................21

Rosati's Franchise Sys., Inc. v. Rosati,
    No. 05-C-3146, 2006 WL 163145 (N.D. Ill. Jan. 17, 2006)............................19

S & R Corp. v. Jiffy Lube Int'l, Inc.,
    968 F.2d 371 (3d Cir. 1992)..............................................................................18

Scott Paper Co. v. Scott's Liquid Gold, Inc.,
    589 F.2d 1225 (3d Cir. 1978)............................................................................15

## MISCELLANEOUS

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
    (4th ed. 2005) .......................................................................................16, 19, 21

## NATURE AND STAGE OF PROCEEDINGS

Defendants C. V. Starr & Co., Inc. ("C. V. Starr") and American International Marine Agency of New York, Inc. ("AIMA") submit this memorandum of law in opposition to the motion of American International Group, Inc. ("AIG") for a preliminary injunction.

AIG's application for an emergency temporary restraining order was denied by the Court in a conference call with counsel on August 9. During that conference, defendants advised the Court that they would be making a transfer motion under 28 U.S.C. § 1404(a). The Court set a briefing schedule for that motion, and for the submission of defendants' opposition to AIG's motion for a preliminary injunction, and scheduled argument for Wednesday, August 30, 2006 at 2:30 P.M. Defendants' transfer motion is being submitted separately.

## PRELIMINARY STATEMENT

Through its motion, AIG seeks to enjoin AIMA from using the name and mark it has used continuously since 1945, i.e., for the past sixty-one years.[1] AIG has proceeded with its motion even though AIMA advised AIG in writing that AIMA would move promptly to change its name to "Starr Marine" as soon as permitted by state regulatory authorities (a process expected to take three to four months).

AIMA refused AIG's pre-lawsuit demand that AIMA stop using its own name "immediately," because to do so would have required AIMA to suspend business

---

[1]    Although AIG seeks an injunction against the use of the "American International" mark, said mark is not used by AIMA except as part of its name, i.e., in conjunction with "Marine."

operations for three to four months while waiting for regulatory approvals from more than 20 states.  AIMA also refused to commit to a date certain, given the uncertainty inherent in the regulatory process.

No doubt AIG prefers to put AIMA out of business for a period of time, no matter how brief, to boost AIG's efforts to develop its new marine insurance underwriting unit already in the market competing with AIMA.  AIG's motion must be denied, however, because it cannot satisfy <u>any</u> of the elements necessary to entitle it to the extraordinary remedy of a preliminary injunction.

## No Likelihood of Success on the Merits

AIG cannot demonstrate a likelihood of success on the merits of its trademark infringement claim.  First, AIG cannot establish a necessary element of its claim, <u>i.e.</u>, that AIG's rights to use AIMA are senior to the rights of AIMA.  AIG concedes that AIMA was incorporated in 1945, and has been using the AIMA name continuously since then, for sixty-one years.  By contrast, AIG was not even incorporated until more than twenty years later, in 1967, and its "AIMA" trademark registrations (Compl. Ex. A) were not filed until 1975 — thirty years after AIMA began operations. The law is clear that even incontestable trademark registrations do not take priority over the rights of pre-existing users.  Thus, AIG's conclusory "information and belief" allegations are insufficient to meet its burden on this issue, especially on a motion for preliminary injunction being made on an emergency basis before an opportunity for discovery.

Second, AIG cannot demonstrate that there will be a likelihood of confusion during the transition period. The relevant customers, mostly marine insurance specialists at large insurance brokerage firms, are highly sophisticated industry professionals. The unwinding of the relationship between AIG and C. V. Starr and its agencies, which began in January, 2006, has received enormous publicity in industry trade publications. Both protagonists, moreover, have communicated directly to the brokers to ensure that they know that the AIG-AIMA relationship has ended. The customers, accordingly, are all well aware that AIMA is no longer an agent for AIG, and there is virtually no chance that they will be confused during the transition period.

### AIMA Is Entitled to a Reasonable Transition Period

Even under AIG's theory of the case – that AIMA's use of its name is pursuant to an implied license from AIG (Mucerino Decl. ¶ 12) – AIMA would still be entitled under common law contract principles to reasonable notice. The reasonable period, for a relationship that has been in existence for decades, is certainly as long as the time necessary to obtain state regulatory approvals for a change. This is particularly true given that the termination period provided for in the written "Marine Management Agreement" of December, 1977 (which did not address any trademark rights) was six months.

### Immediate Irreparable Harm

Nor can AIG demonstrate that it will be irreparably harmed by AIMA's use of the latter's historical corporate name during a transition period expected to be approximately three to four months in length. When AIG applied to this Court for a

3

temporary restraining order during the conference on August 9, it asked only for an injunction that would have imposed a three-month deadline. (See Tr. of Aug. 9, 2006, at p. 6.) It is difficult to see what immediate irreparable harm AIG would suffer if the transition period ended up being only several weeks longer because of regulatory delays in approving the pending requests to change AIMA's name.

Moreover, AIG had agreed in the Spring of 2006 not to contest the right of American International Aviation Agency, Inc. ("AIAA") -- another terminated C. V. Starr agency -- to take a comparable period of time (more than 3 months) to effectuate its name change to Starr Aviation. Nor has AIG offered any evidence whatsoever that there was any marketplace confusion during that period.

Defendants, however, would suffer immediate irreparable harm if the injunction AIG seeks were granted. AIMA cannot conduct business under its new name until regulatory approval has been obtained. Accordingly, if approval is not obtained before the three-month deadline AIG seeks to have the Court impose, AIMA would be forced to suspend operations. This would unquestionably cause it to suffer loss of good will and credibility among brokers, as well as inevitable losses in revenues that would be difficult to quantify.

### The Public Interest

Finally, the public interest will be served by denying the requested injunction, thereby protecting marketplace competition. Whatever legitimate trademark interest AIG may have, that interest will be more than adequately protected by AIMA's

pre-lawsuit commitment to move forward expeditiously with the name change to Starr Marine.

*          *          *

In sum, the injunction sought by AIG would not prevent a likelihood of confusion, but would serve only AIG's interests in imposing restraints on AIMA's ability to compete effectively. Should the Court not order this lawsuit transferred to the Southern District of New York, AIG's motion for a preliminary injunction should be denied.

**FACTUAL BACKGROUND**

In opposition to AIG's motion, defendants are submitting declarations from the following witnesses:

1.    Charles Capozzoli, Executive Vice President of AIMA;

2.    William Eason, Vice President of Starr Aviation;

3.    Honora Keane, Senior Counsel and Vice President of C. V. Starr;

4.    William Weichold, President of C.V. Starr & Co.;

5.    Richard Shaak, President of Starr Technical Risks Agency, Inc.; and

6.    Kenneth A. Plevan, outside counsel for defendants.

**A.    The Parties**

**1.    Plaintiff AIG**

Plaintiff AIG is a Delaware corporation with its principal place of business located at 70 Pine Street, New York, New York. (Compl. ¶ 2.) Incorporated in 1967, AIG refers to itself as the "world's leading insurance enterprise." (Id. ¶ 1.)

**2.    Defendant AIMA**

AIMA was incorporated in New York in 1945, and has been underwriting marine insurance continuously since then under its current name. (Capozzoli Decl. ¶ 2.) AIMA underwrites a variety of marine insurance, including insurance for ocean cargo and ocean-going vessels, insurance for inland or coastal vessels, and liability insurance. (Id. ¶ 4.)

Virtually all of AIMA's business is placed through insurance brokers --

highly sophisticated insurance industry professionals. About 80% of AIMA's business is

accounted for by 10 brokerage firms. At each of these major brokerage firms, there are

commercial insurance brokers who specialize in marine insurance. (Id. ¶ 5.)

AIMA has served as a managing general agent ("MGA") for marine

insurance for AIG member insurance companies since AIG's formation in 1967. (See

Mucerino Decl. ¶¶ 6, 10.) An MGA is a business that underwrites and manages a

specialty line of insurance. The term was defined by AIG in its Amended Counterclaims

in the New York lawsuit as follows:

> An MGA is an agent authorized by an insurance company to manage all or
> part of an insurer's business, often in a specific geographic territory and/or
> for a particular class of insurance. An MGA may market an insurer's
> business, underwrite and issue policies, collect premiums, adjust and pay
> claims, supervise policy-related litigation and negotiate reinsurance
> agreements. In exchange for these services, MGAs typically retain a
> percentage of the premiums collected on the business they underwrite.

For the purposes of the pending motion, AIG's definition will serve as a reasonable

description of the nature of the services performed by an MGA.

In December, 1977, the AIG-AIMA relationship was formalized with a

written "Marine Management Agreement." (Capozzoli Decl. ¶ 7.) The Agreement

provided that it could only be terminated on six-month prior notice. It said nothing about

rights to trademarks or trade names. As of the date of its execution, AIMA had been

using its name for more than thirty years. (Id. ¶ 8.)

7

### 3.    Defendant C. V. Starr

AIMA is a wholly-owned subsidiary of defendant C. V. Starr.  Formed in 1950, C. V. Starr is a holding company which, among other assets, today owns four active managing general agencies.  In addition to AIMA, the agencies are (i) Starr Aviation Agency, Inc. ("Starr Aviation," formerly "American International Aviation Agency, Inc." or "AIAA"), (ii) C.V. Starr & Co., and (iii) Starr Technical Risks Agency, Inc.  (Capozzoli Decl. ¶ 3.)

## B.    AIG's Termination of AIMA's Marine Management Agreement

On June 29, 2006, AIMA received notice that AIG's subsidiaries were terminating the Marine Management Agreement effective as of December 31, 2006.  At the same time, AIG announced the formation of a new unit, AIG Global Marine, to take over AIMA's role.  (Capozzoli Decl. ¶ 10, Ex. C.)  On June 30, 2006, AIMA also gave its counterparties notice of termination of the Marine Management Agreement, also providing the required six-months notice.  (Id. ¶ 11.)

Following these notices of termination, AIG sought to impose on AIMA a series of restrictions on AIMA's ability to conduct its MGA business for the remaining six months of the Marine Management Agreement.  AIMA viewed these restrictions as unreasonable and advised AIG that it refused to accept them.  (Id. ¶ 12.)  On July 25, 2006, AIG sent AIMA a letter withdrawing AIMA's authority to act as an agent for AIG insurance companies and terminating the Marine Management Agreement effective that day.  (See Mucerino Decl. Ex. J.)

8

C.    **The Filing of This Lawsuit**

On July 28, 2006, AIG filed the instant action, with eight separate claims asserted under federal and state law.

On Monday morning, July 31, 2006, the first business day after this lawsuit was filed, defendants' counsel wrote to counsel for AIG, assuring them that the AIMA name would be changed as soon as permitted by state regulatory requirements. (Plevan Decl. ¶ 10.) In the letter, counsel expressed surprise that AIG had not sought to work out a reasonable schedule for the name change as had been done with respect to AIAA, the C. V. Starr agency whose MGA relationship with AIG had been terminated in January, 2006. (Id. ¶¶ 5, 8.) In response, AIG's counsel asserted that the AIAA situation was different, but never explained why. (Id. ¶ 10.)

In fact, the AIAA situation is quite analogous. AIAA was incorporated in 1961, i.e., six years before AIG was formed. (Id. ¶ 4.) On February 17, 2006, several weeks after the agency termination, AIG demanded that AIAA cease use of its name. (Id. Ex. B.) In response, AIAA's counsel advised AIG's counsel that, accepting arguendo AIG's position that AIAA had an "implied license," at a minimum AIAA was entitled to a "reasonable" period within which to change its name. (See id. Ex. C.) Counsel for the parties eventually reached an understanding that AIAA's usage would not be challenged, in exchange for AIAA's informal commitment to proceed expeditiously with the name change. (Plevan Decl. ¶ 7.)

That new name, Starr Aviation, was adopted in mid-May, more than three months after AIG's original notice of termination. (Id. ¶ 8.) At no time during this

9

transition period did AIAA become aware of any consumer confusion caused by its continued use of AIAA. (Eason Decl. ¶ 8.) Nor do AIG's declarations submitted in support of its motion for a preliminary injunction point to any instances of AIG/AIAA confusion during the transition period. Yet, inexplicably, AIG now refuses to agree to a similar reasonable transition period for AIMA.

## D.    AIMA's Decision to Change Its Name

In the face of the July 25, 2006 termination of the Marine Management Agreement, AIMA has determined to change its name to Starr Marine. AIMA made this decision not because it believed that AIG had superior rights in the AIMA name, but because (i) its sister MGAs were operating under a "STARR" brand, and (ii) it wanted to avoid an unnecessary legal confrontation with AIG that might jeopardize AIMA's competitive posture. (Capolozzi Decl. ¶ 14.)

As set forth more fully in the Keane Declaration, because AIMA is regulated by the insurance departments in each of the states in which it conducts business, AIMA's name change is a lengthy, multi-stage process that requires approval in more than twenty-five states. (Keane Decl. ¶¶ 5-8.) More significantly for purposes of AIG's instant motion, AIMA cannot conduct business under its new name, Starr Marine, until it obtains the necessary approvals from applicable state insurance departments. (Id. ¶ 6.)

Although the efforts to change the name of AIMA is well under way (see id. ¶ 9), it is reasonably anticipated that process will take at least 90-120 days (see id. ¶ 5), approximately the same time it took to change AIAA's name to Starr Aviation.

10

AIMA does not use the "American International" mark separate and apart from its name. (Capozzoli Decl. ¶ 28.) Nor does any of its marketing materials any longer refer to its former relationship with AIG. (Id. ¶ 29.)

## **ARGUMENT**

## **AIG'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED**

### A.    Applicable Preliminary Injunction Standards

A preliminary injunction "is an 'extraordinary remedy, which should be granted only in limited circumstances.'" Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) (citation omitted).  A party seeking preliminary injunctive relief must show:  (i) a likelihood of success on the merits; (ii) the extent to which it will suffer irreparable harm without injunctive relief; (iii) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (iv) that an injunction would favor the public interest.  See Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708-09 (3d Cir. 2004) (setting forth standard for preliminary injunction in Lanham Act trademark case).  The burden rests upon the moving party to establish each of the elements.  See In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982).

### B.    AIG Cannot Establish a Likelihood of Success on the Merits

As noted in the Preliminary Statement, there are three fundamental reasons why AIG cannot establish likelihood of success on the merits.  Each is discussed below.[2]

---

[2]    Although AIG repeatedly asserts that defendants have "conceded infringement" (e.g., AIG Opening Brief at 1), this is certainly not the case.

1.    **AIG Cannot Demonstrate Senior
       Rights to the AIMA Mark**

As an initial, and entirely dispositive matter, AIG's request for a preliminary injunction must fail because it cannot establish a necessary element of its infringement claim: that AIG has rights to the AIMA mark that are senior to those of defendants. Although AIG makes much of the fact that its "AIMA" trademark registrations are incontestable (Compl. ¶ 17), "[e]ven if a junior user's mark has attained incontestable status, such status does not cut off the rights of a senior user." Marshak v. Treadwell, 240 F.3d 184, 198 n.10 (3d Cir. 2001) (Alito, J.); see also Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1395 (3d Cir. 1985) ("[A] federal registrant is still subject to the defense of a prior user of the mark who has established a market in specific areas notwithstanding that senior user's failure to register.") This is true because trademark rights typically belong to senior users of the mark at issue. See Natural Footwear, 760 F.2d at 1395, 1397.

Here, there can be no doubt that AIMA's use of its name began in 1945, and thus predated the formation of AIG by more than twenty years. (Capozzoli Decl. ¶ 2; Mucerino Decl. ¶¶ 6, 10.) Though AIG asserts that it has prior rights based on an "implied license" theory (Mucerino Decl. ¶ 12), said assertions are only made "on information and belief," allegedly based on unidentified "company records." (Id. ¶ 2.) It is noteworthy that AIG's two trademark registrations for AIMA marks cite a first-use date of April 2, 1945 (see Compl. Ex. A), which is simply the date AIMA was incorporated and went into business. (Capozzoli Decl. Ex. A.)

13

It is particularly telling that AIG has misrepresented when its AIMA marks were registered with the PTO. In his Declaration, AIG's Vice President, Ralph Mucerino, asserts that the "registrations for AIMA and MARINE INSURANCE AIMA . . . were registered in 1945 to a predecessor of AIG." (Mucerino Decl. ¶ 7 (emphasis added).) Paragraph 16 of AIG's Complaint makes the same "1945" assertion. In fact, however, as is readily apparent from Ex. A to AIG's Complaint, these marks were not registered until June 1, 1976, more than thirty years later.[3] And the written Marine Management Agreement, executed the following year (December 1, 1977, see Capozzoli Decl. Ex. B), makes no reference whatsoever to AIG's alleged superior rights in the AIMA marks.

AIG tries to bolster its position by references to its rights in the mark "American International." (E.g., Compl. ¶ 17.) But AIMA's stellar reputation for expertise in underwriting marine insurance services has earned it a unique identity in the market, allowing customers for such services to distinguish AIMA from AIG. (See Capozzoli Decl. ¶ 27.) Indeed, even AIG has recognized AIMA's unique identity, as confirmed in an AIG report written in 1997:

> AIMA has proven itself to be a financially sound and well-managed operation. The Agency has showed strong premium profits over the past three years. Its management is confident in the quality efficiency of its operations particularly the service standards implemented from the TQM exercise of 1994. These standards, so far has showed solid productivity. [sic] In addition, the inherent "separateness" from AIG coupled with its highly specialized lines of business gives the Agency a "uniqueness" in

---

[3]    The chart of federal registrations in AIG's Complaint (¶ 17) omitted the date the marks were issued.

14

the marketplace. AIMA's business position requires it to operate with a "real separation" from AIG . . . .

(Plevan Decl. Ex. D) (emphasis added by the Report authors).

In sum, the question of which entity has superior rights in the AIMA mark is far from a resolved one on the record before the Court.

## 2. AIG Cannot Demonstrate a Likelihood of Confusion

Even assuming that AIG could demonstrate that it possesses rights in the AIMA name/mark that are senior to those of defendants, AIG would still not be entitled to the relief it seeks because it cannot demonstrate a likelihood of confusion.

More than 25 years ago, this Circuit first enunciated the series of factors to be considered in guiding the likelihood-of-confusion inquiry in trademark infringement cases. See Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978). These are generally referred to as the Lapp factors. See Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983) (citation omitted).

The Third Circuit has made it clear that not all factors will be relevant in all cases, and that a "'district court should utilize the Lapp factors that seem appropriate to a given situation.'" Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 471 (3d Cir. 2005) (citation omitted). As shown below, the Lapp factors that are most "appropriate" here all demonstrate that there is no likelihood of confusion if AIMA is permitted to continue to conduct business under its name for several months while waiting for regulatory approval for a name-change.

(a)    **The Sophisticated Customer
Base Is Unlikely to Be Confused**

The high level of sophistication of AIMA's customers weighs heavily against a finding of likelihood of confusion here. When consumers exercise greater care in assessing the relevant products before making purchasing decisions, courts have routinely found there is not a strong likelihood of confusion. See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 284 (3d Cir. 2001). Indeed, "[w]here the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." Id. (citing Versa Prods. Co. v. Bifold Co., 50 F.3d 189, 204 (3d Cir. 1995)).

Courts and commentators alike have also made clear that where the relevant purchasers are professionals or commercial purchasers well-versed in the field, they are sufficiently sophisticated and not likely to be confused, even if the trademarks are otherwise closely similar. See Checkpoint Sys., 269 F.3d at 285 (citing 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:101); Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 293 (3d Cir. 1991) (professional buyers or consumers of very expensive goods); Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 128 (4th Cir. 1990) ("[I]n a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone."); Oreck Corp. v. U.S. Floor Sys., Inc., 803 F.2d 166, 173-74 (5th Cir. 1986) (same).

Here, there can be no serious claim that the sophisticated customer base for marine insurance underwriting services will believe that, following the July 25, 2006

16

well-publicized termination and during the transition period, AIMA continues to offer

services approved or sponsored by AIG. For example:

- The vast majority of AIMA's customers are insurance brokers -- industry professionals who are well aware of the well-publicized unwinding of the relationships between AIG and C. V. Starr's subsidiaries. (Capozzoli Decl. ¶ 18.)

- Following the July 25, 2006 "immediate" termination of AIMA, AIG issued a press release announcing the termination. (Capozzoli Decl. Ex. H.) This resulted in a prominent article in the next issue of <u>Business Insurance</u>. (<u>Id.</u>, Ex. I.)

- On July 25, AIG also sent out a "Dear Producer" letter, directly advising brokers of the immediate termination of AIMA. (<u>Id.</u> Ex. J.)

- AIMA has also sent out communications to customers, as part of its efforts to compete effectively with AIG's newly formed Global Marine unit, which communications made it clear that AIMA was no longer associated with American International. (<u>Id.</u> Exs. D and L.)

- These recent communications followed six months during which trade publications gave prominent coverage to the AIG - C. V. Starr "divorce" (<u>see id.</u> Exs. E-G), thus alerting industry professionals that the relationship between these two entities was being unwound.

Moreover, as part of AIG's sales efforts following the initial six-month

notice of termination, AIG held meetings with marine insurance brokers in major cities

across the country. (Capozzoli Decl. ¶ 23.) This effort shows AIG's ability to reach

industry professionals with any messages it believes are necessary to protect its interests.

### (b)    <u>No Evidence of Actual Confusion</u>

In light of the foregoing, it is little wonder that AIG's moving papers offer

no evidence that consumers have been actually confused into believing that AIMA

continues to underwrite insurance for AIG.

17

It is equally significant that AIG has been unable in its moving papers to point to any confusion whatsoever during the more than three months in the Spring of 2006 that AIAA continued to use its historical corporate name, before obtaining regulatory approval to change to Starr Aviation. (A Starr Aviation executive has confirmed the absence of any such market confusion during that period.) (See Eason Decl. ¶ 8.)

### (c)    AIMA's Good Faith Use of Its Name

Nor can AIG demonstrate that AIMA's continued use of its own corporate name is in bad faith. The only reason AIMA continues to use its historical name now is because it will take approximately three to four months to obtain the necessary regulatory approvals to change to "Starr Marine," and without these approvals it cannot operate its business under the new name.[4]

\*            \*            \*

AIG's reliance on franchisee cases such as Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800 (3d Cir. 1998), and S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371 (3d Cir. 1992) (AIG Opening Br. at 12) is entirely misplaced. In both Hardee's and Jiffy Lube, the parties at issue were using identical marks ("ROY ROGERS" and "JIFFY LUBE" respectively). See Hardee's, 143 F.3d at 804; Jiffy Lube, 968 F.2d at 375. Here, the parties are using different marks, and AIG does not claim that

---

[4]    Contrast AIMA's demonstrated good faith with the fact that in the New York lawsuit, AIG has filed counterclaims seeking to enjoin C. V. Starr and its agencies from using any of the STARR marks. (See Weichold Decl. ¶ 7; Shaak Decl. ¶ 7; Plevan Decl. ¶ 9.) This helps confirm that AIG's true motivation for this lawsuit is to try to protect itself from new competition. There is no question that AIG and its former agencies are now engaged in intense competition. (E.g. Shaak Decl. ¶¶ 6,7; Weichold Decl. ¶¶ 6,7.)

18

it has ever used the mark AIMA. In addition, whereas <u>Hardee's</u> and <u>Jiffy Lube</u> involved

products and services targeted to members of the general consuming public, the

customers at issue here are highly knowledgeable industry professionals. Moreover, in

the cited cases there was no way for consumers to know whether the "Jiffy Lube" and

"Hardees" – branded services at issue were not authorized; here, brokers readily

understand that the marine insurance they receive through AIMA is offered by Berkshire

Hathaway, not AIG. Finally, in the franchisee cases, there was no need to obtain state

regulatory approval to change the name of the terminated business.

### 3.    AIMA Is Entitled to a Reasonable Period to Complete Its Name Change

It is AIG's position that AIMA's use of its name was under implied

license from AIG. (Compl. ¶ 30.) Even under AIG's theory of the case, the law is clear

that AIMA is entitled to a reasonable time period to transition to a new name. Here, a

reasonable period is six months.

As a general matter, trademark license contract disputes are governed by

the general rules of contract interpretation. <u>See</u> 2 <u>McCarthy on Trademarks</u> § 18:43, at

18-69 to 18-74; <u>see also</u> <u>Rosati's Franchise Sys., Inc. v. Rosati</u>, No. 05 C 3146, 2006 WL

163145, at *5 (N.D. Ill. Jan. 17, 2006) (applying principles of contract interpretation in

holding that defendants were not infringing plaintiffs' trademark). As the Third Circuit

has pointed out: "A trademark licensing agreement is a contract to be interpreted and

enforced under state law." <u>E.g.</u>, <u>Kiwanis Int'l v. Ridgewood Kiwanis Club</u>, 806 F.2d 468,

472 n.8 (3d Cir. 1986).

19

New York law is clear that "reasonable notice" must be given in order to terminate a contract of indefinite duration. See, e.g., 2A N.Y. Jur. 2d Agency § 42 (2006) ("Where there is no provision [in an agency agreement] as to termination, the contract may be terminated after giving reasonable notice."); Italian & French Wine Co. of Buffalo, Inc. v. Negociants U.S.A., Inc., 842 F. Supp. 693, 699 (W.D.N.Y. 1993) ("Even if no definite period of termination is originally fixed in the contract, such a contract is not terminable at will by either party, but only upon reasonable notice."); Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc., No. 87 CIV. 6294 (MJL), 1988 WL 52777, at *2 (S.D.N.Y. May 18, 1988) ("In the absence of an express provision, a contract is terminable after a reasonable duration with reasonable notice.").[5]  In determining what type of notice is reasonable, the courts have looked to the individual circumstances of the case at hand. See Chenoweth, 1988 WL 52777, at *3; Colony Liquor Distribs., Inc. v. Jack Daniel Distillery – Lem Motlow Prop., Inc., 22 A.D.2d 247, 250 (3d Dep't 1964) (modifying trial court order and granting defendant nearly a full year to unwind distributor agreement given parties' eleven-year relationship).

In light of the foregoing, AIG can only terminate the implied trademark license to use the name AIMA upon reasonable notice. See Dial-a-Mattress Operating Corp. v. Mattress Madness, Inc., 847 F. Supp. 18, 20 n.1 (E.D.N.Y. 1994) (holding that termination of an agreement conferring a license to use a trademark for an indefinite time

---

[5]    Although New York law would presumably govern the alleged implied license, given that all parties are headquartered in New York, Delaware law would require the same result. See, e.g., A. R. Dervaes Co. v. Houdaille Indus., Inc., No. 6471, 1981 WL 7625 at *5 (Del. Ch. Sept. 29, 1981) ("[C]ontracts which are silent as to termination are terminable at will by either party . . . upon reasonable notice.").

requires reasonable advance notice); <u>Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.</u>, 88

F. Supp. 2d 914, 921 (C.D. Ill. 2000) (a "license with indefinite term may be terminated

at will with reasonable notice") (citation omitted); 2 <u>McCarthy on Trademarks</u> § 18:43, at

18-71 ("The term of the license should be specifically stated in the license because the

law of some states provides that a license without a stated term is terminable at the will of

either party upon reasonable notice.").

        Here, six months is a reasonable period to effectuate a change of AIMA's

name, given that the Marine Management Agreement specified a termination notice

period of six months.  (Capozzoli Decl. ¶ 8.)  In all events, AIMA should be permitted to

continue to conduct marine insurance business under its name at least until such time as

the appropriate state regulators permit it to conduct business under the new name.  As set

forth in the Keane Declaration, AIMA has begun this process and is moving forward

expeditiously.  (Keane Decl. ¶ 9.)  The entire process is expected to take approximately

three to four months.  (<u>Id.</u> ¶ 5.)

        That this period is reasonable is also supported in the case law.  <u>See</u>

<u>Roadway Express Inc. v. Roadway Motor Plazas Inc.</u>, 17 U.S.P.Q.2d 1131 (N.D.N.Y.

1990) (defendants given one year to effectuate name change after bench trial and finding

of infringement); <u>see also</u> <u>Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.</u>, 414 F. Supp. 1003,

1019 (E.D. Pa. 1976) (defendants permitted four months to sell off infringing products

already manufactured); <u>Harley-Davidson Motor Co. v. Iron Eagle of Cent. Fla., Inc.</u>, 973

F. Supp. 1421, 1427 (M.D. Fla. 1997) (defendant given 120 days from entry of judgment

to comply with order).

## C.    **AIG Cannot Show Irreparable Harm**

AIG's motion should be denied for the further reason that it cannot demonstrate that it will suffer irreparable harm if AIMA is permitted to continue using its name while it awaits regulatory approval for its new name. The Third Circuit has repeatedly held that the extraordinary equitable relief AIG seeks should not be granted if the injury to it is merely speculative. See, e.g., Acierno v. New Castle Cty., 40 F.3d 645, 655 (3d Cir. 1994); Instant Air Freight, 882 F.2d at 802-03; Marxe v. Jackson, 833 F.2d 1121, 1129 (3d Cir. 1987).

Thus, to succeed on its motion AIG must make a "clear showing" of immediate, irreparable injury caused by AIMA's continued use of its name following the end of the three-month period even AIG does not contest. See Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989). Here, AIG has failed to point to anything more than speculative harm that it may suffer to support its requested injunction.

On the issue of the alleged harm, the example of the AIAA termination and subsequent name change is particularly instructive. As noted, in late January 2006, AIG terminated AIAA's role as MGA, and only several weeks later requested that AIAA drop "American International" from its name. (Plevan Decl. ¶ 5.) Thereafter, counsel for the parties negotiated an arrangement whereby AIG deferred any legal challenge in exchange for AIAA's informal commitment to expedite the name-change process. (Id. ¶ 7.)

The AIAA example should be considered controlling here because, in its Complaint, AIG specifically cited it as a "reasonable post-termination treatment" by C. V.

Starr.  (Compl. ¶ 52.)  AIG should not be permitted to back away from its own affirmative allegations.

Finally, AIG can, and has, addressed any possible harm by providing notices to its customers.  (See Capozzoli Decl. Exs. H, J-K.)

**D.  AIMA Would Be Irreparably Harmed if an Injunction Is Issued**

In contrast, if the injunction AIG seeks were granted, defendants would be confronted with significant harm.  Any AIMA business interruption caused by the injunction would obviously severely harm AIMA's reputation and good will among its customers, as well as cause it to lose sales.  (Capozzoli Decl. ¶ 34.)

**E.  An Injunction Would Not Favor the Public Interest**

The public interest is favored by maintaining the status quo and permitting AIMA to continue to compete in the marketplace while it awaits approval to use its new name.  Courts in this Circuit have recognized that the public is best served when there are competitive forces in the marketplace.  See, e.g., Duraco Prods. Inc. v. Joy Plastic Enters. Ltd., 822 F. Supp. 1202, 1211 (W.D. Pa. 1993) (holding that the public interest favored healthy competition over trademark protection where there had been no showing of a likelihood of confusion), aff'd, 40 F.3d 1431 (3d Cir. 1994); Laidlaw, Inc. v. Student Transp. of Am., Inc., 20 F. Supp. 2d 727, 769 (D.N.J. 1998) (denying motion for preliminary injunction, noting the value of competition in the marketplace and concluding that "the public interest would be adversely affected by putting [defendant] out of business").  All that an injunction would accomplish would be to reward AIG with a potential competitive windfall.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court

deny AIG's motion for a preliminary injunction.

/s/ Edward B. Micheletti
Edward P. Welch (I.D. No. 671)
Edward B. Micheletti (I.D. No. 3794)
Jenness E. Parker (I.D. No. 4659)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
Attorneys for Defendants

*Of Counsel:*

Kenneth A. Plevan
John L. Gardiner
Anthony J. Dreyer
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036

DATED:  August 16, 2006

466289.01-Wilmington Server 1A - MSW

## CERTIFICATE OF SERVICE

I, Edward B. Micheletti, hereby certify that on August 16, 2006, a copy of

Defendants' Opposition to AIG's Motion for a Preliminary Injunction, Declaration of Kenneth A.

Plevan, Declaration of Richard Shaak, Declaration of William J. Weichold, Declaration of

Honora Keane, Declaration of William Eason and Declaration of Charles Capozzoli were served

on the following counsel of record:

> VIA CM/ECF
> Rodger D. Smith II, Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899

> /s/ Edward B. Micheletti
> Edward B. Micheletti (I.D. No. 3794)
> SKADDEN, ARPS, SLATE, MEAGHER
>   & FLOM LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, Delaware  19899-0636
> (302) 651-3000