# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>C. V. STARR & CO., INC. and AMERICAN )<br>INTERNATIONAL MARINE AGENCY OF )<br>NEW YORK, INC., )<br>)<br>Defendants. ) | C.A. No. 06-463 |

## DECLARATION OF CHARLES CAPOZZOLI

CHARLES CAPOZZOLI, under penalty of perjury, declares as follows:

1.    I am Executive Vice President of defendant American International

Marine Agency of New York, Inc. ("AIMA"), headquartered at 90 Park Avenue, New

York, New York 10016. I have worked for AIMA for approximately 25 years. The facts

in this Declaration are based on my own personal knowledge.

### Business of AIMA

2.    AIMA was incorporated in New York in 1945 (see Ex. A hereto),

and has been underwriting marine insurance continuously since then under its current

name.

3.    AIMA is a wholly-owned subsidiary of defendant C. V. Starr &

Co., Inc. ("C. V. Starr"). Formed in 1950, C. V. Starr is a holding company which,

among other assets, today owns four active managing general agencies ("MGAs") –

companies that underwrite and manage various specialty lines of insurance. In addition

to AIMA, there are (i) Starr Aviation Agency, Inc., (ii) C.V. Starr & Co., and (iii) Starr Technical Risks Agency, Inc.

4.    AIMA underwrites a variety of marine insurance, including insurance for ocean cargo and ocean-going vessels, insurance for inland or coastal vessels, and liability insurance.

5.    Virtually all of AIMA's business is placed through insurance brokers, who are highly sophisticated insurance industry professionals. About 80% of AIMA's business is accounted for by 10 brokerage firms. At each major brokerage firm, there are commercial insurance brokers who specialize in marine insurance.

### History of AIMA's Relationship
### With AIG Member Companies

6.    AIMA has never been a subsidiary of AIG.

7.    AIMA has served as a managing general agent for marine insurance for AIG member insurance companies since AIG's formation in 1967. In December, 1977, this relationship was formalized with a written "Marine Management Agreement." (Ex. B.)

8.    The Marine Management Agreement provided that it could only be terminated on six-month prior notice. It said nothing about rights to trademarks or trade names. As of the date of the execution of said Agreement, AIMA had been using its name for more than 30 years.

9.    To my knowledge, there has never been a written agreement between AIG or any of its member companies and AIMA regarding trademarks or trade names. Nor to my knowledge had AIG ever questioned AIMA's right to use our name

2

until this summer in connection with AIG giving notice of termination of the Marine

Management Agreement.

### Termination of the Marine Management Agreement

10.    On June 29, 2006, AIMA received notice from AIG that AIG's

subsidiaries were terminating the Marine Management Agreement effective as of

December 31, 2006. The following day, AIG announced the formation of a new unit,

AIG Global Marine. (Ex. C.)

11.    On June 30, 2006, AIMA also gave its counterparties notice of

termination of the Marine Management Agreement, providing the required six-months

notice. On that same date, we issued a press release disclosing this action. (Ex. D.) We

widely circulated copies of that press release by e-mail to brokers, customers, and other

insurance industry participants.

12.    Following these notices of termination, AIG in our view sought to

impose on AIMA a series of unreasonable restrictions regarding AIMA's ability to

conduct its MGA business for the remaining six months of the Marine Management

Agreement. We advised AIG that AIMA refused to accept these restrictions.

13.    On July 25, 2006, AIMA received a letter from AIG withdrawing

AIMA's authority to act as an agent for the insurance companies owned by AIG and

terminating the Marine Management Agreement effective that day. (See Mucerino Decl.,

Ex. J.)

### Decision to Use New Name

14.    In the face of the termination of the Marine Management

Agreement, AIMA decided to change its name to Starr Marine. We made this decision

not because we believed that AIG had superior rights in the AIMA name, but because (i)

3

our sister MGAs were operating under a "STARR" brand, and (ii) we wanted to avoid an unnecessary legal confrontation with AIG that might jeopardize our competitive posture while we were in the process of switching to serving underwriters for new insurance companies.

   15. However, as AIG's executives, lawyers, and regulatory staff undoubtedly know, it takes several months or more to legally change the name of a state-regulated insurance business. The details of the process are set forth in the Declaration of Honora Keane, regulatory counsel at our parent C. V. Starr & Co., Inc.

   16. In the July 25, 2006 termination letter, AIG's Vice President demanded that we stop using the AIMA name "immediately." (See Mucerino Decl., Ex. J at 2.) We rejected this demand, because to comply would have meant effectively going out of business until our new name had cleared regulatory hurdles.

## NO CUSTOMER CONFUSION

   17. Contrary to AIG's contentions, there is virtually no chance that there will be any customer confusion during the estimated 3-4 month transition period before we are legally free to change our name to Starr Marine. There are many reasons for this.

### Sophisticated Customers

   18. First, our customers are highly sophisticated industry professionals. As noted, about 80% of our business is accounted for by 10 insurance brokerage businesses, including industry giants such as AON, Marsh, and Willis. In addition, the larger of these organizations have brokers who specialize in marine insurance and who follow industry developments very carefully.

4

**Highly Publicized Dispute**

19.     Second, the termination of AIMA is only the most recent event in a highly-publicized unwinding of contractual relationships between (i) AIG and its member companies on one hand, and (ii) C. V. Starr Co., Inc. and its managing general agencies on the other.  AIG's earlier terminations of C. V. Starr agencies in January and February, 2006, and the lawsuits they spawned, have been regularly reported in the industry trade press.  Representative articles include the following:

- A July 2006 cover story article in BEST'S REVIEW, entitled "RISING STARR:  C.V. Starr & Co. Inc. agencies vow to succeed without the help of — and in competition with — AIG";

- A June 26, 2006 article from Business Insurance, entitled "Public entities profit from AIG-Starr War";

- A July 3, 2006 article from Business Insurance entitled "AIG to finalize divorce from Starr.  Insurer forms energy/marine unit, ends MGA pact."

(See Exs. E through G.)  This last article specifically covered AIG's announcement that it was setting up a new unit, AIG Global Marine and Energy, "to take over business previously underwritten by Managing General Agencies owned by [its] former C. V. Starr & Co., Inc. affiliates."

20.     Not surprisingly, AIG's July 25, 2006 notice of "immediate" termination was announced in an AIG press release (Ex. H), and also prominently reported in the trade press.  See July 31, 2006 article in Business Insurance:  "AIG cuts ties to C.V. Starr marine unit."  (Ex. I.)

21.     On the same day as the termination (July 25, 2006), AIG sent a notice of the immediate termination to its "producers" (i.e. brokers).  (Ex. J.)

## AIG's Competitive Campaign

22.     Moreover, as soon as its initial 6-month termination notice was announced, AIG began a campaign to communicate with brokers about its marine insurance business as part of its efforts to enter into competition with us. Thus, on June 29, 2006, AIG Global Marine President Richard Decker sent a memorandum to brokers informing them of the termination of the AIMA-AIG relationship, as well as the formation of AIG Global Marine. (Ex. K.)

23.     Thereafter, we received reports from brokers that AIG Global Marine representatives were scheduling presentations for marine insurance brokers in major cities across the country. AIG representatives at these presentations included Mr. Mucerino and Mr. Decker. We were advised that, at these presentations, AIG made the pitch that the marine insurance policy holders could switch from AIMA to AIG Global Marine immediately, rather than waiting for the end of the MGA relationship in January, 2007.

24.     Given these competitive efforts, we are confident that AIG has taken the trouble to systematically notify brokers of the July 25, 2006 termination, and that these brokers are well aware of this change in our status.

## AIMA's Notices to its Customers

25.     AIMA has also taken steps to ensure that marine insurance brokers are aware that we no longer represent AIG member companies. As noted, our June 30, 2006 press release was sent to thousands of industry participants.

26.     On Friday, August 11, 2006, having received clearance from our new insurance company counterparts, AIMA sent a bulletin to hundreds of its broker customers providing instructions for continuing their relationship with AIMA, through

6

AIMA's representation of various Berkshire Hathaway insurance companies. (Ex. L.)
The bulletin expressly cited the AIG termination.

27.    In this connection, I note that in the marine insurance business,
AIMA and its senior executives are very well known, as we have established an
unmatched reputation for our underwriting expertise in the marine insurance area.
Brokers, accordingly, can easily distinguish and differentiate between AIMA on the one
hand, and AIG and its member companies on the other.

### AIMA's Current Marketing Materials

28.    I understand that AIG is seeking an injunction against our use of
"American International," as well as against our use of our name—AIMA and American
International Marine Agency, Inc. In this connection, we have not and are not making
any use of "American International" aside from using it as a part of our name.

29.    There are no current AIMA marketing materials which reference
AIG. Because brochures printed in prior years noted AIMA's relationship with AIG, and
to ensure that any such old materials are no longer used in the field, I sent a reminder by
e-mail on August 1, 2006, to all of AIMA's underwriters that any such materials should
be discarded promptly and not used. (Ex. M.) Nor are there any references to AIG on
AIMA stationery or business cards.

30.    AIMA does not currently engage in any media advertising (with
the one exception of an annual advertisement placed in the journal issued in connection
with the annual meeting of the American Institute of Marine Underwriters). I am aware
that our parent company, C. V. Starr & Co, Inc., has disseminated certain advertising
featuring the STARR brand, which also makes reference to the Starr agencies, including
AIMA.

7

## No Confusion

31.    Since the termination of the AIMA-AIG Marine Management Agreement was first announced in late June, 2006, no instance has come to my attention of any AIMA customer believing that AIMA and AIG are still associated with one another.

32.    In view of the factors set forth above, I believe any such confusion during whatever period of time is necessary for state regulatory approval for the name change is extremely unlikely.

## Injury to AIMA if the Motion Were Granted

33.    As noted, if we cannot use our name of 60 years pending regulatory approval of our new name, we would be out of business until we obtain such approval.

34.    Any such interruption would severely disrupt our business, and could cause us to lose not only credibility among our customers, but specific business as well.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed in New York, New York on August 15, 2006.

Respectfully submitted,

CHARLES CAPOZZOLI

EXHIBIT A

6404

18

## CERTIFICATE OF INCORPORATION

of

## AMERICAN INTERNATIONAL MARINE AGENCY, INC.

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED  APR 2 - 1945
TAX $25.—
FILING $40

SECRETARY OF STATE
BY
CASHIER

William F. Delaney, Jr.
Counselor at Law
111 John Street
New York 7, New York

6404-12-1

CERTIFICATE OF INCORPORATION

of

AMERICAN INTERNATIONAL MARINE AGENCY, INC.

(Pursuant to Article Two of
the Stock Corporation Law)

WE, THE UNDERSIGNED, desiring to form a stock corporation

pursuant to the provisions of Article Two of the Stock Corporation

Law of the State of New York, DO HEREBY CERTIFY as follows:

FIRST: The name of the corporation is AMERICAN INTERNATIONAL

MARINE AGENCY, INC.

SECOND: The purposes for which it is to be formed are to

do any and all of the things hereinafter set forth to the same extent

as natural persons might or could do in any part of the world, namely:

> To act as representative, broker or agent for insurers
> of life, health, rights, and property of all kinds or nature,
> whether real, personal, tangible or intangible, against loss
> or damage of any kind from any and all causes. To act as
> agent, representative or broker for the placing and writing
> of marine, fire, casualty, surety, automobile liability, em-
> ployers' liability and other insurance of all kinds. To act
> as representative, broker or agent for bonding, surety and
> title guarantee companies. To act as representative, agent or
> broker for insurance companies, domestic or foreign, and for
> corporations, individuals or associations in all matters per-
> taining to the business of insurance; to act as intermediary
> in treaties of reinsurance; to engage in, conduct and carry
> on the business of insurance agent or broker; to solicit, re-
> ceive applications for, and place insurance of all kinds; to
> appraise property; to investigate and report upon the case
> and extent of insured losses; to adjust and to act as agent in
> the payment of same; to attend to the collection of premiums
> on policies issued by its principals and to attend to the
> cancellation, alteration and extension of policies and other
> contracts made by them when and as authorized and directed;
> to conduct and carry on a general insurance agency and broker-
> age business and generally to transact and carry on every kind,
> nature and description of business as may be delegated to insur-

64.

ance agents and brokers by insurance companies of all
kinds, and generally to undertake all such functions and
to do such things in connection with or in relation to
the business of insurance or the representation of insur-
ance companies as it may lawfully undertake, do and per-
form. To do any and all things incidental to or suitable
for the complete accomplishment of the foregoing purposes.

To acquire by purchase or otherwise, hold, own, develop,
improve, sell, convey, exchange, mortgage, lease and other-
wise deal or trade in and dispose of real property and any
estate, interest or right therein; to lend money on bonds
secured by mortgage on real or personal property or other-
wise; to erect, construct, alter, maintain and improve
houses and buildings of every description on any lands of
the corporation or upon any other lands, and to rebuild,
alter and improve existing houses and buildings thereon,
to the extent now or hereafter permitted by the law.

To purchase, exchange, hire, or otherwise acquire such
personal property, chattels, rights, easements, permits,
privileges, and franchises as may lawfully be purchased,
exchanged, hired or acquired under the Stock Corporation
Law of the State of New York.

. To borrow money for its corporate purposes, and to
make, accept, endorse, execute and issue promissory notes,
bills of exchange, bonds, debentures or other obligations
from time to time, for the purchase of property or for any
purpose in or about the business of the company, and, if
deemed proper, to secure the payments of any such obliga-
tions by mortgage, pledge, deed of trust or otherwise.

To lend money or make advances, with or without col-
lateral security, and upon the security of mortgages, leases
on real and/or personal property located in or out of the
State of New York and for the financing of building opera-
tions and the improvement of real property located in or
out of the State of New York, but only to the extent per-
mitted to corporations organized under the Stock Corporation
Law.

To underwrite, purchase, acquire, hold, pledge, hypothe-
cate, exchange, sell, deal in and dispose of, alone or in
syndicates or otherwise in conjunction with others, stocks,
bonds and other evidences of indebtedness and obligations
of any corporation, association, partnership, syndicate, en-
tity, person or governmental, municipal or public authority,
domestic or foreign, and evidences of any interest, in respect
of any such stocks, bonds and other evidences of indebtedness
and obligations; to issue in exchange therefor its own stocks,
bonds or other obligations; and, while the owner or holder
of any such, to exercise all the rights, powers and privileges
of ownership in respect thereof; and, to the extent now or
hereafter permitted by law, to aid by loan, subsidy, guaranty
or otherwise those issuing, creating or responsible for any

-2- 6404-12-3

such stocks, bonds or other evidences of indebtedness or
obligations or evidences of any interest in respect there-
of.

To purchase, hold, sell, transfer, reissue or cancel
the shares of its own capital stock or any securities or
other obligations of the corporation in the manner and to
the extent now or hereafter permitted to corporations or-
ganized under the laws of the State of New York; provided,
that the corporation shall not use its funds or other assets
for the purchase of its own shares of stock when such use would
cause any impairment of the capital of the corporation, and
provided further, that shares of its own capital stock belong-
ing to the corporation shall not be voted upon directly or
indirectly.

To apply for, purchase, register, or in any manner to
acquire, and to hold, own, use, operate and introduce, and
to sell, lease, assign, pledge, or in any manner dispose of,
and in any manner deal with patents, patent rights, licenses,
copyrights, trademarks, trade names, and to acquire, own, use
or in any manner dispose of any and all inventions, improvements
and processes, labels, designs, brands, or other rights, and
to work, operate, or develop the same, and to carry on any sim-
ilar business, manufacturing or otherwise, which may directly
or indirectly, effectuate these objects or any of them.

To acquire and to take over as a going concern and there-
after to carry on the business of any person, firm, or corpora-
tion engaged in any business which this corporation is authorised
to carry on, and in connection therewith, to acquire the good
will and all or any of the assets and to assume or otherwise pro-
vide for all or any of the liabilities of any such business.

To carry on business at any place or places within the jur-
isdiction of the United States, and in any and all foreign coun-
tries, and to purchase, hold, mortgage, convey, lease or other-
wise dispose of and deal with real and personal property at any
such place or places.

To undertake, contract for or carry on any business incidental
to or in aid of, or advantageous in pursuance of, any of the ob-
jects or purposes of the corporation.

To do any of the things hereinbefore enumerated for itself
or for account of others and to make and perform contracts for
doing any part thereof.

To enter into, make, perform and carry out contracts of every
sort and kind which may be necessary or convenient for the business
of this company, or business of a similar nature, with any person,
corporation, private, public or municipal, body politic under the
government of the United States or any state, territory or colony
thereof, or any foreign government, so far as and to the extent
that the same may be done and performed by corporations organised
under Article Two of the Stock Corporation Law.

- 2 -  6404 -12- 4

To do all and everything necessary, suitable or proper for the accomplishment of any of the purposes, the attainment of any of the objects or the furtherance of any of the powers hereinbefore set forth, either alone or in connection with other corporations, firms or individuals and either as principals, or agents, and to do every other act or acts, thing or things incidental or appurtenant to or growing out of or connected with the aforesaid objects, purposes or powers or any of them.

The foregoing enumeration of specific powers shall not be deemed to limit or restrict in any manner the general powers of the corporation, and the enjoyment and exercise thereof, as conferred by the laws of the State of New York upon corporations organized under the provisions of the Stock Corporation Law.

THIRD:  The total number of shares that may be issued by the corporation is 500, all of which are to be of one class and without par value.

FOURTH:  The capital of the corporation shall be at least equal to the sum of the aggregate par value of all issued shares having par value, plus the aggregate amount of consideration received by the corporation for the issuance of shares without par value, plus such amounts as, from time to time, by resolution of the board of directors, may be transferred thereto.

The authorized shares of stock without par value, may be issued by this corporation from time to time for such consideration as may be fixed from time to time by the Board of Directors; and any and all shares without par value so issued, the consideration for which so fixed has been paid or delivered, shall be fully paid stock and shall not be liable to any further call or assessment thereon, and the holders of such shares shall not be liable for any further payments in respect of such shares.

FIFTH:  The office of the corporation is to be located in the City of New York, County of New York, State of New York, and the address to which the Secretary of State shall mail a copy of process in any action or proceeding against the corporation, which may be served upon him, is 111 John Street, New York, New York.

**SIXTH:** The duration of the corporation is to be perpetual.

**SEVENTH:** The number of directors shall be not less than three nor more than fifteen Directors, of whom none need be stockholders.

**EIGHTH:** The names and postoffice addresses of the directors until the first annual meeting of the stockholders are as follows:

| NAMES | POST OFFICE ADDRESSES |
|---|---|
| W. A. Hale | 111 John Street, New York 7, N.Y. |
| Leslie A. Ward | 111 John Street, New York 7, N.Y. |
| Frank G. Sterritte | 111 John Street, New York 7, N.Y. |

**NINTH:** The names and post office addresses of each subscriber to this certificate and the number of shares of stock which each agrees to take are as follows:

| NAMES | POST OFFICE ADDRESSES | NO. OF SHARES |
|---|---|---|
| W. A. Hale | 111 John Street, New York 7, N.Y. | 1 |
| Leslie A. Ward | 111 John Street, New York 7, N.Y. | 1 |
| Frank G. Sterritte | 111 John Street, New York 7, N.Y. | 1 |

**TENTH:** All of the subscribers of this Certificate of Incorporation are of full age, at least two-thirds of them are citizens of the United States of America, and at least one of them is a resident of the State of New York, and that at least one of the persons named as a director is a citizen of the United States of America and a resident of the State of New York.

**ELEVENTH:** The Secretary of State is hereby designated as the agent of the corporation upon whom process in any action or proceeding against it may be served.

c404-12 6

TWELFTH: The following provisions are inserted for the regulation and conduct of the affairs of corporation, and it is expressly provided that they are intended to be in furtherance and not in limitation or exclusion of the powers conferred by statute.

No contract or other transaction between the corporation and any other firm or corporation shall be affected or invalidated by reason of the fact that any one or more of the directors or officers of this corporation is or are interested in, or is a member, stockholder, director, or officer, or are members, stockholders, directors, or officers of such other firm or corporation; and any director or officer or officers, individually or jointly, may be a party or parties to, or may be interested in, any contract or transaction of this corporation or in which this corporation is interested, and no contract, act, or transaction of this corporation with any person or persons, firm, association or corporation, shall be affected or invalidated by reason of the fact that any director or directors or officer or officers of this corporation is a party or are parties to, or interested in, such contract, act or transaction, or in any way connected with such person or persons, firm, association or corporation, and each and every person who may become a director or officer of this corporation is hereby relieved from any liability that might otherwise exist from thus contracting with this corporation for the benefit of himself or any firm, association or corporation in which he may be in anywise interested.

Subject to the By-Laws of the stockholders, the Board of Directors may make By-Laws, and may provide therein for the appointment of an executive committee from their own members, to exercise all or any of the powers of the Board, which may lawfully be delegated when not in session. The By-Laws may be amended or repealed, at any time, by the stockholders.

-6-   6404-12-7

The Board of Directors shall have power, in its discretion, to provide for and to pay to directors rendering unusual or exceptional services to the corporation special compensation appropriate to the value of such services.

Each director of the corporation shall be indemnified by the corporation against expenses actually and necessarily incurred by him in connection with the defense of any action, suit or proceeding in which he is made a party by reason of his being or having been a director of this corporation, except in relation to matters as to which he shall be adjudged in such action, suit or proceeding to be liable for negligence or misconduct in the performance of his duties as such director; such right of indemnification shall not be deemed exclusive of any other rights to which he may be entitled, under any By-laws, agreement, vote of stockholders or otherwise.

The corporation may use and apply its surplus earnings or accumulated profits, not otherwise by law to be reserved, to the purchase or acquisition of property and to the purchase or acquisition of its own capital stock from time to time and to such extent and in such manner and upon such terms as its Board of Directors shall determine; and neither the property nor the capital stock so purchased or acquired, nor any of its own capital stock taken in payment or satisfaction of any debt due to the corporation, shall be regarded as profits for the purpose

-7-

6404 - 12. 5

of declaration or payment of dividends, unless otherwise determined
by a majority of the Board of Directors.

IN WITNESS WHEREOF, we have made, signed and acknowledged
this Certificate of Incorporation in duplicate, this 30th day of March
1945.

*W. A. Hale* (L.S.)

*Leslie A. Ward* (L.S.)

*Frank G. Sterritte* (L.S.)

STATE OF NEW YORK )
               : ss.:
COUNTY OF NEW YORK )

On this 30th day of March 1945, before me personally came
W. A. HALE, LESLIE A. WARD, and FRANK G. STERRITTE, to me known and known
to me to be the individuals described in and who executed the foregoing
Certificate and they severally duly acknowledged to me that they executed
the same.

*Cecily Fox*
Notary Public

CECILY FOX
Notary Public, New York County
N. Y. Co. Clk't No. 195, Reg. No. 460-F-7
Commission Expires March 30, 1947

-8-

CERTIFICATE OF CHANGE OF NAME

of

AMERICAN INTERNATIONAL MARINE AGENCY, INC.

to

AMERICAN INTERNATIONAL MARINE AGENCY OF NEW YORK, INC.

(Pursuant to Section 40 of the General Corporation Law)

WE, THE UNDERSIGNED, being all of the Subscribers of the Certificate of Incorporation of American International Marine Agency, Inc. and all of the Subscribers to the stock thereof, do hereby, pursuant to Section 40 of the General Corporation Law, certify as follows:

First. The name of the corporation is American International Marine Agency, Inc.

Second. The Certificate of Incorporation of the said corporation was filed in the office of the Secretary of State on the 2nd day of April 1945.

Third. The new name to be assumed by the said corporation is American International Marine Agency of New York, Inc.

IN WITNESS WHEREOF, we have made and subscribed this certificate this 6th day of April 1945.

*W. A. Hale*

*Leslie A. Ward*

*Frank G. Sterritte*

STATE OF NEW YORK )
COUNTY OF NEW YORK ) SS.:

On this 6th day of April 1945, before me personally came W. A. HALE, LESLIE A. WARD, and FRANK G. STERRITTE, to me known and known to me to be the persons subscribed in and who executed the foregoing and who severally acknowledged to me that they executed the same.

*Cecily Fox*

CECILY FOX
Notary Public, New York County
N. Y. Co. Clk's No 196, Reg. No. 360 F.
Commission Expires March 30, 19__

6407 - 44 - 1 -

STATE OF NEW YORK )
                  : SS.:
COUNTY OF NEW YORK; )

FRANK G. STERRITTE, ESQUIRE, being duly sworn, deposes and says:

1. That he is one of the subscribers to the certificate of incorporation of American International Marine Agency, Inc. and one of the subscribers to the stock thereof.

2. That no stock of the American International Marine Agency, Inc. has been issued.

3. That W. A. HALE, LESLIE A. WARD, and FRANK G. STERRITTE, who have subscribed the Certificate of Change of Name of the American International Marine Agency, Inc. to the American International Marine Agency of New York, Inc. are all of the subscribers of the certificate of incorporation of the American International Marine Agency, Inc., filed in the office of the Secretary of State of the State of New York, in Albany, N.Y. on April 2nd 1945.

4. That W. A. HALE, LESLIE A. WARD and FRANK G. STERRITTE, are all of the subscribers to the stock of the said corporation.

Sworn to before me this
6 day of April 1945.

*Frank G. Sterritte*

*Cecily Fox*

CECILY FOX
Notary Public, New York County
N.Y. Co. Clk's No. 195, Reg. No. 450-F-5
Commission Expires March 30, 1946

6407-44-2

`6407`

American International Marine
Agency Inc.

to

American International Marine
Agency of New York, Inc.

CERTIFICATE OF CHANGE OF NAME

and

AFFIDAVIT

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED APR 10 1945

TAX $
FILING FEE $ 25

6407-44-3

State of New York   }  ss:
Department of State }

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.

Witness my hand and seal of the Department of State on    August 7, 2006



Special Deputy Secretary of State

DOS-1286 (Rev. 11/05)

*F̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ 810*

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
41 State Street
Albany, NY 12231
www.dos.state.ny.us

# CERTIFICATE OF AMENDMENT
# OF THE
# CERTIFICATE OF INCORPORATION
# OF

American International Marine Agency of New York, Inc.

Under Section 805 of the Business Corporation Law

FIRST: The name of the corporation is: American International Marine Agency of New York, Inc.

If the name of the corporation has been changed, the name under which it was formed is:
American International Marine Agency of New York, Inc.

SECOND: The date of filing of the certificate of incorporation with the Department of State is:
April 2, 1945.

THIRD: The amendment effected by this certificate of amendment is as follows:

Paragraph ___First___ of the Certificate of Incorporation relating to
American International Marine Agency of New York, Inc.

is hereby amended to read in its entirety as follows:
First: The name of the corporation is Starr Marine Agency, Inc.

-1-

FOURTH: The certificate of amendment was authorized by:

☐ The vote of the board of directors followed by a vote of a majority of all outstanding shares entitled to vote thereon at a meeting of shareholders.

☑ The vote of the board of directors followed by the unanimous written consent of the holders of all outstanding shares.

_(Signature)_

George Hartmann, Vice President, Secretary, & Comptroller
_(Name and Capacity of Signer)_

-2-

$\int$ 060807000870

# CERTIFICATE OF AMENDMENT
## OF THE
## CERTIFICATE OF INCORPORATION
## OF

### AMERICAN INTERNATIONAL MARINE AGENCY OF NEW YORK, INC.

*(Insert Name of Domestic Corporation)*

Under Section 805 of the Business Corporation Law

Filer's Name    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Address    4TH FLOOR, ONE RODNEY SQUARE

City, State and Zip Code    WILMINGTON DE 19899

NOTE: This form was prepared by the New York State Department of State. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal stationery stores. The Department of State recommends that all documents be prepared under the guidance of an attorney. The certificate must be submitted with a $60 filing fee, plus the required tax on shares pursuant to §180 of the Tax Law, if applicable.

*For Office Use Only*

CSC 45
DRAW DOWN

CUSTOMER REF. #
289363(M)

*ICC*

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED AUG 0 7 2006

TAX $
BY: *JCH*
*New York*

-3-

RECEIVED
2006 AUG -7 PM 2:28

# EXHIBIT B

## MARINE MANAGEMENT AGREEMENT

THIS AGREEMENT effective as of the first day of December, 1977, by and between NATIONAL UNION FIRE INSURANCE COMPANY, BIRMINGHAM FIRE INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, COMMERCE AND INDUSTRY INSURANCE COMPANY, AIU INSURANCE COMPANY (hereinafter called the "COMPANIES") and AMERICAN INTERNATIONAL MARINE AGENCY OF NEW YORK, INC. (Hereinafter called the "MANAGING AGENT").

WITNESSETH:

FIRST: The Companies hereby appoint AMERICAN INTERNATIONAL MARINE AGENCY OF NEW YORK, INC. to act as their Managing Agent for Marine insurance (including Marine War Risk) in the Continental United States, Canada, Alaska and Hawaii, subject to such instructions as may be issued from time to time by the Companies for the conduct of the Managing Agency.

The Managing Agent shall have authority to appoint and remove sub-agents, agents and General Agents; issue and cancel contracts of insurance and reinsurance; accept and decline risks; collect premiums; to reject, adjust, compromise and pay losses; to enter into reinsurance agreements with reinsurers by treaty or otherwise, for part or all of any liability assumed by the Companies; to recover from reinsurers return premiums, losses and expenses; to pay return premiums, reinsurance premiums; to pay for surveys, to pay all taxes and fees imposed by authorities in various countries or agencies thereof in respect of business to which this Agreement applies; and generally do everything necessary for the management of Marine business, all by virtue of authority, privileges, duties and obligations herein granted and assumed and which may hereafter be granted or assumed.

The Managing Agent accepts the appointment and agrees faithfully to perform the duties thereof to the best of its knowledge, skill and judgment, and to obey promptly such instructions as it may receive from time to time from the Companies.

- 1 -

The Companies and the Managing Agent agree that the limits of the Managing Agents' underwriting authority and the retention by each Company for its own account of risks written by the Managing Agent under this Agreement, shall be as set forth in Appendix B attached herewith and any subsequent amendments thereto.

SECOND:  The authority granted herein is in respect of risks usually undertaken by the Ocean Marine Departments of insurance companies and specifically as permitted by the charters of the Companies.

THIRD:  The Managing Agent undertakes to maintain an office in New York, N.Y., competent to receive, summarize and adjust all acts or transactions with the Companies, and its records shall be available to the Companies.

FOURTH:  No later than thirty (30) days after the close of each quarter ending March 31, June 30, September 30 and December 31, a statement of accounts shall be forwarded to the Companies in such form and in such detail as may be required by the Companies, and the balance due as shown in such statement shall be remitted to the Companies not later than ninety (90) days after the close of each quarter.  Accounts shall be rendered and all payments made in United States currency.

The Companies shall remit, or permit a deduction from balances paid to them, monies for account of losses paid or claims settled and to be paid.

The Managing Agent shall also furnish the Companies, as soon as practicable after the end of each calendar quarter, or at any time after the close of any month, at the request of the Companies, statements reflecting all necessary figures, for the inclusion in any statements, annual or otherwise, required by Insurance Departments or other authorities of Municipal, State or Federal Governments.

The Managing Agent agrees to use due diligence to collect payment of all premiums of policies or contracts of insurance issued by the Managing Agent and/or any of its appointees however designated and shall in no case be entitled to credit by reason of its failure to collect said premiums from brokers, its agents or policyholders.

- 2 -

FIFTH:  The Companies agree to pay all costs imposed by the authorities of various states and countries to comply with the legal requirements; legal expenses; Underwriting Association fees and assessments; forms and stationery; postage, telegraphic expenses incurred in the conduct of the Agency business; survey expenses; cost of Lloyd's Register and similar publications.

The Companies agree to reimburse the Managing Agent for brokerage, commissions and discounts allowed by said Managing Agent on the business written by it for account of the Companies under this Agreement.

The Managing Agent agrees to credit the Companies with brokerage, overriding commissions (other than management commission), commissions (except contingent commissions), discounts and other allowances received by said Managing Agent on the reinsured portion of the business written by it for account of the Companies under this Agreement.

It is understood that the Managing Agent may retain for its own account allowances made by reinsurers to cover the factor of remuneration of Managing Agent, directly, or indirectly when reinsuring on a "net cost" or similar basis, provided, however, said retentions for the account of the Managing Agent shall not be made to any extent which would result in reducing the total reinsurance allowance factors to each Company to a lesser percentage than what the acquisition cost percentage to each Company would have been had the amount reinsured been retained.

SIXTH:  The Companies will allow the Managing Agent remuneration in respect of all business written for account of the Companies as shown in the Schedule attached herewith designated APPENDIX "A".

SEVENTH:  The Agreement is unlimited as to its duration, but it may be terminated at the end of any calendar year by any party giving to the other parties six (6) months' notice in writing of such desire.

However, this Agreement may be terminated by the Companies at any time and with immediate effect in the event that the Managing Agent becomes insolvent or makes an assignment for the benefit of creditors, and, in such event, the right of the Companies to the use and profit of the management plant in connection with the business written by the Managing Agent or its agents for the Companies, shall be conceded and held inviolate, it being

- 3 -

further understood that should the Companies at their option effect the
collection of monies from agents, policyholders, or others from whom monies
may be due on account of the Companies policies issued through Managing
Agent, the Companies shall give the Managing Agent credit for such sums in
their mutual account.

EIGHT:  The Agreement may be amended from time to time by exchange
of letters which shall be considered of the same effect as formal addenda to
this Agreement.

NINTH:  This Agreement is made in good faith and should there
arise from any unforeseen cause, difference of opinion or of interpretation
of the Agreement which cannot be amicably settled between the Companies and
the Managing Agent, it is then understood and agreed that such difference
shall be submitted for arbitration to  three disinterested officers of marine
insurance offices, one to be chosen, by the Companies, one by the Managing
Agent, and the third by the two so chosen, and a decision of the majority of
the three shall in each case be final.  The arbitrators shall be required to
decide the matters submitted to them upon the customs and usages of the
business and in a spirit of equity rather than of technicalities or of legal
requirements.  Each party shall pay for the expense of its own arbitrator and
a pro rata portion of the expense of the third arbitrator.

TENTH:  This Agreement will be effective December 1, 1977, and
replaces all prior management agreements between the Companies and the
Managing Agent.

IN WITNESS WHEREOF, the parties have caused this Agreement to be
signed and their corporate seals to be affixed hereto by their duly authorized
officers.

NATIONAL UNION FIRE INSURANCE COMPANY

Attest:

- 4 -

Attest:

_[signature]_

BIRMINGHAM FIRE INSURANCE COMPANY

_[signature]_

Attest:

_[signature]_

AMERICAN HOME ASSURANCE COMPANY

_[signature]_

Attest:

_[signature]_

COMMERCE AND INDUSTRY INSURANCE
COMPANY

_[signature]_

Attest:

_[signature]_

AIU INSURANCE COMPANY

_[signature]_

Attest:

_[signature]_

AMERICAN INTERNATIONAL MARINE AGENCY
OF NEW YORK, INC.

_[signature] William Mask_

- 5 -

### APPENDIX "A"

### SCHEDULE OF COMMISSIONS FOR
### MARINE MANAGEMENT AGREEMENT

The Companies shall allow the Managing Agent the following remuneration in respect of all business written for account of the Companies:

1.  Fifteen (15%) percent of the net premiums as defined below on all Cargo policies and/or contracts written for account of the Companies, excluding inward reinsurance assumed treaties.

Ten (10%) percent of the net premiums as defined below on all Hull policies and/or contracts written for account of the Companies.

"Net Premiums" for the purpose of this Provision 1 mean:

Gross Premiums Written (less returns) after deduction of all brokerages, commission, discounts and other allowances (except contingent commission) allowed by the Managing Agent,

LESS

Gross Premiums (less returns) paid for reinsurance (other than Excess of Loss reinsurance) after deduction of all credits to the Companies pursuant to the third paragraph of ARTICLE FIFTH of the Agreement of which this Appendix "A" is a part.

It is the purpose of this definition to provide that the Companies shall, as far as possible, be made whole as respects reinsurance costs, and that the Managing Agent shall be entitled to retain as its management fee any differential commission allowed by reinsurers up to but not exceeding its normal management as provided herein.

2.  Where the Managing Agent allows contingent commission to its agents based on the profits derived from the business written in their respective territories, the Companies will allow, as an expense chargeable to the business, contingent commission so paid, but not exceeding ten (10%) percent of such respective profits.

3.  In addition to the foregoing, the Managing Agent shall receive an annual compensation equal to ten (10%) percent of the net yearly profit of the business as determined by the yearly contingent statement rendered to the Companies.

This yearly net profit shall be determined on a policy year basis from quarterly accounts which are to be rendered on a policy year basis. As respects each policy year, the contingent statement therefore reflecting the profit (or loss) for each such policy year is not to be rendered until December 31st of the next succeeding year and preliminary settlement shall be made on such results. Each year thereafter adjustments to the profit (or loss) as reflected by the quarterly accounts as respects the respective policy years are to be settled, pro or con, in a regular manner.

- 1 -

The calculations for each policy year shall be in accordance with the following formula:

## INCOME

1. Net Premium as shown in the quarterly accounts. (Net premiums for this purpose mean the net premiums as defined in Provision 1 of this Appendix "A" after deduction of charges for Excess of Loss reinsurance and management commissions.)

2. All other items credited by the Managing Agent to the Companies and as shown in the quarterly accounts.

3. Net losses outstanding carried forward from last previous accounting.

## OUTGO

1. Net losses paid, less salvages received, as shown in the quarterly accounts.

2. Net losses outstanding at end of year as of which computation is currently being made.

3. Contingent commissions paid by the Managing Agent to its agents as provided in Provision 2 of this Appendix and included as a charge to the Companies in the quarterly accounts.

4. All other expenses charged by the Managing Agent to the Companies and as shown in the quarterly accounts.

5. Two (2%) percent Home Office expenses computed on the net premiums as shown in Item No. 1 of Income above.

6. Taxes which apply directly to the business (whether imposed in the form of licenses or assessments based on profits or percentages of premiums, or otherwise) incurred by the Companies excluding such as are embraced by Item No. 4 of Outgo above, but not including income, franchise or similar taxes imposed upon the Managing Agent or the Companies.

7. Deficit, if any, from the contingent statement of the preceding policy year adjusted to the end of the year as of which computation is currently being made; provided that no deficit shall be brought forward to any year except the policy year immediately succeeding.

The difference between Income and Outgo will represent the profit or loss on the business and shall be subject to verification by the Companies.

In case of termination of this Agreement, of which this Appendix "A" is a part, for any cause, no contingent, nor adjustments as hereinbefore provided for, shall be paid until at least twelve (12) months after the date of said Agreement ceases, and not until all outstanding losses have been adjusted and paid.

- 2 -

## APPENDIX "B"

## SCHEDULE OF RETENTIONS

The maximum limits any one risk retained by the Managing Agent in their primary pool on behalf of the Companies will be:

| | |
|---|---|
| Blue Water Hull | - $1,300,000 |
| Non Blue Water Hull | - 500,000 |
| Cargo | - 2,600,000 |
| Marine Liabilities | - 5,000,000 |

With respect to Marine Liabilities the Managing Agent has placed excess of loss reinsurance for account of the Companies with limits of $4,500,000 any one loss any one interest excess of $500,000 any one loss any one interest.

The Managing Agent has also placed general marine excess of loss reinsurance for account of the Companies with the following limits:

A) To cover excesses of the Ultimate Net Loss listed below up to a maximum Limit of $5,000,000.

| | | |
|---|---|---|
| a) Blue Water Hulls | $1,300,000 | per occurrence |
| b) Non Blue Water Hulls | $ 250,000 | per occurrence |
| c) Cargo | $ 500,000 | per occurrence |
| d) Marine Liabilities | $ 500,000 | per occurrence |

B) Also to cover excess of the Ultimate Net Loss of $1,300,000 up to a further maximum Limit of $5,000,000 in the event two or more interests and/or coverages are involved in the same occurrence.

The Managing Agent shall have authority to alter or amend the excess of loss reinsurances as in their best judgement will benefit the Companies and to place additional facultative or treaty reinsurance, subject always to the primary pool maximum retained limits set forth above.

The pro rata proportion of the foregoing interests and liabilities of the Company is for   47.50 %.

# EXHIBIT C







International News

# Mucerino to Head New AIG Global Marine and Energy Division

June 30, 2006

American International Group, Inc. announced that it has established AIG Global Marine and Energy, a new division of the AIG property and casualty insurance subsidiaries. "The unit will service the insurance, risk management and loss control needs of marine and energy clients throughout the world," said the bulletin.

AIG Vice President Ralph Mucerino has been named President of AIG Global Marine and Energy. He assumed responsibility for the AIG Global Energy Division in 2002. He joined AIG in 1979 and subsequently served in senior positions in both the domestic general and foreign general insurance units of the AIG Companies, including the commercial lines unit in Paris. He later served as Regional President of the American International Underwriters Africa and Middle East Region, and as Regional President of AIG's non-life insurance companies in Japan and Korea. He was elected an AIG Vice President in 2005.

AIG noted: "The AIG Companies' North American marine insurance underwriting operations have historically been handled by a managing general agent, American International Marine Agency, Inc (AIMA), a subsidiary of C.V. Starr & Co., Inc. The AIG Companies have cancelled the agency arrangement with AIMA, issuing a notice of termination effective December 31, 2006. While AIMA will continue to be available as the AIG Companies' managing general agent until that time, North American marine insurance clients are now free, if the client prefers, to work directly with AIG Global Marine for their underwriting, claims and all other needs."

AIG also announced that "Richard J. Decker has joined the AIG Companies as President of AIG Global Marine. Based in New York." He will be responsible for the commercial marine portfolio globally, reporting to Mr. Mucerino. Decker previously served at ACE as Senior Vice President of Ocean Marine and President of the INAMAR Marine Underwriting Agency. "His experience in the insurance industry dates to 1969 when he joined INA as a College of Insurance intern," said the bulletin. "He subsequently served as an Ocean Marine underwriter before moving through positions of increasing responsibility with Royal Insurance and with ACE." Decker is Vice Chairman of the American Institute of Marine Underwriters, and will be named Chairman of the organization in November 2006. He is also Deputy Chairman of the National Cargo Bureau and Chairman of the Committee on Pilots of the Board of Underwriters of New York.

Mucerino commented: "Consolidating AIG Global Marine with the existing AIG Global Energy Division will concentrate AIG's resources in these two important market sectors. AIG Global Marine and Energy will enhance our marketing and underwriting capability and take advantage of cross-selling opportunities, an important consideration to both our insureds and our brokers. Rich Decker's extensive experience in the commercial marine industry will assure that the AIG Companies continue to provide our commercial marine clients worldwide with the broad-based integrated solutions for which AIG has long been noted. We are pleased to have him on board."

**Find this article at:**
http://www.insurancejournal.com/news/international/2006/06/30/69995.htm

# EXHIBIT D

**FOR IMMEDIATE RELEASE**

Contact:    Brooke Parker
            Weber Shandwick
            212-445-8142

### AIMA Announces Intent to Terminate with AIG

New York, New York – June 30, 2006 – American International Marine Agency, Inc. (AIMA), a wholly owned subsidiary of C. V. Starr & Co., Inc., today informed American International Group, Inc. (AIG) of its intention to terminate the agency's relationship with the insurance company, effective January 1, 2007.

Notice was given pursuant to terms of an agreement between the agency and AIG, which was established in December 1977, and requires six months termination notice. At the time of termination, AIMA will cease acting as managing general agent for AIG.

"This decision marks a significant milestone for AIMA, which has been a market leader in the marine insurance sector for nearly six decades. We look forward to serving new underwriters next year and building upon our reputation for delivering best in class solutions that meet our clients' specific insurance needs," said David French, President, AIMA.

### About American International Marine Agency, Inc.

American International Marine Agency, Inc. (AIMA), a wholly-owned subsidiary of C.V. Starr & Co. Inc., produces ocean marine insurance for cargo, hull and marine liability risks, and covers multinationals, importers, exporters, manufacturers and logistics operators. AIMA is the U.S. market leader in cargo, with a dominant position in multinational and complex risk management segment. The longest standing traditional marine underwriter in North America and a market leader for nearly 60 years, AIMA is a leading marine writer in the United States and one of the top marine writers worldwide.

### About C. V. Starr & Co. Inc.

C. V. Starr & Co. Inc. is an independently-owned holding company with insurance agencies and a portfolio of global investments. Through its wholly owned insurance agencies, C. V. Starr historically has produced approximately $2 billion annually of comprehensive insurance coverage among several specialty lines covering aviation, marine, excess casualty and property, including risks with international exposures.  These agencies provide a broad spectrum of value-added specialized services including claims handling and settlement, risks assessment and loss prevention, and customer focused attention. C. V. Starr also has more than $3 billion in investment assets that include public and private equity, hedge funds and alternative assets. C. V. Starr's significant presence in global markets, backed by the company's international expertise, has made it an industry leader for more than 50 years. The company is headquartered in New York City.

###

# EXHIBIT E



**Business Development**

**Agent/Broker**

# Rising Starr

**Key Points**

- Until relationships soured, American International Group resisted pressure to separate from the Starr agencies, insisting that it lacked the capability to perform many of the services provided by C.V Starr's managing general agents.

- C.V. Starr is planning to grow its four insurance agencies by re-enforcing the Starr brand through heavy advertising, expanding the agencies' geographic footprint domestically and overseas, investing in new products and partnerships and recruiting top talent.

- To survive, the Starr agencies realize they must hold on to key relationships developed over decades as managing general agents of AIG.

EMERGING FROM THE SHADOW OF AIG:

Not too long ago, American International Group viewed the managing general agencies run by C.V. Starr & Co. Inc., specialists in hard-to-place commercial coverages, as an indispensable part of its business.

The world's largest and arguably most sophisticated insurer resisted pressure from certain shareholders to separate from the Starr agencies, insisting that in spite of its size, the corporation lacked the capability to perform many of the services provided by Starr's managing general agents.

Bernd Heinze, executive director of the American Association of Managing General Agents, who was hired by AIG's board to review the corporation's relationship with the agencies, wrote in a report just three years ago, that "AIG would not be able to duplicate or exceed the established brand value, premium and investment income at the combined ratios and underwriting profit levels, ...negotiate favorable terms and conditions with reinsurance companies for the specific risks insured, or achieve the same level of return on equity" without maintaining the agency relationships.

AIG's chief executive, Martin Sullivan, who was then vice chairman and chief operating officer, warned at that time that a breakup with the Starr agencies would permit competitors to "swoop in tomorrow" and establish relationships with brokers and customers who until then had given their business to the Starr agencies. They would jump at any opportunity "to pry open any crack that might appear and provide capacity to replace AIG all or in part," he said.

Of course, that was all before AIG's relations with C.V. Starr disintegrated to their current acrimonious state, before AIG began severing ties to the Starr agencies, before the insurer accused Starr Technical Risks of being a "rogue agent," before the companies sued each other for rights to the "Starr" trademark, and before an accounting scandal caused AIG's board to force out Chairman and Chief Executive Officer Maurice R. (Hank) Greenberg—who left grudgingly, but with the agencies in tow.

Indeed, some of Sullivan's predictions have manifested already.

Warren Buffett's Berkshire Hathaway swooped in this year and signed the Starr agencies to write its policies. Buffett himself recently called Greenberg's agency "a respectable organization. We have no problem. In fact, we look forward to doing a lot of business with them just like we do with Marsh & McLennan or whomever."

---

## STARR & CO. INC.

## Starr **Players**



**Maurice R. (Hank) Greenberg**
Chairman and CEO
of C.V. Starr & Co. Inc.

C.V. Starr & Co. Inc. comprises four agencies:

**American International Marine Agency of New York**
**President:** David French
**Headquarters:** New York
**Lines of Business:** Ocean marine; marine casualty and liability coverage
**Number of Employees:** 96

**Starr Aviation Agency Inc.**
**President:** Steve Blakey
**Headquarters:** Atlanta
**Lines of Business:** Liability cover for airlines, major product manufacturers, airports and repair facilities
**Number of Employees:** 34

**Starr Technical Risks Agency Inc.**
**President:** Richard Shaak
**Headquarters:** New York
**Lines of Business:** First-party property insurance in the energy sector
**Number of Employees:** 110

**C.V. Starr & Co.**
**President:** William Weichold
**Headquarters:** San Francisco
**Lines of Business:** Excess commercial casualty, excess liability, public entity business, residential and contracting business
**Number of Employees:** 60

---

## Building a New Empire

These days, Greenberg, 81, no longer runs the insurance empire he built. He's plotting a new one from his 17th-floor office on Park Avenue in New York City, even as he prepares to face New York state Attorney General Eliot Spitzer in court, this summer, on accounting fraud charges.

His plan involves a rapid build-up of the four insurance agencies he controls as chairman and chief executive of C.V. Starr & Co. by re-enforcing the Starr brand through heavy advertising, expanding the agencies' geographic footprint domestically and overseas, investing in new products and partnerships and recruiting top talent.

For decades, the Starr agencies— American International Marine Agency of New York Inc. (AIMA); Starr Aviation Agency Inc., formerly AIAA; Starr Technical Risks Agency Inc., and C.V. Starr & Co.—lived under the shadow of AIG. Their histories are inextricably intertwined: C.V. Starr was created by AIG's founder, Cornelius Vander Starr, in China in 1919. In 1970, after his insurance business had grown to encompass a group of agencies and companies all over the world, Starr sold the majority of his assets to what became American International Group, but held on to several small domestic agencies.

That's how the Starr agencies came to be a separate, but related entity of AIG. Playing the role of managing general agents, they were authorized to market, underwrite and issue policies, collect premiums, adjust and pay claims, and even negotiate reinsurance agreements on behalf of AIG.

In recent years, C.V. Starr said it generated about $2 billion in annual premium for AIG, business it obtained primarily through the brokerage community; the Marshes, the Aons, and the Willises of the world rely on C.V. Starr to provide tailored, specialty coverage for their clients. In return, the privately held company received hundreds of millions of dollars in compensation from AIG—a cozy relationship that frequently raised eyebrows about the propriety of a publicly traded company doing business with a private affiliate owned by the public company's top executives.

Last year, C.V. Starr offered to sell the agencies to AIG, "but their offer was well below value, and we were never close to a mutually agreeable price," company spokesman Howard Opinsky said. "We also offered to enter into a long-term underwriting agreement between the Starr Agencies and AIG, but AIG never responded to that offer."

Presently, AIMA is the only Starr agency still authorized to write AIG insurance, and it's uncertain how long that

relationship will last. As for the parent company, C.V. Starr, it is looking forward to a new future, one that undoubtedly would involve aggressively competing with AIG for many years to come.

## Aviation Tug-of-War

Starr Aviation, founded in 1961, provides liability cover for airlines, major product manufacturers, airports and repair facilities. The agency now intends to enter other classes of the general aviation market both domestically and overseas. This expansion includes entering the workers' compensation market in the United States, Steve Blakey, the company's president, said.

In March, Starr Aviation, the first of the four Starr agencies to have its contract terminated by AIG, aligned with Marlborough Underwriting Agents, a Berkshire Hathaway Group company, to offer worldwide cover under Lloyd's licenses. Blakey said Starr Aviation is talking to other potential insurance partners.

AIG sued Starr Aviation earlier this year for allegedly continuing to conduct business on its behalf without authoriza-

tion. In that suit, Blakey, who resigned from AIG Aviation in December 2005, was accused of raiding AIG employees, taking with him 24 of his colleagues to Starr Aviation. AIG said it was forced to retaliate by recruiting several employees from a Starr Aviation subsidiary in the United Kingdom, called Redholm Underwriting Agents Ltd.

The tug-of-war between the two, Blakey said, has had "little impact" on Starr Aviation's operations. "We have a reputation, a lot of contacts in the marketplace. I've worked for those brokers my entire career, so they continue to bring the business in."

Redholm has since been renamed Starr Underwriting Agents Ltd., Blakey said. Starr Aviation currently has 34 employees between offices in Atlanta and London, where it is building a new platform to sell aviation products on a worldwide basis.

Since it began offering Marlborough coverage March 8, Blakey said the agency has seen every major account that's come up for renewal in the marketplace.

"We're getting our fair share, but the majority of the business will hit

later in the year, in the fourth quarter of 2006, and that gives me the opportunity to build the team in time for renewal season," he said.

## New Energy Partners

Starr Tech, which writes first-party property insurance in the energy sector, is planning to enter the international risks arena. In the past, the agency focused on U.S. and Canadian-domiciled companies, President Richard Shaak said. "We're now looking at the international markets, and will be staffing up in New York, London, as well as in Asia."

While the company's expertise is in the oil, gas, petrochemical and chemical industries, Starr Tech also writes coverage for utility, mining, pulp and paper, and electronic companies.

Recently, the agency announced it would be offering commercial coverage by Ace USA and Berkshire Hathaway—agreements that provide Starr Tech $200 million of in-house underwriting capacity. This agreement came days after AIG publicly announced it no longer was writing business through Starr Tech.

In January, AIG sued Starr Tech for entering into what it called "unauthorized reinsurance arrangements" with Berkshire. Aspects of this complaint remain in arbitration, although Starr Tech insists it has the right to partner with any underwriter it wishes.

"We've always been an independent agency, even though we've represented AIG for almost 37 years. It would have been great if we could have continued the relationship, but sometimes, two parties need to move in different directions," Shaak said. "Now, we're looking forward to building our future with Berkshire and Ace."

Shaak said Starr Tech, founded in 1968, hasn't decided where in Asia it wants to set up shop, but China and Singapore are top on the list.

## A Public-Entity Presence in N.Y.

The San Francisco-based C.V. Starr & Co. already has launched new operations on the East Coast and is planning others in key U.S. Southern cities. The company, founded in 1953, writes

### The Original Team

C.V. Starr & Co. Inc. and American International Group enjoyed a mutually profitable relationship until 2005.

#### Starr Commissions Paid by AIG

|  | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Starr Marine | $8,474,000 | $9,350,000 | $10,949,000 | $13,409,000 |
| Starr California | 20,182,000 | 31,201,000 | 31,097,000 | 46,780,000 |
| Starr Tech | 8,141,000 | 10,435,000 | 22,494,000 | 16,584,000 |
| Starr Aviation | 17,585,000 | 15,968,000 | 22,606,000 | 36,392,000 |
| Starr Associates | 0 | 0 | 164,000 | 434,000 |
| Total | $54,382,000 | $66,954,000 | $87,310,000 | $113,599,000 |

#### AIG Premiums Earned From Starr-Generated Business

|  | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Starr Marine | $95,580,000 | $101,127,000 | $103,205,000 | $126,712,000 |
| Starr California | 74,723,000 | 108,414,000 | 107,532,000 | 170,931,000 |
| Starr Tech | 30,920,000 | 36,259,000 | 120,730,000 | 208,857,000 |
| Starr Aviation | 79,109,000 | 75,287,000 | 126,486,000 | 255,280,000 |
| Starr Associates | 7,000 | 5,000 | 1,815,000 | 5,128,000 |
| Total | $280,399,000 | $321,092,000 | $459,768,000 | $766,908,000 |

Source: Special Litigation Committee of American International Group Inc.

casualty insurance for all but four of the counties in California, as well as special districts, water districts, utilities, schools and tribal nations. It is looking also at expanding its construction business throughout the United States.

William Weichold, the company's president, said the agency opened a New York operation in late April called Pacific Starr of New York. It has a total of 60 employees, and currently is teaming with Starr Tech to begin offering other non-casualty products to its public-entity clients, Weichold said.

Jeff Hafter, previously national accounts division head at AIG Specialty Excess Unit, will run the New York operation. His task also involves developing the next Starr agency, perhaps, through an acquisition.

"These are decisions that have to be made, and we want a management team in place in New York to discern what we should do, how we should do it, and who should do it," Weichold said.

A New York presence will be key to the construction business of C.V. Starr

"We're now looking at the international markets, and will be staffing up in New York, London, as well as in Asia."
—**Richard Shaak**,
*Starr Technical Risks Agency*

AIMA will be concentrating on cross marketing opportunities with its sister agencies. "That's the beauty of the infrastructure and investment that's being made in C.V. Starr."
—**David French**,
*American International Marine Agency of New York*

"The relationships that our brokers have had over the years have been with us, with C.V. Starr (California). That relationship is in place."

—**William Weichold**,
*C.V. Starr & Co.*

"The majority of the business will hit later in the year, in the fourth quarter of 2006, and that gives me the opportunity to build the team in time for renewal season."
—**Steve Blakey**,
*Starr Aviation Agency*

# IMSA = QUALITY = SUCCESS

IMSA companies prove that every day. Companies qualified for the Insurance Marketplace Standards Association perform better in a number of key areas.

Does your company have what it takes? To find out more, visit www.IMSAethics.org.



**IMSA**

INSURANCE MARKETPLACE
STANDARDS ASSOCIATION

*Committed to honesty,
integrity and ethics*

**Business Development**

**Agent/Broker**

(California). "Many of the very large national accounts and commercial accounts market their business through New York, and if we're going to be the casualty insurance platform for the C.V. Starr group of agencies, we really need to be there," he said.

When the C.V. Starr (California) contract with AIG terminated May 14, a new partnership with Everest National kicked in the next day. Starr pursued Everest Re as its new partner to replace AIG, Weichold said, because "their back-shop operation is so dynamic, and they have the support that we need to develop our future products."

Like Blakey, Weichold insists the AIG breakup hasn't disrupted operations.

"As far as our brokerage community goes, they are very anxious to have us write on behalf of Everest National. They appreciate the fact that we have the financial strength of C.V. Starr, and the leadership of Hank Greenberg behind us. They are opening their arms to this whole experience," he said.

Last year, the public entity class of business had a retention rate of well over 90%, Weichold said. He expects it will remain as high this year. "The relationships that our brokers have had over the years have been with us, with C.V. Starr (California). That relationship is in place," he said.

### One Link With AIG

So far, there's no indication AIMA's relationship with AIG will be changing, said President David French. "We're still under contract, and we're still approached by our major clients and brokers as AIG's managing general agency in North America for ocean marine business," he said. "If AIG has any plans otherwise, they'd best answer that."

French said AIMA continues to provide stellar financial results for AIG. The agency's retention rate is between 87% and 90%, and its gross production growth for April, he said, was above the mutually agreed target. "We anticipate our gross written premium for this year would be roughly $300 million."

It's possible AIG doesn't want to disturb this partnership. AIMA, formed in 1945, currently has 4,000 clients, comprising the nation's top shippers—exporters and importers. The agency also provides marine casualty and liability coverage, including terminal operators' legal liability and shippers' peril liability, both on a primary and excess casualty level, and is known around the world for its loss control expertise.

French said AIMA, too, will be concentrating on cross marketing opportunities with its sister agencies. He's currently working with Weichold to provide new products for port clients and with Shaak's Starr Tech on opportunities with onshore energy clients. "That's the beauty of the infrastructure and investment that's being made in C.V. Starr," he said.

### On Its Own

Does C.V. Starr have what it takes to go head to head with AIG and distinguish itself in the commercial brokerage community without AIG's help?

C.V. Starr wouldn't discuss the commission terms it has with new carriers, but Opinsky said the company is "very satisfied with our arrangements and expects that the collective premiums for the Starr Agencies in the future will exceed historical levels."

The fundamentals of how their businesses are run will differentiate them from competitors, the agency heads say.

That means, holding on to key clients, broker and insured relationships will be crucial. It also means maintaining C.V. Starr's widely-regarded loss control, claims and underwriting expertise.

"We will grow because people want to do business with us. The brokerage agencies that we deal with have arms throughout the entire United States, so we won't have to introduce ourselves to new brokerage communities. It would be an easy transition for us," said Weichold.



**The Best Risk Managers Expect the Unexpected.**

Prepare for the unexpected with the best risk management education, the **CERTIFIED RISK MANAGERS (CRM)** PROGRAM.

CRM courses deliver the most practical training available – thorough preparation for managing the exposures, potential hazards, and unforeseen risks of your company and/or clients.

www.TheNationalAlliance.com
800-633-2165

THE NATIONAL ALLIANCE

# EXHIBIT F

# Business Insurance®

$5

www.businessinsurance.com

June 26, 2006

# Public entities profit from AIG-Starr war

## *Competition cutting prices*

**BY ROBERTO CENICEROS**

As American International Group Inc. and Starr International Co. Inc. continue their messy divorce in court, certain policyholders are benefiting from another battle over which of the former affiliates will keep their business.

Some large, self-insured public entities renewing their excess liability and reinsurance coverage for July 1 are enjoying price reductions as managing general agency C.V. Starr & Co. and AIG compete to retain business previously underwritten when the two were under the direction of AIG management, observers say.

Before Starr International and AIG split up, setting off their legal battles (*BI*, Feb. 6), AIG provided policies to public entities for which C.V. Starr & Co. provided underwriting services.

C.V. Starr & Co. is one of four

managing general agencies under C.V. Starr & Co. Inc., an independently owned New York-based holding company and unit of Starr International. The Starr companies

- SICO sues to obtain documents from AIG
  **PAGE 2B**
- Starr Aviation enters agreement with Chubb
  **PAGE 2B**

are run by Maurice R. Greenberg, the former chairman and chief executive officer of AIG, who was forced out in 2005 amid mounting investigations of the insurer's practices.

In the latest of their legal entanglements, Starr International last

See STARR / page 2B

# Starr: Competition for public entity business benefiting policyholders

**Continued from page 1**

week sued AIG in Delaware's Court of Chancery to gain access to certain documents (see related story). Starr, which controls more than 300 million shares of AIG, filed its complaint as a shareholder. The suit claims that the documents may show that AIG mismanaged the $1.64 billion settlement the insurer reached with New York Attorney General Eliot Spitzer and other officials in February.

But the courtroom is just one front in the struggle between AIG and its estranged former affiliate.

In the ongoing renewal competition against each other, AIG and C.V. Starr & Co. are pushing their prices down as each attempts to retain the pools, captives and other self-insured public entities that traditionally renew their coverage on July 1, several sources said.

In some cases, policyholders that initially were told they would receive flat renewal pricing are instead seeing discounts of up to 10%, said John Chino, area senior vp in Aliso Viejo, Calif., for Arthur J. Gallagher Risk Management Services Inc.

That is occurring in a market

where pricing has otherwise been creeping up gradually each year since 2001, Mr. Chino added.

"This is an unexpected bright spot in a public entity's renewal," Mr. Chino explained. "They weren't anticipating a 10% reduction in their liability program. They probably budgeted for a flat to small increase, so it's not dramatic, but it's better than what was expected."

The situation is adding a "bit of downward pressure" on pricing, said John Hayden, a regional partner in Columbus, Ohio, for Willis CAPS Pooling, a unit of Willis Group Holdings Ltd.

This competition is welcome, as the number of insurers providing coverage for public entities has steadily shrunk, Mr. Hayden said.

In some cases, public entity policyholders have a choice of only three major insurers, not including C.V. Starr or AIG, another broker said.

The separation of C.V. Starr & Co. from AIG creates an additional insurer from which policyholders can obtain a quote, Mr. Hayden said.

AIG in February announced the formation of AIG Specialty Access

to assume business previously handled by C.V. Starr & Co. Inc.

Mr. Hayden said there have been a couple of instances where other insurers lowered their public entity rates for pools to compete with the decreased pricing offered by AIG and C.V. Starr & Co. Generally, though, the additional pricing competition has remained between the two entities, he added.

William Welchold, president of C.V. Starr & Co. in San Francisco, said the agency provides very broad coverages to meet the needs of governmental agencies with the product and pricing customized for each client.

Sources also say C.V. Starr and AIG have eased their underwriting practices somewhat—though not drastically—by requiring less detailed submission information.

Agreeing that the situation is lowering pricing is the manager for a pool insuring municipalities that for several years has purchased excess and reinsurance policies provided by an AIG unit and underwritten by C.V. Starr.

Both C.V. Starr and AIG view that business as their renewal account, said the manager, who asked not to be identified because he is in nego-

tiations with both.

Their competition for his renewal business will prove beneficial, he added.

Because of past losses, the manager said he otherwise would expect to see his renewal rates climb. But he expects the competition between AIG and C.V. Starr "will beat down the price," and "the increases are not going to be what they would otherwise," he said.

To foster competition between the two for his account, the policyholder extended by several months his July 1 renewal date, he said. He did so after the "divorce" of C.V. Starr and AIG to ensure C.V. Starr would secure the insurer capacity needed to offer the coverage limits his large pool needs.

C.V. Starr announced in April that it had partnered with Liberty Corner, N.J.-based Everest National Insurance Co., a member of the Hamilton, Bermuda-based Everest Re Group, to write public entities and contractors. The deal offers $10 million in underwriting capacity.

## Who is incumbent?

While AIG and C.V. Starr vie for incumbent insurer status among

existing policyholders, the pool manager said he understands how they could both be considered incumbents.

AIG has provided his account the security of a stable insurer and paid his claims for years. Yet, like many savvy risk managers, he has formed a relationship with the underwriters at C.V. Starr.

"I tend to follow relationships when push comes to shove," he said. "So I might give a bit of an edge to C.V. Starr. But I think I could argue either side of it, really."

That is a common viewpoint among pool managers who regularly form bonds with their underwriters, brokers said.

Most clients have a neutral position on the issue, though they do ask for advice about which of the two entities deserves the courtesy often extended to the incumbent insurer, Gallagher's Mr. Chino said. He said he advises clients to look for distinctions in the arrangements the two entities are able to offer.

"This is a very strange situation, and both truly are still the incumbents and deserve the courtesy or business relationship that being an incumbent requires," he said.

# EXHIBIT G

# Business Insurance®

July 3, 2006

www.businessinsurance.com

$5

## AIG to finalize divorce from Starr

### Insurer forms energy/marine unit, ends MGA pact

By ROBERTO CENICEROS

NEW YORK—American International Group Inc. has set up a unit, AIG Global Marine & Energy, to take over business previously underwritten by managing general agencies owned by former its former C.V. Starr & Co. Inc. affiliate.

AIG also issued a notice of termination Thursday, advising that it is canceling its arrangement with American International Marine Agency, an underwriting unit of C.V. Starr. The termination is effective Dec. 31, as AIG was required by contract to give C.V.

Starr six months' notice.

Hours later, AIMA also announced it was terminating its 29-year-old relationship with AIG, effective Jan. 1, 2007.

Until the agency agreement with AIMA expires, any policy renewals, new business or issues concerning in-force policies may be handled by AIG or by AIMA, according to a copy obtained by

Business Insurance of a letter that brokers received from AIG.

In all instances, AIG client claims will continue to be handled by the insurer's AI Marine Adjusters Inc. unit, according to the letter. AIG noted in the letter that AIG Global Marine, part of AIG Global Marine & Energy, provides cargo, marine liability, and hull/machinery coverage.

Ralph W. Mucerino, an AIG vp who has overseen the AIG Global Energy division since 2002 (see related story), has been named president of the new combined marine and energy division, and Richard J. Decker has joined AIG as president of AIG Global Marine. Mr. Decker previously was a senior vp of ocean marine business at ACE Ltd.

New York-based C.V. Starr, which owns four MGAs writing energy, marine, aviation and specialty risks, for many years provided business for AIG. New

See SUMMARY / page 27

## Energy: AIG and ACE create energy divisions

Continued from page 3

York-based AIG and C.V. Starr, however, have had a contentious relationship since early 2005, when Maurice R. Greenberg was ousted as AIG's longtime chairman and chief executive. Mr. Greenberg is chairman of C.V. Starr & Co.

Over the past several months, AIG and the C.V. Starr agencies have severed their ties, and the agencies have entered underwriting contracts with other insurers, in-

cluding ACE Ltd., Berkshire Hathaway Inc., Chubb Corp. and Everest National Insurance Co.

In another energy market development, Philadelphia-based ACE USA has set up ACE USA Custom Casualty Energy to offer primary general liability, primary commercial automobile, lead umbrella and pollution liability programs to energy-related risks.

The new unit is marketing the coverage to oil and gas lease opera-

tors, well-servicing contractors, drilling contractors, alternative energy producers, utilities, mining companies and other energy risks.

Primary general liability limits of $2 million per occurrence with a $4 million aggregate are available. The new unit has up to $25 million in lead umbrella liability capacity, ACE USA said in a statement.

*Senior Editor Michael Bradford contributed to this article.*

# EXHIBIT H





Contact:          Joe Norton
                      Director of Public Relations
                      212/770-3144

## AIG COMPANIES ANNOUNCE TERMINATION OF AGENCY RELATIONSHIP

## WITH AMERICAN INTERNATIONAL MARINE AGENCY

NEW YORK, July 25, 2006 – The AIG Companies have announced that their agency relationship with American International Marine Agency of New York, Inc. (AIMA), a subsidiary of C.V. Starr & Co. Inc., originally scheduled to cease on December 31, 2006, has been terminated, effective today. Accordingly, AIMA no longer has any authority to act as agent for the AIG Companies.

All marine insurance business formerly conducted by AIMA on behalf of the AIG Companies will now be serviced by AIG Global Marine, a division of the property and casualty insurance subsidiaries of AIG. This includes all underwriting of new business, renewal business, in-force policy service, marine loss control and engineering, accounting and administrative functions formerly conducted by AIMA as an agent of the AIG Companies. Claims will continue to be handled by AI Marine Adjusters, Inc., a wholly owned subsidiary of AIG.

#      #      #

American International Group, Inc. (AIG), world leaders in insurance and financial services, is the leading international insurance organization with operations in more than 130 countries and jurisdictions. AIG companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer. In addition, AIG companies are leading providers of retirement services, financial services and asset management around the world. AIG's common stock is listed on the New York Stock Exchange, as well as the stock exchanges in London, Paris, Switzerland and Tokyo.

#      #      #

**AIG Companies***
70 Pine Street, New York, NY 10270

# EXHIBIT I

Business insurance ®

$5

www.businessinsurance.com

July 31, 2006

# AIG cuts ties to C.V. Starr marine unit

### By ROBERTO CENICEROS

**NEW YORK**—American International Group Inc. said last week it has ended its agency relationship—effective July 25—with American International Marine Agency of New York Inc., a subsidiary of C.V. Starr & Co. Inc.

"Accordingly, AIMA no longer has any authority to act as agent for the AIG companies," AIG said in a statement.

Earlier this month, AIG announced the formation of a new division, AIG Global Marine & Energy, and its intention to cancel the company's arrangement with AIMA, effective Dec. 31. AIG also said earlier this month that policy renewals, new business or in-force policy issues could be handled by AIMA or AIG until the Dec. 31 termination date.

But that apparently is no longer the case. An AIG spokesman declined to say why the effective dates for the termination changed.

This month, AIMA announced an agreement to produce ocean marine business for Berkshire Hathaway Inc.'s National Liability & Fire Insurance Co. Under the agreement, AIMA can offer up to $100 million in limits for cargo, hull and marine liability risks.

New York-based AIG said in its statement last week that all marine business formerly conducted by AIMA on behalf of AIG will now be serviced by AIG Global Marine. "This includes all underwriting of new business, renewal business, in-force policy service, marine loss control and engineering, accounting and administrative functions formerly conducted by AIMA as an agent of the AIG Companies," AIG said.

New York-based C.V. Starr, which owns four managing general agencies, for many years was an affiliate of AIG and produced business for the insurer. C.V. Starr and AIG, however, have had a contentious relationship since early 2005, when Maurice R. Greenberg was ousted as AIG's chairman and chief executive officer. Mr. Greenberg is chairman of C.V. Starr.

*Sally Roberts contributed to this report.*

# EXHIBIT J

**AIG Global Marine**
175 WATER STREET
NEW YORK, N. Y. 10038

**RICHARD J. DECKER**
PRESIDENT

July 25, 2006

To Our Producers:

AIG Global Marine would like to advise our valued producers and clients that the agency relationship with American International Marine Agency of New York, Inc. (AIMA), a subsidiary of C.V. Starr & Co., Inc. originally scheduled to cease on December 31, 2006 has been terminated effective today, July 25, 2006. Accordingly, AIMA no longer has any authority to act as agent for the AIG Companies.

All marine insurance business formerly conducted by AIMA on behalf of the AIG Companies will now be serviced by AIG Global Marine. This includes all underwriting of new business, renewal business, in-force policy service, marine loss control and engineering, accounting and administrative functions. Claims will continue to be expertly handled by AI Marine Adjusters, Inc., a wholly owned subsidiary of AIG.

AIG Global Marine looks forward to providing you with the professional service, customer focus, and innovative solutions necessary to help manage the worldwide marine exposures of your clients. Through an experienced staff, AIG Global Marine provides industry leading Cargo, Marine Liability, and Hull & Machinery coverage. With our Energy partners and the rest of the AIG family of insurance services, we can seamlessly address all of your client's insurance needs.

AIG Global Marine is located in Atlanta, Boston, Chicago, Houston, Los Angeles, New York, Philadelphia, San Francisco, Seattle and Toronto. The AIG global network, our financial strength, engineering capabilities, and superior claim service are among the reasons our policyholders choose the AIG Companies as their insurance partner.

We sincerely value the support of our producers and policyholders, and we are dedicated to ensuring excellent, uninterrupted service to the insurance marketplace.

Sincerely,

# EXHIBIT K

AIG Global Energy

**AIG GLOBAL MARINE**
175 WATER STREET
NEW YORK, N. Y. 10038

**RICHARD J. DECKER**
PRESIDENT

June 29, 2006

To Our Producers:

The AIG Companies are pleased to announce the launch of AIG Global Marine, a unit focused on writing new marine business in North America. Historically, the AIG Companies' domestic marine business has been handled by an agency, American International Marine Agency, Inc. (AIMA), a subsidiary of C.V. Starr & Co., Inc. The AIG Companies have advised AIMA of our decision to cancel the agency arrangement effective December 31, 2006.

New business, renewals and in-force policies may now be handled either by AIMA, until the agency agreement expires on December 31, 2006, or if a client prefers, directly through AIG Global Marine. In all instances our clients' claims will continue to be handled by AI Marine Adjusters, Inc.-a long time member company of AIG.

Effective January 1, 2007, all underwriting, loss control and administrative functions relating to accounts formerly underwritten by AIMA on behalf of the AIG Companies will be handled by AIG Global Marine. Again, claims will continue to be handled by AI Marine Adjusters, Inc.

AIG Global Marine, part of AIG Global Marine and Energy, provides industry leading Cargo, Marine Liability, and Hull & Machinery coverage. AIG Global Marine can handle the worldwide marine insurance needs of our customers through a professional staff with years of underwriting experience in the marine sector.

AIG Global Marine is located in New York, Chicago, Atlanta, Boston, Philadelphia, Houston, San Francisco, Los Angeles, Seattle and Toronto, and can access the AIG Companies' worldwide network of offices and resources. The AIG global network, our financial strength and superior claim service are among the reasons our policyholders choose the AIG Companies as their insurance partner.

We sincerely value the support of our producers and policyholders and we are dedicated to ensuring excellent, uninterrupted service to the insurance marketplace.

Sincerely,

Division of the AIG Companies

**AIG GLOBAL MARINE**
**NORTH AMERICAN DIVISION**
**CONTACTS**

For more information, please contact any of the following:

**New York Home Office**
Richard Decker
President, AIG Global Marine
212-458-6557
Richard.Decker@aig.com

Nicholas Benson
Senior Vice President AIU

**New York**
Mark Schumacher
Assistant Vice President (Cargo)
212-458-3274
Mark.Schumacher@aig.com

Gail Sorenson
Assistant Vice President (Marine

AIG Global Energy

212-458-6054
Nicholas.Benson@aig.com

Mark Patterson
Senior Underwriting Officer AIU
212-458-6057
Mark.Patterson2@aig.com

**New York Home Office Claims**
Steven Gillen
President, AI Marine Adjusters, Inc.
212-458-6091
Steve.Gillen@aig.com

**New York Home Office Marine Loss Control
Engineering**
Jorge Pecci-Saavedra
Vice President
212-458-6058
Jorge.PecciSaavedra@aig.com

**San Francisco and Seattle**
Lee Meyrick
Vice President
415-836-2811
Lee.Meyrick@aig.com

**Los Angeles**
Thomas Passanisi
Vice President
213-689-3558
Thomas.Passanisi@aig.com

Anthony Myvett
Business Development Manager
213-689-2739
Anthony.Myvett@aig.com

Liabilities)
212-458-3294
Gail.Sorenson@aig.com

**Philadelphia Office**
Paul Borner du Cane
Senior Marine Underwriter
215-255-6039
Paul.Bornerducane@aig.com

**Boston Office**
Michael Coyle
Vice President
617-457-2980
Michael.Coyle@aig.com

**Atlanta Office**
Belinda Rowan
Vice President
770-671-2130
Belinda.Rowan-Jones@aig.com

**Chicago Office**
John Evans
Vice President
312-831-8091
John.Evans@aig.com

**Houston Office**
Susan Swails
Vice President
713-342-7356
Susan.Swails@aig.com

**Toronto**
Paul Down
Marine Manager
416-596-3011
Paul.Down@aig.com

Ed Davy
Assistant Marine Manager
416-596-3010
Ed.Davy@aig.com

Copyright © 2006 American International Group, Inc. All rights reserved.

175 Water Street, New York, NY 10038

If you do not wish to receive messages like this one in the future, please click here.

# EXHIBIT L

**To (insert producer/client)**

Many of our clients and producers have asked us to provide them with an outline of the steps to be taken to continue their business relationship with AIMA through our representation of various Berkshire Hathaway group insurance companies. The process is straightforward and outlined below:

1. Advise AIMA staff of all existing accounts you would like to have written on Berkshire Hathaway group paper.
2. Marine Policies typically contain a "Cancellation" provision which outlines the procedure for cancellation. A copy of the notice of cancellation you send to the current carrier should be forwarded to your AIMA representative.
3. AIMA is prepared to duplicate existing coverage effective from the cancellation date.
4. The AIMA team members with whom you have worked closely in the past are also ready to handle your renewal and new business offerings.

The companies within the Berkshire Hathaway group issuing these covers through AIMA are rated A++ (Superior) by AM Best and AAA/Stable by Standard & Poor's.

The AM Best financial strength ratings are the highest in the insurance industry, providing you with independent confirmation that the Berkshire Hathaway group issuing company has a superior ability to meet its ongoing obligations to its policyholders.

AIMA continues to offer you the same underwriting capacity and capabilities. The team you and your clients have been doing business with will provide the same policy and coverage construction, expertise and prompt personal service that you have come to expect from us.

AIMA has full locally admitted insurance capabilities world wide through our partnership with Globex a recognized leader in placing local policies. Full details about Globex's capabilities can be found on their web site http://www.globexintl.com/new/about.htm

AIMA Loss Control Services (LCS) has an in house staff of experts with over 150 years of combined experience. Located throughout the US, the same team you have worked with in the past together with a global network of partnered surveyor companies is available to you and your clients.

We are excited to announce that we will be enhancing our claims handling capabilities by combining a strong experienced internal team with the VeriClaim

network of external "third party adjusters". VeriClaim (formerly known as Toplis & Harding) is well known and highly respected in the industry. Together with AIMA's team of professionals, VeriClaim will also handle subrogation. More information about VeriClaim is available at http://www.vericlaiminc.com/

# EXHIBIT M

**From:**      Charles Capozzoli
**To:**        AIMAregionalmanagers; AIMAstaffmeetingofficers
**Subject:**   Promotional Material
**Date:**      8/1/2006 9:37:23 AM
**CC:**
**BCC:**

**Message:**

This probably goes without saying, but if you happen to have any promotional material that has AIG's name on it, you should cease using it and discard it immediately.

Charles Capozzoli
Executive V.P. - AIMA
90 Park Avenue
New York, N.Y. 10016
Phone:  646 - 227 - 6448
Fax:  212 - 599 - 3129

IMPORTANT NOTICE:

The information in this email (and any attachments hereto) is confidential. If you are not the intended recipient, you must not use or disseminate the information. If you have received this email in error, please immediately notify me by "Reply" command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by American International Marine Agency or its subsidiaries or affiliates either jointly or severally, for any loss or damage arising in any way from its use.

## CERTIFICATE OF SERVICE

I, Edward B. Micheletti, hereby certify that on August 16, 2006, a copy of

Defendants' Opposition to AIG's Motion for a Preliminary Injunction, Declaration of Kenneth A.

Plevan, Declaration of Richard Shaak, Declaration of William J. Weichold, Declaration of

Honora Keane, Declaration of William Eason and Declaration of Charles Capozzoli were served

on the following counsel of record:

> VIA CM/ECF
> Rodger D. Smith II, Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899

> /s/ Edward B. Micheletti
> Edward B. Micheletti (I.D. No. 3794)
> SKADDEN, ARPS, SLATE, MEAGHER
>    & FLOM LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, Delaware  19899-0636
> (302) 651-3000