IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> C.V. STARR & CO., INC. and AMERICAN ) <br> INTERNATIONAL MARINE AGENCY OF ) <br> NEW YORK, INC., ) <br> ) <br> Defendants. ) <br> ) | C.A. No. 06-463-SLR |

# AIG'S REPLY BRIEF IN SUPPORT OF ITS MOTION
## FOR PRELIMINARY INJUNCTION

                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                Rodger D. Smith II (#3778)
                1201 N. Market Street
                P.O. Box 1347
                Wilmington, DE 19899
                (302) 658-9200
                  *Attorneys for Plaintiff*
                  *American International Group, Inc.*

OF COUNSEL:

Jeffrey A. Conciatori
Michael B. Carlinsky
Jennifer J. Barrett
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601
(212) 849-7000

August 23, 2006

i.

TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF CITATIONS | ii |
| INTRODUCTION | 1 |
| ARGUMENT | 2 |
| I. DEFENDANTS ARE INFRINGING AIG'S TRADEMARKS | 2 |
| II. THE COURT SHOULD ENTER A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM FURTHER INFRINGING AIG'S TRADEMARKS | 5 |
|     A. AIG Has A Reasonable Likelihood Of Success | 6 |
|         1. The Marine Agency Is Not The Senior User Of The AIMA Mark | 6 |
|         2. Likelihood Of Confusion Is Inevitable | 8 |
|     B. Any Possible Harm To Defendants Is Self-Inflicted | 9 |
|     C. The Public Interest Favors The Issuance Of Injunctive Relief | 10 |
| III. DEFENDANTS SHOULD BE ENJOINED FROM USING AIG'S TRADEMARKS IN ADVERTISING AND MARKETING, AND SHOULD BE ORDERED TO COMPLETE THE NAME CHANGE BY OCTOBER 31, 2006 | 11 |
|     A. Defendants Should Be Enjoined From Using AIG's Trademarks In Advertising And Marketing | 11 |
|     B. Defendants Should Be Ordered To Complete The Name Change By October 31, 2006 | 12 |
|     C. The Aviation Agency Experience Is Instructive | 13 |
| CONCLUSION | 14 |

ii.

## TABLE OF CITATIONS

Page(s)

Cases

*American Footwear Corp. v. General Footwear Co.*,
    609 F.2d 655 (2d Cir. 1979) ............................................................................ 6

*Century 21 Real Estate Corp. v. LendingTree, Inc.*,
    425 F.3d 211 (3d Cir. 2005) ............................................................................ 11

*Franchised Stores of New York, Inc. v. Winter*,
    394 F.2d 664 (2d Cir. 1968) ............................................................................ 7

*Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*,
    2002 WL 1543817 (S.D.N.Y. July 12, 2002) ................................................. 9

*Interspace Corp. v. Lapp, Inc.*,
    721 F.2d 460 (3d Cir. 1983) ............................................................................ 8

*Kaufman v. Tudor Realty Servs. Corp.*,
    772 N.Y.S.2d 265 (2004) ................................................................................. 4

*Liebowitz v. Elsevier Science Ltd.*,
    927 F. Supp. 688 (S.D.N.Y. 1996) .................................................................. 7

*Lurzer GMBH v. Am. Showcase, Inc.*,
    75 F. Supp. 2d 98 (S.D.N.Y. 1998) ................................................................ 7

*Opticians Ass'n of America v. Indep. Opticians of America*,
    920 F.2d 187 (3d Cir. 1990) ............................................................................ 8

*Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*,
    143 F.3d 800 (3d Cir. 1998) ............................................................................ 8, 9, 10

*Rockland Mortgage Corp. v. Shareholders Funding, Inc.*,
    835 F. Supp. 182 (D. Del. 1993) ..................................................................... 11

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
    968 F.2d 371 (3d Cir. 1992) ............................................................................ 8, 9, 11

*William Steven, Ltd. v. Kings Village Corp.*,
    234 A.D.2d 287 (2d Dept. 1996) .................................................................... 5

iii.

Statutes

15 U.S.C. § 1115(b)(2)                                                                                           7

15 U.S.C. § 1119                                                                                                  7

INTRODUCTION

Plaintiff American International Group, Inc. ("AIG") submits this Reply Brief in further support of its motion for temporary and preliminary injunctive relief enjoining defendants' ongoing unauthorized and inherently deceptive use of AIG's federally registered trademarks in connection with a competing business.

As demonstrated in AIG's Opening Brief, AIG holds numerous federally registered trademark registrations, including registrations for the designations AMERICAN INTERNATIONAL MARINE AGENCY, AMERICAN INTERNATIONAL, AI and AIMA (the "AMERICAN INTERNATIONAL marks"). Although defendants do not dispute AIG's registered rights now, before this lawsuit was filed they did, and it was not until injunctive relief was sought that they were willing to represent to the Court, as they have now done, that they will pursue steps to seek regulatory approvals for a new name for their business.

Defendants object, however, to any court order, even of a preliminary nature, requiring them to do that which they say they will, suggesting that "[a]ll that an injunction would accomplish would be to reward AIG with a potential competitive windfall" (D.I. 17 at 23). Putting aside that defendants assumed the risk of an injunction when they disregarded a six-month notice period during which they had represented to AIG and the market that they would not compete with AIG (and during which they could have easily accomplished an orderly name change), AIG does not seek to gain anything here other than a limited order requiring defendants to be true to their word and to refrain from any advertising or marketing of the trademarks that indisputably belong exclusively to AIG.

In an effort to avoid any restrictions on their ability to compete with AIG using AIG's own registered trademarks, defendants advance novel and unsupportable legal theories about "senior rights" and revisionist history as to the facts not only of this dispute but also the

dispute between AIG and another agency, American International Aviation Agency, Inc. ("the Aviation Agency"), in which, contrary to defendants' account, the Aviation Agency engaged in just the sort of unauthorized and misleading use of AIG's trademarks that warrants the relief sought here.  The fact that the Aviation Agency was able to mislead the public and cause confusion in the past, as described more fully in the accompanying Declaration of Peter Jarrett, surely does not serve to excuse defendants' doing so now.  Indeed, the true history of that dispute illustrates why some form of injunctive relief is essential here to insure that the defendants' "informal commitments" of what they will do are more than simply lip service disguising anticompetitive and deceptive marketplace conduct.

For the reasons discussed further below, defendants' attempt to avoid any judicial intervention should be rejected, and an order should be issued either enjoining any and all use of AIG's registered trademarks in competition with AIG, or alternatively, if there is to be any period during which defendants are permitted to seek approval for a new name, that period be well defined with a date certain and that in the interim defendants be directed not to engage in any advertising or marketing of AIG's trademarks.

ARGUMENT

I.     DEFENDANTS ARE INFRINGING AIG'S TRADEMARKS

The Marine Agency suggests that "AIG's true motivation for this lawsuit is to try to protect itself from new competition" (D.I. 17 at 18 n.4).  AIG is not trying to protect itself from new competition.  AIG is trying to protect itself from unfair competition in which defendants use AIG's own trademarks in representing AIG's direct competitor.

Defendants conveniently gloss over certain key facts to arrive at the false conclusion that defendants continue to have the right to use the AMERICAN

INTERNATIONAL marks.  The Marine Agency was formed and operated to service the marine business of AIG and its member companies exclusively, as their fiduciary and agent (D.I. 10, ¶ 11).  Only for so long as its agency relationship with AIG and its member companies existed (and only in connection with the business of those entities) was the Marine Agency authorized to use AMERICAN INTERNATIONAL and AIMA as part of its name (*id.*, ¶ 12).

At the end of June, AIG and the Marine Agency each delivered to the other written notice that the relationship between them would terminate as of year-end 2006, after a six-month notice period during which the Marine Agency would continue to serve as AIG's agent (D.I. 10, ¶ 17).  In a June 30, 2006 press release, the Marine Agency announced that it "look[ed] forward to serving new underwriters next year" (*id.*, Ex. E).  As a result, AIG and the market were led to believe that the Marine Agency would continue to represent AIG for six months -- during which it would take all necessary steps to wind down its MGA relationship with AIG, including taking any steps necessary to cease using the AMERICAN INTERNATIONAL marks.

Only three weeks later, however, on July 21, 2006, defendants decided to take a different tack, announcing that it had entered into an agreement with National Liability and Fire Insurance Company ("National Liability"), a member of the Berkshire Hathaway group of insurance companies -- and a direct competitor of AIG (D.I. 10, Ex. F).  The Marine Agency announced this new business relationship without taking any steps to cease using the AMERICAN INTERNATIONAL marks, and prominently promoted its new program with National Liability using AIG's world-famous trademarks (*id.*):

> American International Marine Agency, Inc. (AIMA), a wholly owned subsidiary of C.V. Starr & Co., Inc., today announced a new agreement with National Liability and Fire Insurance Company, a member of the Berkshire Hathaway group

of insurance companies, which will expand the agency's servicing capabilities. The leading insurance agency for the marine industry, AIMA said that the relationship with National Liability and Fire Insurance Company will allow the agency to immediately offer $100 Million of commercial underwriting capacity to its clients.

"Our new agreement with National Liability and Fire Insurance Company ensures that AIMA will continue to offer the breadth of tailored marine products and services that have made the company an industry leader for more than 60 years," said David French, President, AIMA. "It also reflects our commitment to providing superior coverage and solutions, through the industry's top companies, that meet our clients' needs."

In response to this flagrant violation of its implied license from AIG, on July 24, 2006, AIG reminded the Marine Agency that it could not use the AMERICAN INTERNATIONAL or AIMA designations in connection with any business dealings that are not undertaken solely for the benefit of AIG and its member insurance companies (D.I. 10, Ex. G).[1] On July 25, 2006, the Marine Agency indicated that it had no intention of discontinuing its use of the AMERICAN INTERNATIONAL marks (D.I. 10, Ex. H), and without any right to do so and in flagrant disregard of its obligations under the MGA,[2] the Marine Agency demanded that AIG rescind within 24 hours certain instructions related to the Marine Agency's conduct during the six-month notice period, or suffer the consequences of the Marine Agency "deeming" the MGA to be terminated (*id.*, Ex. I).[3]

---

[1] Defendants do not mention -- let alone, explain -- their relationship with National Liability in their brief.

[2] *See* D.I. 23, Ex. B at 1 ("The Managing Agent . . . agrees . . . to obey promptly such instructions as it may receive from time to time from the Companies.").

[3] The Marine Agency says that it "viewed these restrictions as unreasonable and advised AIG that it refused to accept them" (D.I. 17 at 8). What defendants ignore, however, is that the Marine Agency was duty-bound to follow AIG's instructions, and its failure to do so constituted a clear repudiation of its contractual and fiduciary obligations to AIG. *See Kaufman v. Tudor Realty Servs. Corp.*, 772 N.Y.S.2d 265, 266 (2004) (finding agent
(continued . . .)

5.

Defendants continue to make prominent and unlawful use of AIG's famous AMERICAN INTERNATIONAL marks in violation of AIG's intellectual property rights, including prominent treatment on defendants' website (www.cvstarrco.com) of the AMERICAN INTERNATIONAL and AIMA marks to promote the Marine Agency's services on behalf of AIG's competitors (D.I. 10, Ex. M). Defendants have also used the marks in providing customers with "instructions for continuing their relationship with AIMA, through AIMA's representation of various Berkshire Hathaway insurance companies" (D.I. 23, ¶ 26). *See id.*, Ex. L ("AIMA continues to offer you the same underwriting capacity and capabilities.").

II.  THE COURT SHOULD ENTER A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM FURTHER INFRINGING AIG'S TRADEMARKS

On August 1, 2006, defendants told the New York court that "the only issue raised by AIG's Delaware complaint that requires resolution is the 'reasonable time period' by which C.V. Starr must effectuate the name change" (D.I. 9, Ex. F at 10). Now, somewhat belatedly, in its August 16, 2006 brief, defendants argue that AIG does not have rights to the AIMA mark senior to those of defendants, and that there is no evidence of a likelihood of confusion. Defendants had it right the first time -- the only issue here is the "reasonable time period" in which defendants must effectuate a name change, and what actions defendants should be required to take, or refrain from taking, to avoid marketplace confusion.

---

(. . . continued)
    duty-bound to principal); *William Steven, Ltd. v. Kings Village Corp.*, 234 A.D.2d 287, 288 (2d Dept. 1996) ("[T]he principal retains control over the conduct of the agent with respect to matters entrusted to the agent, and the agent acts in accordance with the direction and control of the principal."); *see also* Restatement (Second) of Agency § 385 (1958) ("An agent has a duty to obey all reasonable instructions and directions with regard to the manner of performing a service that he or she has contracted to perform and to adhere faithfully to them.").

6.

    A.    <u>AIG Has A Reasonable Likelihood Of Success</u>

           1.    <u>The Marine Agency Is Not The Senior User Of The AIMA Mark</u>

Defendants argue that AIG cannot establish that it has "rights to the AIMA mark that are senior to those of defendants" (D.I. 17 at 13). This argument is a red herring. Whatever common law rights the Marine Agency may have developed in the AIMA name beginning with its first use in 1945 changed over time in light of the changing nature of the use. From 1977 to July 2006, it is undisputed that the Marine Agency rendered services under the AIMA name exclusively for AIG marine insurance products. Thus, any common law rights associated with the AIMA name evolved and, over time, became coextensive with the purpose and manner of the use that the Marine Agency was actually making of the name. In other words, the Marine Agency's common law "right to use" the AIMA name was limited to use in connection with AIG marine insurance products. *See American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663-64 (2d Cir. 1979) ("The right . . . to exclusive use of a trademark derives from, and is limited by, its actual use in the marketplace.").

There is also no dispute that, at least since 1977, the Marine Agency carried out its business for the sole benefit of AIG and its member companies, and did so using the AIMA mark under an implied license from AIG, as defendants have acknowledged. *See* D.I. 16, Ex. F at 8 ("AIMA's use of the American International mark was under implied license from AIG."). As such, all benefits of the AIMA mark inured to AIG. Moreover, it is undisputed that at all times after 1977, AIMA marketed solely marine insurance products of AIG and its member companies. It is a fundamental tenet of trademark law that the value generated through the use of a trademark inures to the benefit of the party responsible for the nature and quality of the

7.

goods or services sold or rendered under that mark. *See Liebowitz v. Elsevier Science Ltd.*, 927 F. Supp. 688, 695-96 (S.D.N.Y. 1996).

Although AIG disputes that the Marine Agency ever established "senior" common law rights in the AIMA name, even assuming *arguendo* that it had, it has long since abandoned those rights or ceded them to AIG -- the business entity encompassing the same insurance companies that the Marine Agency served since its inception in 1945. The Lanham Act expressly provides that a trademark registration can be set aside where the mark "has been abandoned by the registrant," 15 U.S.C. § 1115(b)(2), including where a trademark owner ceases to supervise the goods and services offered under its mark. *See, e.g., Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664, 668-69 (2d Cir. 1968) (failure of trademark owner to exercise rights over mark "may result in the cancellation of the mark").

A court may also award the rights to a trademark to the party who has been supervising the services offered under a mark in lieu of the registered owner. *See* 15 U.S.C. § 1119 ("In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations . . . and otherwise rectify the register with respect to the registrations of any party to the action."); *Lurzer GMBH v. Am. Showcase, Inc.*, 75 F. Supp. 2d 98, 105 (S.D.N.Y. 1998) (incontestable mark "may be cancelled or assigned by the Court pursuant to its powers under § 1119").

In short, whether the Marine Agency may have had some historical common law rights in the AIMA mark is not material to the present motion. AIG was indisputably responsible for services offered under the AIMA mark since at least 1977, and any rights of the Marine Agency should be deemed to have been modified by its actual use or abandoned or ceded to AIG.

2.   Likelihood Of Confusion Is Inevitable

Defendants argue that there is "no evidence that consumers have been actually confused into believing that AIMA continues to underwrite insurance for AIG" (D.I. 17 at 17). In a case like this, however, where the same trademark is used concurrently by unrelated entities in the same line of business, the Third Circuit has held that a likelihood of confusion is inevitable. *See Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 804 (3d Cir. 1998) ("This court has held that where the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable."); *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) ("There is no question in this case that Durst and Jiffy Lube are using the same legally protectable trademark, owned by Jiffy Lube, and that their concurrent use is highly likely to cause consumer confusion about Durst's affiliation with the franchise.").

As the Third Circuit has explained, "[w]here the owner of the trademark and the infringer 'deal in competing goods and services, the court need rarely look beyond the mark itself. In those cases, the court will generally examine the registered mark . . . and compare it against the challenged mark." *Opticians Ass'n of America v. Indep. Opticians of America*, 920 F.2d 187, 195 (3d Cir. 1990) (quoting *Interspace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983)). Because "there is a great likelihood of confusion when an infringer uses the exact trademark[,] . . . likelihood of confusion is inevitable when, as in this case, the identical mark is used concurrently by unrelated entities." *Id.*[4]

---

[4]   Defendants' argument that "brokers readily understand that the marine insurance they receive through AIMA is offered by Berkshire Hathaway, not AIG" (D.I. 17 at 19) misses the point. That is like saying that if a Ford auto dealership called Wilmington Ford starts to sell General Motors cars under the Wilmington Ford name, as long as consumers can distinguish between Ford cars and GM cars, that is the end of the confusion inquiry. That is not correct. The Lanham Act also protects against confusion concerning the affiliation between two entities. *See Guinness United Distillers &*
(continued . . .)

There is no question that AIG and defendants are now direct competitors, and that there is an inevitable likelihood of confusion resulting from their concurrent use of the same marks.[5]

### B.    Any Possible Harm To Defendants Is Self-Inflicted

Defendants argue that "AIG has failed to point to anything more than speculative harm that it may suffer to support its requested injunction" (D.I. 17 at 22). In a trademark case, however, once infringement is established, irreparable harm is established as a matter of law. *See S & R Corp.*, 968 F.2d at 378 ("[T]rademark infringement amounts to irreparable injury as a matter of law."); *Pappan*, 143 F.3d at 805 ("This court has held that once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury.").

Defendants also argue that "[a]ny AIMA business interruption caused by the injunction would obviously severely harm AIMA's reputation and good will among its

---

(. . . continued)
  *Vintners B.V. v. Anheuser-Busch, Inc.*, 2002 WL 1543817, at *2 (S.D.N.Y. July 12, 2002) ("Likelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification."). In the car dealership hypothetical, the Court would need to consider whether customers who were aware that they were purchasing GM cars might conclude, erroneously, that Ford was somehow now affiliated with GM. A single newspaper announcement by the local Ford dealer, stating that it was now selling GM cars rather than Ford cars would not serve to dispel potential confusion.

[5] Defendants argue that there was no "consumer confusion caused by its continued use of AIAA" (D.I. 17 at 10). *See* D.I. 19, ¶ 8 ("At no time . . . did we encounter any alleged trademark or name confusion among customers . . ."). In fact, as detailed in the Declaration of Peter Jarrett (submitted herewith), the Aviation Agency's continued use of the AMERICAN INTERNATIONAL mark caused confusion in the marketplace, both among insureds and among co-insurers, and caused a substantial number of payments to be misdirected.

customers, as well as cause it to lose sales" (D.I. 17 at 23). Any possible harm to defendants, however, is self-inflicted.

Defendants could have waited until January 1, 2007 to begin representing AIG's competitors -- or at least until they had effectuated the necessary name changes to avoid using AIG's own trademarks in competing against it. Indeed, defendants initially stated in their June 30, 2006 press release that they "look[ed] forward to serving new underwriters next year" (D.I. 10, Ex. E). Defendants changed course, however, and decided to enter into a contractual relationship with National Liability -- one of AIG's direct competitors -- before having taken all the steps necessary to effect the appropriate name changes. *See Pappan*, 143 F.3d at 805 ("[A]ny difficulties Pappan now faces were brought on by its own conduct in continuing to use the ROY ROGERS marks despite the termination of the franchise agreements.").

The irreparable harm to AIG resulting from defendants' trademark infringement outweighs defendants' self-inflicted harm. *See Pappan*, 143 F.3d at 806 ("[A] party's self-inflicted harm by choosing to stop its own performance under the contract and thus effectively terminating the agreement is outweighed by the immeasurable damage done to the franchisor of the mark.").

### C.   The Public Interest Favors The Issuance Of Injunctive Relief

Defendants argue that "the public interest is favored by maintaining the status quo and permitting AIMA to continue to compete in the marketplace while it awaits approval to use its new name" (D.I. 17 at 23). That is not the status quo that should be maintained, however. Before this controversy began, the only parties that were entitled to use the AMERICAN INTERNATIONAL and AIMA marks were AIG and its licensees, and the only authorized use of those marks was in connection with AIG marine insurance policies. That is the status quo that

should be maintained. *See Opticians*, 920 F.2d at 197 ("Finally, one of the goals of the preliminary injunction analysis is to maintain the status quo . . . . Before this controversy began, the Guild marks could only be used by OAA members.").

Moreover, the public interest favors enjoining defendants' continued trademark infringement to avoid the confusion caused by defendants' concurrent use of the AIG marks. *See S & R Corp.*, 968 F.2d at 379 ("Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest."); *Rockland Mortgage Corp. v. Shareholders Funding, Inc.*, 835 F. Supp. 182, 200-01 (D. Del. 1993) ("[D]efendant's use is likely to cause further public confusion. Injunctive relief is therefore in the public interest.").

### III. DEFENDANTS SHOULD BE ENJOINED FROM USING AIG'S TRADEMARKS IN ADVERTISING AND MARKETING, AND SHOULD BE ORDERED TO COMPLETE THE NAME CHANGE BY OCTOBER 31, 2006

#### A. Defendants Should Be Enjoined From Using AIG's Trademarks In Advertising And Marketing

Defendants state in their brief that none of their "marketing materials any longer refer to its former relationship with AIG" (D.I.17 at 11). In his declaration, Mr. Capozzoli states that defendants "are not making any use of 'American International' aside from using it as part of our name" (D.I. 23, ¶ 28), "[t]here are no current AIMA marketing materials which reference AIG" (*id.*, ¶ 29), and "AIMA does not currently engage in any media advertising" (*id.*, ¶ 30).

Having represented to the Court that they are not using AIG's trademarks in any advertising and marketing, defendants should not be heard to complain about an injunction against such advertising or marketing. *See Century 21 Real Estate Corp. v. LendingTree, Inc.*, 425 F.3d 211, 217 (3d Cir. 2005) (trademark infringement action is not mooted by assurance of change by infringer).

B.     Defendants Should Be Ordered To Complete The Name
       Change By October 31, 2006

Defendants argue that "AIG . . . refuses to agree to a . . . reasonable transition period for AIMA" (D.I. 17 at 10).  That is simply not true.  It is defendants that have refused to give AIG anything more than "informal commitments."

On August 1, 2006, defendants told AIG that "AIMA intends to effectuate the name changes as promptly as reasonably possible" (D.I. 10, Ex. C).  In response, AIG asked defendants for a more concrete agreement concerning the name change, suggesting that they "change the language from 'as promptly as reasonably possible' to something a bit more active, such as 'will take all steps and measures to effect the name change, including the necessary regulatory approvals as promptly as possible'" (*id..*, Ex. D).

On August 3, 2006, AIG sent defendants proposed terms as to how the name change would be effectuated, which would have required defendants to use their best efforts to effectuate the name changes within three months time (D.I. 10, ¶ 8).  Defendants refused to negotiate those terms, indicating they were not willing to enter into "a contract at all" and were willing to give only "informal commitments" (*id.*, Ex. G).  On August 6, 2006, defendants reiterated that they were "not willing to enter into a formal agreement" (*id.*, Ex. H).

Although defendants initially indicated that they could effectuate a name change "within 2½-3 months" (D.I. 10, Ex. B), they now claim that the name change process "is expected to take approximately three to four months" (D.I. 17 at 21).  Based on those representations, defendants should be ordered to effectuate the name change no later than

13.

October 31, 2006 -- three months after they began the process[6] -- or show good cause at that time as to why an extension of the date is necessary.[7]

        C.      The Aviation Agency Experience Is Instructive

The parties' experience with the termination of the Aviation Agency is quite instructive. After AIG terminated its business relationship with the Aviation Agency, AIG demanded on February 17, 2006, that "AIAA immediately cease and desist from any unauthorized use of the designation AMERICAN INTERNATIONAL" (Conciatori Decl, Ex. B). In response, the Aviation Agency agreed on March 13, 2006, to change its name, indicating that "this effort will be complete by May 9, 2006" (*id.*, Ex. C). In return for that commitment, the Aviation Agency asked AIG not to challenge "AIAA's use of the AMERICAN INTERNATIONAL name/mark in the interim" (*id.*).

AIG accepted the Aviation Agency's proposal on March 27, 2006, stating that "[w]e hereby agree to the terms set forth in your March 13, 2006 letter" "in which your client AIAA agreed to permanently discontinue its use of the AMERICAN INTERNATIONAL mark on or before May 9, 2006, in exchange for AIG's promise not to challenge its use of the mark in the interim" (Conciatori Decl., Ex. D).

On May 5, 2006, just four days before the name change was supposed to have been completed, the Aviation Agency unilaterally decided to add "another 6-8 weeks" to the date

---

[6]     *See* D.I. 18, ¶ 4 ("On Monday, July 31, 2006, I began coordinating the process to change the name of AIMA and its subsidiaries . . . .").

[7]     Defendants argue that they are entitled to a "reasonable notice" period before the parties' agreement is terminated (D.I. 17 at 19-21). What defendants ignore, however, is that it was the Marine Agency -- not AIG -- that terminated the agreement by demanding that AIG rescind within 24 hours certain instructions, or suffer the consequences of the Marine Agency "deeming" the MGA to be terminated (D.I. 10, Ex. I).

14.

by which the name change would be completed (Conciatori Decl., Ex. E). As a result of this course of conduct, and the experience of the Aviation Agency's continued use causing actual confusion (*see* Jarrett Decl.), AIG is not prepared to accept defendants' "informal commitments" concerning the Marine Agency's name change, and seeks a court order requiring defendants to refrain from advertising and marketing, and to effect the name change by October 31, 2006, or show good cause at that time as to why an extension of the date is necessary.

## CONCLUSION

For the foregoing reasons and those set forth in AIG's Opening Brief, defendants should be enjoined and restrained from using the designation AMERICAN INTERNATIONAL MARINE AGENCY, the marks AMERICAN INTERNATIONAL, AI, AIMA, or any colorable imitations thereof, or anything confusingly similar thereto, in any advertising and marketing, and should be ordered to change the name of the Marine Agency by October 31, 2006, or show good cause at that time as to why an extension of the date is necessary.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
 *Attorneys for Plaintiff*
 *American International Group, Inc.*

15.

OF COUNSEL:

Jeffrey A. Conciatori
Michael B. Carlinsky
Jennifer J. Barrett
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010-1601
(212) 849-7000

August 23, 2006
533977

**CERTIFICATE OF SERVICE**

I, Rodger D. Smith II, hereby certify that on August 23, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

>Edward P. Welch
>Edward B. Micheletti
>Jenness E. Parker
>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

I also certify that copies were caused to be served on August 23, 2006, upon the following in the manner indicated:

**BY HAND**

>Edward P. Welch
>Edward B. Micheletti
>Jenness E. Parker
>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
>One Rodney Square
>Wilmington, DE  19801

**BY FEDERAL EXPRESS**

>Kenneth A. Plevan
>John L. Gardiner
>Anthony J. Dreyer
>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
>Four Times Square
>New York, NY  10036

>*/s/ Rodger D. Smith II*
>Rodger D. Smith II (#3778)
>MORRIS, NICHOLS, ARSHT & TUNNELL LLP
>Wilmington, DE  19801
>(302) 658-9200
>rsmith@mnat.com