IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-463-SLR |
| | ) | |
| C.V. STARR & CO., INC. and AMERICAN | ) | |
| INTERNATIONAL MARINE AGENCY OF | ) | |
| NEW YORK, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF RODGER D. SMITH II

RODGER D. SMITH II, declares as follows:

1.    I am a member of Morris, Nichols, Arsht & Tunnell LLP, counsel for plaintiff American International Group, Inc. ("AIG") in this action. I submit this declaration in support of AIG's opposition to Defendants' Motion to Transfer Venue.

2.    AIG is duly incorporated under the laws of the State of Delaware.

3.    According to online records, Defendant American International Marine Agency of New York, Inc. ("Marine Agency") holds a valid producer license from the Delaware Insurance Department. *See* Exhibit A.

4.    Defendant C.V. Starr is currently a defendant in an ongoing shareholder derivative lawsuit in the Court of Chancery of the State of Delaware, *Teachers' Retirement System of Louisiana v. American International Group, Inc. et al.* (C.A. No. 20106-NC) (the "*Teachers' Litigation*"). The *Teachers' Litigation* was brought in December 2002 by a retirement fund owning shares of AIG against C.V. Starr, AIG and certain former directors of

AIG and C.V. Starr, including Maurice Greenberg. The complaint in the *Teachers' Litigation* alleges that C.V. Starr operated as a method for Greenberg, the president of C.V. Starr and the former chairman and CEO of AIG, to compensate himself and other top AIG executives, at the expense of AIG. The complaint further alleges that C.V. Starr and its agencies' supposedly separate operational status was a sham, allowing C.V. Starr to secure substantial payments from AIG and from reinsurers dealing with AIG, which generated extremely large compensation for C.V. Starr's stockholders. C.V. Starr, Greenberg and two other individual defendants moved to dismiss the complaint against them. On June 21, 2006, Vice Chancellor Strine issued a decision, a true and correct copy of which is attached at Exhibit B, denying their motion to dismiss. C.V. Starr and the Marine Agency are represented in the *Teachers' Litigation* by Skadden, Arps.

5.     On July 21, 2006, the Marine Agency issued a press release announcing that it had entered into a business relationship with National Liability & Fire, a Berkshire Hathaway Insurance Group company. A copy of that press release is attached as Exhibit C.

6.     Berkshire Hathaway Insurance Group is a Delaware corporation with its principal place of business in Nebraska. National Liability is a Connecticut company, also with its principal place of business in Nebraska. Attached as Exhibit D are true and correct copies of the Best's Rating reports for National Liability & Fire Insurance Company and the Berkshire Hathaway Insurance Group.

7.     Berkshire Hathaway Insurance Group is currently a defendant in an administrative action in the Court of Chancery of the State of Delaware, *Felice Vasquez v. Samuel C. Butler, Geico Corp. et al.* (C.A. No. 14507). Attached as Exhibit E is a true and correct copy of the docket record for that case.

2

8.    Attached as Exhibit F is a true and correct copy of a July 25, 2006 letter from David S. French, President and CEO of the Marine Agency, to Ralph Mucerino of AIG.

I declare, on this 27th day of August 2006, under penalty of perjury that the foregoing is true and correct.

By: _____

Rodger D. Smith II

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on August 28, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Edward P. Welch
> Edward B. Micheletti
> Jenness E. Parker
> SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

I also certify that copies were caused to be served on August 28, 2006 upon the following in the manner indicated:

### BY HAND

> Edward P. Welch
> Edward B. Micheletti
> Jenness E. Parker
> SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
> One Rodney Square
> Wilmington, DE  19801

### BY FEDERAL EXPRESS

> Kenneth A. Plevan
> John L. Gardiner
> Anthony J. Dreyer
> SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
> Four Times Square
> New York, NY  10036

> */s/ Rodger D. Smith II*
> Rodger D. Smith II (#3778)
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> Wilmington, DE  19801
> (302) 658-9200
> rsmith@mnat.com

533760

EXHIBIT A

**Delaware Insurance Department**

841 Silver Lake Boulevard; Dover DE 19904
(302)739-4251
*Hours: Mon-Fri 8-4:30 EST*

SBS Ver.2.0
Powered By



Powered By
ARTHENT

# Licensee Look-up

**This document may serve in lieu of a Letter of Certification.**

**Report Date: July 27, 2006**
**Total Number of Licensees = 1**

| Selected Criteria | |
|---|---|
| First Name = None | Last Name = None |
| Business Entity Name = american international marine | Is Resident? = All |
| License Num = None | License Type = All |
| License Status = All | LOAs = All |
| National Producer Number = None | DBA Name = None |
| Sort By = Last Name | Licensee Type: = All |

**\* Indicates those agents which have branch offices. Click the link to view.**

| Look-Up Results | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| License Number | NPN | Res Status | Full Name | License Type | License Status | LOAs (Effective Date) | Expiration Date | DBA Name | Business Address City, State, Zip | Business Phone |
| 1042645 | | N | AMERICAN INTERNATIONAL MARINE AGENCY OF NEW YORK INC | PRODUCER | ACTIVE | | 02/28/2007 | | NEW YORK, NY, 10016 | (646) 227-6300 |

# EXHIBIT B

# EXHIBIT B-1

Westlaw.

2005 WL 1403533                                                                    Page 1
2005 WL 1403533 (Del.Ch.)

For opinion see 900 A.2d 654

**Motions, Pleadings and Filings**

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
to order copies of documents related to this or other matters.
Additional charges apply

Court of Chancery of Delaware.
New Castle County
TEACHERS' RETIREMENT SYSTEM OF LOUISIANA, Plaintiff,
v.
M. Bernard AIDINOFF, Eli Broad, Pei-Yuan Chia, Marshall A. Cohen, Martin S.
Feldstein, Ellen V. Futter, Maurice R. Greenberg, Carla A. Hills, Frank J.
Hoenemeyer, Donald P. Kanak, Edward E. Matthews, Howard I. Smith, Martin J.
Sullivan, Thomas R. Tizzio, Edmund S. W. Tse, Jay S. Wintrob, Frank G. Wisner,
Frank G. Zarb, C.V. Starr & Co., Inc., Defendants,
and
American International Group, Inc., a Delaware corporation, Nominal Defendant.
C.A. No. 20106
May 17, 2005.

Amended Complaint

Stuart M. Grant (Del. Bar I.D. #2526), Cynthia A. Calder (Del. Bar I.D.  #2978),
Grant & Eisenhofer P.A., Wilmington, Delaware, Attorneys for Plaintiff

Plaintiff Teachers' Retirement System of Louisiana ("Teachers"), by its
undersigned attorneys, as and for its Complaint herein alleges, upon knowledge as
to itself and its own actions, and upon information and belief as to all other
matters, as follows:

SUMMARY OF THE ACTION

1. In this action, Teachers challenges the blatant disregard of fundamental
corporate governance of American International Group, Inc. ("AIG" or the
"Company"), as well as a series of self-dealing transactions between AIG and two
companies controlled by seven of AIG's directors.

2. Since its IPO in the late 1960s, AIG has enjoyed phenomenal growth. The man
largely credited as the reason for that growth is Maurice "Hank" Greenberg, the
Company's Chairman and CEO until earlier this year. Known as a micromanager,
Greenberg directed every aspect of AIG's business. It was widely known to AIG
employees that you did not criticize or question what Hank wanted, you simply did
it or you were out.

3. Greenberg set up his house from the very beginning to ensure that he would have
total control over his executives. In the organization of AIG as the public company
it is today, Greenberg caused AIG to purchase assets from both C.V. Starr & Co.,
Inc. ("Starr") and Starr International Company, Inc. ("SICO"). Starr and SICO were

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                                    Page 2
2005 WL 1403533 (Del.Ch.)

paid for those assets with AIG stock. SICO, headed by none other than Greenberg,
was designated as a long term incentive compensation plan for AIG, touted by
defendants as a means to reward AIG executives without dipping into AIG's coffers.
The SICO board meets annually to determine which AIG executives will receive their
largesse. AIG's Compensation Committee has no part in this process, and is merely
informed of the results of the annual SICO board meetings. Over 600 AIG executives
have been granted lucrative compensation by SICO, but they generally do not receive
the payout of that compensation until they retire. In order to enjoy the benefits
of SICO compensation, one usually must spend his or her entire career at AIG. In
his own words, Greenberg stated that SICO "marr[ies] people" to AIG. People are not
wedded to AIG to receive their SICO payouts - they are enslaved to Hank Greenberg
who controls what SICO doles out. He proclaims the establishment of the SICO plan
as "his legacy to corporate governance" - and what a legacy of control and
domination it is.

4. Greenberg likewise used Starr to control his executives, albeit a more select
group than with SICO. Membership in Starr, lovingly referred to internally at AIG
as the "Billionaires Club," is by invitation only. Not surprisingly, the
invitations are issued by none other than Hank Greenberg, director, president and
CEO of Starr. If an AIG executive is among the chosen few to receive the
invitation, he or she is entitled to buy shares of Starr at $300 per share, and
then can enjoy his or her proportionate share of the profits of Starr. These
profits are substantial. For example, in 2002 Starr's operating profit was
approximately $47.8 million - to be shared by fewer than 50 shareholders. But even
these huge payouts come with strings. The profits are paid annually in the form of
a preferred stock dividend, and can only be liquidated at the time of retirement.
As Greenberg described it, a departure from AIG on "unhappy terms" (i.e., against
Greenberg's wishes) would mean the forfeiture of all appreciation of the owner's
Starr stock.

5. Starr's operating profits come from transactions with AIG. The self-dealing
transactions have resulted in hundreds of millions of dollars in payments to Starr
(comprised of four agencies referred to herein as "Starr Marine," "Starr
California," "Starr Tech," and "Starr Aviation") for purportedly originating
insurance business for AIG from 1999 to 2003. It strains credulity to think that
AIG, a multi-billion dollar international insurance conglomerate, would need this
minute company to generate any business for it at all. The reality is that AIG does
not need this company for the production of insurance business because AIG has
"mirror" divisions that produce the same kinds of business that Starr produces. Not
only does AIG possess the capacity to do the Starr business for itself through its
mirror divisions, it even employs several of the same key individuals that Starr
employs. For example, David French is both the head of Starr Marine and the head of
AIG's mirror marine division. John Myers is both the head of AIG's aviation
division and of Starr Aviation. AIG and Starr Aviation share over 30 employees.

6. Because AIG has the capacity to produce the Starr business for itself, the
commission payments it makes to Starr, totaling $495.2 million from 1999 to 2003
were completely unnecessary and were simply a means of lining the pockets of
Starr's owners. At the time Teachers originally brought this action, Starr was
owned by seven AIG directors: Hank Greenberg, Edward E. Matthews, Howard I. Smith,
Thomas R. Tizzio, Edmund S. W. Tse, Martin J. Sullivan and Jay S. Wintrob. As of
the date of this complaint, current AIG directors Greenberg, Tse, Smith, Sullivan
and Donald P. Kanak are owners of Starr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533
2005 WL 1403533 (Del.Ch.)

7. The other Starr entity, Starr International Co., Inc. ("SICO") received over $28.1 million in payments from AIG from 1999 to 2003 for undisclosed "services" and "rental" fees, when according to defendants this company exists for the primary purpose of paying out long term incentive compensation to AIG executives. As with other matters in the House of Hank, there is absolutely no indication that the AIG board of directors considered the fairness of these self-interested transactions.

8. When challenged in the press and through shareholder proposals about this self-dealing, Greenberg chose to defend himself by haughtily pointing to AIG's impressive growth and profits. It is quickly becoming clear that AIG's growth and profits were generated in large part by manipulations of AIG's books at the express direction of Greenberg himself and several other key insiders.

9. Greenberg's "marrying" the key executives to his management decisions through the use of Starr and SICO allowed him to arrange a number of shady transactions for the sole purpose of improperly bolstering AIG's bottom line. He arranged for AIG to purchase reinsurance from a number of offshore reinsurers that are actually part of the AIG family. Due to the structure of the transactions, AIG never truly shifted risk off its own books, and therefore was not entitled to claim the reserve increases that it took. He and several other key executives deliberately bypassed AIG's admittedly weak internal controls in order to accomplish these transactions. Greenberg caused AIG to pay kickbacks - euphemistically called "contingent commissions" - to the Marsh & McLennan brokerage house (headed by none other than Greenberg's son Jeffrey) in order to get business steered to AIG.

10. Greenberg's Marsh maneuvers caught the attention of New York Attorney General Eliot Spitzer, who launched an investigation. The deeper Spitzer's office probed, the more wrongdoing they found at AIG. The House that Hank built was quickly being exposed as a house of cards. Under threat of the criminal indictment of AIG, the AIG board, which had long been content to allow Greenberg free reign, began to panic. The board quickly decided that it was time for Greenberg to "retire" as CEO, and Greenberg left that position with extreme reluctance in March 2005. Greenberg was soon forced to relinquish his position as Chairman, although he remains an AIG director today. Having allowed Greenberg to engage in so many questionable transactions over the last several years, the board is now scrambling to restate AIG's financials in the hope of staving off criminal proceedings against the Company. They now find themselves in the unenviable position of trying to unwind and unravel the intricate web of interested transactions Greenberg set up with AIG.

THE PARTIES

11. Plaintiff Teachers, a Louisiana public trust fund, is a public employee pension plan. Teachers is charged with the investment and reinvestment of the trust fund of the Teachers' Retirement System of Louisiana, a public employee welfare and pension benefit plan, and certain other funds. Teachers maintains its office and principal place of business at 8401 United Plaza Boulevard, Baton Rouge, Louisiana. Its postal address is P.O. Box 94123, Baton Rouge, Louisiana, 70804-9123. At all times alleged herein, Teachers has been a holder of common stock of AIG, and will retain holdings in the Company through the course of this litigation. As of May 12, 2005, Teachers was the beneficial owner of 461,200 shares of AIG's common stock.

12. Nominal Defendant AIG is a Delaware corporation with its principal place of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 4
2005 WL 1403533 (Del.Ch.)

business located in New York, New York. AIG is a holding company for a wide array
of subsidiaries which offer a broad range of insurance products, investment
services and financial management services.

13. Defendant Starr is an entity organized under the laws of the State of
Delaware, and maintains its principal place of business in Bermuda. Starr operates
four managing general agencies which produce insurance business for AIG. Starr owns
1.8% of AIG's outstanding common stock.

14. Defendant SICO is an entity organized under the laws of Panama, and maintains
its principal place of business in Bermuda. SICO administers a long-term incentive
plan for AIG employees. SICO owns 11.94% of AIG's outstanding common stock.

15. Defendant Maurice R. Greenberg ("Greenberg"), age 76, was until early 2005 the
Chairman and Chief Executive Officer of AIG. He has been an AIG director since
1967. Greenberg owns 1.74% of AIG's outstanding common shares. Greenberg is also
the President, Chief Executive Officer and a director of Starr. Greenberg is also a
director of SICO. Greenberg owns 16.41% of Starr's outstanding common stock and
8.33% of SICO's outstanding common stock.

16. Defendant Edward E. Matthews ("Matthews") was the Senior Vice Chairman,
Investments and Financial Services and a director of AIG until his retirement in
2003. Matthews was also a director of Starr and SICO, and owned 9.78% and 8.3%,
respectively, of those companies' outstanding shares.

17. Defendant Howard I. Smith ("Smith") was an Executive Vice President and the
Chief Financial Officer of AIG until he was fired from those positions in early
2005 for failing to cooperate with regulatory investigations of AIG. Smith was at
all relevant times, and remains today, a director of AIG. Smith is also a director
of Starr and SICO, and owns 7.69% and 8.33%, respectively, of those companies'
outstanding shares.

18. Defendant Thomas R. Tizzio ("Tizzio") was a Senior Vice Chairman, General
Insurance of AIG and a director of AIG until 2003. Tizzio was also a director of
Starr and SICO, and owned 7.61% and 8.33%, respectively, of those companies'
outstanding shares.

19. Defendant Edmund S. W. Tse ("Tse") is Senior Vice Chairman, Life Insurance of
AIG and has been a director of AIG since 1996. Tse was also a director of Starr and
SICO until early 2005 and owns 7.18% and 8.33%, respectively, of those companies'
outstanding shares.

20. Defendant Martin J. Sullivan ("Sullivan") was Senior Vice President, Foreign
General Insurance of AIG until March 2005, when he assumed the CEO position vacated
by Greenberg. Sullivan was elected to the AIG Board in 2002 and has served as an
AIG director from that time to the present. Sullivan was also a director of Starr
and SICO until early 2005, and owns 4.62% of Starr's outstanding shares.

21. Defendant Frank G. Wisner ("Wisner") was Vice Chairman, External Affairs of
AIG and an AIG director until 2004. Wisner also served as a director of EOG
Resources, Inc., a publicly traded company which had been a subsidiary of Enron
Corp., and Ethan Allen Interiors, Inc., another publicly traded company.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 5
2005 WL 1403533 (Del.Ch.)

22. Defendant Jay S. Wintrob ("Wintrob") was a director of AIG from 1999 to 2004, and was the President and Chief Executive Officer of SunAmerica Inc., a wholly owned subsidiary of AIG. Wintrob also served as a director of Starr and SICO, and owns 3.26% of Starr's outstanding shares. Wintrob also served as a director of AIG SunAmerica Life Insurance Company and First SunAmerica Life Insurance Company, both of which are wholly owned subsidiaries of AIG.

23. Defendant Bernard M. Aidinoff ("Aidinoff") has been a director of AIG since 1984. Aidinoff is senior counsel to, and was formerly a partner of, Sullivan & Cromwell, a law firm which has repeatedly been retained by AIG in the last several years to represent AIG in major acquisitions, stock offerings and related tax matters.

24. Defendant Eli Broad ("Broad") was a director of AIG until 2003. Broad was the Chairman of SunAmerica Inc., now a wholly owned subsidiary of AIG.

25. Defendant Pei-Yuan Chia ("Chia") has been a director of AIG since 1996. Chia is also a director of Baxter Healthcare Corporation.

26. Defendant Marshall A. Cohen ("Cohen") has been a director of AIG since 1992. Cohen is Counsel to Cassels, Brock & Blackwell (Barristers and Solicitors), a Canadian law firm. Cohen also serves as director of seven corporations which are publicly traded in the United States (Barrick Gold Corporation, Haynes International, Inc., LaFarge North America, Inc., Premcor Inc., The Premcor Refining Group, Inc., Premcor USA Inc., and Toronto Dominion Bank), and is director of two other corporations (Collins & Aikman Corporation, and Metaldyne Corporation).

27. Defendant Martin S. Feldstein ("Feldstein") has been a director of AIG since 1987. Feldstein is a Professor of Economics at Harvard University and is the President and Chief Executive Officer of the National Bureau of Economic Research. Feldstein is also a director of Eli Lilly and Company, Hospital Corporation of America, Inc. and TRW Inc. Feldstein also has the following positions in various committees, thinktanks, and other organizations: President Elect of the American Economic Association; Fellow of the Econometric Society; Member of the American Philosophical Society; Member of the Institute of Medicine of the National Academy of the Sciences; Fellow of the American Academy of Arts and Sciences; Fellow of the National Association of Business Economists; Corresponding Fellow of the British Academy; Foreign Member of the Austrian Academy of Sciences; Trustee of the Council on Foreign Relations; Member of the Executive Committee of The Trilateral Commission; Director of the National Committee on United States-China Relations; International Research Fellow of the Kiel Institute of World Economics; Board of Contributors of the Wall Street Journal; Member of the International Advisory Council: Daimler-Chrysler, Robeco, J. P. Morgan International; Member of the Panel of Economic Advisers of the Congressional Budget Office; Member of the Panel of Economic Advisers of the Federal Reserve Bank; Member of the Panel of Academic Advisers of the Federal Reserve Bank of Boston; Member of the Chairman's Advisory Council of the Financial Stability Forum; Member of the Academic Advisory Board of the US Business School in Prague; and Member of the Corporation, Massachusetts General Hospital.

28. Defendant Ellen V. Futter ("Futter") has been a director of AIG since 1999. Futter is the President of the American Museum of Natural History and is a director

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                                    Page 6
2005 WL 1403533 (Del.Ch.)

of publicly traded Bristol-Myers Squibb Company, J.P. Morgan Chase & Co., Inc., and
Consolidated Edison, Inc. Futter also serves as a Trustee of Consolidated Edison of
New York, Inc., NYC & Company, the Council on Foreign Relations, Memorial Sloan-
Kettering Cancer Center, the Yale School of Management Advisory Board. Futter is
also a Fellow of the American Academy of Arts and Sciences, and a partner and
member of the Executive Committee of New York City Partnership, Inc.

29. Defendant Carla A. Hills ("Hills") has been a director of AIG since 1993.
Hills is also Chairman and Chief Executive Officer of her own company, Hills &
Company. Hills is also a director of the publicly traded AOL Time Warner Inc.,
ChevronTexaco Corporation, and Lucent Technologies, Inc. Hills' own consulting
service, Hills & Company, was retained by AIG in 2000 and 2001 to provide
substantial services relating to international trade.

30. Defendant Frank J. Hoenemeyer ("Hoenemeyer"), age 82, has been a director of
AIG since 1985. Hoenemeyer is also a financial consultant, and serves as director
of Carey Fiduciary Advisors, Inc. and Cincinnati, Inc. Hoenemeyer was a career
executive of Prudential Insurance Company of America, Inc. and retired as its Vice
Chairman.

31. Defendant Frank G. Zarb ("Zarb") has been a director of AIG since 2001. Zarb
is a Senior Advisor of Hellman & Friedman LLC and is the former Chairman of the
National Association of Securities Dealers, Inc. and The NASDAQ Stock Market, Inc..

32. Defendant Donald P. Kanak ("Kanak") has been a director of AIG since 2004.
Kanak is the Vice Chairman of the AIG board, and is AIG's Chief Operating Officer.
Kanak was also a director of Starr and SICO until early 2005, and owns 4.1% of
Starr's stock.

33. Barber A. Conable, Jr. ("Conable"), was a director of AIG from 1991 until
2003.

34. Robert L. Crandall ("Crandall") was a director of AIG until 2002.

35. Richard C. Holbrooke ("Holbrooke") is a director of AIG. Holbrooke is also a
director of the publicly traded Human Genome Sciences, Inc., and is the Vice
Chairman of Perseus, L.L.C.

36. Non-party William Cohen has been a director of AIG since 2004. He is also the
Chairman and Chief Executive Officer of The Cohen Group.

37. Non-party Stephen L. Hammerman ("Hammerman") joined the AIG board in March
2005.

38. Non-party George L. Miles ("Miles") joined the AIG board in April 2005.

39. Non-party Morris W. Offit ("Offit") joined the AIG board in April 2005.

FACTUAL BACKGROUND

40. AIG, an insurance company founded in 1919 by Cornelius Vander Starr,
originally sold its insurance products through its own insurance agencies. In 1962,
AIG recast its business model by selling its agencies and operating as a commercial

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                      Page 7
2005 WL 1403533 (Del.Ch.)

insurer selling through brokers. AIG underwent a further reorganization in 1967 to
create the holding company structure that exists today. The U.S. assets of the
company were transferred to newly incorporated AIG, and the non-U.S. assets
remained with two privately held companies. AIG went public in 1969, and soon
thereafter the non-U.S. assets of the privately held companies were transferred to
AIG in exchange for AIG stock. Hank Greenberg led AIG through all of these changes,
and designed the roadmap for AIG's future. Unfortunately for AIG's shareholders,
that roadmap included many interested transactions which benefited Greenberg and
other insiders at the expense of AIG.

1. The Establishment of Starr and SICO - Owned by AIG Insiders, Engaging in
Interested Transactions with AIG and Being Used to Guarantee the Allegiance of
AIG's Officers to Greenberg

A. Starr

41. One of the two privately held companies carved out during AIG's 1960's
reorganization was Starr. At the time Starr and SICO exchanged their foreign assets
for AIG stock, Starr also owned domestic insurance agencies which it retained.
According to defendant Greenberg, "[a]lthough [the Starr insurance] agencies were
part of the original operations of AIG's founders, they were not sold to AIG with
other Starr assets over 30 years ago after AIG went public, because they were small
and not profitable at the time, and management did not want to saddle AIG with
money-losing operations." Greenberg also stated that the Starr agencies were
"simply meaningless" at this time. Aidanoff deemed the Starr agencies "side shows"
and "insignificant." The "side show" Starr agencies were owned by Greenberg and
four other individuals at the time.

42. According to Greenberg, "we tried to build [these agencies]" over time. Under
Greenberg's direction, these "unprofitable" and "insignificant" little agencies -
as Greenberg calls them, "something I built" - have developed into highly
profitable managing general agencies over the years. What he fails to highlight,
however, is that these agencies have developed on the strength of the business they
do with their one customer - AIG.

43. Greenberg and the other defendants attribute the success of the agencies to
what they claim is the unparalleled level of expertise of the Starr employees - an
expertise they claim AIG does not possess. What they downplay is that these very
"experts" who supposedly drive Starr's success are also AIG employees in AIG
companies writing policies in the same lines of business as those in which the
Starr agencies produce business. For example, David French is the president of
Starr Marine. According to an expert retained by defendants, French is the major
force behind Starr Marine's success. The expert stated that French "is directly
involved in setting strategies, creating specific underwriting guidelines and
authority levels, overseeing and assessing the underwriting process, recruiting and
selecting specialized personnel, providing technical assistance, guiding new
product development, monitoring results and managing the overall operation." French
is also the head of AIG's mirror company, AIU Marine.

44. Starr Aviation provides an even more glaring example of the crossover of
talent between AIG and Starr. The number one and number two executives at Starr
Aviation, John Myers and Steven Blakey, hold the exact same positions at AIG
Aviation, AIG's mirror company to Starr Aviation. The defendants' expert in this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 8
2005 WL 1403533 (Del.Ch.)

litigation stated that in his role as president of Starr Aviation, Myers "is
directly involved in setting strategies, creating specific underwriting guidelines
and authority levels, overseeing and assessing the underwriting process, recruiting
and selecting specialized personnel, providing technical assistance, guiding new
product development, monitoring results and managing the overall operation of Starr
Aviation." In other words, Myers - and AIG employee - is critical to all aspects of
Starr Aviation's operations and its resultant success. Starr Aviation and AIG share
more employees than just Myers and Blakey, however. No fewer than 30 of Starr
Aviation's 63 employees are also AIG employees.

45. It is therefore clear that AIG does not need the Starr agencies at all to
produce insurance business because AIG possesses all the same core competencies as
the Starr agencies. Not only that, but the upper echelon employees of the Starr
agencies - the very people that defendants' expert has identified as the key to
these agencies' success - are employees of the AIG companies who mirror the
business of Starr. These key individuals at the Starr agencies actually developed
their expertise on the AIG side of their employment. Defendants would be hard
pressed to deny this fact, as these individuals have maintained their dual
employment for their entire careers with AIG and Starr and they have received the
full support of AIG's considerable resources throughout that time. As defendants
admit, AIG provides Starr with virtually every support service it could possibly
need. Surprisingly, even though Greenberg claims that AIG's transactions with Starr
are always conducted on arm's-length terms, AIG only charges Starr the "cost" of
providing these invaluable services.

46. Why then do the profits of the Starr agencies, owned in large part by
fiduciaries of AIG and drawing on vast amounts of AIG resources, flow out of AIG's
coffers? The answer is the greed of Starr's owners. As long as Starr can at least
nominally justify its "unique expertise" it can continue to collect commission
payments from AIG "for the production of insurance business." AIG paid Starr more
than $495 million in commission from 1999 to 2003 ($24.5 million more than AIG
disclosed in its public filings with the SEC). [FN1]

     FN1. Because AIG has failed to file its 2004 Form 10-K on a timely basis, the
amount of commission AIG paid Starr in 2004 is unavailable to Teachers to include
in this amended complaint.

47. In addition to drawing commission payments from AIG for the production of
insurance business (i.e., direct commissions), Starr receives reinsurance
commissions from AIG companies who act as reinsurers of the primary insurer AIG
companies. In other words, AIG is paying Starr a reinsurance commission to
negotiate reinsurance between AIG sister companies. Clearly AIG does not need an
outsider to arrange a reinsurance transaction between AIG's own subsidiaries. Thus,
Starr's negotiating of reinsurance between AIG sister companies and the payment of
reinsurance commissions by AIG reinsurers is completely unnecessary and is nothing
more than giving AIG's money away to Starr.

48. Starr's avarice for commissions does not end there. Starr also draws
commission payments from non-AIG reinsurers who reinsure the business that Starr
produces for AIG. From 1999 through 2002, [FN2] Starr received $404.8 million in
commission from these non-AIG reinsurers. Starr had no business keeping those
reinsurance commissions, however, because industry standard practice is that
reinsurance commissions are always paid to the insurer - in this case, AIG.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 9
2005 WL 1403533 (Del.Ch.)

FN2. Teachers learned that the non-AIG reinsurers paid Starr $404.8 million in the period 1999 to 2002 because those figures were disclosed during the SLC process on Teachers' original complaint. AIG did not disclose the non-AIG reinsurer commissions paid to Starr in any of its public filings, despite the fact that those commissions are earned on the strength of AIG's relationship with Starr. In other words, without AIG's business to reinsure, Starr would not be getting those reinsurance commissions from the non-AIG reinsurers. It is clear that Starr received commissions from the non-AIG reinsurers in 2003 and 2004, but Teachers does not have access to those numbers because they are not publicly disclosed.

49. Defendants' justification for allowing Starr to keep those reinsurance commissions is twofold. First, they contend that Starr is uniquely qualified to bind AIG to this reinsurance and therefore is entitled to this compensation. Second, they claim that AIG pays commission to Starr on only the portion of the business that AIG keeps (i.e., what it does not cede to the reinsurers), and that Starr is therefore entitled to the commission payments on the ceded portion of the business from the non-AIG reinsurers. Neither of these contentions is supportable.

50. First, Starr is not "uniquely qualified" to arrange for reinsurance of the business it produces for AIG. AIG is one of the largest purchasers - and at most of the times relevant to this complaint was the largest purchaser - of reinsurance in the world. AIG's prowess in the reinsurance market is legendary. Moreover, AIG has a strict policy of tightly controlling its reinsurance business, and due to the number of reinsurers going under, AIG has a very short list of approved reinsurers with which it will do business. AIG dictates to Starr which reinsurers Starr may use - there is no discretion or unique ability that Starr brings to the reinsurance table. The most that Starr could possibly contribute to the reinsurance process is making its top executives available for technical questions the reinsurers might have before signing on to a reinsurance treaty. As was shown above, those top executives are also AIG employees, so their ability to answer those questions is hardly a skill unique to Starr.

51. In addition to the fact that AIG does not need Starr for reinsurance, it was actually violative of the Managing General Agents Act ("MGA Act") for certain of the Starr agencies to be binding AIG companies to treaty reinsurance in certain years during 1999 to 2002. Because the amount of business those agencies produced for AIG insurers exceeded 5% of those insurers' policyholder surplus in certain years, the MGA Act prohibited those Starr agencies from binding those AIG reinsurers to treaty reinsurance during those years. Starr did it anyway, and defendants have admitted in this action that they violated not only that prohibition of the MGA Act, they also violated the Act's requirement that AIG audit the Starr agencies' procedures and that AIG require an independent financial examination of Starr's books.

52. Defendants also cannot justify Starr's keeping the reinsurance commissions by claiming that AIG pays commission on only its retention (i.e., the portion of the Starr business it does not cede to reinsurers). The contracts pursuant to which AIG and Starr do business say that AIG is to pay all acquisition costs of the production of business. Acquisition costs are the cost of producing the business, specifically, broker fees. Reinsurance commissions are meant to be the reinsurers' contribution to those acquisition costs. If AIG is bearing all of those costs on the entire pot of business being produced by Starr - and the contracts say that AIG

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                                Page 10
2005 WL 1403533 (Del.Ch.)

is doing so - then AIG is absolutely entitled to those reinsurance commissions to offset those acquisition costs. Letting Starr keep those reinsurance commissions is simply giving AIG's money away to Starr.

53. Even if AIG was not fronting the acquisition costs on the entire pot of business - and documents produced in this litigation by defendants say that it is fronting those costs - Starr is still inappropriately keeping money that belongs to AIG. If the transactions with Starr were structured according to industry standards (and defendants have never offered a valid business reason for not structuring them according to such standards), AIG would pay Starr commission on the entire pot of business Starr produces. The non-AIG reinsurers would then enter the picture, and would pay their reinsurance commission to AIG to help offset AIG's acquisition costs. Defendants have trumpeted throughout this litigation that the non-AIG reinsurers are paying higher commission rates to Starr than AIG is. If those higher commission rates were appropriately paid to AIG, AIG would not only recoup the commission it paid Starr for the production of that portion of the business, it would be getting that portion of the reinsurance commission that is higher than the underlying commission AIG itself paid. Based upon the numbers defendants themselves have put forward in this litigation, this difference is collectively in excess of $66 million for the years 1999 to 2002. Thus, even under defendants' paradigm - a paradigm contradicted by their own documents - Starr is being given $66 million of AIG's money for no valid business reason.

54. Against this backdrop of transactions clearly structured to favor Starr's interests over AIG's interests, it should come as no surprise that Starr's relationship with AIG has proven to be quite lucrative for Starr's owners. For example, Starr's operating profit in 2002 was $47.8 million, and Greenberg's proportionate share of it was $8.22 million. This interest alone dwarfed Greenberg's AIG cash compensation of $1 million in salary and a $5 million bonus. Defendant Matthews' share of Starr's operating profit in 2002 was $4.67 million - more than 3 times his AIG compensation that year ($718,846 in salary and $730,000 in bonus). Defendant Tse's share of Starr's operating profit in 2002 was nearly $3.6 million - 2.5 times his AIG cash compensation. In addition to their proportionate shares of Starr's operating profits, Defendants Greenberg, Matthews, Smith, Tizzio and Tse collectively drew salaries from Starr of $6.06 million from 1999 to 2002, and received cash dividends from Starr collectively totaling $17.49 million.

55. Greenberg used Starr for more than just siphoning off millions of dollars for himself and the other AIG directors who owned Starr. He also used it as the ultimate tool of control over the top echelon of AIG's executives. Starr is known internally at AIG as the "Billionaires Club", and membership is by invitation only from the Starr board (chaired, of course, by Greenberg). Executives at AIG spend their entire careers trying to please Greenberg in order to be among the elite few who are invited to become owners of Starr. A Starr member's financial well-being is assured for life if that member stays in Greenberg's good graces until they retire and their proportionate share of Starr is liquidated and paid to them.

B. SICO

56. In addition to the Billionaires Club (Starr), Greenberg used SICO to control a broader base of the AIG executives. SICO received AIG stock in the foreign asset exchange at the time of AIG's reorganization. At the time of the exchange, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533
2005 WL 1403533 (Del.Ch.)

market value of the AIG stock SICO received was many times higher than its book value ($110 million). Greenberg and the other SICO owners purportedly decided to use SICO's AIG-derived value to reward key AIG executives and executives of its subsidiaries for continued growth at AIG.

57. Starting in 1975, SICO set up a series of long term incentive plans ("Ltips") to benefit AIG executives. SICO, which is controlled by defendants Greenberg, Smith, Tizzio, Tse and Matthews (each with 8.33% of SICO's common stock) and a handful of other AIG executives, has complete discretion to choose which executives will be eligible for awards from the Ltips and to set the amount of the awards to those individuals.

58. The Ltips are administered in two year increments, and executives chosen to receive awards are granted "units" at the beginning of the two year term. To receive Ltip awards at the end of a given two year period, the executive must remain employed by AIG until the age of 65. The "units" are configured by an undisclosed formula, but generally represent a certain number of SICO's AIG shares conditionally set aside for the participant at the beginning of the two year term. The amount of growth in AIG's earnings per share during that two year period will determine the number of AIG shares the participant will receive at the end of the period. According to AIG's 2000 Annual Report to Shareholders ("2000 Report"), if there is no growth in AIG's earnings per share during a two year period under the Ltips, there would be "no AIG shares...set aside under that plan."

59. However, while earnings per share declined over the two year Ltip period (2000 to 2002) due to large losses incurred with World Trade Center-related policies written by AIG, the disclosed conditional awards by SICO were merely decreased in value - not eliminated as the plan description indicates. The collective amount designated for defendants Greenberg, Smith, Tizzio, Tse and Matthews was reflected in AIG's 2002 Proxy Statement as decreasing from a 2000 starting amount of $55.6 million to $41.7 million as of February 28, 2002.

60. As of December 32, 2001, the value of the AIG shares owned by SICO had reached $23.3 billion. AIG represented in its 2000 Report that only 1.5% of SICO's available AIG stock had been distributed to participants, but that nearly 8% of its available AIG stock was conditionally set aside to cover the current two year period's grants.

61. The elite few of AIG's former executives who control the 50% block of SICO's common stock (Greenberg, Matthews, Smith, Tizzio, Tse and a handful of other AIG executives), thus have control over SICO, its Ltip plans, and the AIG shares SICO owns - currently 12% of AIG's public float.

62. Because these defendants control SICO, they control the largest piece of the compensation pie available to AIG executives. Over 600 AIG employees currently participate in the SICO plan. Their participation in the plan and the ultimate payout they can hope to enjoy when they retire are controlled by Greenberg. They are thus beholden to him and previously allowed him to cause AIG to enter into the unjustifiable Starr transactions described above, as well as the improper finite insurance transactions, bid-rigging, and bypassing of AIG's internal controls as described below.

GREENBERG CAUSES AIG TO ENGAGE IN IMPROPER FINITE INSURANCE TRANSACTIONS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                                    Page 12
2005 WL 1403533 (Del.Ch.)

63. Having cemented his control over the executives of AIG, Greenberg set up an elaborate web of finite insurance transactions that were designed to improperly bolster AIG's books. He caused AIG to engage in billions of dollars of fraudulent finite risk insurance and reinsurance transactions that were concealed through AIG's consolidated financial accounting, public misstatements, and hidden and altered business documents.

64. Under the blind eye of the defendants, including those who purport to have decades of insurance experience, Greenberg designed a multi-billion dollar series of finite insurance transactions for AIG. These transactions, categorized as finite insurance by AIG, were in fact loans disguised as insurance. They did not involve the sine qua non of insurance - the transfer of significant risk of loss from the insured to the insurer. GAAP requires finite insurance and reinsurance transactions to transfer "significant" risk from one party to another if either intends to account for the transaction as insurance - an asset on balance sheets. Without the transfer of significant risk of loss, the "policy" is really just a loan and must be recorded as a liability.

65. Greenberg's elaborate scheme of improper finite insurance (AIG's selling and buying it) started coming to light in late 2004 and early 2005 with the investigation by both the Securities and Exchange Commission ("SEC") and New York Attorney General Eliot Spitzer into these finite insurance transactions. These probes brought to light the fact that Greenberg caused AIG to engage in the finite reinsurance transactions, described in detail below, for no other purpose than to burnish AIG's books and the books of the companies to whom AIG sold finite insurance.

66. On May 1, 2005, under severe pressure from the regulatory agencies investigating it, AIG announced that on May 31, 2005, it would restate its financial statements from 2000 to 2004 to reverse the improper accounting treatment of AIG's finite insurance transactions. The restatements are currently being projected to decrease AIG's net worth by an astounding $2.77 billion. The AIG internal investigations into the matter are continuing and may result in an even larger hit to net worth by the time the restatements are actually filed.

67. In its May 1 release, AIG also admitted that "prior accounting for improper or inappropriate transactions or entries" was the result of "material weaknesses" in AIG's internal controls. Thus, AIG's board had no choice but to blame itself for its failure to catch the improper finite insurance transactions. AIG's board turned a blind eye to the "serious issues with . . . [AIG's] internal controls" for at least fifteen years. The board's only offered explanation for its shocking lack of oversight was that PricewaterhouseCoopers ("PwC"), AIG's auditor of more than 20 years, just discovered the material systematic control weaknesses in an internal investigation that was initiated in late February 2005. The defendants knew, or at least would have known had they exercised any degree of care at all, that the finite risk transactions detailed below were improperly manipulating the financial statements of AIG and other publicly reporting companies.

68. To date, AIG has paid over $126 millions in fines related to its finite insurance practices, and will likely pay millions more before all outstanding investigations are settled.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AIG IMPROPERLY USED REINSURANCE IT PURCHASED FROM GEN RE AND REINSURERS THAT IT
CONTROLLED TO "SMOOTH" ITS EARNINGS

69. On February 14, 2005, AIG announced that it had received subpoenas on February
9, 2005 from both the SEC and the New York Attorney General's office ("NYAG"). AIG
described the subpoenas as "relating to investigations of non-traditional insurance
products and certain assumed reinsurance transactions and AIG's accounting for such
transactions." The United States Department of Justice ("DOJ") soon joined in the
SEC and NYAG investigation and, by March 17, 2005, the New York Insurance
Department ("NYID") had also joined in the investigation of AIG's finite
reinsurance transactions.

70. The reason finite reinsurance contracts are of such special concern is that
"the ultimate limit of liability of the reinsurer is capped by a maximum," and the
contract is entered into after loss events have occurred. Finite reinsurance always
brings with it the question of whether there has been a transfer of sufficient risk
for the contract to be deemed "insurance" rather than a loan because finite
reinsurance is the reinsurance of business that is already incurring loss. The full
extent of that loss in an appropriate finite reinsurance transaction is not known
or readily ascertainable, i.e., there is substantial risk that the claims may end
up being significantly higher than they appear to be at the beginning of the
transaction. The insurer purchasing the finite reinsurance usually "borrows" the
claims reserves of the finite reinsurer in exchange for which the finite reinsurer
receives a portion of the premiums of the underlying policies.

71. To be compliant under GAAP: (1) the insurer buying the finite reinsurance
policy must be transferring a significant insurance risk of loss to the finite
reinsurer (i.e., that the reinsurer has the real risk of losing more of its claims
reserves than it collects in premium); and (2) it must be "reasonably possible"
that the reinsurer may realize a significant loss from the transaction. (Statement
of Financial Accounting Standards No. 113, Accounting and Reporting for Reinsurance
of Short-Duration and Long-Duration Contracts). If significant risk is not
transferred, then the transaction does not qualify as "insurance," and is more
appropriately accounted for as a loan transaction. AIG's finite reinsurance
transactions did not meet these requirements, and the defendants knew or with
reasonable care should have known that fact.

1. AIG's Improper Finite Reinsurance Transaction With Gen Re

72. The NYAG and SEC initially focused their investigations on one particular
reinsurance transaction between AIG and General Reinsurance Corp. ("Gen Re"), a
wholly-owned subsidiary of Berkshire Hathaway Inc., run by Greenberg's long-time
friend, Warren E. Buffett.

73. As an insurer, AIG sells insurance policies to corporations and individuals.
In return for payment of premiums, AIG assumes the risk of financial loss resulting
from certain events. To pay off claims that are filed, AIG must maintain a reserve
of cash sufficient to cover the claims it can expect to pay out during a given
period, called a loss reserve. Investors look closely at an insurer's level of loss
reserves because if the loss reserves are low and an insurer receives a large
number of claims in a short period of time, the insurer would be in financial
crisis.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                           Page 14
2005 WL 1403533 (Del.Ch.)

74. In the fall of 2000, Greenberg wanted to boost AIG's reserves, so he sought the aid of Buffett's Gen Re, a reinsurance company. In a typical reinsurance transaction, the insurer will pay the reinsurer a portion of its premiums in exchange for which the reinsurer will assume a portion of the risk from the policies written by the insurer. In the deal negotiated in 2000, Gen Re (through its Cologne Re unit) agreed to pay AIG's wholly owned subsidiary, National Union, $500 million in premiums and, in return, National Union assumed the risk from a number of policies Gen Re had sold to other insurance companies. National Union received $500 million from Gen Re, which it categorized as a normal insurance contract, and AIG counted on its consolidated balance sheets the $500 million as income that went towards its reserves to pay future claims. Gen Re, on the other hand, received a sizeable fee on the transaction - approximately $5 million.

75. The problem with this transaction was that the policies Gen Re transferred to AIG had little or no risk. Over time, AIG would have paid out in losses an amount equal to the $500 million in premiums (i.e., there was no significant transfer of risk).

76. Such an arrangement should have been accounted for as a loan as AIG received an amount of cash that it would later have to pay back plus interest (i.e., the fee paid to Gen Re). If AIG properly accounted for the $500 million payment as a loan, it would have had to reduce its income and report it as a liability on its financial statements.

77. The defendants knew, or should have known, about this illegal transaction with Gen Re. In fact, there is evidence that Greenberg personally initiated the Gen Re deal on behalf of AIG. According to The Wall Street Journal, certain internal AIG e-mails show that Greenberg was directly involved in the deal between AIG and Gen Re, and that a person claimed to be knowledgeable about the evidence stated that, "[t]he e-mails were pretty explicit on Hank's motivation to boost reserves." According to statements made by Joseph Fritsch, director of insurance accounting policy for the NYID, Warren Buffet confirmed "that Hank knew about the deal" between AIG and Gen Re.

78. At the time the Gen Re deal was being struck, the defendants were also aware of the market's criticism of the adequacy of AIG's loss reserves. Greenberg even told a former Gen Re executive that he was disturbed about repeated questioning from Wall Street analysts over the level of AIG's loss reserves. It is quite clear that AIG initiated and completed the Gen Re transaction for the sole purpose of artificially inflating its reserves.

79. As a result of the Gen Re transactions, Greenberg was able to issue a press release on February 8, 2001 in which he stated: "We added $106 million to AIG's general insurance net loss and loss adjustment reserves for the quarter, and together with [an acquisition], increased the total of those reserves to $25.0 billion at year-end 2000."

80. Just bolstering AIG's reserves with improper accounting was not Greenberg's only motivation, however. Two months later, on April 3, 2001, Greenberg made an unsolicited all-stock bid for American General Corp. ("Am Gen") for $23 billion with a 5% collar on the downward movement of AIG stock, outbidding the offer made by Prudential Plc by a significant margin. AIG's significantly improved reserves helped raise its stock price, thereby allowing Greenberg to outbid Prudential and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

purchase Am Gen with an artificially inflated stock price.

81. According to a Morningstar equity analyst, "The General Re transaction could
have helped fool the market into thinking that AIG was in better financial shape
than it was," thereby keeping the trading price of AIG within the needed price
range.

82. On March 30, 2005, AIG's Board admitted that the accounting for the Gen Re
reinsurance transaction was improper. Regulatory investigations of this transaction
are likely to result in millions of dollars of fines and defense costs for AIG.

2. AIG's Improper Reinsurance Transactions With Off-Shore Reinsurance Companies
Controlled By AIG

83. In early 2005, regulators started focusing on reinsurance transactions between
AIG and Union Excess Reinsurance Company, Ltd. ("Union Excess") and Richmond
Insurance Company Ltd. ("Richmond"), two off-shore reinsurance companies with
significant business dealings with AIG. According to Bloomberg, AIG's 2003 state
regulatory filings show that AIG used private, offshore companies for at least six
times more reinsurance than any of its nine biggest United States competitors.

84. The reason AIG was going to these offshore companies became clear in March
2005, when press reports revealed that AIG was engaging in reinsurance transactions
with offshore companies in which it secretly owned significant equity. The
transactions, which were actually with AIG affiliates, should have had no net
effect on AIG's balance sheets because AIG reports on a consolidated basis. Rather
than collapse the transactions on its financials, AIG accounted for them as if they
were with arm's length, unrelated third parties.

85. On March 30, 2005, AIG publicly admitted that its accounting for the Union
Excess, Richmond and Capco reinsurance transactions (described in detail below) was
improper. As a result of these accounting improprieties, AIG announced that it will
need to decrease AIG's net worth by at least $2.77 billion, one of the largest
adjustments in the history of corporate America.

a. Union Excess

86. AIG subsidiaries have been engaging in reinsurance transactions with Union
Excess, a Barbados-domiciled reinsurance company, since 1991.

87. While AIG owned no direct equity interest in Union Excess, it was determined
that AIG had indirect control over this reinsurer through SICO, AIG's purported
long-term compensation vehicle (described above) which provided the golden
handcuffs Greenberg used to ensure total compliance of AIG's executives with his
will. At all relevant times, Union Excess did business with no one other than AIG.

88. Due to AIG's indirect control of Union Excess (and Greenberg's irrefutable
direct control of Union Excess), the reinsurance transactions AIG engaged in with
Union Excess did not involve a sufficient transfer of risk, and therefore could not
be considered "insurance." In other words, these transactions were loans among
related entities that AIG failed to report as liabilities on its balance sheet for
a period of at least fourteen years.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 16
2005 WL 1403533 (Del.Ch.)

89. If Union Excess ends up being consolidated onto AIG's financial statement, there will be a drastic reduction of "approximately $1.1 billion in AIG's consolidated shareholders' equity as of December 31, 2004, which represents the after-tax cumulative effect of the transactions with Union Excess over a 14 year period from 1991 to 2004."

  b. Richmond

90. AIG subsidiaries have engaged in reinsurance transactions with subsidiaries of Richmond, a Bermuda-based reinsurance holding company in which AIG holds a 19.9% ownership interest. Even though AIG's equity interest constitutes only minority ownership, AIG has admitted (through its May 1, 2005 press release) that it actually controlled Richmond. As a result, Richmond should have been treated as a consolidated entity in AIG's financial statements. Under Greenberg's control, AIG's transactions with Richmond were treated as dealings with an arm's-length, unrelated reinsurer.

91. These reinsurance transactions with Richmond did not involve a sufficient transfer of risk, and therefore could not be considered "insurance." In other words, these transactions were loans that AIG failed to report as liabilities on its balance sheet during the period it did business with Richmond.

92. The transactions between AIG and Richmond were initiated for the sole purpose of aiding AIG in artificially increasing its premium income and loss reserves.

 3. Other Accounting Problems Involving Capco

93. AIG also engaged in reinsurance transactions with Capco Reinsurance Company, Ltd. ("Capco"), a Barbados domiciled reinsurance company. The deals with Capco were improperly structured so that AIG could:

     recharacterize underwriting losses relating to auto warranty business as capital losses. That structure...consisted primarily of arrangements between subsidiaries of AIG and Capco that will require Capco to be treated as a consolidated entity in AIG's consolidated balance sheets...[T]he result of the adjustment will be to reverse capital losses for the years 2000 through 2003 and recognize a corresponding amount of underwriting losses in 2000.

  (AIG's May 1, 2005 press release). Thus, AIG will need to recharacterize approximately $200 million of capital losses as underwriting losses.

94. As admitted by AIG's board, the Capco transactions were "structured for the sole purpose or primary purpose of accomplishing a desired accounting effect" and none had a substantive transfer of risk that is required for a transaction to be called insurance.

A. AIG Sold Illegal Income Smoothing Products To Public Companies

95. Beginning in 1997, AIG developed, started marketing and sold "non-traditional" insurance products to publicly reporting companies. Under these "non-traditional" arrangements, companies would pay AIG a substantial fee, in exchange for which AIG provided the company with a backdated insurance policy that enabled the company to "smooth" out its income statement by deferring known losses over a period of time.

                    ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 17
2005 WL 1403533 (Del.Ch.)

96. AIG also designed, marketed, sold and participated in special purpose entities ("SPEs") that were formed for the sole purpose of helping reporting companies move poorly performing assets off their balance sheet.

1. AIG Sold Illegal "Retroactive" Insurance Policies

97. The "retroactive" insurance policies sold by AIG were generally structured as follows: A public company would approach AIG with the total amount of losses it needed to hide from investors and, for a fee, AIG would underwrite a policy and charge the company a premium for the purported policy (which would be paid in monthly installments) equal to the amount of the total losses that the public company wanted to conceal from its investors.

98. Each month the company would deposit money with AIG under the pretense that it was paying the "premium" that it owed AIG. This enabled the company to report the "premium" as an ordinary monthly business expense. AIG, on the other hand, would report the "premium" as income.

99. The company would then file a claim on the policy for the total amount of the losses it sought to defer, which AIG would unquestionably pay the company. After AIG paid, the public company would apply the insurance proceeds to offset the losses in the financial period in which the losses were incurred.

100. By the end of the policy term, AIG would have recovered the full amount it paid out on the company's claim and a fee for the arrangement. Any deposits beyond this amount would be refunded to the company.

101. At no point in this "insurance" transaction was there any actual transfer of risk. AIG knew its total exposure and that it was going to pay out on the company's claim at the time that the policy got issued. As such, this finite transaction was nothing more than a loan transaction improperly accounted for as "insurance."

102. To avoid raising suspicion, AIG designed these sham insurance transactions to falsely reflect legitimate traditional insurance transactions. AIG did this by combining the retroactive insurance policy with another traditional insurance policy, making the retroactive policy unidentifiable by investors.

103. The most egregious example of AIG income-smoothing products to date is AIG's transaction with Brightpoint, Inc. ("Brightpoint"), which concealed $11.9 million in losses that Brightpoint had sustained in 1998 and overstated Brightpoint's pre-tax net income by 61% in its 1998 Form 10-K.

104. In October 1998, Brightpoint announced that it would need to recognize losses ranging from $13 to $18 million in the fourth quarter of 1998. Brightpoint's problems worsened when sometime after this announcement it discovered that its losses in that quarter were actually $29 million.

105. Brightpoint turned to National Union, one of AIG's principal general insurance company subsidiaries, for assistance. National Union offered Brightpoint an "insurance" product that was specifically designed to "smooth" the impact of the real losses on the company's financial statement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 18
2005 WL 1403533 (Del.Ch.)

106. Brightpoint purchased from National Union a "retroactive" insurance policy
that covered all of Brightpoint's extra losses. The parties combined this
"retroactive coverage" with other insurance coverage (the "Policy") in an effort to
make the arrangement look like a traditional, non-retroactive indemnity insurance
policy, and then backdated the policy to August 1998.

107. The "cost" of this "retroactive coverage" to Brightpoint was about $15
million, which Brightpoint paid for in monthly "premiums" over the three-year term
of the Policy. Shortly after the Policy was finalized in January 1999, Brightpoint
made an insurance claim on the policy in the amount of its excess losses, which AIG
approved and paid out. AIG issued a letter to Brightpoint's auditors in which it
falsely represented that Brightpoint would probably recover under the Policy, when
all along AIG knew that Brightpoint was certain to recover.

108. Upon AIG's payment on the insurance claim, Brightpoint was able to record an
insurance receivable of $11.9 million in the fourth quarter of 1998, which offset
its total losses of $29 million, and brought Brightpoint's reported net loss within
the previously disclosed range of $13 to $18 million.

109. In October 2001, the SEC began making inquiries into the Policy AIG had sold
to Brightpoint.

110. After Brightpoint's auditors again reviewed the insurance transaction with
AIG, they were unable to verify whether or not the Policy qualified as insurance,
but at the very least Brightpoint was required to restate its 1998 financials to
reflect the entire premium expense, which amounted to $15.3 million.

111. On January 31, 2002, Brightpoint announced that it would need to again
restate its financials for 1998 to reflect that the "premiums" paid under the
Policy were deposits made with AIG. When Brightpoint "cancelled" the Policy and AIG
refunded the full amount of premiums Brightpoint had paid to AIG over and above the
"insurance claim payments" under the Policy, there was no doubt that this
transaction was not insurance.

112. The SEC found that AIG designed and sold this insurance product to enable "a
public reporting company to spread the recognition of known and quantified one-time
losses over several future reporting periods." The SEC stated that:

    the "retroactive coverage" should not have been accounted for as insurance. It
was only a mechanism for Brightpoint to deposit money with AIG - in the form of
monthly "premiums" - which AIG was then to refund to Brightpoint as purported
"insurance claim payments."

113. The SEC concluded that AIG had played an "indispensable part in the
fraudulent transaction" and, on September 11, 2003, an enforcement action was
initiated against AIG, Brightpoint and several Brightpoint officers and employees
on the basis of the "non-traditional" or "finite" insurance product AIG sold to
Brightpoint.

114. On that same day, AIG agreed to pay a $10 million fine in settlement of the
SEC's enforcement action and entered into a consent order agreeing not to market
such a product again.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2. AIG Sold And Engaged In Illegal Off-Balance Sheet Transactions

a. The C-GAIT Deals

115. From March 2001 through January 2002, AIG developed and aggressively
marketed, through its wholly-owned subsidiary AIG Financial Products Corp.
("AIGFP"), a product called the Contributed Guaranteed Alternative Investment Trust
Security ("C-GAITS"), which was designed to enable companies to remove troubled or
volatile assets off its balance sheet through the use of special purpose entities
("SPEs").

116. AIG structured the C-GAITS products as follows:

a. AIG would represent to a prospective counterparty that AIGFP would establish
a special purpose entity (SPE) to which the counterparty would transfer cash and
certain troubled, underperforming or volatile assets. In exchange, the counterparty
would receive preferred stock that could later be converted to common stock that
carried voting rights only with respect to the liquidation of the SPE.

b. If the assets appreciated, the counterparty would be able to liquidate its
investment and report the proceeds as income on its balance sheet. If the assets
depreciated, the counterparty would maintain the SPE investment on its balance
sheet as an "available for sale" security. In either case, the poorly performing
assets were off the counterparty's balance sheet.

c. So that the counterparty could avoid consolidating the SPE on its financial
statement, certain GAAP requirements had to be met; namely an independent third-
party investor, in this case AIGFP, would have to make a "substantive capital
investment" equal to 3% of the total assets. AIGFP had to have "substantive risks
and rewards of ownership of the assets of the SPE" under GAAP.

d. AIGFP would make a capital investment equal to 3% of the assets that the
counterparty transferred to the SPE, in return for which it received preferred
stock and voting common stock in the SPE.

e. The counterparty would pay AIGFP a structuring fee that exceeded AIGFP's
capital investment in the SPE. Part of the fee would be paid at closing and the
remainder would be paid out over a four year period. If the SPE is liquidated
within this period, AIGFP would receive the present value of the outstanding fees.

f. The cash contributed to the SPE by the counterparty would be used to
purchase 30-year zero coupon notes (notes that paid no interest until maturity),
which upon maturity ensured that the counterparty would recover its original
capital investment, without regard to the performance of the volatile assets that
were contributed.

g. The cash contributed to the SPE by AIG would be used to purchase highly
rated debt securities, which carried low risk.

117. Before selling any C-GAITS, AIG asked an outside accounting firm to give its
opinion on whether or not the above transaction complied with GAAP. AIG explained
the terms of the transaction to the accounting firm, including the fact that the
party issuing the 30-year zero coupon note would be AIG itself.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 20
2005 WL 1403533 (Del.Ch.)

118. The outside accountant expressed reservations about AIG's issuance of the zero coupon note because it could be viewed as a return of AIG's capital investment (through the SPE's "purchase" of the note from AIG), bringing AIGFP's capital investment below the 3% minimum required by GAAP.

119. The outside accountant's opinion also saw the risk of AIGFP's capital investment falling below the required 3% under GAAP because the large prepayment of fees could be viewed as a return of AIGFP's capital investment. The accountant recommended that AIGFP increase its capital contribution from 3% to 5% to help alleviate this risk.

120. Disregarding the outside accountant's advice, on or around May 29, 2001, AIG proposed the C-GAIT to PNC Financial Services Group ("PNC") as an SPE in which AIGFP would make a 3%, not 5%, capital investment and AIG would issue the 30-year zero coupon note to PNC. AIG did not disclose the opinion of its outside accountant to PNC or other potential counterparties.

121. AIG helped PNC structure three of these SPEs in 2001 through three C-GAITS transactions, named the PAGIC transactions (PAGIC I, II, and III). Though AIG did not end up issuing the 30-year zero coupon note, it did fail to increase its capital investment to 5%, as recommended by its outside accountant.

122. The result was that AIG improperly recognized fees of $46.36 million from the C-GAITS transactions with PNC, and such fees reduced AIGFP's capital investment below the 3% threshold required by GAAP. PNC, on the other hand, improperly removed $762 million worth of doubtful loans and volatile venture-capital investments from PNC's balance sheet and into the C-GAITS, and thereby avoided charges to its income statement from declines in the value of these troubled assets.

123. The SEC warned AIG in an October 5, 2004 release that it was considering an enforcement action against AIG concerning the C-GAITS transactions. This release was the first notice to the investing public of the problems with the transactions and the possibility of AIG's liability.

124. According to the SEC's Complaint, ultimately filed on November 30, 2004:

AIG (a) recklessly made misstatements of material facts, and omitted to state material facts, about whether the C-GAITS product satisfied GAAP requirements for nonconsolidation of an SPE; and (b) entered into the three PAGIC transactions with PNC that it was reckless in not knowing did not satisfy the GAAP requirements for nonconsolidation of the SPEs by PNC.

125. On September 29, 2004, AIG announced that the DOJ was joining in the SEC's investigation of the three C-GAITS transactions involving AIG and PNC, and on October 21, 2004, AIG became the target of a federal grand jury investigation.

126. On November 30, 2004, the SEC and DOJ announced that AIG agreed to pay a fine in the amount of $126.36 million to settle the C-GAIT charges, which included an $80 million fine and the disgorgement of AIG's fees of $46.36 million.

b. The GAITS Deals

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                              Page 21
2005 WL 1403533 (Del.Ch.)

127. Between June 2000 and March 2001, wholly-owned subsidiaries of AIGFP also entered into five "Guaranteed Alternative Investment Trust Security" ("GAITS") transactions with insurance company subsidiaries of two publicly traded companies.

128. AIGFP received a fee in each of the GAITS transactions, in return for which the two counterparties to the five GAITS transactions transferred $231,659,000 in assets to the SPEs.

129. The GAITS transactions also failed to satisfy GAAP requirements for non-consolidation of the SPE because the structuring fees received by AIG reduced its capital investment below the 3% minimum threshold required by GAAP.

### CONCEALMENT OF THE "FINITE" AND INCOME-SHIFTING TRANSACTIONS FROM GOVERNMENT REGULATORS AND THE PUBLIC

130. AIG used a number of different evasive tactics to escape repercussions for its misconduct and conceal the Brightpoint, PNC and Gen Re transactions from government regulators, and the public.

131. For example, according to The Wall Street Journal, on March 29, 2005, AIG's lawyers admitted that AIG intentionally gave false information to the NYID during its annual inspection of the property and casualty business of AIG. The information AIG provided to the NYID was "intentionally false":

[AIG's lawyers] told the authorities that AIG officials had exaggerated the degree to which risk was transferred to the reinsurer. . . In describing other findings from AIG's internal probe, [AIG's lawyers] said they had uncovered evidence suggesting that past filings were misleading. But in this case, [AIG's lawyers] admitted that the information provided during the [NYID] examination earlier this year was intentionally false and not an honest mistake.

The Wall Street Journal, March 30, 2005.

132. In addition to outright lying to investigators, AIG just flat out refused to cooperate with regulatory agencies. When the SEC issued the release about the AIG-Brightpoint settlement in November 2004, it commented on AIG's unwillingness to cooperate with its investigation. Mark K. Schonfeld, Associate Regional Director of the SEC's Northeast Regional Office stated that:

The $10 million penalty against AIG reflects the gravity of its misconduct. It also reflects the fact that, in the course of the Commission's investigation, AIG did not come clean. On the contrary, AIG withheld documents and committed other abuses, as outlined in the administrative order, compounding its overall misconduct.

133. Likewise, during the SEC's 2002 investigation of PNC and its use of the off-balance sheet C-GAIT transactions, AIG issued a false press release to try and deflect public attention to its wide-spread marketing and use of such transactions. With regard to the PNC investigation, AIG announced on January 30, 2002 that, "AIG has not entered into any other transactions using this [C-GAIT] structure." This statement was false because, according to the SEC, AIGFP had previously entered into five other similar transactions (the GAITS transactions discussed above) with two other unidentified counterparties. The defendants feebly tried to excuse this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

false statement by claiming that the five other transactions, structured exactly
like the PNC C-GAIT transactions, were entered into for different reasons. The
Board stated: "unlike the PNC transactions, none of the [other five]. . .
transactions had the primary purpose of moving troubled, volatile or
underperforming assets off the balance sheet" of a company. Regardless of
motivation, the transactions did not qualify under GAAP for the treatment they
received on AIG's books.

134. When false statements and general lack of cooperation would not work, AIG
resorted to altering documents to cover up its wrongdoing. The New York Times
reported that certain documents in connection with the Gen Re deal "were doctored
several months after the deal was struck," quoting unnamed executives with direct
knowledge of the transaction. The deal was "repapered" by midlevel employees of Gen
Re in an effort to assist AIG to avoid government scrutiny. The transaction, which
was initiated by Greenberg, was re-documented to make it appear as though Gen Re
paid $10 million to AIG, when in reality AIG paid Gen Re $5 million for services.

135. By Easter weekend 2005, Greenberg, having just been forced out of the CEO
seat he had held for decades, sent his representatives to remove documents from
AIG's office in Bermuda. In an escapade that has become known as the "Document
Caper," Greenberg's representatives removed boxes of documents from an AIG office
in Bermuda that AIG shared with Starr, SICO and other Greenberg-driven entities. On
March 26, 2005, it was discovered that records were missing and that an AIG
employee had destroyed computer records and tape recordings of business meetings.

136. NYAG Spitzer was incensed over the "Document Caper," and warned AIG that it
would be criminally indicted if its board did not take immediate action to secure
all removed documents. AIG's board, under threat of criminal indictment, retrieved
the documents from Greenberg's representatives and sent its armed security force to
guard the Bermuda office and the documents it contained.

137. On the heels of the Document Caper, the SEC secured a court order on April 7,
2005 from the United States District Court for the Southern District of New York
compelling AIG, Greenberg and Starr to preserve any documents requested by the SEC.
The order prohibits AIG, Greenberg and Starr "from interfering with the ability of
the [SEC] to obtain any and all documents" in those parties' possession or control.
The order also sets out security measures and security procedures for the
production of documents located outside the United States.

### AIG'S PAYMENT OF CONTINGENT COMMISSIONS AND PARTICIPATION IN ILLEGAL BID-RIGGING

138. On October 14, 2004, after approximately six months of investigating
improprieties within the insurance industry, NYAG Spitzer filed a civil complaint
(the "Spitzer Complaint") in Supreme Court, New York County against Marsh &
McLennan Companies, Inc. ("Marsh"), the world's largest insurance broker which, not
coincidentally, was headed by Jeffrey Greenberg, Hank Greenberg's son.

139. The Spitzer Complaint revealed that, since at least the late 1990s, AIG,
along with several other insurance companies, paid Marsh hundreds of millions of
dollars each year in so-called "contingent commissions," i.e., commissions above
and beyond those normally understood to be paid to brokers, based on the volume or
profitability of the business the broker directed to them. In return, Marsh agreed

to "steer" unsuspecting clients to purchase policies from AIG and the other insurance companies that paid the largest contingent commissions. The Attorney General's Office noted in its press release announcing the filing of the Spitzer Complaint that it "has uncovered extensive evidence showing that [the paying of contingent commissions] distorts and corrupts the insurance marketplace and cheats insurance customers."

140. The Spitzer Complaint alleges that, to facilitate the contingent commission scheme, AIG and others participated in illegal bid-rigging. The very day that the Spitzer Complaint was filed, two AIG executives - Karen Radke and Jean-Baptist Tateossian - pleaded guilty to participating in rigging bids for insurance contracts.

141. On the announcement of the Spitzer Complaint, shares of AIG fell by over 10 percent, or $6.80, from $66.99 to $60.19. On October 15, 2004, AIG's stock price fell another 3.6 percent, to close at $57.85, representing a $24 billion loss in AIG's market capitalization over the two days.

How the Bid-Rigging and Contingent Commission Scheme Worked

142. There are essentially three kinds of entities in the insurance industry. First, there are the clients, i.e., individuals and businesses that seek to purchase insurance for their businesses, employees or themselves. Second, there are brokers and independent agents (collectively "brokers"), who are hired by clients to advise them about coverage and to find insurance companies that offer suitable coverage at fair prices. Brokers represent the clients, obtain price quotes from insurance companies, present the quotes to the clients, and make recommendations to the clients. Third, there are the insurance companies, who submit quotes to the brokers, and, if ultimately selected by the clients, enter into contracts that provide insurance for the clients.

143. A client makes two types of payments. First, a client pays its broker an advisory fee or commission for finding the best insurance company for its needs. Second, a client pays the insurance company premiums for the insurance policy itself.

144. As NYAG Spitzer's investigation revealed, brokers sometimes also receive another kind of payment, called "contingent commissions," from insurance companies pursuant to arrangements generally known as "contingent commission agreements." These agreements typically require the insurance company to pay the broker this extra commission based on one or more of the following factors: (i) how much business the broker's clients place with the insurance company; (ii) how many of the broker's clients renew policies with the insurance company; and (iii) the profitability of the business the broker places with the insurance company. (Spitzer Compl. ¶ 16).

145. Since at least the 1990s, AIG, along with several other insurance companies, paid Marsh billions of dollars in contingent commissions in order to induce Marsh to steer business to them and reduce competition. Styled as payments for various fictional "services," the agreements to pay the contingent commissions were called "placement service agreements" ("PSAs") or "market services agreements" ("MSAs"). (Spitzer Compl. ¶ 7).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B-2

2005 WL 1403533                                                              Page 24
2005 WL 1403533 (Del.Ch.)

146. In 2003 alone, AIG and other insurance companies paid Marsh nearly $800 million in contingent commissions, which constituted more than 53% of Marsh's reported net income for that year. (Spitzer Compl. ¶ 10). AIG's misconduct was directly harmful to its clients because the costs of the contingent commission were borne by AIG's customers in the form of higher premiums. (Spitzer Compl. ¶ 42).

147. One of the exhibits to the Spitzer Complaint is the "Placement Service Agreement" between Marsh and AIG that became effective on January 1, 2003. The agreement provided that contingent commissions were made "in addition to and not in lieu of customary commission payments to Marsh by" AIG.

148. In the late 1990s Marsh began internally rating the insurance companies on lists labeled as "tiering reports" based on how much they paid Marsh pursuant to their contingent commission agreements. (Spitzer Compl. ¶ 33). Marsh's employees were expected to use the tiering reports to prioritize between insurance companies in selling to Marsh's clients.

149. The insurance companies were ranked on the tiering reports based purely on the amount of contingent commissions paid to Marsh instead of the price, value or service provided to the insurance customer. (Spitzer Compl. ¶ 30).

150. A September 2003 internal e-mail from a Marsh executive explained that  "[w]e need to place our business in 2004 with those [insurance companies] that have superior financials, broad coverage and pay us the most." (Spitzer Compl. ¶ 34).

151. AIG was one of the companies to which Marsh was "steering business." A Marsh "tiering report" which was circulated to various Marsh executives, ranked AIG and other insurance companies according to how profitable the companies' contingent commission agreements were to Marsh. The report lists four companies as AIG subsidiaries: C.V. Starr, National Accounts, Lexington Primary and Lexington Excess. (Spitzer Compl. ¶ 34).

152. AIG knew that its contingent commissions paid to Marsh were not for any additional "services rendered." The handwritten notes of an AIG executive indicate that Marsh threatened to "kill" AIG if AIG did not "get to [the] right number" on the contingent commission agreement. (Spitzer Compl. ¶ 37).

153. AIG was a principal player in the scheme to rig bids for quotes to Marsh clients. Beginning in or around 2001 until at least the summer of 2004, AIG's American Home Excess Casualty Division engaged in a scheme to systematically rig bids to Marsh clients. (Spitzer Compl. ¶ 44).

154. When AIG was the incumbent insurance carrier for a client whose policy came up for renewal, Marsh solicited a so-called "A Quote" from AIG, whereby Marsh provided AIG with the policy terms and a "target premium" for the quote. If AIG agreed to quote the target Marsh provided, AIG kept the business, regardless of whether it or a competitor could have quoted more favorable terms or a lower premium. (Spitzer Compl. ¶ 45).

155. When insurance companies other than AIG were the incumbent carriers, Marsh asked AIG for what was variously referred to as a "backup quote," "protective quote" or "B Quote," which told AIG that it would not get the business. The "B Quote" was usually based on a target premium and terms provided to AIG by Marsh.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

When submitting "B Quotes" to Marsh, AIG understood that Marsh's target for the "B Quote" was higher than the incumbent carrier's quote, and AIG was not to bid below the incumbent. (Spitzer Compl. ¶ 46).

156. AIG provided Marsh with fictitious "B Quotes" because AIG's was "protected" in situations where it was the incumbent carrier. William Gilman, a senior Marsh executive, said that, because Marsh "protected AIG's ass" when AIG was the incumbent carrier, Marsh expected AIG to help Marsh "protect" other incumbents. (Spitzer Compl. ¶ 50).

157. In other situations, AIG submitted "B Quotes" where Marsh had not set a premium target, but where it was still understood that AIG was not supposed to receive the business. In such instances, AIG examined the terms and premiums of the incumbent carrier's expiring policy and then submitted a sufficiently high quote to ensure that AIG did not get the business. (Spitzer Compl. ¶ 47).

158. Numerous examples of AIG's participation in the bid-rigging scheme are reflected in the Exhibits to the Spitzer Complaint. On December 17, 2002, an assistant vice president of underwriting for ACE insurance company sent a fax to a Marsh executive quoting an annual premium of $990,000 for an excess casualty policy. Later that day, the ACE representative increased its quote on the same terms and conditions to $1,100,000. In an email to a colleague the following day, the ACE assistant vice president of underwriting explained that "[w]e were more competitive than AIG in price and terms. [Marsh] requested we increase premium to $1.1 M to be less competitive, so AIG does not loose [sic] the business...." (Spitzer Compl. ¶ 53).

159. AIG's business was protected even in instances where its clients were unhappy with the Company's services. For example, in June 2003, an insurer learned that Brambles, USA, a manufacturer of commercial pallets and containers, was unhappy with its AIG-written policy that was set to expire. However, Marsh asked the insurer not to submit a competitive bid because Marsh wanted AIG - whose quote was $850,000 - to retain the business with Brambles. The e-mail reads, in relevant part:

  This is another AIG protection job by NY. [redacted] just called to ask if we can beat $850,000 for Lead $25m. I've advised him to go direct [sic] to you, as I cannot make this call.

  Our rating has risk at $890,000 and I advised [Marsh] NY that we could get to $850,000 if needed. Doherty [at Marsh] gave me [sic] song & dance that [the] game plan is for AIG at $850,000 and to not commit our ability in writing.

  Apparently both Marsh Atlanta and [Brambles] are extremely unhappy with AIG and if we can put [sic] offer on table at $800,000 we'll get it.

  (Exhibit 4 to Spitzer Compl., ACE-INA-005786; Spitzer Compl. ¶ 55 (emphasis added).)

160. Similarly, correspondence between Marsh and Munich-American Risk Partners ("MARP") reflect AIG's involvement in the bid-rigging scheme and the benefits AIG received by having its business "protected." A December 6, 2001 email from a Marsh executive to a MARP employee notes that MARP had submitted a competitive bid but

2005 WL 1403533                                                    Page 26
2005 WL 1403533 (Del.Ch.)

"[Marsh] called [MARP] off when incumbent AIG came in with an acceptable deal. (We
[Marsh] owed [AIG], as they cheaped [sic] it the previous year in competition to
help us get the business in broker competition.)" (Exhibit 5 to Spitzer Compl.)

161. In another example of AIG's participation in the bid rigging scheme, an AIG
underwriter described in an October 2003 e-mail said of a particular quote that he
had provided: "This was not a real opportunity. Incumbent Zurich did what they
needed to do at renewal. We were just there in case they defaulted. Broker . . .
said Zurich came in around $750K & wanted us to quote around $900K." [Emphasis
added.] (Spitzer Compl. ¶ 46.)

162. Thus, AIG was among the most frequent accomplices in the bid rigging scheme
and was itself entirely complicit in arranging Marsh's fake bids. These illegal
activities will cots AIG millions of dollars in fines, attorneys' fees and
lawsuits.

             Four AIG Executives Involved in the Scheme Plead Guilty to Felonies

163. On October 14, 2004, two AIG executives, Jean-Baptiste Tateossian and Karen
Radke, each pleaded guilty to one count of violating section 190.65 of the NY Penal
Law: Scheme to Defraud 1st Degree (E Felony), for their participation in the
illegal bid rigging scheme involving AIG. Radke was an AIG senior vice president of
the Excess Casualty Unit of American Home Assurance Company, one of AIG's principal
subsidiaries in AIG's General Insurance business segment. Tateossian was the head
of AIG's National Accounts unit within American Home.

164. On February 15, 2005, Carlos Coello, an underwriter at AIG, pled guilty to
participating in a scheme with Marsh employees to provide phony bids to Marsh's
clients, and swore under oath the following:

During - from September of 2002 through September of 2004, I and others at AIG
participated in a scheme with individuals at Marsh Inc., an insurance brokerage
firm based in Manhattan. I was employed as an underwriter at the time and this was
done at the direction of others.

                                  * * *

During this time period Marsh and AIG periodically instructed me to submit
specific quotes that I believed were higher than those of incumbent carriers and
were designed to insure the incumbent carrier would win certain business and
resulted in clients being tricked and deceived by a deceptive bidding process.

I complied with these requests and by doing so assisted Marsh to obtain property
in the form of commissions and fees from policy holders. And in turn AIG
periodically benefited from this scheme when AIG was incumbent carrier in those
cases. I believe other carriers also submitted noncompetitive quotes that were
higher thereby, allowing AIG to obtain property in the form of insurance premiums
from more than one client.

Pursuant to this scheme, I intentionally engaged in deception and intentionally
conveyed quotes to Marsh under false and fraudulent pretenses. [Emphasis added.]

165. James Mohs, an assistant manager at AIG, also pled guilty to participating in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the illegal bidding process. In his plea, Mohs swore under oath the following:

   During my career at AIG, I and other employees participated in a scheme with
individuals at Marsh Inc., also based in Manhattan. The goals of this scheme
included allowing Marsh to control the market and to protect incumbent insurance
carriers including AIG when their bid was up for renewal.

   During this time period, Marsh and AIG personnel periodically instructed me to
submit specific quotes for insurance rates that I believed, [1], were higher than
those of incumbent carriers; [2], were designed to insure that the incumbent
carriers would win certain business; and [3] resulted in clients being tricked and
deceived by their deceptive bidding practice. On numerous occasions I and others
complied with these requests by submitting such quotes. By doing so, we assisted
Marsh to obtain property in the form of commissions and fees from policy holders
and insurance companies.

   In turn AIG periodically benefited from this scheme when AIG was the incumbent
carrier. In those cases I believe the other carriers were submitting non
competitive quotes specified by Marsh thereby allowing AIG to obtain property in
the form of insure premiums in excess of $1,000 from policy holders.

   Pursuant to this scheme I intentionally engaged in deception and intentionally
conveyed quotes to policy holders through Marsh under false and fraudulent
pretenses. [Emphasis added.]

AIG'S and Greenberg's Response to the Spitzer Complaint

   166. Thestreet.com reported that on October 15, 2004, one day after the Spitzer
Complaint was filed, Defendant Greenberg said in a call with analysts, "We are
sickened by this action that took place and [are] doing everything to root this out
promptly. As CEO of AIG, I take responsibility for everything that goes on within
the company."

   167. Defendant Greenberg also revealed during the call that AIG had received a
subpoena from Attorney General Spitzer sometime the prior month, September 2004
and, in response, the Company had launched an internal investigation. During the
same call, Defendant Greenberg also admitted that he knew, since at least early
2002, that AIG had been paying contingent commissions.

   168. On February 9, 2005, Defendant Greenberg, attempting to play down AIG's
participation in the illegal bid rigging scheme, issued a statement that said: "We
continue to believe that the issue that has been the primary focus of the New York
Attorney General's investigation of AIG is confined to one broker relationship and
one unit." (Bloomberg,

   169. February 9, 2005.) During that same February 9, 2005 call with analysts,
Defendant Greenberg lashed out at federal regulators, accusing them of turning
"foot-faults into murder charges" in the course of their investigations. (Financial
Times, February 9, 2005.)

   170. AIG's General Counsel, Ernest Patrikis, in a conference call with analysts on
February 9, 2005 claimed, "[w]e looked at every piece of smoke we could find. We
found no fire." (Dow Jones Newswire, February 14, 2005.) Fortune magazine reported

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                       Page 28
2005 WL 1403533 (Del.Ch.)

that Patrikis's February 9 comments, by suggesting to investors that AIG's internal investigation of the bid-rigging scheme turned up very little, had "angered" Attorney General Spitzer.

171. On February 15, 2005, Attorney General Spitzer questioned the conclusions of AIG's internal investigation, stating that, "[W]ith the guilty pleas that are being entered today, there will now be four individuals from AIG who will have pled guilty. And as a consequence, whatever claim they've made that only one person was implicated is clearly wrong, and the problems there are more expansive than, certainly, their internal audit had demonstrated to them. (Transcript of Fox News Interview, February 17, 2005.)

172. The harm done to AIG as a result of the schemes with Marsh has yet to be fully quantified. It is clear, however, that AIG will not escape liability, and that hundreds of millions of dollars in fines, penalties and costs of defense are a virtual certainty.

## DERIVATIVE ALLEGATIONS

173. Plaintiff brings this action derivatively for the benefit of AIG to redress injuries suffered and to be suffered by AIG as a direct result of the breaches of fiduciary duty by the defendants.

174. Plaintiff has owned AIG stock continuously throughout the course of wrongful conduct by the defendants alleged herein, and will continue to hold AIG stock throughout the course of this litigation.

175. Plaintiff will adequately and fairly represent the interests of AIG and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in shareholder derivative litigation.

## DEMAND ON THE AIG BOARD IS EXCUSED AS FUTILE

176. Plaintiff hereby realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

177. No demand has been made by Plaintiff on AIG's board of directors to rectify the wrongs complained of herein because a majority of AIG's board suffered from conflicts of interest and divided loyalties which preclude them from exercising independent business judgment.

## THE ORIGINALLY FILED CLAIMS

178. At the time Teachers originally filed this action, it asserted claims for the breach of the fiduciary duties of loyalty and care against the directors for commission payments made to Starr and service fees paid to SICO from 1999 to 2002. Because those claims, asserted again in this amended complaint, were first asserted in December 2002, the futility of demand with regard to them should be measured by the composition of the board as of that time. The board members at the time of the filing (December 31, 2002) were Aidinoff, Greenberg, Smith, Broad, Chia, Cohen, Conable, Feldstein, Futter, Hills, Hoenemeyer, Holbrooke, Matthews, Sullivan, Tizzio, Tse, Wintrob, Wisner and Zarb.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                        Page 29
2005 WL 1403533 (Del.Ch.)

179. Defendants Greenberg, Smith, Matthews, Tizzio, Tse, Sullivan and Wintrob
could not have impartially considered a demand related to the payment of hundreds
of millions of dollars in commissions to Starr and tens of millions of dollars to
SICO for services and rentals because they are, as shareholders and directors of
Starr and directors of SICO, financially interested in those transactions.

180. Defendants Greenberg, Smith, Tizzio, Tse, Sullivan, Matthews and Wintrob had
de facto control over AIG as they, along with a handful of other AIG executives,
had a voting block of over 21% of AIG's outstanding common stock through their
direct holdings and the holdings of Starr and SICO, which they controlled. While
21% may not always translate into direct control of a company, AIG had more than
2.6 billion shares outstanding widely scattered through tens of thousands of
shareholders. Indeed, SICO was disclosed in AIG's public filings to be the only
shareholder of AIG who held in excess of 5% of the shares. Given this wide
dispersion, Greenberg, Smith, Tizzio, Tse, Sullivan, Matthews and Wintrob had a
formidable voting block and clear and uncontested control of AIG.

181. Defendant Broad could not have impartially considered a demand relating to
the Starr commission payments and service and rental payments to SICO because, as
the Chairman of AIG's wholly owned subsidiary, SunAmerica Inc., he was eligible for
extremely lucrative awards under the SICO Ltip plans. Any award Broad would receive
from SICO would be determined by defendants Greenberg, Smith, Tizzio, Tse and
Matthews, the primary beneficiaries of the Starr commission payments and SICO
service and rental fees. Moreover, Broad served in his position at SunAmerica at
the pleasure of Greenberg, Smith, Tizzio, Tse and Matthews, by virtue of the fact
that AIG owns all of SunAmerica's shares and therefore decided who serves on
SunAmerica's board. AIG, in turn, is controlled by Greenberg, Smith, Tizzio, Tse,
Sullivan, Matthews and Wintrob, with their 21% voting block.

182. Defendant Wisner could not impartially consider a demand relating to the
Starr commission payments and SICO rental and service fees because, as the Vice
Chairman of External Affairs at AIG, he, like defendant Broad, was eligible for the
largesse that was bestowed under SICO Ltip plans at the discretion of Greenberg,
Smith, Tizzio, Tse and Matthews. Moreover, Wisner served in his position at AIG at
the pleasure of Greenberg, Smith, Tizzio, Tse and Matthews, with their 21% voting
block.

183. Defendant Aidinoff could not impartially consider a demand relating to the
Starr commission payments and SICO service and rental fees because the law firm to
which he is Senior Counsel (and was formerly a partner of), namely Sullivan &
Cromwell, has received millions of dollars of business from AIG. While Teachers
cannot allege with exactitude what fees Sullivan & Cromwell receives from AIG
because AIG does not disclose those figures, it must be in the tens of millions of
dollars given the type and sheer number of these representations. For example,
Sullivan & Cromwell's website reveals that it has represented AIG in its
acquisition of Hartford Steam & Boiler, 20th Century Industries, SunAmerica (a
$16.5 billion stock transaction), HSB Group (a $1.19 billion stock transaction), in
AIG Highstar Capital, L.P.'s $555 million acquisition of Williams Gas Pipelines
Central, Inc. and units of Western Frontier Pipeline Company, L.L.C., in the
establishment of Allied World Assurance and Transatlantic Holdings, including its
subsequent IPO, in IPC's attempt to acquire AIG's Tempest Re, and in connection
with the establishment of the Bermuda Commodities Exchange (an index of insured
property losses), including drafting legislation in Bermuda, preparing the rules of

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 30
2005 WL 1403533 (Del.Ch.)

the exchange, a related clearinghouse, and consultation with the relevant
authorities of Bermuda. Sullivan & Cromwell also established grandfathered federal
thrifts for AIG, provided executive compensation and employee benefits advice, and
represented AIG in "a variety of private investment matters" including investment
in the Blackstone Group. Sullivan & Cromwell also lists AIG as a significant
investment advisor client. Thus, Aidinoff, through Sullivan & Cromwell, has derived
and will continue to derive substantial revenues for legal representation at the
mercy of Greenberg, Smith, Tizzio, Tse, Sullivan, Matthews and Wintrob.

184. Defendant Hills could not impartially consider a demand relating to the Starr
commission payments and SICO rental and service fees because she has been (and
continues to be eligible to be) a paid consultant to AIG. Hill's company, Hills &
Company, provided consulting services to AIG on "trade issues" in 2001 and part of
2002. Although AIG does not disclose the amount paid to Hills & Company for these
vaguely described services, Teachers believes it was a sizable sum and a
significant portion of Hills & Company's income given AIG's intensive push in
recent years to expand its worldwide operations, particularly in China. Hills was
therefore dependent upon and beholden to Greenberg, Smith, Tizzio, Tse, Sullivan,
Matthews and Wintrob for this consultancy income.

185. Thus, a majority (at least 11 of 20 directors - namely defendants Greenberg,
Smith, Tse, Sullivan, Wintrob, Broad, Wisner, Aidinoff, and Hills) of the AIG Board
could not have impartially considered a demand related to the multi-million dollar
commission payments to Starr and service and rental fees to SICO. Defendants
tacitly admitted that all board members except Hoenemeyer and Cohen were unable to
impartially consider a demand by the appointment of Hoenemeyer and Cohen to a
special litigation committee charged with examining these original claims. Demand
was (and is) therefore excused as futile as to the original claims.

186. Demand is further excused due to the Board's apathy and unwillingness to even
investigate, let alone challenge, the transactions with Starr and SICO. As Teachers
learned through documents produced to it in response to its October 2002 § 220
demand, at a September 18, 2002 meeting of the AIG Board, defendant Greenberg
responded to a BusinessWeek article that was critical of AIG's corporate governance
in general and its relationships with Starr and SICO in particular. Greenberg
extolled the virtues of these relationships and the need to retain them. He
suggested that the Audit Committee (comprised of Aidinoff, Conable, Hills,
Hoenemeyer, and Zarb) consider engaging AIG's auditors, PricewaterhouseCoopers, "to
review the agency relationships with [AIG] subsidiaries...." Defendant Hoenemeyer
did not accept this invitation. Instead he merely stated that the Audit Committee
would "take such action under advisement." Documents produced in this litigation
demonstrate that Hoenemeyer and the Audit Committee did nothing to investigate the
AIG/Starr relationship until after Teachers - a well-known activist for corporate
governance reform - made its § 220 demand on AIG.

187. What limited and conflicted action the Audit Committee took in response to
Teachers' § 220 demand demonstrates that its members were wholly unable to
impartially consider a demand. They retained PricewaterhouseCoopers ("PwC"), AIG's
auditor, to examine whether AIG's "2001 commission payments [to Starr] reasonable
and customary commercial arrangements." All PwC did on this engagement was to
examine Starr's books to determine what AIG was paying and compare those payments
to market rates PwC obtained "from limited inquiries made by PwC actuaries to 6
unrelated insurance carriers." (PwC report, at SLC2912). This unscientific

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                                    Page 31
2005 WL 1403533 (Del.Ch.)

comparison, without any indicia of comparability of the companies to AIG, found
that in certain instances AIG was paying Starr as much as 4.5% higher commissions
than PwC's comparables. PwC also found that AIG had under-reported the amount of
commission it was paying Starr by at least 8.6%. Despite these glaring facts, PwC
opined that the commission payments (in 2001) were fair, and the Audit Committee
unquestioningly accepted that flawed opinion. Not coincidentally, PwC's fees from
AIG engagements grew from a pre-investigation $26.9 million in 2001 to $44.8
million in post-investigation 2003.

188. This reliance on an obviously flawed, biased and limited in scope fairness
opinion demonstrates that this Board would not carry out its fiduciary duties and
impartially, fairly and adequately consider a demand relating to the Starr and SICO
transactions.

189. Even were the Board inclined to undertake an investigation, one must question
their ability to competently do so. Greenberg, in responding to corporate
governance criticisms in recent years, points to the credentials of the directors.
While many of these directors may be luminaries in their fields (many of them have
a history of careers in the U.S. Foreign Service or trade relations), they each sit
on numerous other boards, committees, and thinktanks. For example, defendant Cohen
is a director of no less than 9 other companies (7 of which are publicly traded)
and is Counsel to a major Canadian law firm. Defendant Futter is the President of
the American Museum of Natural History (a full-time job) and sits on the boards of
three major publicly traded companies (Con-Ed, Bristol-Myers Squibb, and J.P.
Morgan). Defendant Feldstein is a Harvard business professor (again, a full-time
job) and sits on the boards of three significant companies, two of which are
publicly traded, and serves in trustee, officer or member capacity in no less than
20 charitable, lobbying and thinktank organizations. In other words, even the few
board members who might have been able to look at this issue objectively were just
spread too thin to give adequate attention to a demand related to the Starr and
SICO transactions.

190. Finally, the Board demonstrated in the past that it has no interest in
entertaining corporate governance reforms. The few governance proposals that
shareholders have managed to get onto AIG's proxies have met with resounding
management opposition. For example, in 2002 a shareholder proposed that AIG's Board
be required to constitute an independent nominating committee because currently the
entire Board makes nominating decisions. Predictably, management recommended a "no"
vote to this proposal. The Board has not shown the slightest sensitivity toward or
desire to honestly address any criticism levied against AIG's corporate governance
or, in particular, the unusual relationship AIG has with Starr and SICO. Greenberg,
speaking on behalf of the Board, frequently adopted an attitude of "so what" when
confronted with these issues and has suggested that the shareholders ought to be
grateful that AIG has shown such tremendous growth over the years. Phenomenal
growth does not excuse self-dealing, and a Board that thinks it does cannot
adequately consider a demand.

191. Even if demand on the original claims is not measured by the composition of
the Board in December 2002, demand is still futile for the reasons set forth in the
following paragraphs.

DEMAND MEASURED BY TODAY'S BOARD IS STILL FUTILE

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

192. AIG's current board is composed of Aidinoff, Chia, Cohen, William Cohen, Feldstein, Futter, Greenberg, Hammerman, Hills, Holbrooke, Kanak, Miles, Offit, Smith, Sullivan, Tse and Zarb.

193. Defendants Greenberg, Kanak, Smith, Sullivan and Tse cannot impartially consider a demand because they are financially interested in the self-dealing transactions between and among AIG, Starr and SICO.

194. Defendants Kanak, Sullivan and Tse cannot impartially consider a demand because they are full-time employees of AIG and derive their livelihood from such employment. They are beholden to defendants Greenberg and Smith not only for their employment at AIG (as Greenberg and Smith control nearly 20% of AIG's outstanding stock through their directorships of SICO and Starr), but also for their long-term compensation awarded through SICO and their proportionate share of Starr's profits.

195. Defendants Greenberg and Smith cannot impartially consider a demand for the further reason that they asserted their Fifth Amendment right against self-incrimination when they were deposed by the regulatory agencies on the matters challenged in this complaint. Defendant Smith was fired from his CFO position at AIG for failing to cooperate with these investigating authorities.

196. Defendant Hills cannot impartially consider a demand because, as detailed above, she has served as a consultant to AIG and derived substantial income from such retentions.

197. Defendant Hoenemeyer cannot impartially consider a demand because he, as an "expert director" in the field of insurance due to his lengthy career as an executive and director of Prudential Insurance Company of North America, stands to be jointly and severally liable for the harm caused by the transactions complained of herein. As an expert director, he knew or should have known that the transactions were unfair, illegal, and harmful to AIG. Hoenemeyer has actually demonstrated his inability to fairly and thoroughly consider a demand related to claims of unfair or illegal insurance practices, for all the reasons stated in Teachers' Answering Brief In Opposition to the Special Litigation Committee's Motion to Terminate, filed with this Court in January 14, 2005 (the allegations of which are incorporated by reference herein).

198. Defendant Aidinoff cannot impartially consider a demand due to his ties to Sullivan & Cromwell, AIG's outside counsel, as set forth in detail above. Aidinoff is also a director of First SunAmerica Life Insurance Company, a wholly-owned AIG subsidiary, and as such, serves in that position at the pleasure of Greenberg (who controls nearly 20% of AIG's outstanding stock through the Starr/SICO entities). Aidinoff is a council member of the Brookings Institute and the Council on Foreign Relations, to which the Starr Foundation (chaired by Greenberg) gave $1.95 million and $7 million, respectively. The board has already tacitly conceded Aidinoff's inability to impartially consider a demand by failing to appoint him the to Special Litigation Committee charged in 2003 with investigating Teachers' original claims (which are all reasserted herein).

199. Defendant Futter cannot impartially consider a demand because the American Museum of Natural History - of which Futter is President - received a whopping $36.5 million donation from the Starr Foundation (chaired by Greenberg). So profound was Futter's and the museum's gratitude for this gift that they named a

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533
2005 WL 1403533 (Del.Ch.)                                    Page 33

state-of-the-art laboratory at the museum "The C.V. Starr Natural Science Building." In addition to the largesse Greenberg grants to Futter's museum through the Starr Foundation, his personal foundation donates $50,000 to the museum each year. Futter also served Deputy Chairman of the Federal Reserve Bank of New York board while Greenberg was its Chairman.

200. Defendant Chia cannot impartially consider a demand because Greenberg, through the Starr Foundation he chairs, has recently made a $25 million donation to Memorial Sloan-Kettering - a cause dear enough to Chia's heart that he and his family donated between $1 million and $2,499,999 of their own money to the same entity.

201. Defendant Feldstein cannot impartially consider a demand because the Bureau of Economic Research - of which Feldstein is President and CEO - received $2.65 million from the Starr Foundation (chaired by Greenberg) in 2001 and 2002. He also serves on the Council on Foreign Relations with defendants Greenberg, Hills and Aidinoff.

202. Defendant Cohen cannot impartially consider a demand because he has actually demonstrated his inability to fairly and thoroughly consider a demand related to claims of unfair or illegal insurance practices, for all the reasons stated in Teachers' Answering Brief In Opposition to the Special Litigation Committee's Motion to Terminate, filed with this Court in January 14, 2005 (the allegations of which are incorporated by reference herein).

203. William Cohen cannot impartially consider a demand because he is beholden to Greenberg for the Starr Foundation's $1 million donations to the William S. Cohen Center for International Policy and Commerce at the University of Maine in 1999 and 2001.

204. Holbrooke cannot impartially consider a demand because the Starr Foundation (chaired by Greenberg) donated nearly $6 million to the Asia Society during Holbrooke's tenure on the AIG board. The Asia Society is dear to Holbrooke, who has chaired the Society since 2002. The 2001-2002 Annual Report of the Society show that both Greenberg (through Maurice R. and Corrine P. Greenberg, Inc.) and the Starr Foundation each donated more than $5 million.

205. For all the reasons set forth above, a majority of the board (13 of 17 members) cannot impartially consider a demand on the claims alleged herein. Demand is therefore futile.

COUNT I

(For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob, and Wisner)

206. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

207. Plaintiff brings this count derivatively on behalf of AIG against defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob and Wisner.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 34
2005 WL 1403533 (Del.Ch.)

208. These defendants, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

209. These defendants have breached their fiduciary duty of loyalty by approving the insurance transactions between Starr and AIG in 1999 and continuing to allow further commission payments to be made to the present. These transactions resulted in the payment of direct and reinsurance commissions by AIG to Starr, and AIG's giving Starr reinsurance commissions paid by non-AIG reinsurers that rightfully belonged to AIG. The defendants preferred the interests of defendants Greenberg, Tizzio, Tse, Wintrob, Matthews, Smith and Sullivan to those of AIG by approving the payments to Starr, through which defendants Greenberg, Tizzio, Tse, Wintrob, Matthews, Smith and Sullivan personally derived multi-millions of dollars in profit.

210. These defendants have breached their fiduciary duty of care by approving the insurance transactions between AIG and Starr in 1999. These defendants utterly abdicated their duty to inform themselves about the proprietary of using Starr to "produce insurance business," of paying commissions to Starr, or of the structure of the transactions with Starr which allowed Starr to keep the non-AIG reinsurers' commission payments that rightfully belonged to AIG. Their sole consideration of the matter consisted of listening to the interested defendant Greenberg spend a few minutes at a board meeting to describe the relationship between Starr and AIG. They never conducted market surveys or any other valuation technique to gauge the fairness of the amount of the commissions paid to Starr, and they did not participate in any way in negotiating the business transactions between Starr and AIG.

211. As a result of the defendants' breaches of the fiduciary duties of loyalty and care, AIG has been and continues to be damaged.

COUNT II

(For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob and Wisner)

212. Plaintiff repeats and realleges all of the allegations contained in preceding paragraphs as if fully set forth herein.

213. Plaintiff brings this count derivatively on behalf of AIG against defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob and Wisner.

214. These defendants, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

215. The defendants have breached their fiduciary duty of loyalty by approving the insurance transactions between AIG and Starr in 2000 and continuing to allow further commission payments to be made to the present. These transactions resulted in the payment of direct and reinsurance commissions by AIG to Starr, and AIG's giving Starr reinsurance commissions paid by non-AIG reinsurers that rightfully belonged to AIG. The defendants preferred the interests of defendants Greenberg,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                              Page 35
2005 WL 1403533 (Del.Ch.)

Tizzio, Tse, Wintrob, Matthews, Smith and Sullivan to those of AIG by approving the
payments to Starr, through which defendants Greenberg, Tizzio, Tse, Wintrob,
Matthews, Smith and Sullivan personally derived multi-millions of dollars in
profit.

216. These defendants have breached their fiduciary duty of care by approving the
insurance transactions between AIG and Starr in 2000. The defendants utterly
abdicated their duty to inform themselves about the proprietary of using Starr to
"produce insurance business," of paying commissions to Starr, or of the structure
of the transactions with Starr which allowed Starr to keep the non-AIG reinsurers'
commission payments that rightfully belonged to AIG. Their sole consideration of
the matter consisted of listening to the interested defendant Greenberg spend a few
minutes at a board meeting to describe the relationship between Starr and AIG. They
never conducted market surveys or any other valuation technique to gauge the
fairness of the amount of the commissions paid to Starr, and they did not
participate in any way in negotiating the business transactions between Starr and
AIG.

217. As a result of the defendants' breaches of the fiduciary duties of loyalty
and care, AIG has been and continues to be damaged.

COUNT III

(For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Tizzio, Smith, Tse, Wintrob, Wisner and Zarb)

218. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

219. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Tizzio, Smith, Tse, Wintrob, Wisner and Zarb.

220. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

221. These defendants have breached their fiduciary duty of loyalty by approving
the insurance transactions between AIG and Starr in 2001 and continuing to allow
further commission payments to be made to the present. These transactions resulted
in the payment of direct and reinsurance commissions by AIG to Starr, and AIG's
giving Starr reinsurance commissions paid by non-AIG reinsurers that rightfully
belonged to AIG. These defendants preferred the interests of defendants Greenberg,
Tizzio, Tse, Wintrob, Matthews, Smith and Sullivan to those of AIG by approving the
payments to Starr, through which defendants Greenberg, Tizzio, Tse, Wintrob,
Matthews, Smith and Sullivan personally derived multi-millions of dollars in
profit.

222. These defendants have breached their fiduciary duty of care by approving the
insurance transactions between AIG and Starr in 2001. The defendants utterly
abdicated their duty to inform themselves about the proprietary of using Starr to
"produce insurance business," of paying commissions to Starr, or of the structure
of the transactions with Starr which allowed Starr to keep the non-AIG reinsurers'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 36
2005 WL 1403533 (Del.Ch.)

commission payments that rightfully belonged to AIG. Their sole consideration of
the matter consisted of listening to the interested defendant Greenberg spend a few
minutes at a board meeting to describe the relationship between Starr and AIG. They
never conducted market surveys or any other valuation technique to gauge the
fairness of the amount of the commissions paid to Starr, and they did not
participate in any way in negotiating the business transactions between Starr and
AIG.

223. As a result of the defendants' breaches of the fiduciary duties of loyalty
and care, AIG has been and continues to be damaged.

COUNT IV

(For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Smith, Sullivan, Tizzio, Tse, Wintrob, Wisner and Zarb)

224. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

225. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Smith, Sullivan, Tizzio, Tse, Wintrob, Wisner and Zarb.

226. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

227. These defendants have breached their fiduciary duty of loyalty by approving
the insurance transactions between AIG and Starr in 2002 and continuing to allow
further commission payments to be made to the present. These transactions resulted
in the payment of direct and reinsurance commissions by AIG to Starr, and AIG's
giving Starr reinsurance commissions paid by non-AIG reinsurers that rightfully
belonged to AIG. These defendants preferred the interests of defendants Greenberg,
Tizzio, Tse, Wintrob, Matthews, Smith and Sullivan to those of AIG by approving the
payments to Starr, through which defendants Greenberg, Tizzio, Tse, Wintrob,
Matthews, Smith and Sullivan personally derived multi-millions of dollars in
profit.

228. These defendants have breached their fiduciary duty of care by approving the
insurance transactions between AIG and Starr in 2002. These defendants utterly
abdicated their duty to inform themselves about the propriety of using Starr to
"produce insurance business," of paying commissions to Starr, or of the structure
of the transactions with Starr which allowed Starr to keep the non-AIG reinsurers'
commission payments that rightfully belonged to AIG. Their sole consideration of
the matter consisted of listening to the interested defendant Greenberg spend a few
minutes at a board meeting to describe the relationship between Starr and AIG. They
never conducted market surveys or any other valuation technique to gauge the
fairness of the amount of the commissions paid to Starr, and they did not
participate in any way in negotiating the business transactions between Starr and
AIG.

229. As a result of the defendants' breaches of the fiduciary duties of loyalty
and care, AIG has been and continues to be damaged.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### COUNT V

(For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Smith,
Sullivan, Tse, Wintrob, Wisner and Zarb)

230. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

231. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Smith,
Sullivan, Tse, Wintrob, Wisner and Zarb.

232. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

233. These defendants have breached their fiduciary duty of loyalty by approving
the insurance transactions between AIG and Starr in 2003 and continuing to allow
further commission payments to be made to the present. These transactions resulted
in the payment of direct and reinsurance commissions by AIG to Starr, and AIG's
giving Starr reinsurance commissions paid by non-AIG reinsurers that rightfully
belonged to AIG. These defendants preferred the interests of defendants Greenberg,
Tse, Wintrob, Smith and Sullivan to those of AIG by approving the payments to
Starr, through which defendants Greenberg, Tse, Wintrob, Smith and Sullivan
personally derived multi-millions of dollars in profit.

234. These defendants have breached their fiduciary duty of care by approving the
insurance transactions between AIG and Starr in 2003. These defendants utterly
abdicated their duty to inform themselves about the proprietary of using Starr to
"produce insurance business," of paying commissions to Starr, or of the structure
of the transactions with Starr which allowed Starr to keep the non-AIG reinsurers'
commission payments that rightfully belonged to AIG. Their sole consideration of
the matter consisted of listening to the interested defendant Greenberg spend a few
minutes at a board meeting to describe the relationship between Starr and AIG. They
never conducted market surveys or any other valuation technique to gauge the
fairness of the amount of the commissions paid to Starr, and they did not
participate in any way in negotiating the business transactions between Starr and
AIG.

235. As a result of the defendants' breaches of the fiduciary duties of loyalty
and care, AIG has been and continues to be damaged.

### COUNT VI

(For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak,
Smith, Sullivan, Tse and Zarb)

236. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

237. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                      Page 38
2005 WL 1403533 (Del.Ch.)

Smith, Sullivan, Tse and Zarb.

238. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

239. These defendants have breached their fiduciary duty of loyalty by approving
the insurance transactions between AIG and Starr in 2004 and continuing to allow
further commission payments to be made to the present. These transactions resulted
in the payment of direct and reinsurance commissions by AIG to Starr, and AIG's
giving Starr reinsurance commissions paid by non-AIG reinsurers that rightfully
belonged to AIG. These defendants preferred the interests of defendants Greenberg,
Tse, Kanak, Smith, Sullivan and Wintrob to those of AIG by approving the payments
to Starr, through which defendants Greenberg, Tse, Kanak, Smith, Sullivan and
Wintrob personally derived multi-millions of dollars in profit.

240. These defendants have breached their fiduciary duty of care by approving the
insurance transactions between AIG and Starr in 2004. These defendants utterly
abdicated their duty to inform themselves about the proprietary of using Starr to
"produce insurance business," of paying commissions to Starr, or of the structure
of the transactions with Starr which allowed Starr to keep the non-AIG reinsurers'
commission payments that rightfully belonged to AIG. Their sole consideration of
the matter consisted of listening to the interested defendant Greenberg spend a few
minutes at a board meeting to describe the relationship between Starr and AIG. They
never conducted market surveys or any other valuation technique to gauge the
fairness of the amount of the commissions paid to Starr, and they did not
participate in any way in negotiating the business transactions between Starr and
AIG.

241. As a result of the defendants' breaches of the fiduciary duties of loyalty
and care, AIG has been and continues to be damaged.

                                    COUNT VII

      (For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
      Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak,
                          Smith, Sullivan, Tse and Zarb)

242. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

243. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak,
Smith, Sullivan, Tse and Zarb.

244. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

245. These defendants have breached their fiduciary duty of loyalty by approving
the insurance transactions between AIG and Starr in 2005. These transactions
resulted in the payment of direct and reinsurance commissions by AIG to Starr, and
AIG's giving Starr reinsurance commissions paid by non-AIG reinsurers that
rightfully belonged to AIG. These defendants preferred the interests of defendants
Greenberg, Tse, Smith, Kanak, Sullivan and Wintrob to those of AIG by approving the

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                    Page 39
2005 WL 1403533 (Del.Ch.)

payments to Starr, through which defendants Greenberg, Tse, Kanak, Smith, Sullivan and Wintrob personally derived multi-millions of dollars in profit.

246. These defendants have breached their fiduciary duty of care by approving the insurance transactions between AIG and Starr in 2005. These defendants utterly abdicated their duty to inform themselves about the proprietary of using Starr to "produce insurance business," of paying commissions to Starr, or of the structure of the transactions with Starr which allowed Starr to keep the non-AIG reinsurers' commission payments that rightfully belonged to AIG. Their sole consideration of the matter consisted of listening to the interested defendant Greenberg spend a few minutes at a board meeting to describe the relationship between Starr and AIG. They never conducted market surveys or any other valuation technique to gauge the fairness of the amount of the commissions paid to Starr, and they did not participate in any way in negotiating the business transactions between Starr and AIG.

247. As a result of the defendants' breaches of the fiduciary duties of loyalty and care, AIG has been and continues to be damaged.

COUNT VIII

(For Breach of Fiduciary Duty Against Defendants Greenberg, Kanak, Matthews, Smith, Sullivan, Tizzio, Tse and Wintrob)

248. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

249. Plaintiff bring this count derivatively on behalf of AIG against defendants Greenberg, Kanak, Matthews, Smith, Sullivan, Tizzio, Tse and Wintrob.

250. Defendants Greenberg, Kanak, Matthews, Smith, Sullivan, Tizzio, Tse and Wintrob, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

251. Defendants Greenberg, Kanak, Matthews, Smith, Sullivan, Tizzio, Tse and Wintrob have breached their fiduciary duties by usurping AIG's corporate opportunity in originating the insurance policies Starr ultimately placed with AIG and in placing the reinsurance for those insurance policies. The insurance business Starr purportedly generates is clearly within AIG's line of business - after all, the contracts are ultimately underwritten by AIG. Moreover, AIG has mirror companies that produce business in the same insurance lines of business as Starr does, and the key employees at the Starr agencies are also employees of the AIG mirror companies. AIG, a multi-billion dollar company that has consistently generated huge profits, clearly was and continues to be financially able to take advantage of the opportunity. Moreover, AIG, with its myriad of subsidiaries and their own salesforces, was and continues to be capable of providing the "services" Starr purportedly provides. AIG is more than capable - arguably the most capable company in the world - to negotiate its own reinsurance for the business Starr produces. Starr does not possess a single skill set with regard to placing reinsurance that AIG does not have - AIG's skills with regard to reinsurance dwarf Starr's.

252. The opportunity has come to defendants Greenberg, Kanak, Matthews, Smith,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                          Page 40
2005 WL 1403533 (Del.Ch.)

Sullivan, Tizzio, Tse and Wintrob, who currently stand or have stood in the dual
roles of directors of AIG and Starr by their own choosing, and they have not
offered it to AIG. Rather, defendants Greenberg, Kanak, Matthews, Smith, Sullivan,
Tizzio, Tse and Wintrob have preferred their own interests to those of AIG and have
for years taken for themselves over $1 billion dollars in commissions that AIG
never should have had to pay or to forego.

   253. As a result of defendants Greenberg, Kanak, Matthews, Smith, Sullivan,
Tizzio, Tse and Wintrob's breaches of fiduciary duty, AIG has been and continues to
be damaged.

                                 COUNT IX

        (For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
       Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
                  Matthews, Smith, Tizzio, Tse, Wintrob and Wisner)

   254. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

   255. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Smith, Tizzio, Tse, Wintrob and Wisner. These defendants, as directors
and/or officers of AIG, at all times relevant to this count, owed AIG the highest
duties of good faith, fair dealing and loyalty.

   256. The defendants have breached their fiduciary duty of loyalty by approving the
payment of "service" and "rental" fees by AIG to SICO in 1999. The defendants
preferred the interests of defendants Greenberg, Matthews, Kanak, Smith, Sullivan,
Tizzio, Tse and Wintrob to those of AIG by approving the payments to SICO.

   257. These defendants have breached their fiduciary duty of care by approving the
payment of "service" and "rental" fees by AIG to SICO in 1999. These defendants
utterly abdicated their duty to inform themselves about the proprietary of paying
these fees to SICO. Their sole consideration of the matter consisted of listening
to the interested defendant Greenberg spend a few minutes at a board meeting to
describe the relationship between SICO and AIG. They never conducted market surveys
or any other valuation technique to gauge the fairness of the amount of the fees
paid to SICO, and they did not participate in any way in negotiating the business
transactions between SICO and AIG. In fact, there is no evidence that the Board
even knows for what the service and rental fees were being paid.

   258. As a result of the defendants' breaches of the fiduciary duties of loyalty
and care, AIG has been and continues to be damaged.

                                 COUNT X

        (For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
       Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
                  Matthews, Smith, Tizzio, Tse, Wintrob and Wisner)

   259. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

             ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                      Page 41
2005 WL 1403533 (Del.Ch.)

260. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Smith, Tizzio, Tse, Wintrob and Wisner.

261. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

262. These defendants have breached their fiduciary duty of loyalty by approving
the payment of "service" and "rental" fees by AIG to SICO in 2000. These defendants
preferred the interests of defendants Greenberg, Matthews, Smith, Sullivan, Tizzio,
Tse, and Wintrob to those of AIG by approving the payments to SICO.

263. These defendants have breached their fiduciary duty of care by approving the
payment of "service" and "rental" fees by AIG to SICO in 2000. These defendants
utterly abdicated their duty to inform themselves about the proprietary of paying
these fees to SICO. Their sole consideration of the matter consisted of listening
to the interested defendant Greenberg spend a few minutes at a board meeting to
describe the relationship between SICO and AIG. They never conducted market surveys
or any other valuation technique to gauge the fairness of the amount of the fees
paid to SICO, and they did not participate in any way in negotiating the business
transactions between SICO and AIG. In fact, there is no evidence that the Board
even knows for what the service and rental fees were being paid.

264. As a result of the defendants' breaches of the fiduciary duties of loyalty
and care, AIG has been and continues to be damaged.

                                COUNT XI

        (For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
        Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
                  Matthews, Smith, Tizzio, Tse, Wintrob and Wisner)

265. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

266. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Smith, Tizzio, Tse, Wintrob and Wisner.

267. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

268. These defendants have breached their fiduciary duty of loyalty by approving
the payment of "service" and "rental" fees by AIG to SICO in 2001. These defendants
preferred the interests of defendants Greenberg, Tizzio, Tse, Matthews, and Smith
to those of AIG by approving the payments to SICO.

269. These defendants have breached their fiduciary duty of care by approving the
payment of "service" and "rental" fees by AIG to SICO in 2001. These defendants
utterly abdicated their duty to inform themselves about the proprietary of paying
these fees to SICO. Their sole consideration of the matter consisted of listening
to the interested defendant Greenberg spend a few minutes at a board meeting to
describe the relationship between SICO and AIG. They never conducted market surveys

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                        Page 42
2005 WL 1403533 (Del.Ch.)

or any other valuation technique to gauge the fairness of the amount of the fees
paid to SICO, and they did not participate in any way in negotiating the business
transactions between SICO and AIG. In fact, there is no evidence that the Board
even knows for what the service and rental fees were being paid.

270. As a result of these defendants' breaches of the fiduciary duty of loyalty,
AIG has been and continues to be damaged.

COUNT XII

(For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Smith, Sullivan, Tizzio, Tse, Wintrob, Wisner and Zarb)

271. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

272. Plaintiff brings this count derivatively on behalf of AIG against all
defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills,
Hoenemeyer, Matthews, Smith, Sullivan, Tizzio, Tse, Wintrob, Wisner and Zarb.

273. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

274. These defendants have breached their fiduciary duty of loyalty by approving
the payment of "service" and "rental" fees by AIG to SICO in 2002. These defendants
preferred the interests of defendants Greenberg, Matthews, Smith, Sullivan, Tizzio,
Tse, and Wintrob to those of AIG by approving the payments to SICO.

275. These defendants have breached their fiduciary duty of care by approving the
payment of "service" and "rental" fees by AIG to SICO in 2002. These defendants
utterly abdicated their duty to inform themselves about the proprietary of paying
these fees to SICO. Their sole consideration of the matter consisted of listening
to the interested defendant Greenberg spend a few minutes at a board meeting to
describe the relationship between SICO and AIG. They never conducted market surveys
or any other valuation technique to gauge the fairness of the amount of the fees
paid to SICO, and they did not participate in any way in negotiating the business
transactions between SICO and AIG. In fact, there is no evidence that the Board
even knows for what the service and rental fees were being paid.

276. As a result of these defendants' breaches of the fiduciary duty of loyalty,
AIG has been and continues to be damaged.

COUNT XIII

(For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Smith,
Sullivan, Tse, Wintrob, Wisner and Zarb)

277. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

278. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Smith,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Sullivan, Tse, Wintrob, Wisner and Zarb.

279. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

280. These defendants have breached their fiduciary duty of loyalty by approving
the payment of "service" and "rental" fees by AIG to SICO in 2003. These defendants
preferred the interests of defendants Greenberg, Matthews, Smith, Sullivan, Tizzio,
Tse, and Wintrob to those of AIG by approving the payments to SICO.

281. These defendants have breached their fiduciary duty of care by approving the
payment of "service" and "rental" fees by AIG to SICO in 2003. These defendants
utterly abdicated their duty to inform themselves about the proprietary of paying
these fees to SICO. Their sole consideration of the matter consisted of listening
to the interested defendant Greenberg spend a few minutes at a board meeting to
describe the relationship between SICO and AIG. They never conducted market surveys
or any other valuation technique to gauge the fairness of the amount of the fees
paid to SICO, and they did not participate in any way in negotiating the business
transactions between SICO and AIG. In fact, there is no evidence that the Board
even knows for what the service and rental fees were being paid.

282. As a result of these defendants' breaches of the fiduciary duty of loyalty,
AIG has been and continues to be damaged.

                              COUNT XIV

        (For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants
        Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak,
                          Smith, Sullivan, Tse and Zarb)

283. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

284. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak,
Smith, Sullivan, Tse and Zarb.

285. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

286. These defendants have breached their fiduciary duty of loyalty by approving
the payment of "service" and "rental" fees by AIG to SICO in 2004. These defendants
preferred the interests of defendants Greenberg, Matthews, Smith, Sullivan, Tizzio,
Tse, and Wintrob to those of AIG by approving the payments to SICO.

287. These defendants have breached their fiduciary duty of care by approving the
payment of "service" and "rental" fees by AIG to SICO in 2004. These defendants
utterly abdicated their duty to inform themselves about the proprietary of paying
these fees to SICO. Their sole consideration of the matter consisted of listening
to the interested defendant Greenberg spend a few minutes at a board meeting to
describe the relationship between SICO and AIG. They never conducted market surveys
or any other valuation technique to gauge the fairness of the amount of the fees
paid to SICO, and they did not participate in any way in negotiating the business

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533
2005 WL 1403533 (Del.Ch.)

transactions between SICO and AIG. In fact, there is no evidence that the Board even knows for what the service and rental fees were being paid.

288. As a result of these defendants' breaches of the fiduciary duty of loyalty, AIG has been and continues to be damaged.

COUNT XV

(For Breach of The Fiduciary Duties of Loyalty and Care Against Defendants Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak, Smith, Sullivan, Tse and Zarb)

289. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

290. Plaintiff brings this count derivatively on behalf of AIG against defendants Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak, Smith, Sullivan, Tse and Zarb.

291. These defendants, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

292. These defendants have breached their fiduciary duty of loyalty by approving the payment of "service" and "rental" fees by AIG to SICO in 2005. These defendants preferred the interests of defendants Greenberg, Matthews, Smith, Sullivan, Tizzio, Tse, and Wintrob to those of AIG by approving the payments to SICO.

293. These defendants have breached their fiduciary duty of care by approving the payment of "service" and "rental" fees by AIG to SICO in 2005. These defendants utterly abdicated their duty to inform themselves about the proprietary of paying these fees to SICO. Their sole consideration of the matter consisted of listening to the interested defendant Greenberg spend a few minutes at a board meeting to describe the relationship between SICO and AIG. They never conducted market surveys or any other valuation technique to gauge the fairness of the amount of the fees paid to SICO, and they did not participate in any way in negotiating the business transactions between SICO and AIG. In fact, there is no evidence that the Board even knows for what the service and rental fees were being paid.

294. As a result of these defendants' breaches of the fiduciary duty of loyalty, AIG has been and continues to be damaged.

COUNT XVI

(For Breach of Fiduciary Duty Against All Defendants)

295. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

296. Plaintiff brings this count derivatively on behalf of AIG against all defendants.

297. These defendants, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                                 Page 45
2005 WL 1403533 (Del.Ch.)

298. These defendants have breached their fiduciary duty to AIG and its
shareholders by approving transactions with Union Excess. The Union Excess
transactions were improperly accounted for as transactions with a third party. Due
to the tangle of financial arrangements between AIG, SICO and Union Excess, Union
Excess should have been reflected as an AIG company on AIG's consolidated financial
statements. Collapsing Union Excess into AIG's statements has resulted in a minimum
reduction of $1.2 billion to shareholder equity.

299. As a result of these defendants' breach of fiduciary duty, AIG is the subject
of regulatory investigations by, inter alia, the New York Attorney General, the
SEC, and the New York Insurance Department. These investigations are likely to lead
to the imposition of multimillion dollar fines, and possible criminal indictment of
AIG.

300. Also as a result of these defendants' breach of fiduciary duty, AIG is being
forced to restate its financial statements and reduce shareholder equity.

301. AIG has been and continues to be harmed by these defendants' breach of
fiduciary duty.

COUNT XVII

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Broad, Chia, Cohen,
Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak, Matthews, Smith,
Sullivan, Tizzio, Tse, Wintrob, Wisner and Zarb)

302. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

303. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Kanak, Matthews, Smith, Sullivan, Tizzio, Tse, Wintrob, Wisner and Zarb.

304. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

305. These defendants have breached their fiduciary duty to AIG and its
shareholders by approving transactions with Richmond. The Richmond transactions
were improperly accounted for as transactions with a third party. Due to AIG's
control of Richmond, Richmond should have been reflected as an AIG company on AIG's
consolidated financial statements. Collapsing Richmond into AIG's statements will
result in a reduction of shareholder equity in an amount that has yet to be
determined.

306. As a result of these defendants' breach of fiduciary duty, AIG is the subject
of regulatory investigations by, inter alia, the New York Attorney General, the
SEC, and the New York Insurance Department. These investigations are likely to lead
to the imposition of multimillion dollar fines, and possible criminal indictment of
AIG.

307. Also as a result of these defendants' breach of fiduciary duty, AIG is being
forced to restate its financial statements and reduce shareholder equity.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533
2005 WL 1403533 (Del.Ch.)

Page 46

308. AIG has been and continues to be harmed by these defendants' breach of fiduciary duty.

## COUNT XVIII

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob and Wisner)

309. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

310. Plaintiff brings this count derivatively on behalf of AIG against defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob and Wisner.

311. These defendants, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

312. These defendants have breached their fiduciary duty to AIG and its shareholders by approving transactions with Capco in 2000 and for approving the method by which these transactions were accounted for in AIG's financial statements for 2000 through 2003. The Capco transactions were improperly accounted for as transactions with a third party. Capco should have been reflected as an AIG company on AIG's consolidated financial statements. Collapsing Capco into AIG's statements will result in a recharacterization of $200 million in previously reported capital losses to $200 million of underwriting losses.

313. As a result of these defendants' breach of fiduciary duty, AIG is the subject of regulatory investigations by, inter alia, the New York Attorney General, the SEC, and the New York Insurance Department. These investigations are likely to lead to the imposition of multimillion dollar fines, and possible criminal indictment of AIG.

314. Also as a result of these defendants' breach of fiduciary duty, AIG is being forced to restate its financial statements and reduce shareholder equity.

315. AIG has been and continues to be harmed by these defendants' breach of fiduciary duty.

## COUNT XIX

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob, Wisner and Zarb)

316. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

317. Plaintiff brings this count derivatively on behalf of AIG against defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob and Wisner.

318. These defendants, as directors and/or officers of AIG, at all times relevant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 47
2005 WL 1403533 (Del.Ch.)

to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

319. These defendants have breached their fiduciary duty to AIG and its
shareholders by approving transactions with Capco in 2001 and for approving the
method by which these transactions were accounted for in AIG's financial statements
for 2001 through 2003. The Capco transactions were improperly accounted for as
transactions with a third party. Capco should have been reflected as an AIG company
on AIG's consolidated financial statements. Collapsing Capco into AIG's statements
will result in a recharacterization of $200 million in previously reported capital
losses to $200 million of underwriting losses.

320. As a result of these defendants' breach of fiduciary duty, AIG is the subject
of regulatory investigations by, inter alia, the New York Attorney General, the
SEC, and the New York Insurance Department. These investigations are likely to lead
to the imposition of multimillion dollar fines, and possible criminal indictment of
AIG.

321. Also as a result of these defendants' breach of fiduciary duty, AIG is being
forced to restate its financial statements and reduce shareholder equity.

322. AIG has been and continues to be harmed by these defendants' breach of
fiduciary duty.

COUNT XX

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Broad, Chia, Cohen,
Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Sullivan,
Tizzio, Tse, Wintrob and Wisner)

323. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

324. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Smith, Sullivan, Tizzio, Tse, Wintrob and Wisner.

325. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

326. These defendants have breached their fiduciary duty to AIG and its
shareholders by approving transactions with Capco in 2002 and for approving the
method by which these transactions were accounted for in AIG's financial statements
for 2002 through the first three quarters of 2004. The Capco transactions were
improperly accounted for as transactions with a third party. Capco should have been
reflected as an AIG company on AIG's consolidated financial statements. Collapsing
Capco into AIG's statements will result in a recharacterization of $200 million in
previously reported capital losses to $200 million of underwriting losses.

327. As a result of these defendants' breach of fiduciary duty, AIG is the subject
of regulatory investigations by, inter alia, the New York Attorney General, the
SEC, and the New York Insurance Department. These investigations are likely to lead
to the imposition of multimillion dollar fines, and possible criminal indictment of
AIG.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

328. Also as a result of these defendants' breach of fiduciary duty, AIG is being forced to restate its financial statements and reduce shareholder equity.

329. AIG has been and continues to be harmed by these defendants' breach of fiduciary duty.

## COUNT XXI

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Smith, Sullivan, Tse, Wintrob, Wisner and Zarb)

330. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

331. Plaintiff brings this count derivatively on behalf of AIG against defendants Defendants Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Smith, Sullivan, Tse, Wintrob, Wisner and Zarb.

332. These defendants, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

333. These defendants have breached their fiduciary duty to AIG and its shareholders by approving transactions with Capco in 2003 and for approving the method by which these transactions were accounted for in AIG's financial statements for 2003 and the first three quarters of 2004. The Capco transactions were improperly accounted for as transactions with a third party. Capco should have been reflected as an AIG company on AIG's consolidated financial statements. Collapsing Capco into AIG's statements will result in a recharacterization of $200 million in previously reported capital losses to $200 million of underwriting losses.

334. As a result of these defendants' breach of fiduciary duty, AIG is the subject of regulatory investigations by, inter alia, the New York Attorney General, the SEC, and the New York Insurance Department. These investigations are likely to lead to the imposition of multimillion dollar fines, and possible criminal indictment of AIG.

335. Also as a result of these defendants' breach of fiduciary duty, AIG is being forced to restate its financial statements and reduce shareholder equity.

336. AIG has been and continues to be harmed by these defendants' breach of fiduciary duty.

## COUNT XXII

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob, Wisner and Zarb)

337. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

338. Plaintiff brings this count derivatively on behalf of AIG against defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 49
2005 WL 1403533 (Del.Ch.)

Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Smith, Tizzio, Tse, Wintrob, Wisner and Zarb.

339. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

340. These defendants have breached their fiduciary duty to AIG and its
shareholders by approving the C-GAITS transactions in 2001 and for approving the
method by which these transactions were accounted for in AIG's financial statements
for 2001 through 2003. The accounting treatment of those transactions violated
GAAP, and they were structured to allow the companies to overstate their 2001
earnings. One such company, PNC, overstated its 2001 financial statements through
the transfer of $762 million of its troubled assets into an SPE created by AIG.

341. As a result of these defendants' breach of fiduciary duty, AIG was the
subject of regulatory investigations by, inter alia, the SEC and the DOJ.

342. Also as a result of these defendants' breach of fiduciary duty, AIG agreed to
pay an $80 million fine and $46 million into a disgorgement fund.

343. AIG has been and continues to be harmed by these defendants' breach of
fiduciary duty.

COUNT XXIII

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Broad, Chia, Cohen,
Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse,
Wintrob, Wisner and Zarb)

344. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

345. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Matthews, Smith, Tizzio, Tse, Wintrob, Wisner and Zarb.

346. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

347. These defendants have breached their fiduciary duty to AIG and its
shareholders by approving the sale of "income-smoothing" finite insurance products.
The finite insurance products were improperly accounted for as insurance on AIG's
and the purchasing companies' financial statements when they did not qualify as
insurance because there was no transfer of significant risk to AIG.

348. As a result of these defendants' breach of fiduciary duty, AIG was the
subject of regulatory investigations by, inter alia, the SEC, particularly as to
AIG's sale of an income-smoothing product to Brightpoint.

349. Also as a result of these defendants' breach of fiduciary duty, AIG agreed to
pay a $10 million fine and entered into a consent order pursuant to which AIG
agreed not to sell such products again.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

350. AIG has been and continues to be harmed by these defendants' breach of fiduciary duty.

### COUNT XXIV

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob and Wisner)

351. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

352. Plaintiff brings this count derivatively on behalf of AIG against defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob and Wisner.

353. These defendants, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

354. These defendants have breached their fiduciary duty to AIG and its shareholders by approving the payment of contingent commissions to Marsh in an elaborate bid-rigging scheme that fraudulently secured insurance business for AIG in 1999 and 2000 and for approving the method by which these transactions were accounted for in AIG's financial statements for 2000 through 2003.

355. As a result of these defendants' breach of fiduciary duty, AIG was the subject of regulatory investigations by, inter alia, the New York Attorney General, the SEC and the DOJ.

356. At the time of the filing of this complaint, no fewer than four senior AIG executives have plead guilty to felonies connected with the Marsh bid-rigging scheme. The regulatory investigations of AIG's involvement are ongoing, and may well result in severe civil penalties for AIG, or worse - criminal indictment.

357. AIG has been and continues to be harmed by these defendants' breach of fiduciary duty.

### COUNT XXV

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob, Wisner and Zarb)

358. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

359. Plaintiff brings this count derivatively on behalf of AIG against defendants except Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Tizzio, Tse, Wintrob, Wisner and Zarb.

360. These defendants, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

361. These defendants have breached their fiduciary duty to AIG and its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533
2005 WL 1403533 (Del.Ch.)

shareholders by approving the payment of contingent commissions to Marsh in an elaborate bid-rigging scheme that fraudulently secured insurance business for AIG in 2001 and for approving the method by which these transactions were accounted for in AIG's financial statements for 2001 through 2003.

362. As a result of these defendants' breach of fiduciary duty, AIG was the subject of regulatory investigations by, inter alia, the New York Attorney General, the SEC and the DOJ.

363. At the time of the filing of this complaint, no fewer than four senior AIG executives have plead guilty to felonies connected with the Marsh bid-rigging scheme. The regulatory investigations of AIG's involvement are ongoing, and may well result in severe civil penalties for AIG, or worse - criminal indictment.

364. AIG has been and continues to be harmed by these defendants' breach of fiduciary duty.

COUNT XXVI

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Sullivan, Tizzio, Tse, Wintrob, Wisner and Zarb)

365. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

366. Plaintiff brings this count derivatively on behalf of AIG against defendants Aidinoff, Broad, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Matthews, Smith, Sullivan, Tizzio, Tse, Wintrob, Wisner and Zarb.

367. These defendants, as directors and/or officers of AIG, at all times relevant to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

368. These defendants have breached their fiduciary duty to AIG and its shareholders by approving the payment of contingent commissions to Marsh in an elaborate bid-rigging scheme that fraudulently secured insurance business for AIG in 2002 and for approving the method by which these transactions were accounted for in AIG's financial statements for 2002 through the first three quarters of 2004.

369. As a result of these defendants' breach of fiduciary duty, AIG was the subject of regulatory investigations by, inter alia, the New York Attorney General, the SEC and the DOJ.

370. At the time of the filing of this complaint, no fewer than four senior AIG executives have plead guilty to felonies connected with the Marsh bid-rigging scheme. The regulatory investigations of AIG's involvement are ongoing, and may well result in severe civil penalties for AIG, or worse - criminal indictment.

371. AIG has been and continues to be harmed by these defendants' breach of fiduciary duty.

COUNT XXVII

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 52
2005 WL 1403533 (Del.Ch.)

(For Breach of Fiduciary Duty Against Defendants Aidinoff, Chia, Cohen,
Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Smith, Sullivan, Tse, Wintrob,
Wisner and Zarb)

372. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

373. Plaintiff brings this count derivatively on behalf of AIG against defendants
Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Smith,
Sullivan, Tse, Wintrob, Wisner and Zarb.

374. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

375. These defendants have breached their fiduciary duty to AIG and its
shareholders by approving the payment of contingent commissions to Marsh in an
elaborate bid-rigging scheme that fraudulently secured insurance business for AIG
in 2003 and for approving the method by which these transactions were accounted for
in AIG's financial statements for 2003 and the first three quarters of 2004.

376. As a result of these defendants' breach of fiduciary duty, AIG was the
subject of regulatory investigations by, inter alia, the New York Attorney General,
the SEC and the DOJ.

377. At the time of the filing of this complaint, no fewer than four senior AIG
executives have plead guilty to felonies connected with the Marsh bid-rigging
scheme. The regulatory investigations of AIG's involvement are ongoing, and may
well result in severe civil penalties for AIG, or worse - criminal indictment.

378. AIG has been and continues to be harmed by these defendants' breach of
fiduciary duty.

COUNT XXVIII

(For Breach of Fiduciary Duty Against All Defendants Aidinoff, Chia, Cohen,
Feldstein, Futter, Greenberg, Hills, Hoenemeyer, Kanak, Smith, Sullivan, Tse
and Zarb)

379. Plaintiff repeats and realleges all of the allegations contained in the
preceding paragraphs as if fully set forth herein.

380. Plaintiff brings this count derivatively on behalf of AIG against defendants
Defendants Aidinoff, Chia, Cohen, Feldstein, Futter, Greenberg, Hills, Hoenemeyer,
Kanak, Smith, Sullivan, Tse and Zarb.

381. These defendants, as directors and/or officers of AIG, at all times relevant
to this count, owed AIG the highest duties of good faith, fair dealing and loyalty.

382. These defendants have breached their fiduciary duty to AIG and its
shareholders by approving the payment of contingent commissions to Marsh in an
elaborate bid-rigging scheme that fraudulently secured insurance business for AIG
in 2004.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

383. As a result of these defendants' breach of fiduciary duty, AIG was the subject of regulatory investigations by, inter alia, the New York Attorney General, the SEC and the DOJ.

384. At the time of the filing of this complaint, no fewer than four senior AIG executives have plead guilty to felonies connected with the Marsh bid-rigging scheme. The regulatory investigations of AIG's involvement are ongoing, and may well result in severe civil penalties for AIG, or worse - criminal indictment.

385. AIG has been and continues to be harmed by these defendants' breach of fiduciary duty.

COUNT XIX

(Against Defendants Starr, Greenberg, Kanak, Matthews, Smith, Sullivan, Tizzio, Tse and Wintrob For Imposition of a Constructive Trust on the Assets of Starr)

386. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

387. Plaintiff brings this count derivatively on behalf of AIG against defendants Starr, Greenberg, Kanak, Matthews, Smith, Sullivan, Tizzio, Tse and Wintrob for the imposition of a constructive trust on the assets of Starr.

388. The business of Starr was developed with money and resources from AIG, and yet defendants Greenberg, Kanak, Matthews, Smith, Sullivan, Tizzio, Tse and Wintrob, owners of Starr, kept Starr as a separate entity. They caused Starr to engage in insurance transactions with AIG from 1999 to the present in which AIG paid hundreds of millions of dollars in commissions to Starr. During the same time period, Starr also collected and kept reinsurance commissions paid by non-AIG reinsurers, which payments/commissions rightfully belonged to AIG.

389. As a result of these defendants' actions, Starr has been paid more than $1 billion that rightfully belongs to AIG.

390. Plaintiff therefore requests the imposition of a constructive trust on the assets of Starr in the value of all commission payments made by AIG to Starr from 1999 to the present and in the value of all commission payments made by non-AIG reinsurers to Starr from 1999 to the present.

RELIEF REQUESTED

WHEREFORE Plaintiff demands judgment in AIG's favor and prays that the Court enter judgment and relief in AIG's favor, and against Defendants on all counts, as follows:

(a) Declaring that the defendants have breached their fiduciary duties of loyalty and care in approving the payment of commissions to Starr and of service and rental fees to SICO;

(b) Declaring that defendants Greenberg, Smith, Matthews, Sullivan, Tizzio, Kanak, Wintrob and Tse have breached their fiduciary duties by usurping AIG's corporate opportunity in producing insurance business for itself;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 54
2005 WL 1403533 (Del.Ch.)

(c) Declaring that defendants have breached their fiduciary duties in approving
the sale of finite insurance/income-smoothers and the Gen Re, Union Excess,
Richmond, Capco, C-GAITS/GAITS transactions;

(d) Declaring that defendants have breached their fiduciary duties in approving
the payment of contingent commissions to Marsh as part of the bid-rigging scheme to
illegally secure business for AIG;

(e) Declaring that defendant Hoenemeyer is an "expert director" and is therefore
jointly and severally liable for all damages awarded herein;

(f) Imposing a constructive trust on the assets of Starr in the value of all
commission payments made by AIG to Starr from 1999 to the present and in the value
of all commission payments made by non-AIG reinsurers to Starr from 1999 to the
present;

(g) Awarding compensatory damages to AIG, including pre- and post-judgment
interest thereon;

(h) Awarding Teachers the costs and expenses incurred this action, including but
not limited to, attorneys' and expert fees; and

(h) Granting such other relief as may be just and proper.

DATED: May 17, 2005

Stuart M. Grant (Del. Bar I.D. #2526), Cynthia A. Calder (Del. Bar I.D. #2978),
GRANT & EISENHOFER P.A., Chase Manhattan Centre, 1201 North Market Street,
Wilmington, Delaware 19801, (302) 622-7000, (302) 622-7100 (facsimile)

Attorneys for Plaintiff

### Motions, Pleadings and Filings (Back to top)

• 2006 WL 1489693 (Trial Motion, Memorandum and Affidavit) Reply Brief of
Defendants Maurice R. Greenberg and Edward E. Matthews in Further Support of their
Motion to Stay Discovery (Apr. 17, 2006)

• 2006 WL 1489696 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum
of Law in Opposition to Defendants Maurice R. Greenberg and Edward E. Matthews'
Motion to Stay Discovery (Apr. 7, 2006)

• 2006 WL 1084079 (Trial Motion, Memorandum and Affidavit) Defendant Howard I.
Smith's Reply Memorandum in Support of his Motion to Dismiss the Amended Complaint
(Mar. 14, 2006)

• 2006 WL 1489694 (Trial Motion, Memorandum and Affidavit) Defendant C.V. Starr &
Co., Inc.'s Reply Memorandum in Support of its Motion to Dismiss (Mar. 14, 2006)

• 2006 WL 1489697 (Trial Motion, Memorandum and Affidavit) Defendant Howard I.
Smith's Reply Memorandum in Support of his Motion to Dismiss the Amended Complaint
(Mar. 14, 2006)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1403533                                                    Page 55
2005 WL 1403533 (Del.Ch.)


• 2006 WL 1084076 (Trial Motion, Memorandum and Affidavit) Plaintiff Teachers'
Retirement System of Louisiana's Consolidated Answering Brief in Opposition to the
Motions to Dismiss of Defendants Maurice R. Greenberg, Edward E. Matthews and
Howard I. Smith (Feb. 1, 2006)

• 2006 WL 1084078 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of
Plaintiff's Opposition to C.V. Starr & Co., Inc's Motion to Dismiss (Feb. 1, 2006)

• 2006 WL 1489695 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of
Plaintiff's Opposition to C.V. Starr & Co., Inc.'s Motion to Dismiss (Feb. 1, 2006)

• 2005 WL 3670889 (Trial Motion, Memorandum and Affidavit) Opening Brief of
Defendants Maurice R. Greenberg and Edward E. Matthews in Support of their Motion
to Dismiss (Oct. 31, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

July 21, 2006 05:49 PM US Eastern Timezone

## AIMA Announces Agreement with National Liability and Fire Insurance Company

NEW YORK—(BUSINESS WIRE)—July 21, 2006—American International Marine Agency, Inc. (AIMA), a wholly owned subsidiary of C. V. Starr & Co., Inc., today announced a new agreement with National Liability and Fire Insurance Company, a member of the Berkshire Hathaway group of insurance companies, which will expand the agency's servicing capabilities. The leading insurance agency for the marine industry, AIMA said that the relationship with National Liability and Fire Insurance Company will allow the agency to immediately offer $100 Million of commercial underwriting capacity to its clients.

"Our new agreement with National Liability and Fire Insurance Company ensures that AIMA will continue to offer the breadth of tailored marine products and services that have made the company an industry leader for more than 60 years," said David French, President, AIMA. "It also reflects our commitment to providing superior coverage and solutions, through the industry's top companies, that meet our clients' needs."

About American International Marine Agency, Inc.

American International Marine Agency, Inc. (AIMA), a wholly-owned subsidiary of C. V. Starr & Co. Inc., produces ocean marine insurance for cargo, hull and marine liability risks, and covers multinationals, importers, exporters, manufacturers and logistics operators. AIMA is the U.S. market leader in cargo, with a dominant position in multinational and complex risk management segment. The longest standing traditional marine underwriter in North America and a market leader for nearly 60 years, AIMA is a leading marine writer in the United States and one of the top marine writers worldwide.

About C. V. Starr & Co. Inc.

C. V. Starr & Co. Inc. is an independently-owned holding company with insurance agencies and a portfolio of global investments. Through its wholly owned insurance agencies, C. V. Starr historically has produced approximately $2 billion annually of comprehensive insurance coverage among several specialty lines covering aviation, marine, excess casualty and property, including risks with international exposures. These agencies provide a broad spectrum of value-added specialized services including claims handling and settlement, risks assessment and loss prevention, and customer focused attention. C. V. Starr also has more than $3 billion in investment assets that include public and private equity, hedge funds and alternative assets. C. V. Starr's significant presence in global markets, backed by the company's international expertise, has made it an industry leader for more than 50 years. The company is headquartered in New York City.



Contacts
Weber Shandwick
Brooke Parker, 212-445-81



EXHIBIT D

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00811 - Berkshire Hathaway Insurance Group

Page 1

Berkshire Hathaway Insurance Group

# BERKSHIRE HATHAWAY INSURANCE GROUP

**1440 Kiewit Plaza, Omaha, Nebraska, United States 68131**
**Web:www.berkshirehathaway.com**

Tel: 402-346-1400
AMB#:  00811

Fax:  402-346-3375

## KEY FINANCIAL INDICATORS

Statutory Data ($000)

| Period Ending | Direct Premiums Written | Net Premiums Written | Pretax Operating Income |
|---|---|---|---|
| 2001 | 7,861,198 | 12,001,171 | -1,823,089 |
| 2002 | 9,491,979 | 15,742,195 | 2,332,135 |
| 2003 | 11,056,177 | 16,475,840 | 5,936,914 |
| 2004 | 12,019,088 | 16,714,444 | 5,097,858 |
| 2005 | 13,487,690 | 17,315,834 | 5,850,957 |
| 03/2005 | 3,317,280 | 4,656,514 | 2,759,040 |
| 03/2006 | 3,748,774 | 5,341,388 | 1,594,247 |

Statutory Data ($000)

| Period Ending | Net Income | Total Admitted Assets | Policy- holders' Surplus |
|---|---|---|---|
| 2001 | -251,267 | 74,783,698 | 27,511,565 |
| 2002 | 2,065,542 | 80,541,451 | 28,762,102 |
| 2003 | 5,737,183 | 94,456,487 | 41,208,669 |
| 2004 | 4,682,707 | 103,830,968 | 49,164,895 |
| 2005 | 12,380,841 | 113,869,432 | 52,435,464 |
| 03/2005 | 2,922,918 | 106,575,799 | 49,541,455 |
| 03/2006 | 1,325,653 | 111,321,589 | 51,465,701 |

(*) Data reflected within all tables of this report has been compiled through the A.M. Best Consolidation of statutory filings. Within several financial tables of this report, this group is compared against the Private Passenger Automobile Composite.
(*) The most recent data contained in this Best's Company Report is "As Received" indicating that this financial data was recorded as it was received from the company. While the data provided were obtained from sources believed to be reliable, their accuracy cannot be guaranteed.

## CORPORATE OVERVIEW

Berkshire Hathaway Inc. ("Berkshire") is a holding company that is engaged in various business activities the most important of which are the insurance and reinsurance businesses through more than 50 domestic and international affiliates. Collectively, these subsidiaries comprise the Berkshire Hathaway Insurance Group (BHIG), which ranks among the 15 largest groups, based on net premiums, and is the largest capitalized property / casualty group in the United States. In 2005 Berkshire's consolidated revenues, including realized capital investment gains totaled $81.6 billion and at December 31 shareholders' equity was $91.5 billion.

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00811 - Berkshire Hathaway Insurance Group

Page 2

BHIG insurance and reinsurance operations are managed through four major business segments as follows: (1) General Re, which provides reinsurance coverage on a global basis, with significant international reinsurance operations conducted through affiliates, primarily Gesellschaft AG ("Cologne Re") in Germany; (2) GEICO, which provides private passenger automobile insurance in 48 states and the District of Columbia; (3) Berkshire Hathaway Reinsurance Group led by the National Indemnity Company, which is engaged primarily in excess of loss and quota share reinsurance to other insurers and reinsurers ; and (4) Berkshire Hathaway Primary Group which is comprised of a variety of smaller primary property casualty insurance operations offering products through insurance agents and brokers.

Premiums earned in 2005 by General Re represented 8% of the Berkshire's consolidated revenues before realized capital gains. Comparatively, GEICO's premiums were 13% of consolidated revenues, Berkshire Hathaway Reinsurance Group generated 5% of consolidated revenues, and Berkshire Hathaway Direct Insurance contributed about 2% of consolidated revenues. Investment income related to these four insurance and reinsurance operations generated 5% of the Berkshire's consolidated revenues in 2005.

Berkshire's non-insurance business activities collectively contributed approximately 67% of consolidated revenues, a percentage that has trended higher in recent years are these businesses have grown significantly through acquisitions since 1999. These business operations, which are diverse in nature, include apparel, building products, flight services, retail, finance and financial products, and manufacturing and distribution enterprises. The group's various business operations are managed autonomously by managers who are well versed in their respective discipline, the largest of which is McLane Company, a former Walmart subsidiary and a distributor of groceries and non-food items to targeted clients that was acquired in 2003. The group's overall objective is to maximize shareholder value over the long-term through the creation of intrinsic value. Because insurance operations represent the group's largest business segment, their overall operating performance has a material effect on Berkshire's financial performance. However, management takes a long-term view relative to these operations, anticipating some near term earnings volatility due to the nature of the insurance business. Therefore, insurance operations are evaluated on their long term operating performance and generation of float for investment purposes.

For the forty-three rated insurance companies, A. M. Best assigns six group financial strength letter ratings as well as four individual ratings. The assignment of a group rating to multiple companies considers their common managerial, operating and financial strength platforms.

The first letter rating applies to the General Reinsurance Corporation and its sixteen core US and international property / casualty and life reinsurance and insurance affiliates. The second rating is assigned to the Government Employees Group, comprised of four core insurance companies, led by Government Employees Insurance Company. The third rating applies to the National Indemnity Company and its nine strategically related companion carriers, which comprise the National Indemnity Group. The fourth rating applies to the Berkshire Hathaway Homestate Companies, which is comprised of six property casualty companies. The fifth rating applies to United States Liability Insurance Group which is comprised of three specialty lines writers and the sixth rating applies to North American Casualty Group, comprised of two insurance companies. The four standalone companies, Central States Indemnity Company, Kansas Bankers Surety Company, Medical Protective, and Fairfield Insurance Company, which, although a part of the Berkshire Hathaway Insurance Group operate on a stand-alone basis through an autonomous management team and serve specialty markets in credit insurance, banking industry, medical malpractice and select clients respectively.

# CORPORATE STRUCTURE

| AMB # | COMPANY NAME | DOMICILE | %OWN |
|---|---|---|---|
| 58334 | *Berkshire Hathaway Inc* | DE | |
| 58383 | *General Re Corporation* | DE | 100.00 |
| 02198 | General Reinsurance Corp | DE | 100.00 |
| 03806 | General Star Indemnity Co | CT | 100.00 |
| 87931 | General Star Intl Indemnity | United Kingdom | 100.00 |
| 00646 | General Star National Ins Co | OH | 100.00 |
| 10758 | Genesis Insurance Company | CT | 100.00 |
| 10757 | Genesis Indemnity Ins Co | ND | 100.00 |
| 50512 | Gen Re Holding Limited | DE | 100.00 |
| 50513 | *Reinsurance Undrg Services Ltd* | United Kingdom | 100.00 |
| 86483 | General Reinsurance UK Limited | United Kingdom | 100.00 |
| 84326 | General & Cologne Re Brasil | Brazil | 79.00 |
| 86052 | General Reins Australia Ltd | Australia | 100.00 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00911 - Berkshire Hathaway Insurance Group

| | | | |
|---|---|---|---|
| 50514 | *GRD Corporation* | DE | 100.00 |
| 50515 | *General Re-CKAG Reins&Inv SARL* | Luxemburg | 100.00 |
| 85310 | Koelnische Rueckversicherungs | Germany | 75.00 |
| 50516 | *Cologne Holding Co of America* | CT | 100.00 |
| 51135 | *Cologne Re Managers Corporatio* | DE | 100.00 |
| 03676 | Cologne Reinsurance Co of Amer | CT | 100.00 |
| 73206 | General & Cologne Lf Re (BB) | Barbados | 75.00 |
| 06234 | General Re Life Corporation | CT | 100.00 |
| 09326 | IdeaLife Ins Co | CT | 100.00 |
| 86630 | Europa Rueck AG | Germany | 75.00 |
| 86628 | Faraday Reinsurance Co Ltd | United Kingdom | 100.00 |
| 86624 | Cologne Re Co (Dublin) Ltd | Ireland | |
| 51136 | *Cologne Reins Finance Hldgs BV* | Netherlands | 100.00 |
| 84336 | General & Cologne Re (Bermuda) | Bermuda | 100.00 |
| 57173 | General Cologne Re (B'dos) Ltd | Barbados | 100.00 |
| 84322 | GeneralCologne Re Mexico SA | Mexico | 100.00 |
| 84327 | GeneralCologne Re Ruckvers AG | Austria | 100.00 |
| 86651 | GeneralCologne Re Africa Ltd | South Africa | |
| 86652 | General Reins Life Australia | Australia | 100.00 |
| 84323 | General & Cologne Re Riga SIA | Latvia | 100.00 |
| 84324 | General & Cologne Re Iberica | Spain | 100.00 |
| 86629 | General Reinsurance Life UK | United Kingdom | 100.00 |
| 84325 | General Cologne Re Scandinavia | Denmark | 100.00 |
| 58427 | *National Re Corporation* | DE | 100.00 |
| 02124 | National Reinsurance Corp | DE | 100.00 |
| 11242 | Fairfield Insurance Company | CT | 100.00 |
| 02199 | North Star Reinsurance Corp | DE | 100.00 |
| 51137 | *GRD Holding Corporation* | | 100.00 |
| 84335 | General Re (Bermuda) Ltd | Bermuda | 100.00 |
| 50517 | *OBH Inc* | DE | 100.00 |
| 50518 | *BH Columbia Inc* | NE | 100.00 |
| 04330 | Columbia Insurance Company | NE | 100.00 |
| 50411 | *Medical Protective Corporation* | IN | 100.00 |
| 00591 | Medical Protective Company | IN | 100.00 |
| 02421 | Republic Insurance Company | TX | 100.00 |
| 50519 | *Blue Chip Stamps* | CA | 100.00 |
| 50520 | *Wesco Financial Corporation* | DE | 82.10 |
| 50521 | *Wesco Holdings Midwest Inc* | NE | 100.00 |
| 02026 | Wesco-Financial Insurance Co | NE | 100.00 |
| 00533 | Kansas Bankers Surety Company | KS | 100.00 |
| 12334 | Brookwood Insurance Company | IA | 100.00 |
| 50522 | *Central States of Omaha Cos* | NE | 82.00 |
| 02660 | Central States Indemnity Co | NE | 100.00 |
| 08488 | CSI Life Insurance Company | AZ | 100.00 |
| 00308 | Cypress Insurance Company (CA) | CA | 100.00 |
| 02428 | National Fire & Marine Ins Co | NE | 100.00 |
| 04329 | Redwood Fire & Cas Ins Co | NE | 100.00 |
| 02429 | National Indemnity Company | NE | 100.00 |
| 87960 | Berkshire Hathaway Intl Ins | United Kingdom | 100.00 |
| 60060 | Berkshire Hathaway Life of NE | NE | 100.00 |
| 60200 | BHG Life Insurance Company | NE | 100.00 |
| 04207 | Cornhusker Casualty Company | NE | 100.00 |
| 60389 | First Berkshire Hathaway Life | NY | 100.00 |
| 03722 | Oak River Insurance Company | NE | 100.00 |
| 03770 | Continental Divide Ins Co | CO | 100.00 |
| 58381 | *GEICO Corporation* | DE | 99.20 |
| 02204 | GEICO Indemnity Company | MD | 100.00 |
| 01737 | GEICO Casualty Company | MD | 100.00 |
| 02205 | Government Employees Ins Co | MD | 100.00 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00811 - Berkshire Hathaway Insurance Group

Page 4

| 01852 | GEICO General Insurance Co | MD | 100.00 |
|---|---|---|---|
| 04406 | National Indem Co of Mid-Amer | IA | 100.00 |
| 01824 | National Indem Co of the South | FL | 100.00 |
| 86491 | Tenecom Limited | United Kingdom | 100.00 |
| 03775 | Unione Italiana Reins of Amer | NY | 100.00 |
| 00481 | National Liab & Fire Ins Co | CT | 100.00 |
| 50523 | *U S Investment Corporation* | PA | 100.00 |
| 02540 | Mount Vernon Fire Ins Co | PA | 100.00 |
| 03736 | U S Underwriters Insurance Co | ND | 100.00 |
| 02541 | United States Liability Ins Co | PA | 100.00 |

32.3% of Berkshire Hathaway Inc. is owned by Warren E. Buffett. The other 8% of GEICO Corporation is owned by Cypress Insurance Company.

## 2005 BUSINESS PRODUCTION AND PROFITABILITY ($000)

| Product<br><br>Line | Premiums Written | | % of<br>Total<br><br>NPW | Pure<br>Loss<br>Ratio | Loss<br><br>& LAE<br>Reserves |
|---|---|---|---|---|---|
| | Direct | Net | | | |
| Priv Pass Auto Liab | 6,443,841 | 6,449,174 | 37.2 | 61.8 | 5,210,562 |
| Auto Physical | 3,745,998 | 3,800,036 | 21.9 | 62.3 | 394,576 |
| Reins-Property | ... | 1,975,392 | 11.4 | 165.3 | 5,280,847 |
| Reins-Casualty | ... | 1,482,349 | 8.6 | 139.3 | 11,143,931 |
| Workers' Comp | 578,496 | 690,954 | 4.0 | 79.9 | 1,644,995 |
| Oth Liab Occur | 667,109 | 651,549 | 3.8 | 43.9 | 2,275,044 |
| Aircraft | 394,017 | 560,988 | 3.2 | 24.9 | 325,866 |
| Med Mal Cl-Made | 431,275 | 332,469 | 1.9 | 59.5 | 823,527 |
| Med Mal Occur | 278,752 | 305,677 | 1.8 | 74.2 | 803,444 |
| All Other | 948,202 | 1,067,245 | 6.2 | 25.7 | 2,010,102 |
| Totals | 13,487,690 | 17,315,834 | 100.0 | 77.5 | 29,912,894 |

# HISTORY

The Berkshire Hathaway Insurance Group consists of: National Indemnity Company and National Fire & Marine Insurance Company acquired in 1967; Redwood Fire & Casualty Insurance Company, acquired in 1976; Continental Divide Insurance Company, formed in 1978; Cornhusker Casualty Company, formed in 1970; National Indemnity Company of the South, formed in 1983; National Indemnity Company of Mid-America, formed in 1971; and Oak River Insurance Company, formed in 1977.

The Berkshire Hathaway Insurance Group also includes: Central States Indemnity Company of Omaha, acquired in 1992; Columbia Insurance Company, incorporated in 1970; Cypress Insurance Company, acquired in 1977; National Liability & Fire Insurance Company, acquired in 1971; and Wesco-Financial Insurance Company, incorporated in 1985. The life/health members of the group are CSI Life (formerly Aksarben Life Insurance Company), acquired in 1992, Berkshire Hathaway Life Insurance Company of Nebraska, incorporated in 1993 and BHG Life Insurance Company incorporated in 1996. Kansas Bankers Surety Company was acquired in 1996. Also, on January 2, 1996 the balance of outstanding shares of GEICO Corporation, the sixth largest auto insurer in the United States, were acquired by National Indemnity Company. Accordingly, GEICO Corporation is a wholly owned indirect subsidiary of Berkshire Hathaway Inc. On December 21, 1998 General Re Corporation and its insurance and financial service subsidiaries became subsidiaries of the Berkshire Hathaway Inc. upon completion of a merger between the two companies.

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

National Liability & Fire Insurance Company

Group Affiliation: Berkshire Hathaway Insurance Group

# NATIONAL LIABILITY & FIRE INSURANCE COMPANY

Stamford, Connecticut, United States
3024 Harney Street, Omaha, Nebraska, United States 68131
Web:www.nationalindemnity.com

Tel: 402-536-3000
AMB#: 00481
FEIN#: 36-2403971

Fax: 402-536-3350
NAIC#: 20052

## BEST'S RATING

Based on our opinion of the consolidated Financial Strength of the property/casualty members of National Indemnity Group, which operate under a group structure, each group member is assigned a Best's Rating of A++ (Superior). The company is assigned the Financial Size Category of Class XV, which is the Financial Size Category of the group.

## RATING RATIONALE

The following text is derived from the report of National Indemnity Group.

**Rating Rationale:** The rating applies to National Indemnity Company and its seven affiliated non-life and life insurance companies that support the group's operating profile.

The rating reflects the group's core importance within the Berkshire Hathaway collection of insurance and non-insurance organizations; its superior risk-adjusted capitalization; premier market profile; superior although irregular earnings stream; strong investment base; astute management and extraordinary liquidity. These strengths are demonstrated in the group's significant underwriting capacity in both reinsurance and primary lines of business, unsurpassed claims paying ability and the operating flexibility to respond opportunistically to new and emerging market risks.

Management's conservative risk management strategy has enabled the group to absorb significant adversity while maintaining ample capacity to support its ongoing business risks. Although the group writes "super cat" and terrorism coverage, its largest per occurrence catastrophe exposure is manageable at less than 20% of statutory surplus due to its disciplined underwriting approach.

The group has also demonstrated the underwriting expertise to achieve favorable underwriting returns over the long term, despite volatility in underwriting performance stemming from high severity losses. On an economic basis, the group has generated excellent total returns on revenue, averaging 11.4% over the past ten years, benefiting from a business model predicated by low cost "float" generated by the group's long-term reinsurance contracts.

Modestly offsetting these positive factors is the group's considerable common stock leverage, which is concentrated in a limited number of large publicly rated U.S. corporations. Management's long-standing investment philosophy has been to maximize its average annual rate of return through a buy and hold strategy of a limited number but diversified group of well-developed and stable companies. Such investments have generated significant unrealized capital gains over the long term, contributing to the group's superior level of capitalization.

A.M. Best believes National Indemnity could currently withstand the compound effect of a mega-catastrophe and moderate devaluation in its invested assets while still maintaining its superior financial strength.

**Best's Rating: A++g**

**Outlook: Stable**

## FIVE YEAR RATING HISTORY

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

Page 2

| Date | Best's Rating |
|---|---|
| 05/09/06 | A++g |
| 01/20/05 | A++g |
| 05/05/04 | A++g |
| 11/24/03 | A++g |
| 06/02/03 | A++g |
| 08/19/02 | A++g |
| 09/27/01 | A++g |

# KEY FINANCIAL INDICATORS

### Statutory Data ($000)

| Period Ending | Direct Premiums Written | Net Premiums Written | Pretax Operating Income |
|---|---|---|---|
| 2001 | 67,919 | 43,087 | 1,953 |
| 2002 | 182,713 | 97,270 | 22,046 |
| 2003 | 255,504 | 130,575 | 44,116 |
| 2004 | 240,741 | 158,947 | 54,919 |
| 2005 | 493,912 | 294,112 | 51,091 |
| 03/2005 | 62,184 | 38,852 | 7,399 |
| 03/2006 | 139,009 | 96,696 | 38,394 |

### Statutory Data ($000)

| Period Ending | Net Income | Total Admitted Assets | Policy-holders' Surplus |
|---|---|---|---|
| 2001 | 879 | 296,838 | 164,490 |
| 2002 | 12,416 | 409,541 | 167,237 |
| 2003 | 38,542 | 538,526 | 235,989 |
| 2004 | 35,000 | 654,764 | 278,812 |
| 2005 | 101,519 | 882,950 | 306,730 |
| 03/2005 | 4,686 | 571,818 | 283,970 |
| 03/2006 | 22,913 | 870,435 | 384,810 |

| | Profitability | | | Leverage | | | Liquidity | |
|---|---|---|---|---|---|---|---|---|
| Period Ending | Comb. Ratio | Inv. Yield (%) | Pretax ROR (%) | NA Inv Lev | NPW to PHS | Net Lev | Overall Liq (%) | Oper. Cash-flow (%) |
| 2001 | 100.2 | 2.0 | 6.5 | 115.9 | 0.3 | 1.1 | 227.7 | 214.9 |
| 2002 | 73.0 | 2.8 | 30.0 | 116.5 | 0.6 | 2.0 | 170.9 | 191.9 |
| 2003 | 63.8 | 1.9 | 38.7 | 97.8 | 0.6 | 1.8 | 179.9 | 178.5 |
| 2004 | 67.8 | 1.7 | 36.4 | 83.5 | 0.6 | 1.9 | 176.7 | 276.9 |
| 2005 | 83.2 | 2.7 | 20.6 | 75.8 | 1.0 | 2.7 | 157.4 | 223.4 |
| 5-Yr Avg | 75.4 | 2.2 | 28.2 | ... | ... | ... | ... | ... |
| 03/2005 | 87.3 | XX | 19.2 | XX | 0.6 | 1.6 | 202.5 | 46.2 |
| 03/2006 | 65.6 | XX | 41.4 | XX | 0.9 | 2.1 | 185.1 | 83.4 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

(*) Data reflected within all tables of this report has been compiled from the company-filed statutory statement. Within several financial tables of this report, this company is compared against the Commercial Automobile Composite.

(*) The most recent data contained in this Best's Company Report is "As Received" indicating that this financial data was recorded as it was received from the company. While the data provided were obtained from sources believed to be reliable, their accuracy cannot be guaranteed.

# BUSINESS REVIEW

This company specializes in writing commercial automobile business in several states. Business is marketed through a network of independent general agencies located throughout the country. The company also writes workers' compensation business principally in California and Alabama. Starting in 2004, the company insures aviation risks as a result of its net participation in a Canadian aviation pool through its licensed Canadian Branch.

The following text is derived from the report of National Indemnity Group.

The National Indemnity Group is primarily engaged in the underwriting of specialized reinsurance covers for primary insurers and reinsurers. The group also underwrites special risk and standard commercial insurance through National Indemnity Company and six other strategically related subsidiaries. These companies collectively generated approximately $11.4 billion in net premium revenue in 2005, of which a significant portion is assumed from its affiliate, General Reinsurance Company. Reinsurance operations currently represent more than three-quarters of the group's unaffiliated underwriting activity and have been the driver for growth. The group also provides primary coverages for the life and non-life markets.

The group has historically been opportunistic in its approach to third party reinsurance business, seeking new business opportunities where market demand and its exceptional financial strength provide a clear advantage in setting contract terms and conditions. The group's reinsurance segment specializes in property catastrophe (super-cat) reinsurance, individual risk, non-traditional covers such as retroactive reinsurance arrangements and other multi-line reinsurance that include other contracts that are written on both a quota share and excess basis. Business is solicited both on a direct and broker market basis.

The super-cat and individual risk contracts provide coverage for large catastrophe exposures of U.S. and worldwide primary insurance and reinsurance companies. It is one of the largest providers of catastrophe excess of loss and individual risk reinsurance coverage, often hundreds of millions and occasionally in excess of $1 billion. The group manages its catastrophe related exposure from all business underwritten on an aggregate basis, with accumulations monitored by geographical zone. Given the group's exceptional financial strength, it has the capacity to comfortably reinsure large pools of catastrophe prone exposures, such as hurricanes, earthquakes, or other natural disasters or other property risks such as aviation and aerospace, commercial multi-peril or terrorism. Terrorism exposures underwritten exclude losses resulting from chemical, biological or nuclear attack, and generally attach above a high deductible and have manageable coverage limits. Catastrophic and individual business written represented 39% of premiums earned in 2004.

The group's retroactive reinsurance business indemnifies the ceding company with respect to past loss events previously insured or reinsured by the cedent. Although these contracts are typically subject to an aggregate limit, it is generally expected that the ultimate losses paid under these agreements will exceed the original premium by a wide margin. The loss margin plus any profit is derived from the investment income earned on the underwriting "float". As it is anticipated that claim payments relative to this type of reinsurance contracts will be made over an extended period of time, "float" is created by investment of the original premium, which is the discounted value of assumed loss reserves, based on time-value-of-money calculations. Therefore the estimation of the ultimate loss, pay-out pattern (tail) of losses and investment yield are critical to the pricing and ultimate profitability of each transaction. Recorded retroactive reinsurance reserves are not discounted; consequently the initial loss upon inception of the contract is recorded as other expense and is not included in net underwriting income. Generally, the group writes a few, relatively large individual retroactive reinsurance transactions in any single year.

The other multi-line business are reinsurance contracts that are written on both a quota share and excess-of loss basis and include the run-off of major quota share contracts from the 1970's and 1980's as well as participations in and contracts with Lloyds syndicates. It also has other reinsurance contracts, which includes intra-group reinsurance and the run-off of Omaha based reinsurance operations from the 1970's - 1980's.

The primary or direct operations include a wide variety of smaller traditional insurance business for commercial accounts, predominately commercial automobile and general liability coverages distributed through general agents. In addition, the group participates in aviation risk pools and underwrites workers compensation and medical malpractice programs.

The group also offers "tailored" business for large complex risks, which generally comes through brokerage channels, and submissions, which are independently reviewed and priced. This business ranges from excess products liability and excess umbrella to excess E&O and D&O, usually covering major corporations.

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

The direct operations also manages structured settlement business written on behalf of individual and group claims settled with periodic payments from casualty insurance carriers through its two affiliated life insurance companies. BHLN's past annuity business was substantially guaranteed by Berkshire Hathaway, Inc. or Columbia Insurance Company, however, recent annuity contracts to not carry such a guarantee.

## 2005 BUSINESS PRODUCTION AND PROFITABILITY ($000)

| Product | Premiums Written | | % of Total | Pure Loss | Loss & LAE |
|---|---|---|---|---|---|
| Line | Direct | Net | NPW | Ratio | Reserves |
| Workers' Comp | 257,594 | 139,725 | 47.5 | 58.3 | 87,321 |
| Aircraft | 146,928 | 64,941 | 22.1 | 21.4 | 19,734 |
| Comm'l Auto Liab | 61,508 | 61,106 | 20.8 | 41.1 | 72,512 |
| Auto Physical | 19,032 | 19,037 | 6.5 | 33.1 | 2,989 |
| All Other | 8,849 | 9,303 | 3.2 | 110.4 | 21,064 |
| Totals | 493,912 | 294,112 | 100.0 | 48.2 | 203,620 |

**Major 2005 Direct Premium Writings By State ($000):** California, $249,992 (50.6%); Alabama, $20,785 (4.2%); Illinois, $9,830 (2.0%); Florida, $8,337 (1.7%); Georgia, $7,736 (1.6%); 42 other jurisdictions, $69,905 (14.2%); Canada, $36,387 (7.4%); Aggregate Alien, $90,940 (18.4%).

# FINANCIAL PERFORMANCE

The following text is derived from the report of National Indemnity Group.

**Overall Earnings:** Despite increased losses from catastrophes and earnings volatility stemming from assumed retroactive reinsurance contracts, National Indemnity Group's historical total return on surplus, including realized capital gains, during the ten-year period performed well relative to the reinsurance industry, averaging 11.4%. Generally favorable underwriting performance and strong investment performance has contributed to this long-term trend. Underwriting and other operating losses have historically been significantly offset by net investment income and realized capital gains. The group's sizable common stock portfolio has generated significant capital gains over the long term and has contributed favorably to the group's superior level of capitalization. Despite interim earnings set backs, such as that experienced on September 11, 2001 and in 2005 from the US hurricanes, over the longer-term, A.M. Best expects the group to sustain superior returns despite potential volatility in year-over-year results stemming from the nature of its business. This is reflective of the group's total return philosophy which emphasizes underwriting discipline and long-term investment performance.

## PROFITABILITY ANALYSIS

| | Company | | | | Industry Composite | | | |
|---|---|---|---|---|---|---|---|---|
| Period Ending | Pretax ROR (%) | Return on PHS(%) | Comb. Ratio | Oper. Ratio | Pretax ROR (%) | Return on PHS(%) | Comb. Ratio | Oper. Ratio |
| 2001 | 6.5 | -12.7 | 100.2 | 81.2 | 4.7 | 5.2 | 102.4 | 92.9 |
| 2002 | 30.0 | 10.2 | 73.0 | 61.7 | 8.6 | -1.4 | 96.6 | 90.0 |
| 2003 | 38.7 | 34.4 | 63.8 | 57.3 | 11.7 | 23.3 | 92.0 | 84.9 |
| 2004 | 36.4 | 16.3 | 67.8 | 62.2 | 8.0 | 13.2 | 98.9 | 91.7 |
| 2005 | 20.6 | 17.0 | 83.2 | 76.2 | 7.2 | 10.3 | 101.0 | 92.6 |
| 5-Yr Avg | 28.2 | 13.3 | 75.4 | 67.8 | 8.3 | 10.7 | 98.0 | 90.3 |
| 03/2005 | 19.2 | XX | 87.3 | 79.4 | XX | XX | XX | XX |
| 03/2006 | 41.4 | XX | 65.6 | 57.6 | XX | XX | XX | XX |

**Underwriting Income:** In recent years National Indemnity Group has benefited from a favorable pricing environment in traditional reinsurance programs written, in contrast to the late 1990s and early 2000s when the group generally stayed on the sidelines in anticipation of more attractive opportunities when the market hardened. The group has built up its unearned premiums which will continue to earn into income over the next few years. At the beginning of 2005, the group negotiated a

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

significant loss portfolio transfer (LPT) and quota share agreements primarily with one of its reinsurance affiliates groups within the Berkshire Hathaway group. Accordingly A. M. Best anticipates that its future underwriting performance will likely be more unstable than in the past, as the LPT contains a sizeable book of assumed casualty risk from the 1997 - 2001 accident years that continue to develop adversely for the US reinsurance sector. However, on an economic basis, the group's historical total return performance should remain above average, due to its solid investment performance benefited by an increased level of "float" created from reinsurance contracts having a long duration.

Due to the accounting treatment for the LPT, incurred loss and loss expense ratios for accident years prior to 2005 are significantly overstated, while the 2005 accident year ratios are understated. Further, the group's reserve development for accident years prior to 2005 is distorted by the amounts of those reserves assumed for those accident years. The increased unfavorable one year net loss and loss expense development from the LPT was approximately $7.6 billion.

## UNDERWRITING EXPERIENCE

| Year | Net Undrw Income ($000) | Pure Loss | LAE | Loss & LAE | Net Comm | Other Exp. | Total Exp. | Div. Pol. | Comb Ratio |
|------|------|------|------|------|------|------|------|------|------|
| 2001 | -3,951 | 54.5 | 15.4 | 69.9 | 20.6 | 9.7 | 30.3 | ... | 100.2 |
| 2002 | 14,206 | 38.8 | 10.2 | 49.1 | 18.1 | 5.8 | 23.9 | ... | 73.0 |
| 2003 | 36,835 | 29.2 | 7.1 | 36.3 | 22.6 | 4.8 | 27.4 | ... | 63.8 |
| 2004 | 46,333 | 34.2 | 5.7 | 39.9 | 19.7 | 8.1 | 27.8 | ... | 67.8 |
| 2005 | 30,262 | 48.2 | 9.7 | 57.9 | 11.0 | 14.3 | 25.3 | ... | 83.2 |
| | | | | | | | | | |
| 5-Yr Avg | ... | 40.4 | 8.6 | 49.0 | 16.5 | 9.8 | 26.3 | 0.0 | 75.4 |
| | | | | | | | | | |
| 03/2005 | 4,752 | 44.7 | 9.8 | 54.5 | XX | XX | 32.8 | ... | 87.3 |
| 03/2006 | 31,085 | 35.6 | 8.9 | 44.5 | XX | XX | 21.1 | ... | 65.6 |

**Investment Income:** The group's historical pre-tax net investment yield reflects management's investment philosophy to maximize long-term investment returns through a buy and hold strategy of common stocks and the generally lower overall yield provided by stocks in relation to bonds. As a result, the group produces considerably higher total return on investments (i.e., including all realized and unrealized capital gains) relative to its peers over a ten-year horizon at 10.8%, reflecting the generally favorable equity market and skillful investing which produced returns exceeding those of the leading stock averages in the early years. A.M. Best expects the group's level of investment income to remain favorable due to its sizeable and growing asset base.

## INVESTMENT INCOME ANALYSIS ($000)

| Year | Net Inv Income | Company Realized Capital Gains | Unrealized Capital Gains |
|------|------|------|------|
| 2001 | 5,742 | 0 | -28,072 |
| 2002 | 8,291 | 0 | 4,525 |
| 2003 | 7,339 | 16,212 | 30,873 |
| 2004 | 8,424 | ... | 6,946 |
| 2005 | 17,261 | 73,787 | -51,869 |
| | | | |
| 03/2005 | 3,039 | 131 | -1,159 |
| 03/2006 | 7,353 | -38 | 3,300 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

| | Company | | | Industry Composite | |
|---|---|---|---|---|---|
| | Inv Inc Growth | Inv Yield | Total Return | Inv Inc Growth | Inv Yield |
| Year | (%) | (%) | (%) | (%) | (%) |
| 2001 | -5.9 | 2.0 | -7.3 | -1.8 | 4.4 |
| 2002 | 44.4 | 2.8 | 4.3 | -1.7 | 3.9 |
| 2003 | -11.5 | 1.9 | 15.4 | 24.1 | 3.9 |
| 2004 | 14.8 | 1.7 | 3.1 | 17.9 | 3.7 |
| 2005 | 104.9 | 2.7 | 6.2 | 20.6 | 4.0 |
| 5-Yr Avg | 31.1 | 2.2 | 4.8 | 12.7 | 4.0 |
| 03/2005 | XX | XX | 0.4 | XX | XX |
| 03/2006 | XX | XX | 1.4 | XX | XX |

## INVESTMENT PORTFOLIO ANALYSIS

| Asset Class | 2005 Inv Assets ($000) | % of Invested Assets | | Annual % Chg |
|---|---|---|---|---|
| | | 2005 | 2004 | |
| Long-Term bonds | 142,420 | 19.7 | 2.6 | 865.3 |
| Stocks | 232,616 | 32.2 | 40.6 | -0.1 |
| Affiliated Investments | ... | ... | 5.4 | -99.9 |
| Other Inv Assets | 347,242 | 48.1 | 51.4 | 18.0 |
| Total | 722,277 | 100.0 | 100.0 | 26.1 |

## 2005 BOND PORTFOLIO ANALYSIS

| Asset Class | % of Total Bonds | Mkt Val to Stmt Val(%) | Avg. Maturity (Yrs) | Class 1 - 2 (%) | Class 3 - 6 (%) | Struc. Secur. (%) | Struc. Secur. (% of PHS) |
|---|---|---|---|---|---|---|---|
| Governments | 97.5 | -0.6 | 1.3 | 100.0 | ... | ... | ... |
| States, terr & poss | 0.0 | -1.6 | 9.4 | 100.0 | ... | ... | ... |
| Corporates | 2.5 | ... | 0.5 | 100.0 | ... | ... | ... |
| Total all bonds | 100.0 | -0.6 | 1.3 | 100.0 | ... | ... | ... |

## CAPITALIZATION

The following text is derived from the report of National Indemnity Group.

**Capital Generation:** Capital generation for National Indemnity Group is primarily driven by the "float" which its sizeable invested asset base generates. While favorable underwriting results also contribute to capital generation, it is the significant invested asset base which provides a stable base for consistency in capital generation. Notably, when the insurance market enters its soft cycle, the group usually pulls back from the insurance and reinsurance markets. Likewise in a market upturn, the group is able to capitalize on its exceptional surplus base to write coverages at limits that no other reinsurance company has the capacity to do. Because of the massive equity base, prudent underwriting discipline and investment strategies, the group has a substantial cushion protecting its liability base.

In 2001, the group reported a 36.8% decline in surplus driven by an adjustment to record a net deferred tax liability mandated by a revision to the NAIC accounting standards, unrealized losses and stockholders' dividends. However by the end of 2004, this decline had been more than offset from earnings as the group increased premium growth in tandem with a healthy rate environment and an increase in investment returns, including realized and unrealized capital gains. A.M. Best anticipates that the group's future growth in surplus will continue to be influenced by prudent investment earnings, supported by underwriting earnings.

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

## CAPITAL GENERATION ANALYSIS ($000)

| | Source of Surplus Growth | | |
|---|---|---|---|
| Year | Pretax Operating Income | Total Inv. Gains | Net Contrib. Capital |
| 2001 | 1,953 | -28,072 | ... |
| 2002 | 22,046 | 4,525 | -16,000 |
| 2003 | 44,116 | 47,085 | ... |
| 2004 | 54,919 | 6,946 | ... |
| 2005 | 51,091 | 21,918 | ... |
| 5-Yr Total | 174,126 | 52,402 | -16,000 |
| 03/2005 | 7,399 | -1,028 | ... |
| 03/2006 | 38,394 | 3,261 | 50,000 |

| | Source of Surplus Growth | | |
|---|---|---|---|
| Year | Other, Net of Tax | Change in PHS | PHS Growth (%) |
| 2001 | -72,531 | -98,650 | -37.5 |
| 2002 | -7,825 | 2,747 | 1.7 |
| 2003 | -22,449 | 68,752 | 41.1 |
| 2004 | -19,042 | 42,823 | 18.1 |
| 2005 | -45,091 | 27,918 | 10.0 |
| 5-Yr Total | -166,938 | 43,591 | ... |
| 03/2005 | -1,213 | 5,158 | 1.8 |
| 03/2006 | -13,575 | 78,080 | 25.5 |

**Overall Capitalization:** The group maintains outstanding capitalization, reflective of its conservative premium leverage, with over $43 billion of surplus supporting $27 billion of loss reserves as of year end 2005, including losses assumed under retroactive reinsurance contracts, nominal reinsurance dependence, and well managed exposure to man made and natural catastrophes. Partially offsetting these positive factors is the group's considerably higher asset risk due to its substantial, and relatively concentrated, equity portfolio. However, this is somewhat mitigated by the high quality of its equity holdings which is comprised largely of long term holdings of blue chip issues. The group's superior capitalization is further enhanced by the considerable financial strength and flexibility of its parent, Berkshire Hathaway Inc., which maintains modest financial leverage, access to the capital markets, and a long history of strong capital growth.

## QUALITY OF SURPLUS ($000)

| | | % of PHS | | | Dividend Requirements | | |
|---|---|---|---|---|---|---|---|
| Year | Year-End PHS | Cap Stk/ Contrib. Cap. | Other | Un-assigned Surplus | Stock-holder Divs | Div to POI (%) | Div to Net Inc. (%) |
| 2001 | 164,490 | 30.9 | 0.1 | 69.0 | ... | ... | ... |
| 2002 | 167,237 | 30.4 | 0.3 | 69.3 | -16,000 | 72.6 | 128.9 |
| 2003 | 235,989 | 21.5 | 0.1 | 78.3 | ... | ... | ... |
| 2004 | 278,812 | 18.2 | 0.1 | 81.7 | ... | ... | ... |
| 2005 | 306,730 | 16.6 | 0.1 | 83.3 | ... | ... | ... |
| 03/2005 | 283,970 | 17.9 | 0.1 | 82.0 | ... | ... | ... |
| 03/2006 | 384,810 | 26.2 | 0.1 | 73.7 | ... | ... | ... |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

**Underwriting Leverage:** The group's underwriting leverage stems from its relatively modest premium and loss reserve base in relation to surplus. Even with consideration of approximately $10 billion of loss reserves assumed through retroactive reinsurance transactions, the group's loss reserves are considerably less than 1x its reported surplus position. Partially offsetting this conservative position is the group's exposure to high severity losses stemming from the risk profile of business underwritten, although management rigorously controls its risk accumulation by zone to cap potential losses.

Over the five-year period, net premium volume has generally increased, but in 2005 due largely to assumed business from an affiliate, as rates for third party business had begun to decline. This is reflective of the group's opportunistic approach to its business, focusing solely on profitability and not knowingly accepting business at inadequate rates.

## LEVERAGE ANALYSIS

| | | | Company | | Industry Composite | | | |
|---|---|---|---|---|---|---|---|---|
| Year | NPW to PHS | Reserves to PHS | Net Lev | Gross Lev | NPW to PHS | Reserves to PHS | Net Lev | Gross Lev |
| 2001 | 0.3 | 0.2 | 1.1 | 1.1 | 1.1 | 0.8 | 2.7 | 4.5 |
| 2002 | 0.6 | 0.3 | 2.0 | 2.1 | 1.3 | 0.9 | 3.3 | 5.0 |
| 2003 | 0.6 | 0.3 | 1.8 | 1.9 | 1.2 | 0.8 | 3.1 | 4.7 |
| 2004 | 0.6 | 0.4 | 1.9 | 1.9 | 1.2 | 0.9 | 3.2 | 5.1 |
| 2005 | 1.0 | 0.7 | 2.7 | 2.8 | 1.1 | 1.0 | 3.0 | 5.0 |
| | | | | | | | | |
| 03/2005 | 0.6 | 0.4 | 1.6 | XX | XX | XX | XX | XX |
| 03/2006 | 0.9 | 0.6 | 2.1 | XX | XX | XX | XX | XX |

Current BCAR: 224.1

## PREMIUM COMPOSITION & GROWTH ANALYSIS

| Period Ending | DPW ($000) | DPW (% Chg) | GPW ($000) | GPW (% Chg) |
|---|---|---|---|---|
| 2001 | 67,919 | 289.4 | 72,896 | 180.4 |
| 2002 | 182,713 | 169.0 | 237,503 | 225.8 |
| 2003 | 255,504 | 39.8 | 270,210 | 13.8 |
| 2004 | 240,741 | -5.8 | 308,437 | 14.1 |
| 2005 | 493,912 | 105.2 | 584,530 | 89.5 |
| | | | | |
| 5-Yr CAGR | ... | 95.2 | ... | 86.4 |
| 5-Yr Change | ... | 999.9 | ... | 999.9 |
| | | | | |
| 03/2005 | 62,184 | 59.2 | 64,277 | 53.7 |
| 03/2006 | 139,009 | 123.5 | 157,844 | 145.6 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

Page 9

| Period | NPW | | NPE | |
|--------|-----|-----|-----|-----|
| Ending | ($000) | (% Chg) | ($000) | (% Chg) |
| 2001 | 43,087 | 118.1 | 30,233 | 84.4 |
| 2002 | 97,270 | 125.8 | 73,517 | 143.2 |
| 2003 | 130,575 | 34.2 | 114,108 | 55.2 |
| 2004 | 158,947 | 21.7 | 150,792 | 32.1 |
| 2005 | 294,112 | 85.0 | 248,382 | 64.7 |
| 5-Yr CAGR | ... | 71.6 | ... | 72.2 |
| 5-Yr Change | ... | 999.9 | ... | 999.9 |
| 03/2005 | 38,852 | 32.9 | 38,470 | 19.9 |
| 03/2006 | 96,696 | 148.9 | 92,721 | 141.0 |

**Reserve Quality:** The group's reserve development has historically been adequate, with relatively modest reserve deficiencies or redundancies reported over the past ten years on both a calendar and accident year basis. In addition, the group has established conservative reserve levels for emerging asbestos and environmental claims.

In addition to statutory reserves reported under Schedule P, the group has also established reserves for retroactive reinsurance contracts totaling $10 billion at YE 2005 which include A&E liabilities and latent injury losses that are believed to be concentrated under various retroactive reinsurance agreements and are not included in the tables relating to Footnote 33. After considering all reserves assumed under retroactive reinsurance National Indemnity Group's net A&E reserves account for less than one-third of its overall carried loss reserve base. However, relative to the group's total surplus, overall reserve leverage remains low at considerably less than 1x, which provides ample cushion for any potential adverse development. In addition, most retroactive covers are written with aggregate limits to cap ultimate liability.

Due to the accounting treatment for the LPT with an affiliate, the group's reserve development for accident years prior to 2005 is distorted by the amounts of those reserves assumed for those accident years. The increased unfavorable one year net loss and loss expense development from the LPT was approximately $7.6 billion.

## LOSS & ALAE RESERVE DEVELOPMENT: CALENDAR YEAR ($000)

| Calendar Year | Original Loss Reserves | Developed Reserves Thru 2005 | Develop. to Orig.(%) | Develop. to PHS (%) | Develop. to NPE (%) | Unpaid Reserves @ 12/2005 | Unpaid Reserves Resrv. to Dev.(%) |
|---------------|----------|----------|----------|----------|----------|----------|----------|
| 2000 | 23,690 | 12,824 | -45.9 | -4.1 | 78.2 | 4,793 | 37.4 |
| 2001 | 32,523 | 26,999 | -17.0 | -3.4 | 89.3 | 8,307 | 30.8 |
| 2002 | 48,272 | 36,589 | -24.2 | -7.0 | 49.8 | 14,450 | 39.5 |
| 2003 | 64,166 | 55,002 | -14.3 | -3.9 | 48.2 | 31,933 | 58.1 |
| 2004 | 101,631 | 99,338 | -2.3 | -0.8 | 65.9 | 72,345 | 72.8 |
| 2005 | 184,214 | 184,214 | ... | ... | 74.2 | 184,214 | 100.0 |

## LOSS & ALAE RESERVE DEVELOPMENT: ACCIDENT YEAR ($000)

| Accident Year | Original Loss Reserves | Developed Reserves Thru 2005 | Develop. to Orig.(%) | Unpaid Reserves @12/2005 | Acc Yr. Loss Ratio | Acc Yr. Comb Ratio |
|---------------|----------|----------|----------|----------|----------|----------|
| 2000 | 8,321 | 4,101 | -50.7 | 466 | 45.3 | 83.6 |
| 2001 | 18,572 | 18,109 | -2.5 | 3,514 | 83.7 | 114.0 |
| 2002 | 26,341 | 17,502 | -33.6 | 6,143 | 38.6 | 62.5 |
| 2003 | 33,546 | 29,958 | -10.7 | 17,483 | 38.0 | 65.5 |
| 2004 | 56,869 | 56,660 | -0.4 | 40,412 | 45.3 | 73.1 |
| 2005 | 111,869 | 111,869 | ... | 111,869 | 59.8 | 85.1 |

## ASBESTOS & ENVIRONMENTAL (A&E) RESERVES ANALYSIS

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

Page 10

| | | Company | | |
|---|---|---|---|---|
| | | Net A&E | Reserve | Net |
| | | Reserves | Retention | IBNR |
| Year | | ($000) | (%) | Mix (%) |
| 2001 | | 361 | 100.0 | ... |
| 2002 | | 361 | 100.0 | ... |
| 2003 | | 406 | 100.0 | ... |
| 2004 | | 239 | 100.0 | 83.7 |
| 2005 | | 281 | 100.0 | 71.3 |

| | | Company | | Industry Composite | |
|---|---|---|---|---|---|
| | | Comb | Comb | | Comb | Comb |
| | Survival | Ratio | Ratio | Survival | Ratio | Ratio |
| | Ratio | Impact | Impact | Ratio | Impact | Impact |
| Year | (3 yr) | (1 yr) | (3 yr) | (3 yr) | (1 yr) | (3 yr) |
| 2001 | ... | -0.5 | ... | ... | 1.4 | ... |
| 2002 | ... | 0.0 | ... | ... | 2.3 | ... |
| 2003 | 54.1 | 0.0 | 0.0 | 8.5 | 1.7 | 1.8 |
| 2004 | 28.6 | -0.1 | 0.0 | 7.8 | 1.4 | 1.8 |
| 2005 | 14.4 | 0.0 | 0.0 | 8.0 | 1.0 | 1.4 |

**Reinsurance Utilization:** Due to the group's excellent capacity to absorb large losses and management's desire not to take on reinsurance credit risk, minimizes use of external retrocession covers choosing instead to spread its losses with internal reinsurance arrangements amongst its member companies. The group's strong surplus position mitigates its exposures to frequency of loss and is such that in an extraordinary catastrophic event, such as a major earthquake in California, its pre-tax loss would be about $6.0 billion or approximately 14% of surplus as of year-end 2005. Management monitors its aggregate exposure by geographic zone in order to keep its worst case loss at a comfortable level.

### CEDED REINSURANCE ANALYSIS ($000)

| | Company | | | Industry Composite | | |
|---|---|---|---|---|---|---|
| | Ceded | Business | Rein Rec | Ceded | Business | Rein Rec | Ceded |
| | Reins | Retention | to PHS | Reins to | Retention | to PHS | Reins to |
| Year | Total | (%) | (%) | PHS (%) | (%) | (%) | PHS(%) |
| 2001 | 7,238 | 59.1 | 3.0 | 4.4 | 48.8 | 104.0 | 186.5 |
| 2002 | 7,732 | 41.0 | 2.7 | 4.6 | 57.1 | 103.0 | 175.2 |
| 2003 | 8,864 | 48.3 | 2.1 | 3.8 | 56.8 | 91.8 | 160.7 |
| 2004 | 11,895 | 51.5 | 2.4 | 4.3 | 56.3 | 99.5 | 192.1 |
| 2005 | 20,811 | 51.1 | 5.4 | 6.8 | 55.8 | 109.2 | 196.5 |

### 2005 REINSURANCE RECOVERABLES ($000)

| | Paid & Unpaid Losses | IBNR | Unearned Premiums | Other Recov* | Total Reins Recov |
|---|---|---|---|---|---|
| US Affiliates | 22,167 | 72,431 | 145,738 | ... | 240,336 |
| US Insurers | ... | 103 | ... | ... | 103 |
| Pools/Associations | 13,838 | 468 | 2,209 | ... | 16,515 |
| Total (ex US Affils) | 13,838 | 571 | 2,209 | ... | 16,618 |
| Grand Total | 36,005 | 73,002 | 147,947 | ... | 256,954 |

* Includes Commissions less Funds Withheld

**Investment Leverage:** The National Indemnity Group maintains high investment leverage largely due to its concentration in common stocks which represents roughly 67% of its surplus at year-end 2005 versus a norm of 44% for the reinsurance industry. Management's long standing strategy has been to maximize its long-term returns through a buy and hold strategy. Investments

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

Page 11

are diversified with well-established and stable U.S. corporations that are anticipated to consistently achieve above average returns. While the group maintains considerable investment leverage, this is largely mitigated by its lower underwriting and manageable catastrophe leverage. As such, A.M. Best does not anticipate that management would be forced to liquidate its holdings to meet claims obligations even under a worst-case catastrophe scenario.

## INVESTMENT LEVERAGE ANALYSIS (% OF PHS)

| | | | | | | | Industry Composite | |
| | Company | | | | | | | |
| Year | Class 3-6 Bonds | Real Estate/ Mtg. | Other Invested Assets | Common Stocks | Non-Affl Inv. Lev. | Affil Inv. | Class 3-6 Bonds | Common Stocks |
|---|---|---|---|---|---|---|---|---|
| 2001 | ... | ... | ... | 115.9 | 115.9 | 9.3 | 5.4 | 37.7 |
| 2002 | ... | ... | ... | 116.5 | 116.5 | 10.0 | 6.4 | 34.8 |
| 2003 | ... | ... | ... | 97.8 | 97.8 | 11.3 | 6.7 | 40.1 |
| 2004 | ... | ... | ... | 83.5 | 83.5 | 11.2 | 4.9 | 47.5 |
| 2005 | ... | ... | ... | 75.8 | 75.8 | ... | 6.3 | 50.0 |

# LIQUIDITY

The following text is derived from the report of National Indemnity Group.

The group's balance sheet liquidity is outstanding, with quick and current liquidity ratios exceeding those of its peers. Additionally, the group's liquidity position is enhanced by historically strong underwriting and net cash flows. However, in previous years, operating cash flow has been somewhat more volatile, due to payments related to retroactive reinsurance transactions. This volatility is compensated for by a robust level of realized capital gains and the substantial financial flexibility of the group and its parent Berkshire Hathaway Inc. due to its substantial size, modest financial leverage, and long history of capital growth.

## LIQUIDITY ANALYSIS

| | Company | | | | Industry Composite | | | |
| Year | Quick Liq (%) | Current Liq (%) | Overall Liq (%) | Gross Agents Bal to PHS(%) | Quick Liq (%) | Current Liq (%) | Overall Liq (%) | Gross Agents Bal to PHS(%) |
|---|---|---|---|---|---|---|---|---|
| 2001 | 187.9 | 218.0 | 227.7 | 3.0 | 49.4 | 130.4 | 162.5 | 16.3 |
| 2002 | 115.1 | 190.5 | 170.9 | 52.8 | 47.8 | 116.6 | 151.3 | 18.2 |
| 2003 | 168.3 | 194.7 | 179.9 | 38.3 | 48.8 | 123.7 | 154.2 | 14.0 |
| 2004 | 182.4 | 199.8 | 176.7 | 26.9 | 41.0 | 120.5 | 151.1 | 14.0 |
| 2005 | 142.5 | 170.8 | 157.4 | 38.9 | 45.9 | 125.2 | 151.7 | 11.7 |
| | | | | | | | | |
| 03/2005 | XX | 180.5 | 202.5 | 7.5 | XX | XX | XX | XX |
| 03/2006 | XX | 165.9 | 185.1 | 19.1 | XX | XX | XX | XX |

## CASH FLOW ANALYSIS ($000)

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

Page 12

| | | | Company | | | Industry Composite | |
|---|---|---|---|---|---|---|---|
| Year | Underw Cash Flow | Oper Cash Flow | Net Cash Flow | Underw Cash Flow (%) | Oper Cash Flow (%) | Underw Cash Flow (%) | Oper Cash Flow (%) |
| 2001 | 21,247 | 26,876 | 39,538 | 192.5 | 214.9 | 95.8 | 118.7 |
| 2002 | 50,571 | 46,742 | -58,631 | 224.9 | 191.9 | 120.9 | 139.9 |
| 2003 | 71,979 | 66,822 | 146,693 | 221.7 | 178.5 | 131.9 | 134.8 |
| 2004 | 121,484 | 123,962 | 124,873 | 288.9 | 276.9 | 122.0 | 126.8 |
| 2005 | 155,637 | 163,589 | 52,354 | 229.1 | 223.4 | 119.6 | 128.3 |
| 03/2005 | -7,739 | -18,638 | -35,207 | 65.8 | 46.2 | XX | XX |
| 03/2006 | 25,381 | -14,240 | 46,030 | 164.8 | 83.4 | XX | XX |

# HISTORY

This company was incorporated on April 23, 1957 under the laws of Illinois and began business December 9, 1958. The original title was Home and Automobile Insurance Company until July 2, 1987, when the current title was adopted. On December 6, 1995, the company redomesticated from Illinois to Connecticut.

Capital paid-up of $5,000,000 consists of 1,000,000 common shares at $5.00 par value each. The company has 2,000,000 shares authorized.

# MANAGEMENT

Complete financial control since August 20, 1980 has resided with Berkshire Hathaway Inc. (Delaware), Omaha, Nebraska. The holding company purchased its interest on that date from its wholly owned subsidiary, National Indemnity Company, Omaha, Nebraska. Financial control (32%) of the holding company is held by Warren E. Buffett. This insurance company is one of 39 insurance carriers under the financial sponsorship of Berkshire Hathaway Inc.

Officers: President, Donald F. Wurster; Executive Vice President and Secretary, Forrest N. Krutter; Senior Vice Presidents, Scott R. Doerr, Philip M. Wolf; Vice Presidents, John D. Arendt, Leslie J. Baller, Joseph G. Casaccio, J. Michael Gottschalk, Tracy L. Gulden, Jerome Y. S. H. Halgan, Michael J. Lawler, Joseph R. Liuzzi, Kara L. Raigue, Karen L. Rainwater, Thomas M. Ryan, Brian G. Snover, Robert S. Stirling, Walter C. Strain; Treasurer and Controller, Dale D. Geistkemper.

Directors: J. Michael Gottschalk, Marc D. Hamburg, Ajit Jain, Forrest N. Krutter, Brian G. Snover, Philip M. Wolf, Donald F. Wurster.

# REGULATORY

An examination of the financial condition was made as of December 31, 2001 by the Insurance Department of Connecticut. The 2005 annual independent audit of the company was conducted by Deloitte & Touche, LLP. The annual statement of actuarial opinion is provided by Ronald L. Wilson, Ph. D, FCAS, MAAA, Beneficial Consultants, LLC.

# TERRITORY

The company is licensed in the District of Columbia, AL, AK, AZ, AR, CA, CO, CT, DE, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MI, MN, MS, MO, MT, NE, NV, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI and WY. It is also licensed in all Canadian provinces and territories.

# REINSURANCE PROGRAMS

The following text is derived from the report of National Indemnity Group.

The group generally does not utilize external retrocession covers, choosing instead to spread its losses with internal reinsurance arrangements amongst its member companies. The National Indemnity Group's tremendous capital position comfortably protects it from exposures related to mega-catastrophes and other risks.

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006-1)
00481 - National Liability & Fire Insurance Company

# BALANCE SHEET ($000)

| ADMITTED ASSETS | 12/31/2005 | 12/31/2004 | 2005 % | 2004 % |
|---|---|---|---|---|
| Bonds | 142,420 | 14,754 | 16.1 | 2.3 |
| Common stock | 232,616 | 232,771 | 26.3 | 35.6 |
| Cash & short-term invest | 346,102 | 293,747 | 39.2 | 44.9 |
| Investments in affiliates | ... | 31,159 | ... | 4.8 |
| Total invested assets | 721,138 | 572,431 | 81.7 | 87.4 |
| Premium balances | 119,483 | 75,092 | 13.5 | 11.5 |
| Accrued interest | 1,140 | 439 | 0.1 | 0.1 |
| All other assets | 41,190 | 6,802 | 4.7 | 1.0 |
| Total assets | 882,950 | 654,764 | 100.0 | 100.0 |

| LIABILITIES & SURPLUS | 12/31/2005 | 12/31/2004 | 2005 % | 2004 % |
|---|---|---|---|---|
| Loss & LAE reserves | 203,620 | 111,599 | 23.1 | 17.0 |
| Unearned premiums | 115,174 | 69,444 | 13.0 | 10.6 |
| Conditional reserve funds | 15,368 | 5,480 | 1.7 | 0.8 |
| All other liabilities | 242,058 | 189,430 | 27.4 | 28.9 |
| Total liabilities | 576,220 | 375,952 | 65.3 | 57.4 |
| Capital & assigned surplus | 51,113 | 51,134 | 5.8 | 7.8 |
| Unassigned surplus | 255,617 | 227,678 | 29.0 | 34.8 |
| Total policyholders' surplus | 306,730 | 278,812 | 34.7 | 42.6 |
| Total liabilities & surplus | 882,950 | 654,764 | 100.0 | 100.0 |

# SUMMARY OF 2005 OPERATIONS ($000)

| STATEMENT OF INCOME | 12/31/2005 | FUNDS PROVIDED FROM OPERATIONS | 12/31/2005 |
|---|---|---|---|
| Premiums earned | 248,382 | Premiums collected | 276,190 |
| Losses incurred | 119,656 | Benefit & loss related pmts | 43,727 |
| LAE incurred | 24,078 | | |
| Undrw expenses incurred | 74,386 | LAE & undrw expenses paid | 76,825 |
| Net underwriting income | 30,262 | Undrw cash flow | 155,637 |
| Net investment income | 17,261 | Investment income | 16,693 |
| Other income/expense | 3,568 | Other income/expense | 3,314 |
| Pre-tax oper income | 51,091 | Pre-tax cash operations | 175,644 |
| Realized capital gains | 73,787 | | |
| Income taxes incurred | 23,360 | Income taxes pd (recov) | 12,056 |
| Net income | 101,519 | Net oper cash flow | 163,589 |

## INTERIM BALANCE SHEET

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

| ADMITTED ASSETS | 03/31/2006 | | |
|---|---|---|---|
| Cash & short term invest | 392,132 | ... | ... |
| Bonds | 149,092 | ... | ... |
| Common stock | 237,075 | ... | ... |
| Other investments | 6 | ... | ... |
| Total investments | 778,305 | | |
| | | | |
| Premium balances | 73,587 | ... | ... |
| Reinsurance funds | 3,068 | ... | ... |
| Accrued interest | 1,702 | ... | ... |
| All other assets | 13,773 | ... | ... |
| Total assets | 870,435 | | |

| LIABILITIES & SURPLUS | 03/31/2006 | | |
|---|---|---|---|
| Loss & LAE reserves | 231,388 | ... | ... |
| Unearned premiums | 119,148 | ... | ... |
| Conditional reserve funds | 15,368 | ... | ... |
| All other liabilities | 119,720 | ... | ... |
| Total liabilities | 485,625 | | |
| | | | |
| Capital & assigned surp | 101,070 | ... | ... |
| Unassigned surplus | 283,740 | ... | ... |
| Policyholders' surplus | 384,810 | | |
| | | | |
| Total liabilities & surplus | 870,435 | | |

## INTERIM INCOME STATEMENT

| | Period Ended 3/31/2006 | Period Ended 3/31/2005 | Increase/ Decrease |
|---|---|---|---|
| Premiums earned | 92,721 | 38,470 | 54,251 |
| Losses incurred | 32,987 | 17,182 | 15,805 |
| LAE incurred | 8,292 | 3,789 | 4,503 |
| Underwriters expenses incurred | 20,357 | 12,746 | 7,611 |
| | | | |
| Net underwriting income | 31,085 | 4,752 | 26,333 |
| Net investment income | 7,353 | 3,039 | 4,314 |
| Other income/expenses | -44 | -391 | 348 |
| | | | |
| Pre-tax operating income | 38,394 | 7,399 | 30,995 |
| Realized capital gains | -38 | 131 | -169 |
| Income taxes incurred | 15,443 | 2,844 | 12,599 |
| | | | |
| Net income | 22,913 | 4,686 | 18,227 |

## INTERIM CASH FLOW

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Property Casualty, US, 2006 Edition (2005 Annual Data, Version 2006.1)
00481 - National Liability & Fire Insurance Company

|  | Period Ended 3/31/2006 | Period Ended 3/31/2005 | Increase/ Decrease |
|---|---|---|---|
| Premiums collected | 64,578 | 14,862 | 49,716 |
| Benefit & loss related pmts | 10,508 | 8,059 | 2,449 |
| Undrw expenses paid | 28,689 | 14,542 | 14,147 |
| Underwriting cash flow | 25,381 | -7,739 | 33,120 |
| Investment income | 6,828 | 1,278 | 5,550 |
| Other income/expense | 357 | -121 | 478 |
| Pre-tax cash operations | 32,566 | -6,582 | 39,148 |
| Income taxes pd (recov) | 46,805 | 12,056 | 34,749 |
| Net oper cash flow | -14,240 | -18,638 | 4,398 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

ANNUAL STATEMENT FOR THE YEAR 2005 OF THE NATIC

## SCHEDULE T - EXH

Allocated

| States, Etc. | | 1<br>Is<br>Insurer<br>Lic-<br>ensed?<br>(Y or N) | Gross Premiums, Including Policy and Membership Fees, Less Return Premiums and Premiums on Policies Not Taken | |
|---|---|---|---|---|
| | | | 2<br>Direct Premiums<br>Written | 3<br>Direct Premiums<br>Earned |
| 1. Alabama | AL | Yes | 20,785 | 20,537 |
| 2. Alaska | AK | Yes | 7 | 6 |
| 3. Arizona | AZ | Yes | 3,126 | 3,511 |
| 4. Arkansas | AR | Yes | 6,226 | 6,640 |
| 5. California | CA | Yes | 249,992 | 207,291 |
| 6. Colorado | CO | Yes | 1,147 | 1,292 |
| 7. Connecticut | CT | Yes | 1,575 | 1,595 |
| 8. Delaware | DE | Yes | 106 | 133 |
| 9. District of Columbia | DC | Yes | 970 | 1,168 |
| 10. Florida | FL | Yes | 8,337 | 9,558 |
| 11. Georgia | GA | Yes | 7,736 | 6,704 |
| 12. Hawaii | HI | Yes | 537 | 542 |
| 13. Idaho | ID | Yes | 282 | 355 |
| 14. Illinois | IL | Yes | 9,830 | 9,699 |
| 15. Indiana | IN | Yes | 1,651 | 1,649 |
| 16. Iowa | IA | Yes | 10 | 23 |
| 17. Kansas | KS | Yes | 54 | 54 |
| 18. Kentucky | KY | Yes | 282 | 292 |
| 19. Louisiana | LA | Yes | 906 | 945 |
| 20. Maine | ME | Yes | 694 | 735 |
| 21. Maryland | MD | Yes | 446 | 450 |
| 22. Massachusetts | MA | No | 0 | 0 |
| 23. Michigan | MI | Yes | 2,234 | 2,613 |
| 24. Minnesota | MN | Yes | 5,197 | 5,603 |
| 25. Mississippi | MS | Yes | 1,575 | 1,622 |
| 26. Missouri | MO | Yes | 4,154 | 4,262 |
| 27. Montana | MT | Yes | 260 | 261 |
| 28. Nebraska | NE | Yes | 367 | 394 |
| 29. Nevada | NV | Yes | 1,180 | 1,141 |
| 30. New Hampshire | NH | No | 0 | 0 |
| 31. New Jersey | NJ | No | 0 | 0 |
| 32. New Mexico | NM | Yes | 1,280 | 1,221 |
| 33. New York | NY | Yes | 1,836 | 1,836 |
| 34. North Carolina | NC | Yes | 942 | 975 |
| 35. North Dakota | ND | Yes | 23 | 25 |

p104

| | | | | |
|---|---|---|---|---|
| 36. Ohio | OH | Yes | 2,397 | 2,482 |
| 37. Oklahoma | OK | Yes | 1,043 | 1,028 |
| 38. Oregon | OR | Yes | 5,390 | 6,186 |
| 39. Pennsylvania | PA | Yes | 7,712 | 8,272 |
| 40. Rhode Island | RI | Yes | 0 | 0 |
| 41. South Carolina | SC | Yes | 555 | 575 |
| 42. South Dakota | SD | Yes | 8 | 7 |
| 43. Tennessee | TN | Yes | 642 | 670 |
| 44. Texas | TX | Yes | 4,583 | 2,942 |
| 45. Utah | UT | Yes | 671 | 602 |
| 46. Vermont | VT | Yes | 206 | 214 |
| 47. Virginia | VA | Yes | 3 | 3 |
| 48. Washington | WA | Yes | 943 | 994 |
| 49. West Virginia | WV | Yes | 6,663 | 3,153 |
| 50. Wisconsin | WI | Yes | 1,930 | 1,881 |
| 51. Wyoming | WY | Yes | 91 | 94 |
| 52. American Samoa | AS | No | 0 | 0 |
| 53. Guam | GU | No | 0 | 0 |
| 54. Puerto Rico | PR | No | 0 | 0 |
| 55. U.S. Virgin Islands | VI | No | 0 | 0 |
| 56. Canada | CN | Yes | 36,387 | 18,913 |
| 57. Aggregate Other Alien | OT | XXX | 90,940 | 85,915 |
| 58. Totals | | 48 | 493,912 | 427,064 |

Explanation of basis c



# EXHIBIT E

Order documents from CourtLink's nationwide document retrieval service.
- OR - Call **1.866.540.8818.**

# Delaware Court of Chancery

## DE Court of Chancery - Statewide

## CA14507

## Felice Vasquez, v. Samuel C.Butler, Geico Corp, et al

### The case was last updated by the court on Wednesday, August 30, 2000

| Header |
|--------|

|  |  |
|--|--|
| **Case Number:** | CA14507 |
| **Date Filed:** | 08/28/1995 |
| **Date Full Case Retrieved:** | 08/30/2000 |
| **Status:** | Closed |
| **Misc:** | Corporate Matters |

[Summary][Litigants][Counsel][Proceedings][Schedule]

| Summary |
|---------|

**Assigned To:**
**Date Assigned:** 04/03/1997
**Dismissed By:** V.C.PARSONS,JR.

Back to Top

| Litigants |
|-----------|

| Litigant Type | Litigant |
|---------------|----------|
| Plaintiff | Felice Vasquez |
| Defendant | Berkshire Hathaway Inc |
| Defendant | John H Bretherick, Jr |
| Defendant | Norma E Brown |
| Defendant | Samuel C Butler |
| Defendant | James E Cheek |
| Defendant | A James Clark |
| Defendant | Geico Corporation |
| Defendant | Deland E Lewis |
| Defendant | Olza M Nicely |
| Defendant | Coleman Raphael |
| Defendant | William J Ruane |
| Defendant | Louis A Simpson |
| Defendant | W Alvon Sparks, Jr |

Back to Top

| Counsel |
|---------|

| Plaintiff | Defendant |
|-----------|-----------|
| Rosenthal Joseph A | |
| Rosenthal, Monhait & Gross | |
| PO Box 1070 | |
| Wilmington, DE 19899 | |
| 656-4433 | |

Back to Top

| Date | # | Proceeding Text |
|------|---|-----------------|

| | | |
|---|---|---|
| 08/28/1995 | 1 | Complaint For Breach of Fiduciary Duties, Joseph Rosenthal Atty.For Plt. |
| 02/27/1997 | 1 | Status Ltr From Joseph A Rosenthal |
| 04/02/1997 | 2 | Notice & Prop.Order of Dismissal Without Prejudice Order Signed by V.C.Jacobs Dtd.04-03-97 |

## Schedule

## No Information is Available for this case

Back to Top

Copyright © 2006 LexisNexis CourtLink, Inc. All rights reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

# EXHIBIT F

AMERICAN INTERNATIONAL MARINE AGENCY
OF NEW YORK, INC.
90 PARK AVENUE, 7TH FLOOR
NEW YORK, NY 10016

DAVID S. FRENCH
PRESIDENT & CEO
\

TELEPHONE (646) 227-6481
FACSIMILE (212) 599-3129

July 25, 2006

Via Electronic Mail and Facsimile

Mr. Ralph W. Mucerino
Vice President
American International Group, Inc.
175 Water Street
New York, NY 10038

Re: **Improper Restrictions Imposed on AIMA**

Dear Mr. Mucerino:

This is in response to your letter dated July 21, 2006 (the "July 21 Letter") written on behalf of certain insurers, including National Union Fire Insurance Company of Pittsburgh, Pa., AIU Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Commerce and Industry Insurance Company and American Home Assurance Company (collectively, the "AIG Insurers") regarding the numerous new restrictions and limitations that the AIG Insurers seek to impose upon AIMA as listed in the AIG Insurers' June 29, 2006 termination letter.

Before addressing each new restriction, we would like to address some of the many misstatements contained in the July 21 Letter. Most fundamentally, the AIG Insurers falsely claim that these new restrictions do not attempt to alter materially the parties' relationship. Yet, the AIG Insurers do not dispute the point made repeatedly in AIMA's July 12, 2006 letter, *i.e.*, that the new restrictions not only will materially and adversely affect AIMA's profitability, but also will provide the AIG Insurers with an unfair

Mr. Ralph W. Mucerino
July 25, 2006
Page 2

competitive advantage. Nothing in the Marine Management
Agreement, effective as of December 1, 1977, between AIMA and
the AIG Insurers (the "Agreement") permits the AIG Insurers to
diminish substantially the profitability of AIMA; nor to use AIMA
information to aid a competitor, merely because the agency rela-
tionship is approaching its end. AIMA considers these new re-
strictions wholly unreasonable. AIMA hereby puts the AIG In-
surers on notice that unless these restrictions are rescinded in writ-
ing, within 24 hours, AIMA will consider the AIG Insurers to be
in material breach of the Agreement and the Agreement will be
deemed terminated.

There are numerous other misstatements in the July 21 Let-
ter. The AIG Insurers ignore that the Agreement nowhere pro-
vides for what the AIG Insurers refer to as "Notice Period Instruc-
tions" and certainly does not contemplate that the AIG Insurers
will be permitted to unilaterally change actual and implied terms
of the Agreement – exactly what the AIG Insurers purport to do.
The AIG Insurers assert that the relationship between the parties
has changed and that these instructions merely "formalize" the
parties' relationship. But the parties' relationship was formalized
almost thirty years ago and nothing in that formalized Agreement
permits the unilateral changes that the AIG Insurers now seek for
their own benefit.

The AIG Insurers try to support the "Notice Period Instruc-
tions" by citing to the supposed nature of the change in the rela-
tionship between the parties. The AIG Insurers cite not only the
parties' respective terminations of each other, but that AIMA has
commenced legal action against the AIG Insurers. The AIG In-
surers fail to mention that AIMA commenced arbitration against
the AIG Insurers -- as a result of the AIG Insurers' interference
with AIMA's performance of its duties -- *five months ago*. Trying
to justify the new restrictions by reference to the five-month-old
and inactive arbitration merely underscores the improper nature of
the Notice Period Instructions.

What is more, the AIG Insurers cite to alleged actions of
AIMA and the other C.V. Starr agencies and make sweeping ac-
cusations against AIMA and the other C.V. Starr agencies, includ-
ing that the agencies "have raided AIG's employees, entered into

Mr. Ralph W. Mucerino
July 25, 2006
Page 3

secret and self-serving arrangements to undermine [the AIG Insurers'] interests, misappropriated [the AIG Insurers'] proprietary documents and information, intentionally or wrongfully mishandled underwriting, claims handling, reinsurance and other matters . . . [and] converted millions of dollars in [the AIG Insurers'] policyholders' premium trusts." These claims are not only without basis, but actions of the other agencies are wholly irrelevant to the relationship between the AIG Insurers and AIMA, a separate agency.

The AIG Insurers also miss the mark when they say they are "hard-pressed" to understand how the AIG Insurers' (i) notice of creation of AIG Global Marine and (ii) public statement that insureds can now directly renew with AIG violates AIMA's rights. As we explained in our July 12, 2006 letter, it is this intention coupled with the restrictions, which for the most part require that the AIG Insurers -- by their own declaration, AIMA's new competitor -- approve AIMA's normal business activities and be granted access to confidential, proprietary information which makes the AIG Insurers' entry into unfair competition with AIMA harmful to AIMA's rights.

The July 21 Letter also inappropriately asserts that AIMA was "subject to AIG's continuous and regular oversight and control." This is an inaccurate depiction of the relationship between the parties. AIMA employees reported to AIMA senior management. While AIMA employees generally worked in the same offices as the AIG Insurers, AIMA paid rent for its space and did not commingle its documents with those of the AIG Insurers. The AIG Insurers' Internal Audit Division conducted infrequent audits – approximately every three years; the AIG Insurers did not freely have access to AIMA documents. That is why certain quarterly reports were provided for in the Agreement. Further, the AIG Insurers did not exercise "continuous and regular oversight and control" over AIMA's business decisions. Indeed, AIMA has and had broad discretion to control its business decisions.

The AIG Insurers falsely claim that AIMA is the one who has been soliciting and hiring AIG employees. That is simply not the case. There is only one employee who works for AIMA who previously worked for AIG. The reality, however, is that she was

Mr. Ralph W. Mucerino
July 25, 2006
Page 4

an AIMA employee, was lured over to AIG a few months ago and then returned unsolicited to AIMA.

The AIG Insurers claim that AIMA has acted in defiance by (1) not providing certain documents to the AIG Insurers, (2) not permitting an underwriting audit, and (3) failing to comply with these restrictions. AIMA was willing to provide the AIG Insurers with a copy of AIMA's documents directly related to the AIG Insurers' business, but the AIG Insurers refused to pay the vendor so the vendor stopped the copy process. Additionally, AIMA was willing to permit an underwriting audit provided it was given reasonable notice as to what files were to be reviewed. AIMA will further address these purported restrictions and the AIG Insurers' latest comments on these restrictions in their order of presentation:

> 1.    "AIMA shall obey and cooperate with ar-
>       rangements to complete the provision by
>       July 15, 2006 of copies of all records relat-
>       ing to the insurance and reinsurance
>       business for which AIMA acts as manag-
>       ing agent for any of the AIG Insurance
>       Companies. . . The records shall be made
>       available by a vendor selected by the AIG
>       Insurance Companies at the AIG Insur-
>       ance Companies' expense in form and or-
>       der in which they have been maintained
>       by AIMA . . ."[1]

Notwithstanding the lack of its having any contractual or independent legal obligation to do so, AIMA has provided certain of its documents to a copy vendor so that the AIG Insurers can have copies made. The AIG Insurers claim that AIMA has prevented the AIG Insurers from having access to AIMA's documents is

---

[1]    We assume that the last sentence of restriction 1, which states: "Instead of merely re-inscribing the instructions, I think we should summarize their objection," was someone's comment on a prior draft of the July 21 Letter, rather than a part of the instruction itself. If that is not correct, please let us know.

Mr. Ralph W. Mucerino
July 25, 2006
Page 5

simply not true. AIMA began sending its documents to the ven-
dor earlier this year. The AIG Insurers received documents pur-
suant to this agreement. About two and a half months ago, the
AIG Insurers refused to pay their copy bill, and the copy vendor
refused to continue providing documents. AIMA had no control
over whether the AIG Insurers paid their bill. Additionally, you
offer no support for your baseless assertion that documents were
produced in a "jumbled form."

That being said, I am informed that our respective attorneys
are in the process of working out an agreement whereby the copy-
ing process will resume and the AIG Insurers will be provided
with copies of the AIMA files relating to the AIG Insurers' poli-
cies. AIMA hopes that this process will be completed as quickly
as possible. The negotiations between counsel also concern the
timing of payment for, and delivery of, the copies.

Your request for an underwriting audit set forth in the July
21 Letter was addressed in a separate letter we sent dated July 24,
2006.

> 2.    "AIMA shall implement a procedure to
> ensure that all correspondence, docu-
> ments and other records related to AIG,
> the AIG Insurance Companies and/or the
> business underwritten or services on their
> behalf that AIMA receives or creates dur-
> ing and after the Notice Period are
> promptly forwarded to the AIG Insur-
> ance Companies, in care of Richard
> Decker."

AIMA is willing to provide the AIG Insurers with a copy of
its documents related to the AIG Insurers' business created during
or after the notice period at the expense of the AIG Insurers. That
expense would include without limitation an allocated portion of
AIMA's labor expense that would be necessitated by this in-
creased burden being undertaken by AIMA. It is not necessary
that the AIG Insurers provide personnel to assist in this process.
This response is subject to working out a mutually acceptable
agreement on cost sharing. As a result of the AIG Insurers' evic-

Mr. Ralph W. Mucerino
July 25, 2006
Page 6

tions of AIMA from its offices around the country and the docu-
ment copying process currently ongoing, AIMA will be able to
begin providing such information once AIMA has settled into its
new offices.

### 3. and 4. Severe Restrictions on Coverage that AIMA may Write on Behalf of the AIG Insurers.

The AIG Insurers' response effectively concedes the poten-
tial anti-competitive and deleterious impact on AIMA of the pro-
vision of information to the AIG Insurers about such a large num-
ber of policies. The AIG Insurers seek to remedy this inequity by
offering for the first time in the July 21 Letter that "AIMA seek
pre-approval (and make all related submissions of information) to
a representative of AIG's Underwriting Resources Division, who
will maintain such information separate from AIG Global Ma-
rine." This response neither addresses the concern about unfair
competition from the AIG Insurers nor addresses the other con-
cerns previously raised by AIMA.

First, as AIMA previously noted -- and the AIG Insurers did
not dispute -- the ability of AIMA to secure profitable business
often depends on prompt decision making; the requirement of
three business days' notice, with no limitations on how long the
AIG Insurers may take to respond to these requests, simply im-
poses too many shackles on AIMA and is unacceptable. While
we cannot agree with your assertion that this will affect less than
20 percent of policies, it is irrelevant in any event. This provision
will have the same anti-competitive effect upon AIMA.

The AIG Insurers' position that the eSTART system will
protect AIMA in this regard is without basis. The AIG Insurers
have cut off AIMA's ability to access eSTART, but at the same
time the AIG Insurers still want AIMA to use eSTART. This is
nothing more than an attempt by the AIG Insurers to gain infor-
mation about AIMA's business. AIMA has not used eSTART
since its access was cut off and will not resume using eSTART.

In addition, the notion of pre-approval is at odds with the na-
ture of the Agreement. Nothing in the Agreement requires AIMA

Mr. Ralph W. Mucerino
July 25, 2006
Page 7

to conduct business in this burdensome and inefficient new man-
ner. This too is unacceptable.

Finally, the offer that the information be provided, to AIG's
Underwriting Resources Division, rather than AIG Global Marine
is of little value, particularly when you offer no iron clad assur-
ances that information will not be shared, such as a judicially en-
forceable confidentiality agreement with very strict penalties for
non-compliance. As framed, both the original new restriction in
the June 29 Letter and the more recent version in the July 21 Let-
ter are unacceptable.

5. "AIMA shall not quote or bind any renewal
of an existing insurance policy at a rate re-
duction of 10% or greater from the previous
policy term without the express prior written
approval by one of the designated authorized
representatives of the AIG Insurance Com-
panies identified on Exhibit A hereto. AIMA
shall make all requests for such prior or writ-
ten approval and provide all necessary in-
formation in connection with such requests
within a reasonable time in advance of when
such approval is needed, but in any event
with no less than three business days' notice.
For any accounts that AIMA renews at a rate
reduction of less than 10% from the previous
policy term, AIMA shall provide notice
thereof to the designated representatives of
the AIG Insurers referred to above within 24
hours after binding the renewal."

Contrary to your assertion, this restriction would impose an
unreasonable restraint upon AIMA and its ability to conduct its
business and will allow the AIG Insurers to usurp AIMA's busi-
ness. Your assertion that AIMA will provide policyholders with
improper discounts is unfounded. Indeed, AIMA's income is de-
rived through a percentage of premiums and through its profit
commission, thus AIMA has an incentive not to provide unrea-
sonable discounts. Again, insureds for whom a 10 percent dis-
count is warranted include some of the most profitable parts of the

Mr. Ralph W. Mucerino
July 25, 2006
Page 8

business, and pre-clearance would create an incentive for the AIG
Insurers to prevent AIMA (with whom the AIG Insurers now have
decided to compete) from underwriting this profitable business.
This pre-clearance is unacceptable.

> 6. "AIMA shall not quote or bind any
> renewal of an existing insurance pol-
> icy with a loss ratio in excess of 80%
> during the previous policy term with-
> out the express prior written approval
> by one of the designated authorized
> representatives of the AIG Insurance
> Companies identified on Exhibit A
> hereto. AIMA shall make all requests
> for such prior written approval and
> provide all necessary information in
> connection with such requests within a
> reasonable time in advance of when
> such approval is needed, but in any
> event with no less than three business
> days' notice."

Again, contrary to your assertion, this restriction will im-
pose an unreasonable restraint upon AIMA and its ability to con-
duct its business and will allow the AIG Insurers to usurp AIMA's
business. The nature of this pre-approval step removes AIMA's
ability to negotiate contracts and control its business and again
AIMA maintains its incentive to write profitable business and not
underprice the policies. This pre-clearance is unacceptable.

> 7. "AIMA shall not cancel or non-renew
> any existing insurance policy without
> the express prior written approval by
> one of the designated authorized rep-
> resentatives of the AIG Insurance
> Companies identified on Exhibit A
> hereto. AIMA shall make all requests
> for such prior written approval and
> provide all necessary information in
> connection with such requests within a
> reasonable time in advance of when

Mr. Ralph W. Mucerino
July 25, 2006
Page 9

> such approval is needed, but in any
> event with no less than three business
> days' notice."

Requiring AIMA to receive approval of cancellation or non-renewals has the potential for the AIG Insurers to foist unprofitable business on AIMA, which would adversely affect AIMA's profit commission and make AIMA a less viable competitor. This new restriction is unacceptable.

> 8. "In accordance with current practice,
> any new or renewal business trans-
> acted by AIMA on behalf of the AIG
> Insurance Companies shall continue
> to be processed on AIGMarine.com or
> eMarine, and all cargo certificates
> shall be issued through the Oceanwide
> system, as applicable. AIMA shall
> continue to comply with the submis-
> sion procedures for processing
> eSTART reservations set forth in my
> letter to you of February 10, 2006.
> AIMA shall cooperate with the AIG
> Insurance Companies in order to en-
> sure that AIMA has appropriate ac-
> cess to all systems that the AIG Insur-
> ance Companies shall require AIMA
> to use during the Notice Period."

Again, this request to use the eSTART reservation system is unreasonable. AIMA has full authority under the Agreement to accept and decline risk. As I wrote in response to restrictions 3 and 4, the AIG Insurers have cut off AIMA's ability to access eSTART, but the AIG Insurers still want AIMA to use eSTART. This is nothing more than an attempt by the AIG Insurers to gain information about AIMA's business. AIMA has not used eSTART since its access was cut off and will not resume using eSTART.

> 9. "Effective immediately, AIMA shall
> have no authority to act on behalf of

Mr. Ralph W. Mucerino
July 25, 2006
Page 10

> AIG's foreign general insurance op-
> erations conducted through American
> International Underwriters ("AIU")
> in connection with referrals or rein-
> surance of marine liability risks origi-
> nated by AIU. AIMA immediately
> shall provide to AIU all records and
> information related to any foreign
> general marine policies previously re-
> ferred or reinsured to it by AIU."

AIMA has provided reinsurance to AIU London for the bulk
of its liability policies in connection with what the parties refer to
as a Treaty. The AIG Insurers commonly refer to this as "Treaty
038873" on documents they issue. This restriction is unreason-
able and AIMA is unable to comply.

> 10. "Effective immediately, AIMA shall
> have no authority to issue or service
> any issuing office "underlyer" policies
> issued in North America for AIU pro-
> ducing offices outside of North Amer-
> ica, and AIMA immediately shall pro-
> vide to AIU all records and informa-
> tion related to such previously issued
> policies."

There is no basis for your assertion that you understand this
to be a representation that "AIMA has produced all such records
and information to the AIG Insurance Companies and specifically
that AIMA is not in possession of any such documents and infor-
mation that have not already been provided by it to AIG." My
initial comment merely reflected that AIMA documents were be-
ing provided pursuant to agreement between the parties and
AIMA would not additionally and separately provide these docu-
ments. As I currently understand, AIMA has provided documents
to be copied for the AIG Insurers' benefit. These documents ei-
ther have already been copied for the AIG Insurers and sent to the
AIG Insurers, or have been awaiting copying for the last two and a
half months as a result of the AIG Insurers' refusal to pay its bill.

Mr. Ralph W. Mucerino
July 25, 2006
Page 11

Again, I am informed that our respective attorneys are working out an agreement whereby the copying process will resume.

> 11. "Effectively immediately, AIMA shall have no authority to conduct or provide any loss control services in connection with any insurance business produced or originated by AIU, and AIMA immediately shall provide to AIU all records and information related to such services that AIMA has conducted."

Please refer to my response to restriction 10 regarding document copying.

> 12. "Effective immediately, AIMA shall have no authority to seek, negotiate or enter into any reinsurance agreement (e.g., treaty, facultative, facultative obligatory or other reinsurance arrangement) on behalf of the AIG Insurance Companies unless it receives the express prior written approval of Richard Skolnik, AIU's Vice President and Senior Reinsurance Officer. For all reinsurance arrangements other than individual facultative reinsurance agreements, AIMA shall make all requests for such prior written approval and provide all necessary information in connection with such requests within a reasonable time in advance of when such approval is needed, but in any event no less than 60 days' written notice. For individual facultative reinsurance placements, AIMA shall make all requests for such prior written approval and provide all necessary information in connection with such requests with at

Mr. Ralph W. Mucerino
July 25, 2006
Page 12

> least three business days' written no-
> tice."

With regard to facultative reinsurance placements this re-
sponse is unreasonable and directly contrary to an express provi-
sion in the Agreement which provides that the Managing Agent
can "enter into reinsurance agreements with reinsurers by treaty or
otherwise." Besides the fact that these statements regarding Starr
Technical Risks Agency, Inc. are inaccurate, they have absolutely
no relevance to the Agreement and relationship between AIMA
and the AIG Insurers.  This restriction inappropriately limits
AIMA's ability to control its business and is yet another way for
the AIG Insurers to gain information and an unwarranted com-
petitive advantage.

> 13. "All claims made under or related to
> insurance policies underwritten or
> serviced by AIMA shall continue to be
> adjusted and approved by AI Marine
> Adjusters.  Nothing herein is intended
> to change the manner in which such
> claims are currently adjusted and ap-
> proved."

> No additional response is necessary to
> this provision.

> 14. "AIMA shall provide to the AIG In-
> surers, care of Richard Decker, a
> weekly report, in written and elec-
> tronic form, identifying and detailing
> all new and renewal insurance busi-
> ness quoted, bound and submitted on
> behalf of the AIG Insurance Compa-
> nies and all policies (by policy number
> and premium) expiring during the
> week of the report and the following
> two-week period."

We appreciate that you are changing the request from a
weekly to a monthly report, but even that is not provided for in the

Mr. Ralph W. Mucerino
July 25, 2006
Page 13

Agreement. As we stated in the July 12 Letter, AIMA will con-
tinue to provide information concerning renewals, newly bound,
and lost business by name of insured on a monthly basis, as it has
done in the past. AIMA, however, will not agree to the new re-
port that you have included in the new restrictions.

> 15. "AIMA shall provide to the AIG In-
> surers, care of Richard Decker, on a
> weekly basis with access to an updated
> version of all databases currently
> maintained for hull fleet schedules
> and cargo warehouses as well as up-
> dated written and electronic reports
> containing all information related
> thereto."

The fact that AIMA is no longer leasing space from the AIG
Insurers is due to the AIG Insurers hastily evicting them. The
AIG Insurers cannot use their own unilateral evictions as a basis
to impose additional administrative costs on AIMA. Moreover,
the information sought can only be used to seek to obtain an un-
fair competitive advantage and is viewed as an unacceptable new
restraint. As I said in my initial response, AIMA currently pro-
vides similar information on a quarterly basis and will continue to
do so.

> 16. "AIMA shall, on a monthly basis,
> provide to the AIG Insurers, care of
> Julie Kanter, the financial reports and
> information identified on Exhibit B.1
> hereto."

Again, this request for these monthly reports is unreason-
able. The Agreement provides that this information be provided
on a quarterly basis and AIMA sees no reason to alter the Agree-
ment.

> 17. "AIMA shall, on a quarterly basis,
> provide to the AIG Insurers, care of
> Julie Kanter, the financial reports and

Mr. Ralph W. Mucerino
July 25, 2006
Page 14

**information identified on Exhibit B.2
hereto.**"

Much of the information that the AIG Insurers request here
is already in the AIG Insurers' possession. In your response, you
even admit that the AIG Insurers have some of this information,
but that AIMA should still provide the information, with no ex-
planation as to why AIMA should do so. AIMA sees no reason
why it should now have to start providing such duplicative infor-
mation to the AIG Insurers. This is nothing but a request to make
AIMA perform unnecessary work. As stated in our original re-
sponse, AIMA will provide the information requested herein ex-
cept for (i) a report concerning net loss greater than $50,000 on all
lines other than cargo on which the reporting threshold is
$100,000, and (ii) the "Supplemental Reports" that you have re-
quested in B.2.c.

\*        \*        \*

If the AIG Insurers do not provide written notice within 24
hours that they withdraw the new restrictions that AIMA deems
unreasonable and unacceptable, AIMA will consider the AIG In-
surers to be in material breach of the Agreement and the Agree-
ment will be deemed terminated.

AIMA reserves all of its rights and remedies with respect to
the foregoing.

Sincerely,

David S. French/les

David S. French

2006-1340

# United States Court of Appeals

*for the*

# Federal Circuit

GTECH CORPORATION,

*Plaintiff-Appellant,*

*v.*

SCIENTIFIC GAMES INTERNATIONAL, INC.,
SCIENTIFIC GAMES HOLDINGS CORPORATION,
SCIENTIFIC GAMES FINANCE CORPORATION,
and SCIENTIFIC GAMES CORPORATION,

*Defendants-Appellees.*

*Appeal from the United States District Court for the District of Delaware in case No. 04-Cv-00138, Judge Joseph J. Farnan, Jr.*

## BRIEF OF DEFENDANTS-APPELLEES

JACK B. BLUMENFELD
RODGER D. SMITH II
MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

*Attorneys for Defendants-Appellees*

AUGUST 28, 2006